I - 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

UNITED STATES OF AMERICA,          Case No. 18-CR-20-SWS

       Plaintiff,

                             Casper, Wyoming

   vs.

                             Volume I

ARAPAHO JAMES OLDMAN,

                             January 7, 2019

       Defendant.               8:42 a.m.

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE
AND A JURY OF TWELVE AND ONE ALTERNATE

---

APPEARANCES:

For the Plaintiff:      MR. JASON M. CONDER
                        United States Attorney's Office
                        P.O. Box 449
                        Lander, Wyoming  82520

For Defendant Oldman:   MS. GALIA Z. AMRAM
                        MS. TRACY RACICOT HUCKE
                        Office of the Federal Public Defender
                        214 West Lincolnway, Suite 31-A
                        Cheyenne, Wyoming  82001


Court Reporter:         MS. ANNE BOWLINE, RMR, CRR
                        111 South Wolcott Street, Room 217
                        Casper, Wyoming  82601
                        (307) 235-3376

*Proceedings recorded by stenography; transcript produced by
computer-aided transcription.*

I - 2

<u>I N D E X</u>

<u>VOIR DIRE</u>                                                      <u>PAGE</u>

The Court                                                         18
Mr. Conder                                                        93
Ms. Hucke                                                        100
jury selected                                                    131


<u>JURY INSTRUCTIONS</u>                                             <u>PAGE</u>

preliminary instructions by the Court                           135


<u>OPENING STATEMENTS</u>                                            <u>PAGE</u>

Mr. Conder                                                       146
Ms. Hucke                                                        160


<u>GOVERNMENT'S WITNESSES</u>                                        <u>PAGE</u>

CHARLES DODGE, JR.
    Direct Examination by Mr. Conder                            165
ALICE MOSS
    Direct Examination by Mr. Conder                            178
ALISE TROSPER
    Direct Examination by Mr. Conder                            185
MARK STRATMOEN
    Direct Examination by Mr. Conder                            198

GOVERNMENT'S
  <u>EXHIBITS</u>          <u>DESCRIPTION</u>              <u>IDENTIFIED</u>   <u>RECEIVED</u>


1-1          photo of Charles Dodge, III        166        170

1-2          November 2017 calendar             171        171

2-1          911 recording                      182        183

2-2          transcript of 911 recording        183

3-1          photo of 331 Great Plains          189        189
             exterior

| 3-2 | aerial photo of Great Plains housing | 190 | 191 |
| 3-2A | aerial photo of Great Plains housing marked by Officer Trosper | 192 | 192 |
| 3-3 | aerial photo of Great Plains housing | 193 | 193 |
| 3-3A | aerial photo of Great Plains housing marked by Officer Trosper | 193 | 194 |
| 3-4 | aerial photo of Great Plains housing | 195 | |
| 3-5 | aerial photo of Great Plains housing | 195 | |
| 4-1 | Stratmoen résumé | 202 | 203 |
| 4-2 | photo of exterior of house | 205 | 206 |
| 4-3 | photo of exterior of house | 206 | 207 |
| 4-4 | photo of exterior of house | 208 | 208 |
| 4-5 | photo of front door | 209 | 209 |
| 4-6 | photo looking through front door | 210 | 210 |
| 4-7 | photo of living room | 211 | 211 |
| 4-8 | photo of kitchen | 212 | 212 |
| 4-9 | photo of basement door and stairs | 212 | 213 |

1          (Proceedings commenced at 8:42 a.m., January 7, 2019.)

2          (The following took place outside the presence of

3     the jury panel.)

4          THE COURT:  Thank you.  Please be seated.  Court is

5     in session in the matter of the United States of America

6     versus Arapaho James Oldman, Case Number 18-CR-020.  I note

7     the presence of counsel for the United States, Mr. Conder, and

8     counsel for the defendant, Ms. Amram and Ms. Hucke.

9          The matter's before the Court on some pretrial

10    matters that I wanted to address with counsel before we bring

11    in the jury panel and begin jury selection.

12          First, let me verify with counsel, any objections to

13    the preliminary instruction packet that was provided to you?

14    Mr. Conder?

15          MR. CONDER:  Your Honor, there's no objection as to

16    substance.  The United States would recommend to the Court

17    on -- would be page 1, paragraph 3, the first sentence it

18    refers to the indictment in this case.  There's a superseding

19    indictment.  It's a matter of semantics, so that's the Court's

20    preference.

21          Your Honor, I would just ask the Court to add,

22    though, that in addition to being charged with Count 1 of

23    premeditate, the first degree murder, that the Court also add

24    and aiding and abetting.

25          THE COURT:  All right.  Thank you.

1           Ms. Amram.

2           MS. AMRAM:  Your Honor, we are objecting to the

3      "beyond a reasonable doubt" language that's in the preliminary

4      instruction and we request the language that we submitted --

5           (Reporter interruption.)

6           MS. AMRAM:  We are objecting to the "beyond a

7      reasonable doubt" instruction in the preliminary instruction

8      and are requesting that the Court use the language that we

9      submitted in our proposed instruction.

10          THE COURT:  All right.  I'll overrule the objection.

11     I believe that the "beyond a reasonable doubt" language as set

12     forth in the preliminary is consistent with the Tenth Circuit

13     pattern instruction as well as case law.

14          With regards to the indictment in this matter, here's

15     how I generally treat that.  Superseding indictment is a form

16     of legal art, but it's not one that I believe that the jury

17     needs to be concerned about.  So I'm not inclined to tell them

18     there is a superseding indictment.  I'm just going to say

19     there's an indictment.  Here's what the indictment alleges.

20          I'm also inclined to read the indictment as it is

21     stated unless everyone agrees that the Court should not for

22     whatever reason include Matthew Whiteplume in that reading of

23     the indictment.

24          Mr. Conder?

25          MR. CONDER:  Your Honor, I believe since

1    Mr. Whiteplume will testify, I think reading the indictment as

2    is is fine.

3              THE COURT:  All right.  Ms. Amram?

4              MS. AMRAM:  We agree he should be included in the

5    indictment.

6              THE COURT:  All right.  I will simply then read to

7    them the indictment as stated.  I won't refer to it as a

8    superseding indictment, though, just because there's no reason

9    to create that confusion.

10             All right.  I believe that addresses the preliminary

11   instruction issues.  One of the things that wasn't identified

12   in the voir dire or voir dire, or however you want to call it,

13   the Court's review of the experts in this matter indicates

14   that there's likely to be quite a bit of I assume photographic

15   evidence.  I haven't looked at all the documents, but do we

16   have photographic evidence as to the decedent?

17             MR. CONDER:  Yes, Your Honor.  There are photos of

18   Mr. Dodge at the scene, and there are also autopsy photos.

19   The United States has tried to limit those as much as

20   possible, but those photographs are necessary for the experts

21   to describe the basis of their opinions, basically just tell

22   what happened to Mr. Dodge.

23             THE COURT:  All right.  What I'm inclined to do is

24   just address with the ladies and gentlemen of the jury that

25   there will be some photographs; some of them may be graphic.

1    We'll limit them as much as possible.  But they will need to

2    be able to look at those and analyze those in terms of the

3    evidence and ultimate determinations that they'll be required

4    to make.  I had a murder case one time where I had a couple of

5    the jurors that had a real hard time.  And I want to give them

6    upfront that information so that we don't have any issues

7    concerning jurors that are declining or refusing to look at

8    graphic photos.

9              Any concerns about that, Mr. Conder?

10             MR. CONDER:  No, Your Honor.

11             THE COURT:  Ms. Amram?

12             MS. AMRAM:  No, Your Honor.

13             THE COURT:  All right.  And go ahead and if you'll

14   pull your microphones down, I'll let you remain seated during

15   our preliminary matters.

16             There's a motion in limine that was filed by the

17   Government regarding Rule 1006 on summaries regarding Verizon

18   phone calls and/or text messages.  Let me first ask Ms. Amram,

19   what's the defense's position regarding that?

20             MS. AMRAM:  I expect we will not object, but I

21   haven't seen the summaries yet.  So I just need to see those.

22             THE COURT:  All right.  I'll reserve -- I assume

23   we're not going to need to get into that during openings, so

24   we shouldn't have any issues yet.  So I'll reserve until

25   you've had an opportunity, and we'll do that then.

1          On Monday, just for scheduling purposes, I have a

2     naturalization ceremony.  I don't know if the kerfuffle --

3     that's the best, nicest word I can use for Washington, D.C.'s

4     current situation -- whether that's going to impact that or

5     not.  I don't know if the Immigration and Naturalization

6     Service is a component of that.  But I don't want to continue

7     that.  We have new citizens that are expecting, anticipating

8     admission.  It's at 3:30.

9          What we'll probably do is go through the lunch hour

10    maybe and just go to 3:00 and recess.  But I'll keep you

11    posted.  It may go away because I don't know if they're

12    functioning or if we can go forward with that given the

13    current status as to the federal Government shutdown.  I'm

14    trying to get some information, but it seems there's not a lot

15    of people to answer phones.  So I'll keep you posted on that,

16    but I wanted to let you know that for purposes of scheduling.

17         And we also, to the extent we need to, I'll expand

18    the day, do whatever so we can -- I know you, Ms. Amram, had a

19    witness that's going to be testifying on Monday.

20         MS. AMRAM:  Well, Mr. Conder and I talked, and he

21    believes his case will take less time than we originally

22    thought, in part because of some update I have on the DNA

23    witnesses, which I can give the Court.  But because of that,

24    Mr. McVicker is actually flying out to testify Thursday,

25    possibly Friday morning.  So that is worked out.

1          THE COURT:  All right.  What -- and that brings up

2     then the next question.  What is the anticipation right now?

3     I'm not going to hold you to it, but when do you think that

4     the evidence, if you were to predict at this point in time,

5     when do you think that evidence would be complete, Mr. Conder?

6          MR. CONDER:  Your Honor, if everything remained on

7     track, the United States would anticipate noontime on

8     Wednesday.  Unforeseen circumstances, things go, I would

9     imagine by the close of business on Wednesday we should be

10    done, Your Honor.

11         THE COURT:  All right.  Ms. Amram, assuming that?

12         MS. AMRAM:  My best guess would be end of the day

13    Thursday.  But I think partly it will depend on how the

14    testimony turns out from the Government and who we end up

15    needing to call.

16         THE COURT:  I ask that only because I want to talk to

17    the jury about how much time we anticipate expecting their

18    resources.  And so what I'll tell them is we would anticipate

19    having this case to them by Friday, and that should be safe.

20    That should give us some time.  Any concerns as to that,

21    Mr. Conder?

22         MR. CONDER:  No, Your Honor.  I think that would be

23    accurate.

24         THE COURT:  Ms. Amram?

25         MS. AMRAM:  Correct.

1          THE COURT:  Okay.  All right.  I believe that covers

2     my checklist.

3          Any additional items, Mr. Conder?

4          MR. CONDER:  Nothing from the United States, Your

5     Honor.

6          THE COURT:  Ms. Amram?

7          MS. AMRAM:  A couple things, Your Honor.  One, I

8     wanted to let the Court know that we have not yet provided

9     paper copies of exhibits, and the reason for that is the vast

10    majority of them are potential impeachment documents.  And we

11    have eight banker boxes downstairs.  So I talked to your

12    clerk.  But we have paper copies of everything, and we have

13    everything in Trial Director so we can get it to the Court

14    before the witness testifies if the Court wants or the morning

15    before the witnesses testify.  But in light of how voluminous

16    the documents are and that, they are impeachment.  We did not

17    give the Court like 20 binders today.  So I did want to give

18    you a heads-up about that.

19         THE COURT:  Do you have them in electronic format?

20         MS. AMRAM:  Yes.

21         THE COURT:  What I would suggest then is make sure

22    that we have the ability to display those if you're intending

23    to use those during examination of -- cross-examination just

24    so that we can have them ready to go.  And if need be, I

25    assume your staff is ready to put up whatever exhibit it might

1   be.

2          I can control the output on this, and what I will do

3   is if an exhibit is not admitted, please tell me that before

4   you push it out so that I can make sure we don't have it

5   displayed to the jury or to the audience.  Once -- if there's

6   some foundational issue that we have to address, once we've

7   done that, you can move for its admission.  I'll either admit

8   it or not.  If I admit it, then I'll publish it and then the

9   jury will be able to see it and follow along.

10          The only limitation we have right now is we've had a

11  glitch with the Madden unit, as I understand it.  So we may

12  have some workaround to that.  But we'll work on that.  But

13  just so that we don't have any concerns as to the ability to

14  publish that or to display it.  Obviously, if it's

15  impeachment, it won't be admitted, but it can be shown under

16  circumstances to the ladies and gentlemen of the jury for

17  purposes of impeachment only.

18          MS. AMRAM:  And, Your Honor, we do also have paper

19  copies that we will bring up before -- you know, when we're

20  getting ready for the witnesses.  Just so the Court knows, out

21  of an abundance of caution, we have multiple copies of

22  everything.

23          THE COURT:  All right.  Well, I -- unless our

24  electronics go down, obviously counsel need to confer and see

25  what you have, but I'm -- I don't want you to break your backs

1    hauling paper.

2         MS. AMRAM:  The other thing I wanted to ask was for

3    jury instructions for objections to the Government's

4    instruction.  Is it okay if we do that orally during the jury

5    instruction conference, or does the Court need us to do that

6    in writing?

7         THE COURT:  What I will do is we've already taken

8    your recommendations and placed them into a pile and sorted

9    them out, and I will then from that prepare.  And Ms. Gorman

10   will work on preparing a final set of jury instructions.

11   We'll anticipate giving that probably to you Wednesday, and

12   then you'll have the opportunity to review that.  We'll then

13   go on the -- we'll have an off-the-record discussion initially

14   to get a feel for what objections may exist.  And then based

15   upon that, we'll then calculate a time to go on the record and

16   have an on-the-record jury instruction conference.

17        At that jury instruction conference, the case law

18   will require that you submit any alternative proposed

19   instructions that you wish to submit that haven't been

20   included in the packet.  But to the extent you wish to object

21   to an instruction proposed by the Court, you may do that

22   orally.  You don't need to do a written submission.  But we'll

23   get a pulse and a feel for everything at the time of the

24   off-the-record discussion so that I can anticipate where you

25   want to go.

1          MS. AMRAM:  And then there were two other things I

2    wanted to tell the Court about witnesses.  One is we are not

3    calling Dr. Krane, and the Government is not calling

4    Ms. Conway.  And I just wanted to put on the record that we

5    are not doing that as any kind of waiver of an appellate issue

6    for the *Daubert* ruling.  We just decided it was too

7    complicated for the jury to have that over-four-contributor

8    battle.  So we have changed the theory to accommodate the

9    Court's ruling, but it's not a waiver of an appeal of that

10   issue should Mr. Oldman be convicted.

11          And then the last thing I wanted to tell the Court is

12   the marshals -- we had a number of witnesses that we asked the

13   marshals to serve subpoenas for.  And some of them they were

14   able to serve, and some they were not.  So we are going to

15   talk today and see if there's anybody that we can limit to try

16   to limit how many still need to be served.  But we do believe

17   there are some that we will ask if the marshals can try again.

18   So I will let the Court know at lunch or at the end of the day

19   today what witnesses we still think we really need.

20          THE COURT:  All right.  Anything we can do to isolate

21   down on exactly who we need to try to identify and get.

22          With regards to the DNA, and I can appreciate the

23   concern may have been over the Court's head even, but at any

24   rate, Ms. Garfinkle was actually the -- I think the DNA

25   casework unit individual that did the DNA.  Ms. Conway, as I

1    understood it, was kind of her supervisor that was present.

2    So is it the intent not to call Ms. Conway or Ms. Garfinkle

3    regarding items 12 and 53?

4              MS. AMRAM:  So Ms. Garfinkle, who did the DNA testing

5    for all the items, she's coming.  Mr. Conder's calling her as

6    a witness, and so she will testify about all the items that

7    she tested.  But -- and I will cross-examine her.  But I'm not

8    going to go into the plus-four-contributor issue.  And so

9    we're not calling Dr. Krane, and we're not calling -- and he's

10   not calling Ms. Conway.

11             THE COURT:  Gotcha.  So 12 and 53 will come in

12   subject to obviously necessary proof but without waiver of the

13   prior objection and the *Daubert*.

14             All right.  Anything else?

15             MR. CONDER:  Nothing from the United States, Your

16   Honor.

17             THE COURT:  Ms. Amram?

18             MS. AMRAM:  No.  Thank you, Your Honor.

19             THE COURT:  I haven't heard, but I'm assuming our

20   ladies and gentlemen jury panel are being brought up to speed

21   in terms of the video and being shown that.  As soon as they

22   get done, we'll get underway.  We'll have the 31 seated on the

23   left-hand side, and we'll have the additionals on the

24   right-hand side.  We've already pulled the 31 to identify who

25   those will be.  I'm assuming.  Is that accurate?

1           THE COURTROOM DEPUTY:  Your Honor, I don't have the

2    list yet, but I will in a few minutes.

3           THE COURT:  All right.  As soon as we have that list,

4    we'll get that to you so that you can use it to assist you.

5           We'll be back momentarily.

6       (At 8:58 a.m., a recess was taken until 9:41 a.m.)

7           THE COURT:  Court is in session in the matter of the

8    United States of America versus Arapaho James Oldman, Case

9    Number 18-CR-020.  I note the presence of counsel for the

10   United States and the defendant and counsel for the defendant

11   and the ladies and gentlemen of the jury panel.

12          Good morning, ladies and gentlemen.  I know that this

13   was probably not at the top of your bucket list, but as United

14   States citizens, our state and nation's judicial system is

15   built upon jurors serving as impartial triers of fact by law.

16   You're required to be here, and by law your employers are

17   required to allow you to serve.  I acknowledge the

18   inconvenience, but I would suggest that that inconvenience is

19   minimal when you compare it to the sacrifices that have been

20   made by the men and women who have given us the rights and

21   freedoms that we enjoy today and continue to give those to us.

22          So we will do everything we can to make this an

23   efficient use of your time.  This matter is set to proceed for

24   one week, or this matter will be submitted to the jury on

25   Friday.  We will select 13 of you to serve as jurors today.

1    We will go through that process this morning and hopefully

2    complete it by around 12:30 or thereabouts.  But in the

3    interim, it's not a marathon.  So if there's a restroom break

4    you need or something, please let us know and we'll do what we

5    need to allow that to occur.  But I want to acknowledge your

6    presence here today, and I appreciate you being here today and

7    blowing into town.

8           Let me first verify with counsel for the United

9    States.  Are you -- is the United States prepared to proceed

10   at this time?

11          MR. CONDER:  Yes, Your Honor.

12          THE COURT:  Counsel for the defendant prepared to

13   proceed?

14          MS. AMRAM:  Yes, we are, Your Honor.

15          THE COURT:  All right.  A few people that you've

16   interacted with already and that I want to verify your

17   understanding of their role.  Ms. Toner is the deputy clerk of

18   court.  She'll be in charge of keeping things organized here

19   in the courtroom and your point of contact if you need

20   anything.

21          Ms. Bowline is seated over here to my right.  She is

22   taking down everything that is said, so it will be important

23   that we do two things:  One is speak up so that you can be

24   heard.  And the other is is that we speak one person at a

25   time.  She's very talented, but she's not capable of

1    simultaneously taking two people.  So it will be very

2    important that we don't talk over one another.

3          There will be a bailiff assigned to attend to the

4    jury once this matter is submitted to you for deliberation.

5    It will be one of those gentlemen that you encountered at the

6    front door when you came in.

7          My law clerk, who will provide me with sound legal

8    advice during the course of this trial, Ms. Gorman, she will

9    be in and out of this courtroom, as may people involved in the

10   trial here at the table.  From time to time, they will need to

11   go out and prepare a witness or get a witness or some

12   document.  So please don't be offended if they leave the

13   courtroom for a moment to do that to take care of those

14   matters.

15         Myself, I am Scott Skavdahl.  I'm the United States

16   Federal District Court judge for the District of Wyoming and

17   have the privilege of holding that position along with Judge

18   Freudenthal and Judge Johnson down in Cheyenne, Wyoming.

19         As noted, this matter is scheduled to proceed for

20   five days, should be submitted to the jury on Friday or by

21   Friday.  We have a couple of things that we're going to have

22   to do this morning because this is a new jury panel.  So we'll

23   get underway with those, and then we'll turn to the voir dire

24   process.  But first, as I understand it, and I'll ask the

25   Clerk of Court to verify, all but one juror has appeared today

1    as required to do so.

2            THE COURTROOM DEPUTY:  Your Honor, yes.  Juror

3    Number 5 failed to appear.  Jurors 27, 36, 38, and 57 were

4    excused.

5            THE COURT:  All right.  I'll ask the juror who failed

6    to appear to be contacted and appear at 8:00 a.m. on Wednesday

7    morning to show cause why he should not be held in contempt

8    and jailed for up to three days and fined up to $1,000.  These

9    ladies and gentlemen have appeared and taken of their time.  I

10   want to know why he is unable to do so.

11           At this time we'll turn to the qualification process.

12   And if I could ask the Clerk of Court to administer the first

13   oath to the ladies and gentlemen of the jury panel.

14       (Oath administered.)

15           THE COURT:  Thank you.  Please be seated.

16           Let me ask first, before we go any further, because

17   sometimes the audio isn't as good or is better than you

18   anticipated, is there anyone in the jury panel that is having

19   difficulty hearing me today?  If so, please raise your hand.

20   We have assistive devices.  All right.

21           And Juror Number 2, I would go ahead and ask that we

22   give him an audio listening device.

23           All right, sir.  Does that help?

24           JUROR NUMBER 2:  Yes.  Thank you.

25           THE COURT:  If at any time anyone has any difficulty

1    hearing, please let us know.  It's important that you're able

2    to hear everything.

3           That reminds me as well.  You're all wearing lanyards

4    with numbers on it.  We do not intend to depersonalize you.

5    It is not our intent to render you a simple number, but rather

6    it's for your personal identity protection and purposes of the

7    record.  So we'll refer to you by your number, and if you'll

8    refer to us back by your number, that way we won't have your

9    names appearing in any public record potentially and preserve

10   any personal identity information.

11          Everybody would love to refer to each other by name,

12   but it's just best that way.  And I'll ask that counsel do

13   that as well, refer by number.

14          Let us turn back to the qualification, then.  In

15   order to serve as a juror in the United States District Court

16   for the District of Wyoming, it is required that you be a

17   citizen of the United States and over the age of 18; that you

18   have resided for at least one year within the District of

19   Wyoming or the state of Wyoming; that you be able to read,

20   write, and understand the English language with a degree of

21   proficiency sufficient to fill out the juror qualification

22   form; that you have no physical or mental infirmity that would

23   make you unable to render satisfactory jury service; and you

24   have not been convicted in federal or state court of a felony,

25   that is a crime punishable by in excess of one year

1  imprisonment, or if so convicted, you have had your civil

2  rights restored.

3         Does anyone believe that they fail to satisfy those

4  requirements as identified to serve as a juror?  If so, please

5  raise your hand.  I don't see any raised hands.  Therefore, I

6  would find the ladies and gentlemen panel qualified to serve.

7         Mr. Conder, does the United States agree?

8         MR. CONDER:  Yes, Your Honor.

9         THE COURT:  Ms. Amram?

10         MS. AMRAM:  Yes, Your Honor.

11         THE COURT:  All right.  The next step of this

12  process, ladies and gentlemen, will require us -- and we've

13  already seated the 31 of you in the south side of the room.  I

14  always want to say left side, but it's your right side.  And

15  we are going to focus on the ladies and gentlemen in that pool

16  of 31.  But that does not relieve you on the north side of the

17  room from listening to the questions because what will happen

18  is if there is a replacement juror that cannot serve in the

19  pool of 31, then one of you ladies and gentlemen will be

20  called to replace that juror to serve.  So listen carefully to

21  the questions.

22         What we'll do is if that happens, I'll ask you:

23  You've heard the questions that have been propounded.  Are

24  there any of those questions that you need to respond to?

25  That way we won't go back over everything with each and every

1    one, but we'll try to be as efficient as possible.  So please

2    listen carefully, and don't be offended by the lawyers

3    directing their questions and the Court directing their

4    questions or its questions to the south side of the room.

5           Before I turn to the oath in terms of the voir dire,

6    let me ask, does anyone have any nonrefundable tickets this

7    week to the Bahamas or Las Vegas or anywhere else?  All right.

8    Anyone else have any tickets somewhere that are nonrefundable

9    during this week?  If so, please raise your hand.  And that

10   goes to both the north and the south side.  I don't see any

11   other raised hands.

12          Let me see.  Is that Juror Number 7?

13          JUROR NUMBER 7:  Yes.

14          THE COURT:  Ma'am, if I could have a microphone

15   handed to you.  Can you tell me the nature of your issue?

16          JUROR NUMBER 7:  Family vacation from Thursday

17   through Sunday out of state.

18          THE COURT:  And are the tickets purchased for that?

19          JUROR NUMBER 7:  Yes.

20          THE COURT:  And where are you going?

21          JUROR NUMBER 7:  Breckenridge.

22          THE COURT:  If it was Wamsutter, I was going to deny

23   it.  But I'm going to go ahead and have a replacement pulled

24   for Juror Number 7, and I'll have Juror Number 7 take a seat

25   on the north side of the room.  I'm not going to excuse you

1    yet, but we'll see if we can find someone else that doesn't

2    have tickets to Breckenridge or somewhere.

3            And, ladies and gentlemen, this emphasizes a point.

4    Once we pull you from the jury pool that I have, we're stuck

5    with you.  So if you don't in advance seek to be excused from

6    jury service, I am locked into the individuals that I have in

7    the pool.  And if I excuse you, I ultimately may have to go to

8    the post office and pull people from the post office line.

9    That might be hard with a Government shutdown, although the

10   Postal Service I understand is still working.  But be mindful

11   of that for the future in terms of if you're not selected

12   today and are called or if you have something on your

13   schedule, let us know.  We'll work with you.  But I -- I

14   become handcuffed when you're in that pool that has been

15   selected, and you get that call to come in.  So be mindful of

16   that.

17           Juror Number 7, if you would go ahead and have a seat

18   on the north side of the room.  I'll ask the Clerk of Court to

19   call a replacement.

20           THE COURTROOM DEPUTY:  Juror Number 14.

21           THE COURT:  All right.  We've covered the

22   nonrefundable tickets or other commitments.  Let me ask, is

23   there anyone here that has scheduled medical care or a loved

24   one that has scheduled care or someone that you care for that

25   has scheduled care during this week that would be problematic

1    if you were selected to serve as a juror?

2          All right.  Your number, sir, Juror Number 24.

3          Could I have a microphone handed to Juror Number 24?

4    Thank you, sir.

5          Sir, you can tell us a little bit about your

6    situation.

7          JUROR NUMBER 24:  Yes, sir.  I have a medical

8    appointment on Thursday with Dr. Earl Sawyers, the kidney

9    specialist.

10         THE COURT:  Is that here in Casper?

11         JUROR NUMBER 24:  Yes, sir.

12         THE COURT:  All right.  And how long have you been

13   waiting for that appointment?

14         JUROR NUMBER 24:  Six months.

15         THE COURT:  All right.  Here's what -- what time is

16   that appointment scheduled?

17         JUROR NUMBER 24:  10:15 in the morning.

18         THE COURT:  All right.  I'm going to go ahead and

19   leave you there for now understanding that you may have those

20   appointments and/or you have that appointment.  We'll see if

21   we're able to select and identify 13 jurors without having to

22   pull you.  Okay?

23         JUROR NUMBER 24:  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you.

25         All right.  Anyone else have -- I see hesitant arm

1    up.  Ma'am, your Juror Number?

2            And if I could have the microphone handed to her.

3            JUROR NUMBER 8:  8.  I'm not sure.  I don't have an

4    appointment, but I have a mandatory training for the Wyoming

5    Department of Education WY-ALT training on Thursday the 10th.

6            THE COURT:  And is that training -- how frequently is

7    it offered?

8            JUROR NUMBER 8:  It's once a year.

9            THE COURT:  And is that necessary for your

10   occupation?

11           JUROR NUMBER 8:  Yes.  I'm a special ed teacher, and

12   it's an alternative assessment for kids with cognitive

13   disabilities.  I'll be giving that test in February, and I

14   have to have the training to be able to assess the students.

15           THE COURT:  All right.  I will place you and I'll

16   leave, at this time, you're in the alternate pool.  And I'll

17   leave you there.  We'll see where we end up.  But I know

18   there's a couple -- there's another I think teacher that had

19   some children that were going to be impacted.  And,

20   unfortunately, I wasn't able to accommodate that.

21           So I've got -- I'm not going to ask any of you if you

22   have a job or something else that you would rather be or

23   scheduled to be doing today because none of you would be left.

24           So with that, Juror Number 47, if I could have the

25   microphone handed to her.

1          JUROR NUMBER 47:  I have a --

2          THE COURT:  I'm sorry.  That's not on yet.

3          JUROR NUMBER 47:  I have a dentist appointment on

4    Wednesday.

5          THE COURT:  All right.  And where is that dentist

6    appointment at?

7          JUROR NUMBER 47:  In Douglas.

8          THE COURT:  Is that just a semiannual appointment?

9          JUROR NUMBER 47:  No.  I have a broken tooth.  I

10   broke it on Friday.

11         THE COURT:  Okay.  How's it feel?

12         JUROR NUMBER 47:  It feels okay.  So I just wanted to

13   tell you, though.

14         THE COURT:  All right.  Well, I broke a tooth one

15   time, and my rulings became very terse.  So I don't want it

16   impacting your ability to sit, contemplate.  So what I'm going

17   to do is move you over to the north side of the room because I

18   don't want to have that all of the sudden flare up or act up

19   on us.  So we'll see if we can proceed without your being

20   required.  But I won't excuse you yet.

21         And if I could have the Clerk of Court call an

22   alternative to Juror Number 47.

23         THE COURTROOM DEPUTY:  Juror Number 19.

24         THE COURT:  All right.  Anyone else that we may have

25   some need for accommodation or concern?  If so, please raise

1    your hand.  I don't see any raised hands.

2            A couple of housekeeping matters before we turn to

3    the additional oath for the voir dire.  Jury service, I called

4    today and I have verified.  You will be compensated for your

5    service.  It is a jury fee of $50 a day.  You also will be

6    reimbursed for mileage if you live more than 10 miles from the

7    city limits.  In addition, for those of you that are here out

8    of town, we will take care of your hotel accommodations.  Just

9    please be sure that you confer with the Clerk of Court so we

10   can take care of that.  We are not yet impacted by the

11   shutdown in terms of funding for jurors, and, frankly, I'll go

12   without my salary if I have to pay jurors because you're more

13   important than I am.

14           If you're not selected to serve on the jury today,

15   you'll be allowed to -- excused and drop your lanyards off and

16   provide any information as you go out to the Clerk of Court so

17   that they have all that.

18           Parking, in terms of those of you who have or are

19   selected, and even those of you that parked this morning, we

20   have arrangements with the city parking garage, which is down

21   the street on Wolcott.  I guess that is to the south.  And we

22   can accommodate you there.  If you're parked in a private spot

23   or you're parked in a time-limited spot, which I think a lot

24   of these spots on Wolcott are, you may end up getting a ticket

25   or getting towed.  And I don't want that to happen.  So please

1   be mindful of that.  When I was a state court judge, I could

2   call somebody and they cared.  Nowadays, they don't care, and

3   so I can't help out much other than giving you a phone call.

4              So we'll be taking a break probably midmorning, and

5   if you need to relocate your vehicle, we'll try to take care

6   of that for you -- or allow you to do that.  But please be

7   mindful and attentive to any parking in the various lots right

8   around the courthouse.

9              All right.  At this time I'll ask the Clerk of Court

10  to administer the oath as to the voir dire.

11         (Oath administered.)

12         THE COURT:  First, let me describe a few things.

13  This is a criminal case that has been brought against the

14  defendant, Arapaho James Oldman, by the United States, who

15  will also be referred to as the prosecution or the United

16  States Attorney.  The defendant is charged by an indictment in

17  this case.  That indictment alleges that between on or about

18  November 22, 2017, and/or about November 30, 2017, in the

19  District of Wyoming and within Indian country, the defendants,

20  Arapaho James Oldman and Matthew Whiteplume, both of whom are

21  Indians, did willfully, deliberately, maliciously, and with

22  premeditation and malice aforethought unlawfully kill Charles

23  Dodge, III, and the defendants did knowingly aid and abet one

24  another in the commission of this offense in violation of

25  federal law.

1          This indictment is simply a charging document by

2    which this matter is brought to trial.  It is an accusation.

3    It is not evidence of anything.  The defendant has pleaded not

4    guilty to each of -- to the charge and denies all allegations,

5    and he is presumed innocent.

6          I want to emphasize that the purpose of voir dire is

7    not to embarrass or humiliate anyone, but it is to determine

8    if you can fairly and impartially view the evidence, follow

9    the instructions of law as given by this Court, and render a

10   fair and just verdict according to the law and evidence.

11   However, during this process, issues may come up that you are

12   uncomfortable with discussing in open court.  And if such an

13   issue arises, please let the court or counsel know, and we'll

14   discuss the matter at the bench, out of the hearing of the

15   general audience.

16         Some rules as to the voir dire process.  The

17   attorneys may not ask or argue about the law, meanings of

18   words, or repeat things you have already answered in your

19   questionnaires.  You might be asked to explain or clarify an

20   answer from your questionnaires.  You will not be asked what

21   your decision might be in any hypothetical circumstance.

22   Questions will be addressed to all of you as a group except to

23   get a more detailed explanation on a particular response.

24         If you are asked if you have formed an opinion, you

25   may answer yes or no.  But please do not state what that

1   opinion is.

2          Each side will be allowed 30 minutes follow-up voir

3   dire following the Court's initial questioning.  And following

4   the questioning of the parties, you will -- the 31 will be

5   passed for cause, and then the parties will each have the

6   opportunity to exercise peremptory challenges, which will get

7   us down to the 13 jurors that will be selected to serve in

8   this matter.

9          Let us turn to the voir dire, and let me -- again, to

10  those of you seated on the north, we're not ignoring you, but

11  please listen carefully.  And we'll address you as need be.

12         Let me ask to start out with if you could -- and

13  we'll start with Juror Number 32, if we have the microphone

14  handed to her.

15         JUROR NUMBER 32:  32?

16         THE COURT:  I'm sorry.  39.  I was -- yes.  I

17  apologize.  I was seeing Juror Number 2 thinking how lucky he

18  was to be seated Number 2, and Juror Number 39 seated to his

19  right.  If I could have the microphone handed to 39.

20         And, ma'am, what I'm going to do is we're going to go

21  through each of the jurors.  And just if I could have you tell

22  us your occupation, where you reside, not specifically but

23  generally, and if you have a significant other, the nature of

24  his or her job or occupation, and your educational background.

25         JUROR NUMBER 39:  Okay.  I live here in Casper.  I

 1    work at Troopers Bingo.  I'm a cashier.  My significant other

 2    works at the post office.  He's a nighttime supervisor.  And

 3    what else did you need to know?

 4              THE COURT:  Educational background.

 5              JUROR NUMBER 39:  I have some years of college.  I

 6    graduated high school, a couple years of college.

 7              THE COURT:  Thank you very much, ma'am.

 8              Juror Number 2.

 9              JUROR NUMBER 2:  Yes.  I'm from Evansville, Wyoming.

10    A truck driver, I run a delivery route.  My wife is an office

11    worker at a hotshot service.  And I'm a high school graduate.

12              THE COURT:  All right.  Thank you, sir.

13              Juror Number 41.

14              JUROR NUMBER 41:  I live in Casper.  I have a

15    bachelor's degree.  My husband is an attorney.

16              THE COURT:  All right.  And let me before --

17              JUROR NUMBER 41:  He's retired.

18              THE COURT:  What was the nature of the practice he

19    was in.

20              JUROR NUMBER 41:  My husband is the public defender

21    for this area.

22              THE COURT:  All right.  I have had the privilege of

23    having him before me many times.

24              JUROR NUMBER 41:  I'm sure you have.

25              THE COURT:  Juror Number 4.

1          JUROR NUMBER 4:  I live in Cody, Wyoming, and I teach

2     school in Meeteetse.  My husband is a portrait photographer in

3     Cody.  I have a master's degree.

4          THE COURT:  And what is the nature of subjects that

5     you teach in school?

6          JUROR NUMBER 4:  I teach first grade.

7          THE COURT:  Lucky you.  All right.  Thank you, ma'am.

8          Juror Number 58.

9          JUROR NUMBER 58:  I'm from Moorcroft.  I work for a

10    coal mine.  I'm a heavy equipment trainer.  And my wife is a

11    para for special needs kids.  I have three years of college

12    plus high school.

13         THE COURT:  All right.  Thank you, sir.

14         Juror Number 6.

15         JUROR NUMBER 6:  I'm from Sheridan.  I am a strategic

16    resource manager.  My husband is a civil engineer.  And I've

17    had a couple years of college.

18         THE COURT:  All right.  Thank you.

19         Juror Number 9.

20         JUROR NUMBER 9:  I am from Pavillion, Wyoming.  I'm a

21    special education paraprofessional for middle school.  My

22    husband is an equipment operator.  And I have some college,

23    and I'm returning back next week.

24         THE COURT:  Good for you.  Okay.  Thank you, ma'am.

25         Juror Number 42.

1          JUROR NUMBER 42:  I'm from Casper.  I work at the

2    post office as a postal clerk, and high school graduate.

3          THE COURT:  All right.  Given that occupation, do you

4    know Juror Number 39?

5          JUROR NUMBER 42:  No.

6          THE COURT:  Fair enough.  I just wanted to make sure.

7          Juror Number 49.

8          JUROR NUMBER 49:  Hi.  I'm from Pavillion.  We have a

9    family business.  We sell firewood.  I graduated high school.

10   And I also went to Bible college for two years for student

11   instructor, to become an instructor.

12         THE COURT:  Thank you, ma'am.

13         Juror Number 1.

14         JUROR NUMBER 1:  I'm from Sheridan, Wyoming.  And I

15   work for Volunteers of America.  I'm director of youth

16   services and homeless outreach in Sheridan and Johnson

17   Counties.  I have a master's degree in counseling, and a

18   single mom of two kids.

19         THE COURT:  And how old are those children, ma'am?

20         JUROR NUMBER 1:  I have a 16-year-old and a

21   19-year-old.

22         THE COURT:  Okay.  Thank you, ma'am.

23         Juror Number 31.

24         JUROR NUMBER 31:  I'm from Sheridan.  I work for *The*

25   *Sheridan Press*, also known as Sheridan newspapers, in the

1   mailroom.  And I'm a high school graduate.  And my girlfriend

2   works for Rehabilitation Enterprises of Northeast Wyoming.

3            THE COURT:  All right.  Have you been on a jury panel

4   before?

5            JUROR NUMBER 31:  In Sheridan, yes, I have, but I

6   wasn't selected.

7            THE COURT:  All right.  Very well.  Thank you, sir.

8            Juror Number 54.

9            JUROR NUMBER 54:  I live in Lander.  I'm a homemaker,

10  stay-at-home mom.  My husband is the vice president of

11  advancement for Wyoming Catholic College.  And I have a

12  bachelor's degree.

13           THE COURT:  All right.  And what is that degree in,

14  ma'am?

15           JUROR NUMBER 54:  Liberal arts.

16           THE COURT:  Thank you.

17           Juror Number 52.

18           JUROR NUMBER 52:  I live in Sheridan, Wyoming.  I'm a

19  1st grade teacher.  I have a master's degree.  And my husband

20  installs heating and air conditioning units for Alpine.

21           THE COURT:  All right.  Thank you.

22           Juror Number 34.

23           JUROR NUMBER 34:  I'm from Buffalo.  I work at the

24  senior center as a receptionist/dispatcher.  I have two years

25  of college.  And my husband is deceased.

1          THE COURT:  All right.  Thank you, ma'am.

2          Juror Number 44.

3          JUROR NUMBER 44:  I'm from Banner, Wyoming.  I have

4   two years of college after high school.  My husband is in

5   industrial construction.  He's a crane operator.  I have

6   guardianship of my granddaughters.  And I think that's it.

7          THE COURT:  All right.  Thank you, ma'am.

8          Juror Number 14.

9          JUROR NUMBER 14:  I'm from Casper.  I'm a control

10  electrical tech out at the power company.  Single.  My

11  education's high school, four-year apprenticeship, and I'm

12  still learning every day.

13         THE COURT:  That's called the practice of law for a

14  reason too.

15         Juror Number 15.

16         JUROR NUMBER 15:  Local to Casper.  Currently working

17  in construction.  My education is a bachelor's degree in

18  computer science.

19         THE COURT:  All right.  Significant other?

20         JUROR NUMBER 15:  No.

21         THE COURT:  Okay.  Thank you, sir.

22         Juror Number 25.

23         JUROR NUMBER 25:  I'm from Cody, Wyoming.  I'm an

24  independent living specialist for Wyoming Services for

25  Independent Living.  I have a bachelor's in religious

1    education.  I have an associate's as a paramedic and an

2    associate's as a paralegal.

3              THE COURT:  All right.  And have you ever done any

4    legal-type work?

5              JUROR NUMBER 25:  No.

6              THE COURT:  All right.  Thank you, ma'am.

7              Juror Number 10.

8              JUROR NUMBER 10:  I'm from Cody.  I have a master's

9    degree in civil engineering.  I work as a civil engineer and

10   municipal engineer.  My wife is a high school teacher at Heart

11   Mountain Academy.

12             THE COURT:  All right.  Thank you, sir.

13             Juror Number 21.

14             JUROR NUMBER 21:  I live in Gillette.  I am a third

15   grade teacher.  And my husband is an agriculture extension

16   agent.  So I have a bachelor's degree.

17             THE COURT:  All right.  Thank you.

18             Juror Number 13.

19             JUROR NUMBER 13:  I'm a plant operator, coal mines,

20   from Sundance, Wyoming.  Significant other is a contract

21   specialist for the company.  Married 43 years today.

22             THE COURT:  Well, congratulations, and my apologies

23   to your wife for taking you away from her, not for having

24   married you.

25             Let me see.  Juror Number 48.

1           JUROR NUMBER 48:  I'm an administrative manager.  I'm

2    from Douglas.  I work for an oil field company.  My husband is

3    a dragline operator at a coal mine.  And I have a year or

4    so -- a year-plus of college.

5           THE COURT:  All right.  And Juror Number 13, I

6    apologize, but I don't know that --

7           JUROR NUMBER 13:  High school.

8           THE COURT:  All right.  Thank you.

9           Juror Number 30.

10          JUROR NUMBER 30:  Gillette, Wyoming.  Mechanic

11   specialist.  Associate's degree.  Married.  Two kids.  She's a

12   CNA.

13          THE COURT:  All right.  Thank you.

14          Juror Number 22.

15          JUROR NUMBER 22:  Powell, Wyoming.  I am a store

16   manager for a national hardware store.  My wife has her own

17   housecleaning business.  And I have a two-year business

18   degree.

19          THE COURT:  All right.  Thank you, sir.

20          Juror Number 40.

21          JUROR NUMBER 40:  Pardon me?

22          THE COURT:  Juror Number 40.

23          JUROR NUMBER 40:  Thermopolis, Wyoming.  I'm an

24   independent contractor.  Graduated high school.  My wife works

25   for the 4-H foundation in Thermop.

1           THE COURT:  All right.  And independent contractor,

2    sir, what type of occupation do you do or business?

3           JUROR NUMBER 40:  Home remodeling, additions, smaller

4    stuff.

5           THE COURT:  All right.  Thank you.

6           Juror Number 53.

7           JUROR NUMBER 53:  I'm from Worland, Wyoming.  I'm a

8    store manager.  Have approximately a year of college.  My

9    husband's retired.

10           THE COURT:  All right.  And what type of store do you

11    manage, ma'am?

12           JUROR NUMBER 53:  I manage a convenience store.

13           THE COURT:  Okay.  Thank you.

14           Juror Number 37.

15           JUROR NUMBER 37:  I'm from Douglas, Wyoming.  I'm a

16    special education paraprofessional.  I have an associate's

17    degree.  My husband's the line foreman in Douglas for the

18    power company.

19           THE COURT:  All right.  Thank you.

20           Juror Number 3.

21           JUROR NUMBER 3:  I'm from Casper.  Business owner in

22    the insurance business.  I've got bachelor's degree from

23    college.  And I'm married to a wonderful wife and mother.

24           THE COURT:  All right.  Thank you, Juror Number 3.

25           Juror Number 19.

1          JUROR NUMBER 19:  I'm from Powell, Wyoming.  I teach

2     mathematics at the Community College.  I have a Ph.D. in

3     mathematics.  I've been married for nine years.  My wife is

4     working towards a associate's in medical -- medical assisting

5     while working at food service.

6          THE COURT:  All right.  Thank you, sir.

7          Juror Number 33.

8          JUROR NUMBER 33:  I'm a speech-language pathologist

9     in Gillette in the school district.  Bachelor's degree and

10    many graduate hours.  My husband's retired, UP engineer.

11         THE COURT:  All right.  Thank you.

12         Juror Number 43.

13         JUROR NUMBER 43:  I'm from Douglas.  I work at

14    Roadrunner Service and Supply.  I've been there 27 years.  My

15    wife works for the District Court judge in Douglas.  She's

16    been there 31 years.  And I'm a high school graduate.

17         THE COURT:  I think I've met her.  All right.

18         JUROR NUMBER 43:  I'll bet you have.

19         THE COURT:  That brings up one of the things that

20    will happen in this matter is this Court will be instructing

21    you as to the law to be applied in contemplating reaching any

22    verdict.  Does anyone have any concerns, first, with their

23    ability to follow the instructions of law as given by this

24    Court?  If so, please raise your hand.  I don't see any raised

25    hands.

1          The second is some of you may know me, and does the

2    fact that you know me or heard anything about me cause you any

3    concern as to your ability to follow the instructions that I

4    give you?  If so, please raise your hand.  I'll take no

5    offense.  All right.  I don't see any raised hands.

6          Let me reverse course and ask:  Have any of you been

7    involved in legal proceedings as a party, as a witness, or as

8    a juror previously?  Let's start back with Juror Number 33,

9    and we'll work our way forward.

10          Can you tell us about that, ma'am?

11          JUROR NUMBER 33:  It was a drunk driving in Douglas.

12          THE COURT:  All right.  And how long ago was that?

13          JUROR NUMBER 33:  Oh, ten years ago maybe.  I don't

14    remember, honestly.

15          THE COURT:  And what was the verdict the jury

16    rendered?

17          JUROR NUMBER 33:  Guilty.

18          THE COURT:  And did you serve as the foreperson in

19    that?  Were you selected to serve as the foreperson?

20          JUROR NUMBER 33:  No, no.

21          THE COURT:  Anything about that process that would

22    cause you any concern if you were selected to serve in this

23    matter?

24          JUROR NUMBER 33:  No.

25          THE COURT:  All right.  Thank you, ma'am.

1              Juror Number 43.

2              JUROR NUMBER 43:  I sat on a jury here.  I think it

3    was nine years ago, maybe ten.

4              THE COURT:  All right.  Here in federal court?

5              JUROR NUMBER 43:  Yes.

6              THE COURT:  What was the nature of that?

7              JUROR NUMBER 43:  It was a drug case, selling.

8              THE COURT:  Criminal matter?

9              JUROR NUMBER 43:  Yeah.

10             THE COURT:  And was there a verdict rendered?

11             JUROR NUMBER 43:  Yes.  Guilty.

12             THE COURT:  And were you selected to serve as the

13   foreperson in that?

14             JUROR NUMBER 43:  Not the foreperson, no.

15             THE COURT:  Anything about that process that would

16   cause you any concern if you were selected to serve today?

17             JUROR NUMBER 43:  Absolutely not.

18             THE COURT:  Thank you, sir.

19             I believe coming forward, Juror Number 37.

20             JUROR NUMBER 37:  I served on a jury.  It was a civil

21   case for punitive damage.  It was about six or seven years

22   ago.  And I was not a foreperson.  And we -- we decided that

23   the person was liable for punitive damages.

24             THE COURT:  All right.  And do you recall where that

25   court was?  Was it in Douglas?

1          JUROR NUMBER 37:  I apologize.  Yes, it was in

2     Douglas.  It was just the Douglas court, county.  Thank you.

3          THE COURT:  In this case, unlike in a civil matter,

4     you will be required to determine -- the burden of proof will

5     be beyond a reasonable doubt as opposed to a preponderance of

6     the evidence in a civil matter.  First, does that cause you

7     any concern in applying the beyond a reasonable doubt burden

8     in this case?

9          JUROR NUMBER 37:  No, sir.

10          THE COURT:  Anything about that civil matter that

11     would cause you any concerns to -- as to your ability to serve

12     if you were selected today?

13          JUROR NUMBER 37:  No, sir.

14          THE COURT:  Thank you very much, ma'am.

15          Let's go to her left.  I believe there was another

16     hand in that row.  Is there anyone else in that row?

17          Juror Number 53.

18          JUROR NUMBER 53:  I served on this Court.  I think

19     it's been about seven years ago maybe.  It was a drug case.  A

20     couple years ago, I served on a jury in Washakie County, which

21     was a wrongful death suit against a physician.  And I've been

22     in court several times through the capacity of my job with

23     shoplifters and stuff.

24          THE COURT:  All right.  Let's back up a little bit

25     then.  In terms of your federal court case, do you recall what

1    the ultimate verdict was in that matter?

2           JUROR NUMBER 53:  Guilty.

3           THE COURT:  And did you serve as a foreperson?

4           JUROR NUMBER 53:  No.

5           THE COURT:  All right.  Anything about that case that

6    would cause you any concerns if you were selected to serve in

7    this matter?

8           JUROR NUMBER 53:  No.

9           THE COURT:  And then in Washakie County, what was the

10   ultimate decision rendered in that case?

11          JUROR NUMBER 53:  Not guilty.

12          THE COURT:  And was that a civil matter?

13          JUROR NUMBER 53:  Well, it was wrongful death against

14   a physician.

15          THE COURT:  All right.  And with regards to your

16   interaction and involvement with the court system and/or law

17   enforcement, anything about those experiences that has caused

18   you any problem or concern?

19          JUROR NUMBER 53:  No.

20          THE COURT:  All right.  I think that covers it then.

21   Thank you, ma'am.

22          Next juror that has had experience?  Juror Number 40.

23          JUROR NUMBER 40:  I served on a jury for

24   environmental damage against an oil company.

25          THE COURT:  All right.  And was that up in Hot

1   Springs County?

2            JUROR NUMBER 40:  It was in Thermopolis.

3            THE COURT:  And what was the verdict rendered in

4   that?

5            JUROR NUMBER 40:  Not guilty.

6            THE COURT:  And were you selected as the foreperson

7   in that?

8            JUROR NUMBER 40:  No, sir.

9            THE COURT:  And was that a matter that was brought by

10  the State or by the County, or was it a civil, personal?

11           JUROR NUMBER 40:  It was personal.

12           THE COURT:  All right.  And anything about that

13  experience that would cause you any concerns if you were

14  selected to serve in this matter?

15           JUROR NUMBER 40:  No, sir.

16           THE COURT:  All right.  Thank you.

17           Next person on that row, is there anyone else on that

18  row that's had experience?  Let's come forward then to the

19  next row.  I believe that there was someone.

20           Juror Number 10.

21           JUROR NUMBER 10:  Yes.

22           THE COURT:  Can you tell us about your experience.

23           JUROR NUMBER 10:  I'm not exactly sure, but I wanted

24  to get this out here.  I've served as an expert witness on a

25  hearing panel in Sheridan about eight years ago for a

1   right-of-way issue.

2        THE COURT:  All right.  And it certainly is part of

3   the analysis.  So you were hired by one party to testify?

4        JUROR NUMBER 10:  Correct.

5        THE COURT:  And what was the result that was

6   ultimately rendered in the matter?

7        JUROR NUMBER 10:  The county commissioners I believe

8   determined that the opposing party from the outfit that had

9   hired me had a right to maintain the -- limit the access to

10  the property that was in question.

11       THE COURT:  All right.  Anything about that

12  experience that would cause you any concern about your ability

13  to -- if selected, to serve as a juror in this matter to cause

14  you any concern?

15       JUROR NUMBER 10:  No.

16       THE COURT:  All right.  Any other experiences, Juror

17  Number 10?

18       JUROR NUMBER 10:  No.

19       THE COURT:  Okay.  Thank you.

20       Juror Number 21.

21       JUROR NUMBER 21:  I doubt this matters, but I served

22  as a witness in 2009 for a small claims incident involving a

23  horse and trailer.

24       THE COURT:  It does matter because you've had

25  involvement in the legal system, and we want to make sure that

1   that involvement doesn't have any impact on your ability if

2   selected.  What was the result that ended up occurring there?

3            JUROR NUMBER 21:  Not guilty.

4            THE COURT:  All right.  Anything about that process

5   that causes you any concern as to law enforcement, as to the

6   court system?

7            JUROR NUMBER 21:  No.

8            THE COURT:  All right.  Thank you, ma'am.

9            Juror Number 13.

10           JUROR NUMBER 13:  I've just been in the jury pool

11  before, never selected before.  Crook County.

12           THE COURT:  All right.  And any concerns about that

13  process that -- while you're sitting there that you gained

14  that you would have concerns if selected?

15           JUROR NUMBER 13:  No, no.

16           THE COURT:  All right.  Very well.  Thank you, sir.

17           Next row forward.  Juror Number 42.

18           JUROR NUMBER 42:  I've given testimony in several

19  cases, as my previous employment I was a manager of a pawn

20  shop.  So we had lots of ins and outs there.

21           THE COURT:  All right.  And a lot of interaction with

22  law enforcement?

23           JUROR NUMBER 42:  Correct.

24           THE COURT:  Anything about that interaction or about

25  that testimony or involvement that would cause you any

1    concerns if selected?

2            JUROR NUMBER 42:  No, sir.

3            THE COURT:  Who was the primary?  Were you dealing

4    with sheriff or city?

5            JUROR NUMBER 42:  Sheriff and city both.

6            THE COURT:  Okay.  Thank you, sir.

7            Juror Number 1 or Number 49, if you've had any

8    experience.

9            JUROR NUMBER 1:  Is this on?

10           THE COURT:  Yes, ma'am.

11           JUROR NUMBER 1:  I was selected as an alternative

12   juror in I believe it was a Circuit Court case in Sheridan

13   regarding where an elk was shot on the boundary line.  But I

14   was released of my duties before they decided on a verdict.

15           THE COURT:  All right.

16           JUROR NUMBER 1:  As well as I do go to District Court

17   with youth from our group home and crisis shelter on CHINS

18   cases and delinquency hearings.

19           THE COURT:  In terms of your service on the jury as

20   an alternate, anything about that experience that would cause

21   you any concern if selected?

22           JUROR NUMBER 1:  Not at all.

23           THE COURT:  And in terms of your interaction with and

24   working with the court system for CHINS and other children in

25   need of assistance, anything about that process that would

1    cause you concerns?

2         JUROR NUMBER 1:  Not currently.

3         THE COURT:  All right.  Very well.  Thank you, ma'am.

4         Anyone else in that row?  I don't see anyone in that

5    row.  Let's go ahead and go to the front row.

6         Since you have it, Juror Number 4.

7         MS. AMRAM:  Your Honor, there was someone in that

8    row.

9         THE COURT:  I'm sorry.  Juror Number 49.

10        JUROR NUMBER 49:  I actually ended up representing

11   myself in a -- I was suing the manufacturer place that I had

12   my new manufactured home put on because my house was sinking.

13   I had an attorney who was actually doing it on contingency,

14   but the people that he was at the law firm with decided they

15   weren't going to do contingency.  So I actually ended up

16   representing myself with his help.  He would help me with what

17   I needed to do, and then I went and done it.

18        THE COURT:  All right.  What was the ultimate result

19   in that?

20        JUROR NUMBER 49:  I got some of what I wanted.

21        THE COURT:  All right.  Anything about that process

22   that would cause you to have any difficulty in serving if

23   selected in this matter?

24        JUROR NUMBER 49:  No, sir.

25        THE COURT:  All right.  Thank you.

1          JUROR NUMBER 49:  You're welcome.

2          THE COURT:  Juror Number 4.

3          JUROR NUMBER 4:  My husband and I were involved in a

4     lawsuit due to a flooding of our business, and it was just

5     handled between lawyers out of court, settled out of court.

6          THE COURT:  All right.  Anything about that process

7     or that interaction with the legal system that would cause you

8     any concerns if selected in this matter?

9          JUROR NUMBER 4:  No, not at all.

10         THE COURT:  Thank you.

11         Anyone else?

12         JUROR NUMBER 41:  Yes, I was selected in the jury

13    pool for District Court.  I did not serve on the jury.

14         THE COURT:  All right.  That was in State District

15    Court.

16         JUROR NUMBER 41:  Right, over here.

17         THE COURT:  Very well.  Anything about that process,

18    though, that would cause you any concerns if selected to serve

19    in this matter?

20         JUROR NUMBER 41:  Not at all.

21         THE COURT:  Thank you, ma'am.

22         I think Juror Number 2.

23         JUROR NUMBER 2:  Yes, I was a witness in a criminal

24    case in Castle Rock, Colorado, this past summer.

25         THE COURT:  What were the nature of the charges in

1    this matter?

2              JUROR NUMBER 2:  It was insurance fraud.

3              THE COURT:  All right.  And it was brought by the

4    State or by the County?

5              JUROR NUMBER 2:  It was federal.

6              THE COURT:  All right.  And who did you testify for?

7    Who called you to testify?

8              JUROR NUMBER 2:  It was the State of Colorado, I

9    suppose.

10             THE COURT:  What was the ultimate result in that

11   case?

12             JUROR NUMBER 2:  It was a guilty verdict.

13             THE COURT:  Anything about that process that would

14   cause you any concerns if selected to serve as a juror in this

15   matter?

16             JUROR NUMBER 2:  No, sir.  Huh-uh.

17             THE COURT:  Anyone else that has had experience or

18   been selected to serve or served on a jury?  I don't see any

19   other raised hands.

20             All right.  Let me ask if any of you or a family

21   member or close friend have served in a law enforcement

22   agency.  Is there anyone?  All right.  Let's see.  Juror

23   Number 34 looks to be the closest.  I'm sorry.

24             JUROR NUMBER 34:  It's all right.  My husband was a

25   correctional officer in the state of California, and also in

1   Rawlins.

2           THE COURT:  All right.  And anything about that

3   service that would cause you any concerns?

4           JUROR NUMBER 34:  No.

5           THE COURT:  Did he retire from that job?

6           JUROR NUMBER 34:  He was medically retired.  He

7   contacted tuberculosis from an inmate, which caused his death.

8   So, no, I don't.

9           THE COURT:  Okay.  Thank you, ma'am.  I'm sorry.

10          Juror Number 52.

11          JUROR NUMBER 52:  My husband was a detentions officer

12  at the Sheridan County jail for two and a half years.

13          THE COURT:  All right.  And anything about that job

14  that would cause you any concerns if selected to serve in this

15  matter?

16          JUROR NUMBER 52:  No, sir.

17          THE COURT:  Thank you.

18          Juror Number 54.

19          JUROR NUMBER 54:  My brother-in-law is on the

20  California Highway Patrol.  My father was briefly a police

21  officer in Texas.  And I have a friend on the Lander police --

22  in the Lander Police Department.

23          THE COURT:  All right.  Anything about those friends

24  and about those relationships that would cause you to have any

25  difficulty being fair and impartial in this matter carefully

1   considering the evidence presented by all witnesses and

2   deciding this case based upon that evidence?

3           JUROR NUMBER 54:  I don't believe so.

4           THE COURT:  Thank you, ma'am.

5           I thought I saw Juror Number 31?  No?

6           Anyone else?  Let me --

7           Juror Number 14.

8           JUROR NUMBER 14:  I don't know if this matters or

9   not, but I'll let you know.  My son was just newly appointed

10  with the Wyoming Game and Fish.  Today would be his first day

11  at the academy.  So officially I guess he's not quite legally

12  law enforcement.

13          THE COURT:  He soon will be.

14          JUROR NUMBER 14:  Yes.

15          THE COURT:  Let me ask you this:  Given the nature of

16  that occupation, would you have any difficulty in fairly and

17  impartially considering the evidence and deciding this case

18  based upon that evidence?

19          JUROR NUMBER 14:  No.

20          THE COURT:  All right.  I believe there was someone.

21  Juror Number 25.

22          JUROR NUMBER 25:  I was a community education officer

23  with the sheriff's department in Knoxville, Tennessee, and I

24  have several relatives who are deputies.

25          THE COURT:  Anything about that job that would cause

1  you difficulty in fairly and impartially considering the

2  evidence if selected?

3            JUROR NUMBER 25:  No.

4            THE COURT:  All right.  Thank you, ma'am.

5            Juror Number 10.

6            JUROR NUMBER 10:  My wife's second cousin was the

7  police chief here in Casper, and I have a friend who was a

8  former police chief in Cody.

9            THE COURT:  All right.  Anything about those

10  relationships that would cause you any difficulty if selected

11  to fairly and impartially view the evidence?

12            JUROR NUMBER 10:  I don't believe so, no.

13            THE COURT:  All right.  Thank you, sir.

14            Juror Number 21?

15            All right.  Anyone else?  Let's go to the back, your

16  right corner.

17            JUROR NUMBER 3:  My brother-in-law was a prosecuting

18  attorney for the DA's office and the U.S. Attorney General's

19  office in Las Vegas.

20            THE COURT:  And, Juror Number 3, anything about those

21  relationships that would cause you any difficulty, if

22  selected, to fairly and impartially view the evidence in this

23  matter and decide the verdict?

24            JUROR NUMBER 3:  No, sir.

25            THE COURT:  All right.  Thank you.

1           Juror Number 19.

2           JUROR NUMBER 19:  I think, yeah -- this is on?  Thank

3    you.  My brother is a metro police officer in Washington, D.C.

4    My stepsister is an attorney in Dallas, Texas.  And a couple

5    other -- one of my cousins, a deputy sheriff for I think

6    Brooke County, West Virginia, and a few other lawyers among

7    more distant relatives.

8           THE COURT:  All right.  Let me -- let me ask if

9    anything about those relationships would cause you difficulty

10   in being able to fairly and impartially listen to the evidence

11   and decide a verdict based upon that alone.

12          JUROR NUMBER 19:  No, sir.

13          THE COURT:  All right.  Thank you.  Anyone else?  Law

14   enforcement connections or relationships?

15          Juror Number 37.

16          JUROR NUMBER 37:  My brother-in-law is a federal

17   agent in Texas, and he was -- he was a police officer in

18   Austin and worked his way up through the ranks and is now a

19   federal officer.

20          THE COURT:  Do you know for what agency he is?

21          JUROR NUMBER 37:  Kind of.  I think it's Homeland

22   Security actually.  We don't see him very much, so I -- but I

23   think it's Homeland Security is -- I believe.

24          THE COURT:  The agency.  Anything about that

25   relationship that would cause you any difficulty, if you were

1    selected, to fairly and impartially view the evidence and

2    consider and decide a verdict?

3                JUROR NUMBER 37:  No, sir.

4                THE COURT:  All right.  Thank you.

5          There's a hand up on the right -- on the left side.

6    Has someone else raised their hand that I missed?

7                THE COURTROOM DEPUTY:  On your right.

8                THE COURT:  Sir, if you'll mark that down.  Do you

9    have something responsive to those questions?

10               PROSPECTIVE JUROR:  Yes.

11               THE COURT:  I'll get to you if we need to, and if you

12   end up over there.  But make a mental note, sir.  Thank you.

13         Anyone else on the south side?  I don't see any other

14   raised hands.

15         Here's what we need to verify.  Obviously people --

16   you have relationships with people in law enforcement, and,

17   ultimately, what I want to make sure and what the parties want

18   to make sure is that if you're selected to serve as a juror in

19   this matter, can you fairly and impartially hear and

20   critically consider the evidence offered by the parties and

21   decide this, render a verdict according to that evidence, not

22   based upon any concerns that you have or fears that you have

23   as to, well, if I go back and tell my brother-in-law that I

24   found the defendant not guilty, he's going to disown me.

25         But that's the nature of the issue that I want to

1    make sure we don't have; that none of you have any

2    relationship in such a way that would cause you any difficulty

3    in deciding the verdict based upon the evidence only and no

4    fears or concerns as to how anyone else might treat you or

5    react to you if you rendered such a verdict.  Does anyone feel

6    that way or have any concerns about that?  If so, please raise

7    your hand.  I don't see any raised hands.  All right.  Thank

8    you.

9            Have any of you ever been involved in any criminal

10   proceedings outside of speeding tickets and parking tickets,

11   those types of things?  But have you been involved or had any

12   loved ones or close friends involved in any criminal

13   proceedings?  If so, please raise your hand.

14           All right.  Let's start back in the back corner there

15   because I think that's where the microphones are.

16           Juror Number 33.

17           JUROR NUMBER 33:  Yes.  My son was involved in a drug

18   case in Douglas.

19           THE COURT:  All right.  And what was the ultimate

20   disposition, ma'am, if I may ask?

21           JUROR NUMBER 33:  I think it was not guilty.

22   Honestly, I don't know.

23           THE COURT:  And anything about the system and the

24   process that occurred there that would cause you to feel one

25   way or another about law enforcement or about the legal

1   system?

2           JUROR NUMBER 33:  No.

3           THE COURT:  All right.  Did you feel that he was

4   treated fairly?

5           JUROR NUMBER 33:  Yes.

6           THE COURT:  All right.  Thank you, ma'am.

7           Anything else, Juror Number 13 [sic]?

8           JUROR NUMBER 33:  No.

9           THE COURT:  Juror Number 19.

10          JUROR NUMBER 19:  Before we were married or much

11  together, when friends, my wife was arrested for shoplifting.

12          THE COURT:  All right.  And anything about that

13  interaction or process that would cause you any concerns?

14          JUROR NUMBER 19:  No.

15          THE COURT:  And where did this occur, sir?

16          JUROR NUMBER 19:  Ohio.

17          THE COURT:  Okay.  Thank you.

18          Coming forward in the next row, Juror Number 37.

19          JUROR NUMBER 37:  It's probably 35 years ago.  My

20  mother and stepfather were -- they actually both served

21  federal time for embezzlement.

22          THE COURT:  All right.  And where did those events

23  occur, ma'am?

24          JUROR NUMBER 37:  In Montana.

25          THE COURT:  All right.  Did you have any concerns

1    with how the process worked or the system operated?

2             JUROR NUMBER 37:  No, sir.

3             THE COURT:  Did you have any concerns as to how they

4    were treated?

5             JUROR NUMBER 37:  No.

6             THE COURT:  All right.  Thank you, ma'am.

7             Juror Number 44.

8             JUROR NUMBER 44:  My ex-husband was prosecuted for

9    sexual misconduct with a minor and is serving time at this

10   time.  And I also was involved -- my niece and her daughter

11   were involved in a case in which she was kidnapped and

12   sexually assaulted, and that perpetrator was also convicted

13   and is serving time at this time.

14            THE COURT:  All right.  Let me ask with regards to

15   either of those matters, did you feel that they were handled

16   properly by law enforcement?

17            JUROR NUMBER 44:  Yes.  As far as I know.

18            THE COURT:  And with regards to the system and the

19   process, did you have any concerns or feel that there was

20   anything inappropriate with regards to what the ultimate

21   disposition and how the system --

22            JUROR NUMBER 44:  Not at all.

23            THE COURT:  Thank you, ma'am.

24            Next person, if you could raise your hand.  I've

25   got -- well, we'll go to the -- Juror Number 21.

1          JUROR NUMBER 21:  Check, one, two.  Just kidding.

2          I got a -- I almost got convicted of an MIP back in

3     college.  I pled guilty, but I was let off.  And it was erased

4     from my record by the grace of God.

5          THE COURT:  All right.  Do you feel like the law

6     enforcement handled the matter appropriately?

7          JUROR NUMBER 21:  Yes.

8          THE COURT:  And did you feel like the Court and the

9     prosecution and the system handled you properly?

10         JUROR NUMBER 21:  Yeah.  They were very gracious.

11         THE COURT:  Very well.  Thank you.

12         Next person.  Juror Number 34.

13         JUROR NUMBER 34:  Actually, my son a couple years ago

14    was brought in front of you under the federal court for

15    duplicating government documents and drugs, and he was

16    convicted.  And he spent a year in federal prison.

17         THE COURT:  All right.  Let me ask you this:

18    Anything about the way that he was handled by law enforcement

19    that would cause you any concerns?

20         JUROR NUMBER 34:  No.  I thought maybe they should

21    have been a little tougher on him.

22         THE COURT:  Fair enough.  And then let me ask you

23    this:  In terms of the system and the court and ultimate

24    disposition, did you have any concerns as to how that process

25    went or what happened?

1          JUROR NUMBER 34:  No, it went very well.  And because

2     of it, he's been clean for two years now.  So I want to thank

3     you.

4          THE COURT:  Well, you've done a yeoman's work in

5     that.  Thank you.

6          All right.  Next person.

7          JUROR NUMBER 39:  My ex-husband was in prison for

8     robbery, but that was 20 years ago or so.  And the only other

9     thing, I guess, is my younger brother got beat up by the

10    police, so that kind of bothered me.

11         THE COURT:  All right.  Let me ask, Juror Number 39,

12    with regards to the events involving your ex-husband, any

13    concerns as to how the law enforcement acted in that matter?

14         JUROR NUMBER 39:  No.

15         THE COURT:  And ultimately, the disposition, did you

16    feel that the system operated properly?

17         JUROR NUMBER 39:  Yeah, I -- yeah.

18         THE COURT:  All right.  With regards to your younger

19    brother, where did those events occur?

20         JUROR NUMBER 39:  They occurred here.

21         THE COURT:  Was that involving Casper Police

22    Department or the Natrona County sheriff?

23         JUROR NUMBER 39:  I believe it was the Casper Police

24    Department.

25         THE COURT:  It didn't involve any federal agents or

1    federal law enforcement?

2              JUROR NUMBER 39:  No.

3              THE COURT:  All right.  Anything about the way that

4    he was treated by law enforcement that would cause you to not

5    be able to fairly and impartially, critically evaluate the

6    testimony, follow the instructions of law, and render a

7    verdict accordingly?

8              JUROR NUMBER 39:  No.  I could do that.

9              THE COURT:  All right.  Thank you, ma'am.

10             Anyone else?

11             Juror Number 2.

12             JUROR NUMBER 2:  Yes.  My brother years ago had a

13   felony for breaking and entering, and it was -- he was like 18

14   years old.  But he was on probation and got a governor's

15   pardon.

16             THE COURT:  All right.  Anything about the way that

17   that matter was handled by law enforcement that caused you

18   concern?

19             JUROR NUMBER 2:  No, I don't believe so.

20             THE COURT:  And anything about the way that the

21   system and the Court system operated and handled that?

22             JUROR NUMBER 2:  No.  It seemed fine.

23             THE COURT:  Thank you, sir.

24             Anyone else?

25             All right.  Juror Number 9.

1          JUROR NUMBER 9:  A couple different things.  My

2    husband has had a couple DUI charges and has been found guilty

3    on both of those in the past, which are more than five years

4    ago.  And the second one is I was the victim of a domestic

5    violence eight years ago.

6          THE COURT:  All right.  Let me ask you with regards

7    to either of those matters, any concerns as to the way those

8    were handled by law enforcement?

9          JUROR NUMBER 9:  No.

10         THE COURT:  Any concerns as to how the system handled

11   either yourself or your husband?

12         JUROR NUMBER 9:  No.

13         THE COURT:  Anything about those that would impact

14   your ability to critically evaluate the testimony of all

15   witnesses and follow the instructions of law and render a

16   verdict accordingly?

17         JUROR NUMBER 9:  No.

18         THE COURT:  Thank you, ma'am.

19         Juror Number 49, I believe.

20         JUROR NUMBER 49:  My son was pulled over for road

21   rage, and the person he was having road rage called the Lander

22   police and told them that he pointed a pistol at him.  Being

23   19 -- or 18, he didn't even need to have that.  Well, when he

24   got pulled over, they also said that they found residue of

25   marijuana.  And he ended up going -- he was in jail for a

1    couple days, ended up going to court.  The two attorneys and

2    the judge all worked together, and now he's waiting to be

3    going into the service.

4           THE COURT:  All right.  Let me back up a little bit.

5    With regards to the way that law enforcement handled the

6    situations, any concerns about that?

7           JUROR NUMBER 49:  No, sir.

8           THE COURT:  And the way the system operated and

9    treated your son, any concerns about that?

10          JUROR NUMBER 49:  No, sir.  I'm proud that he's going

11   into the service and not going to get any more trouble,

12   hopefully.

13          THE COURT:  Well, good for him.

14          Let me ask you, anything about those incidences that

15   would cause you any difficulty to fairly and critically

16   evaluate the testimony that --

17          JUROR NUMBER 49:  No, sir.

18          THE COURT:  Thank you very much, ma'am.

19          Anyone else?

20          Juror Number 58.

21          JUROR NUMBER 58:  I've had a couple DUIs probably 15

22   years ago, one in South Dakota and one in Colorado.

23          THE COURT:  Anything about the way you were handled

24   by law enforcement in those matters that would cause you

25   concern?

1          JUROR NUMBER 58:  No.

2          THE COURT:  Anything about the way that you were

3    treated by the Court system cause you any concern?

4          JUROR NUMBER 58:  No.

5          THE COURT:  All right.  Thank you, sir.  Anyone else?

6          And, ladies and gentlemen, the crux of those

7    questions and the ultimate question that I have for you is,

8    given your involvement and the nature of your involvement or

9    your loved ones' or close friends' involvement or any other

10   involvement, frankly, with law enforcement, do you have any

11   experiences that would cause you to not be able to critically

12   and fairly consider the testimony of all the witnesses and

13   decide this case based upon that testimony and the law as

14   instructed by this Court and not through the skew or the

15   vision of a prior experience, good, bad, or indifferent?

16   Anyone feel they have any difficulty in deciding this case on

17   its own merits and not based upon any of your past

18   experiences?  If so, please raise your hand.  I don't see any

19   raised hands.  Thank you.

20          This case involves issues -- or has issues concerning

21   and involving alcohol consumption or potentially other

22   controlled substances.  Is anyone concerned, based upon their

23   past experience or the nature of their mind-set, look, the

24   minute that I hear anything about alcohol or controlled

25   substances, it's over.  I can't consider anything more.  I

1   can't be fair and impartial?  Does anyone have any concerns

2   given that this case will involve alcohol and/or other

3   controlled substances?  Does anyone have any concerns as to

4   their ability to hear out all the evidence and decide this

5   case fairly and impartially based upon the evidence and the

6   laws given by this Court?  If so, please raise your hand.  I

7   don't see any raised hands.

8          All right.  In today's modern age, a lot of us find

9   resources of Google to be wonderful when you have a question,

10  or I guess there's some TV shows where you can phone a friend

11  when you have an issue.  All those are wonderful resources,

12  but they are not to be used by any jurors selected in this

13  matter.  And in this case you will have to base your decisions

14  based solely on the evidence as presented and the instructions

15  as given by the Court.  You won't be able to do your own

16  research, and you won't be able to seek any guidance from

17  anyone else.

18         Given those limitations and constraints, does anyone

19  have any concerns as to their ability to base their decision

20  and consideration of only the evidence presented in this

21  courtroom and the instructions of law as given by this Court?

22  Anyone have any concerns as to limiting themselves

23  accordingly?  If so, please raise your hand.  I don't see any

24  raised hands.  Thank you.

25         Some, people due to religious or philosophical

1  reasons, find that they are unable to pass upon the guilt or

2  innocence of a fellow citizen or critically evaluate the

3  testimony of a witness.  Does anybody have such belief that

4  would cause them to be unable to critically evaluate and

5  consider and decide this case and render a verdict

6  accordingly?  If so, please raise your hand.  I don't see any

7  raised hands.

8       In this -- well, in most cases the race or

9  nationality of a defendant is irrelevant.  In this case,

10  because of the requirements under federal law, it will be

11  necessary for the United States to prove as an element of the

12  offense charged in the indictment that the individual is an

13  Indian and that the crimes occurred in Indian country, the

14  Wind River Indian Reservation to be specific.  These are

15  jurisdictional matters affecting whether the federal court has

16  jurisdiction and requires the matter to be proved as to racial

17  membership, which would otherwise not be relevant.

18       Does anyone have any concerns or problems with that

19  being an element in this matter given the nature of the law?

20  Does anyone have any concerns with that?  If so, please raise

21  your hand.  I don't see any raised hands.

22       I will tell you, apart from that jurisdictional

23  requirement, the issues as to race or nationality will play

24  and should play no part in your decision in this case and your

25  evaluation of the evidence.

1          Let me ask, has anyone ever had any experiences, good

2     or bad, with Native American people or with the Native

3     American tribe or a tribe?  If so, please raise your hand.

4          All right.  Juror Number 10.  Could you tell us about

5     that, sir?

6          JUROR NUMBER 10:  Actually, it's twofold.  Wind River

7     children living in Sheridan, we were going across the Indian

8     reservation to the north and were stopped by several Indians

9     there with a shotgun who were looking for another tribal

10    member.  And I wasn't old enough to recall all the details,

11    but it sounded like it was pretty difficult for my father.  On

12    the other hand, I -- according to my mother, I'm an eighth

13    Indian, probably Arapaho, and have had some positive

14    experiences as well.

15         THE COURT:  All right.  Let me ask you, ultimately,

16    based upon those experiences, do you have any concern as to

17    your ability to fairly and impartially consider the evidence

18    and render a verdict according to that evidence and not based

19    upon those experiences one way or another?

20         JUROR NUMBER 10:  I do not.

21         THE COURT:  Thank you, sir.

22         I believe that there was another hand.  Juror

23    Number 33.

24         JUROR NUMBER 33:  I currently work with a student at

25    the YES house that is from the Wind River Reservation.

1      THE COURT:  All right.  And anything about that work

2  or experience that would cause you to not be able to fairly

3  and impartially consider the evidence in this case based upon

4  what's presented here in court and not those experiences?

5      JUROR NUMBER 33:  No, sir.

6      THE COURT:  Thank you, ma'am.

7      Juror Number 52 -- I'm sorry.  Not 52.  54.

8      JUROR NUMBER 54:  My father worked for the Bureau of

9  Indian Affairs for most of my growing up, and I lived on the

10  Flathead Indian Reservation and the Makah Indian Reservation

11  when I was growing up.

12      THE COURT:  Anything about those experiences that

13  would cause you any difficulty to fairly and impartially view

14  the evidence?

15      JUROR NUMBER 54:  No.

16      THE COURT:  All right.  Thank you, ma'am.

17      I believe there was someone -- Juror Number 9.  Oh,

18  yeah.  Let's go to Juror Number 9.  And then I think we have

19  another microphone in the back for Juror Number 19.

20      But Juror Number 9 at this time.

21      JUROR NUMBER 9:  I don't think this makes much of

22  a -- so a high percentage of the students at the school I work

23  for are all the Wind River Indian Reservation.  I only have

24  one in the middle school that is part of the special education

25  department that I work directly with, but I do have

1    interactions with both Shoshone and Arapaho on a regular basis

2    because of school functions and things like that.

3              THE COURT:  Anything about those interactions and

4    experiences that might cause you any difficulty to solely base

5    this case upon the evidence presented?

6              JUROR NUMBER 9:  No.

7              THE COURT:  All right.  Thank you, ma'am.

8              I know that Juror Number 19 -- if we could hand Juror

9    Number 19 a microphone.

10             JUROR NUMBER 19:  I believe I've had a few students

11   who were a resident of the Wind River Reservation, but, you

12   know, one or two classes, not anything that would be

13   prejudicial one way or the other.

14             THE COURT:  All right.  Nothing about those

15   interactions would cause you any difficulty?

16             JUROR NUMBER 19:  No, sir.

17             THE COURT:  Thank you.

18             Anyone else?  I don't see any other raised hands.

19             Oh, Juror Number 37.

20             JUROR NUMBER 37:  I also have had students from the

21   Wind River Reservation.  I also attended college with a couple

22   of people from the -- that reservation.  Being raised in

23   Montana, I was raised in Augusta, Montana, which is right by

24   the Blackfoot reservation and have shirttail relatives there.

25             THE COURT:  All right.  And anything about those

1    interactions, ma'am, that would cause you any difficulty to be

2    fair and impartial to both sides?

3                JUROR NUMBER 37:  No, sir.

4                THE COURT:  All right.  Thank you.

5                Anyone else?  And the gist of those questions and the

6    ultimate matter they want to verify with you is that there's

7    nothing about those experiences that would cause you to not be

8    able to fairly and impartially and critically evaluate the

9    testimony, give both sides your fair and unbiased disposition

10   in this matter in accordance with the law.  Anyone have any

11   concerns as to their ability to do so?  If so, please raise

12   your hand.  I don't see any raised hands.

13               Does anyone have any contracts with the federal

14   government?  Are you employed by or does your significant

15   other or your family have any agreements or contracts with the

16   federal government or an agency of the federal government?  In

17   other words, a financial interest tied to it.  If so, please

18   raise your hand.

19               Let me see Juror Number 39.  We'll work our way back.

20               JUROR NUMBER 39:  I don't know if this counts, but my

21   son-in-law drives trucks for the post office.  So he makes

22   money carrying the mail back and forth.  And my significant

23   other works for the post office.

24               THE COURT:  All right.  Anything about those

25   relationships that would cause you to feel like, well, if I

1   don't decide this case in favor of the government, then

2   they're going to lose their job?

3            JUROR NUMBER 39:  No.

4            THE COURT:  All right.  Fair enough.  Thank you.

5            Juror Number 54.

6            JUROR NUMBER 54:  My father's employed by the federal

7   government for 39 years and is currently living on a pension

8   from the government.

9            THE COURT:  All right.  Anything that would cause you

10  concern to decide this case one way or another in terms of his

11  pension or any other relationships?

12           JUROR NUMBER 54:  No.

13           THE COURT:  All right.  Thank you, ma'am.

14           Juror Number 42.

15           JUROR NUMBER 42:  I also work for the post office,

16  and it won't have an effect on me.

17           THE COURT:  Fair enough.  Thank you, sir.

18           The next row, I believe Juror Number 25.

19           JUROR NUMBER 25:  I work part-time for the Department

20  of Defense.  I administer the military entrance exam for the

21  Bighorn Basin.

22           THE COURT:  Any concerns as to that work not being

23  given to you if you decide this case one way or another?

24           JUROR NUMBER 25:  No.

25           THE COURT:  All right.  Very well.  Thank you, ma'am.

1         Juror Number 10.

2         JUROR NUMBER 10:  We have a number of contracts off

3    and on with federal agencies, armed service, forest service,

4    that type of thing.  And it shouldn't have any impact on my

5    ability to give an impartial decision.

6         THE COURT:  Very well.  Thank you, sir.

7         Juror Number 19.

8         JUROR NUMBER 19:  My cousin, first cousin, is

9    employed by the FBI in some capacity.  It should not affect my

10   ability to render any sort of judgment impartially.

11        THE COURT:  Very well.  Thank you, sir.

12        Anyone else?  Bottom line is, we don't want anyone

13   selected to serve on this jury that would feel that if they

14   didn't decide this case one way or another that their family

15   or relative or own personal income would be impacted.  So I

16   appreciate your answers.

17        This ties back briefly to the issues regarding the

18   Wind River Indian Reservation and Native Americans.

19   Sometimes -- well, there's a lot of people that feel like the

20   federal government shouldn't be involved in certain things,

21   but one of the issues obviously here is does anyone believe

22   that one way or another that the federal government should not

23   be involved in crimes alleged to have occurred on the Wind

24   River Indian Reservation?  If so, please raise your hand.  I

25   don't see any raised hands.

1           MS. AMRAM:  Your Honor, could we have a bathroom

2    break?  Do you know how long it's going to be?

3           THE COURT:  Let's take a 15-minute recess.  I'm going

4    to remind you all, please do not discuss this case amongst

5    yourselves or with anyone, particularly these people here at

6    the tables.  They're all very friendly and kind folk, but they

7    cannot discuss this case with you.  Make sure you come back

8    and sit where you were seated.  Those of you on the north side

9    of the room can sit -- as long as you're on the north side,

10   you can sit anywhere you want.  But please come back because

11   I've had people leave, and then we've had to send marshals

12   after them.  So please come back, take your seats on the south

13   side where you were, and we'll resume after the restroom

14   break.  Thank you.

15       (At 11:04 a.m., a recess was taken until 11:24 a.m.)

16           THE COURT:  Thank you.  Please be seated.  I note the

17   presence of defendant, counsel, counsel for the Government,

18   and the ladies and gentlemen of the jury panel.

19           Ladies and gentlemen, thank you for coming back and

20   taking those seats that were assigned to you.

21           Let me ask, does --

22           MS. AMRAM:  Your Honor, could we have a brief

23   sidebar?

24           THE COURT:  You may.

25       (At sidebar.)

1           MS. AMRAM:  Sorry.  I thought, from Crystal, that we

2     were supposed to ask now, but we wanted to ask if we could

3     have more time for voir dire.  And I'm so sorry I forgot to

4     ask earlier.  We want 45 minutes because we're worried about

5     having enough time to talk to people for challenges for cause

6     because of how many people have been raising their hands at

7     various things.  And we're really trying to narrow our voir

8     dire, I promise, but we were hoping for 45 minutes.

9           THE COURT:  Mr. Conder, anything?

10          MR. CONDER:  I'd leave it to the Court.

11          THE COURT:  30 minutes.  I'll cover some additional

12    matters and try to get in some areas so that you can focus.

13    But I don't see that more than 30 minutes would be necessary.

14    The responses by this jury haven't been anything different

15    than any other jury panels I've had in the last 15 years.  And

16    30 minutes is what I've allocated.  I think it should be

17    sufficient.

18          MS. AMRAM:  Thank you.

19          THE COURT:  Thank you.

20       (End of sidebar.)

21          THE COURT:  I'm sorry, ladies and gentlemen.  One

22    housekeeping matter I had to take care of.

23          All right.  Do any of the ladies and gentlemen of the

24    jury panel seated on the -- without jeopardy to the ladies and

25    gentlemen on the north side, do any on the south side have any

1  personal knowledge of this case or the charges that have been

2  brought in this case?  Has it caused -- do you recall anything

3  about or concerning this case?  Does anyone have any such

4  knowledge or believe that they may?

5          Let me start with Juror Number 9.  Let me have you

6  come forward.  I'm going to have a sidebar with Juror Number

7  9.

8      (At sidebar.)

9          THE COURT:  I need you to speak into this microphone,

10  ma'am.  Could you tell us what is it that you may have

11  recalled about or concerning this case.

12          JUROR NUMBER 9:  I think I remember reading something

13  briefly like on our County 10 News site, and I remember like

14  their names, but I don't -- that's --

15          THE COURT:  That's all you remember?

16          JUROR NUMBER 9:  I don't generally open up and read

17  anything.

18          THE COURT:  Okay.

19          JUROR NUMBER 9:  But the names just sound familiar.

20          THE COURT:  All right.  To the extent that there's

21  anything else that you would recall, can you understand that

22  the only evidence that you may consider in arriving at a

23  verdict in this case would be based upon the evidence here in

24  court, and anything that you read about this case or that you

25  may suddenly think, oh, I recall them mentioning something,

1    would not be information you could consider?

2            JUROR NUMBER 9:  Right.

3            THE COURT:  And you understand that?

4            JUROR NUMBER 9:  Yes.

5            THE COURT:  And you could follow that instruction?

6            JUROR NUMBER 9:  Yes.

7            THE COURT:  Any follow-up, Ms. Amram?

8            MS. AMRAM:  No.

9            THE COURT:  Mr. Conder?

10           MR. CONDER:  No.

11           THE COURT:  Thank you, ma'am.

12        (End of sidebar.)

13           THE COURT:  There was another juror, Number 10.

14        (At sidebar.)

15           THE COURT:  Juror Number 10, anything that -- what is

16    it that you may have recalled about this case?

17           JUROR NUMBER 10:  My brother-in-law and his family

18    live in Riverton, and I seem to recall that there were two

19    gentlemen that had beat someone with a hammer or something.

20           THE COURT:  All right.

21           JUROR NUMBER 10:  It seemed like it tied to this, so

22    that was just -- it seemed like there was a connection.

23           THE COURT:  Okay.  Anything in this case?

24           JUROR NUMBER 10:  No personal knowledge.

25           THE COURT:  Okay.  In this case, if you're selected

1    to serve as a juror, you would only be allowed to consider the

2    evidence presented.  You wouldn't be allowed to consider

3    anything about any prior information that may have been told

4    to you or relayed to you.  Can you follow that admonition and

5    follow and only consider the evidence presented here in the

6    court?

7                JUROR NUMBER 10:  Yes.

8                THE COURT:  All right.  Beyond that, you just heard

9    someone say something about an event that occurred.  Do you

10   recall when that was?

11               JUROR NUMBER 10:  Maybe a year and a half ago.

12               THE COURT:  Okay.  Any follow-up, Ms. Amram or

13   Ms. Hucke?

14               MS. HUCKE:  I was having a little bit hard time

15   hearing.  You had a family member that let you know that this

16   case had occurred?

17               JUROR NUMBER 10:  I'm sorry.  My brother-in-law and

18   his family live in Riverton.  So I was just down there, and I

19   heard this -- I think might be this case down in the public

20   purview that they'd found somebody who had been murdered.

21               MS. HUCKE:  Okay.  So you remembered that you had a

22   conversation with your family member about that when you were

23   there?

24               JUROR NUMBER 10:  I probably did.  I don't know that

25   it was -- I don't recall much of the discussion.

1          MS. HUCKE:  So you don't recall much of what anyone's

2    opinions were about the case or what they thought the case was

3    about?

4          JUROR NUMBER 10:  Not really.  Just generalities that

5    showed up in the press.

6          THE COURT:  And you formed no opinions based upon

7    that information yourself?

8          JUROR NUMBER 10:  No.

9          THE COURT:  Okay.  Mr. Conder, any follow-up?

10         MR. CONDER:  Nothing.

11         THE COURT:  Anything further, Ms. Hucke?

12         MS. HUCKE:  No.

13         THE COURT:  All right.  Thank you, sir.

14      (End of sidebar.)

15         THE COURT:  Is there anyone else that believes they

16    may have heard anything about this case?

17         Juror Number 1, if you could come forward, please.

18      (At sidebar.)

19         JUROR NUMBER 1:  I don't want to get in trouble.  I

20    mean, just working for VOA, the only thing I know is that we

21    had VOA employees that were subpoenaed as witnesses and then

22    were let go from being witnesses.  But it's not my program

23    down in that area.

24         THE COURT:  Tell me, who do you recall in terms of

25    witnesses being subpoenaed?

1          JUROR NUMBER 1:  Kelly Buckingham and Courtney Green.

2          THE COURT:  All right.  Do you know anything as to

3     the detail, why they may have been subpoenaed?

4          JUROR NUMBER 1:  No.

5          THE COURT:  Was there any discussion among -- with

6     you or anyone else that you know of about the details of this

7     matter?

8          JUROR NUMBER 1:  No.

9          THE COURT:  So all that you know is that someone --

10          JUROR NUMBER 1:  And it's -- I just knew one of our

11     programs housed an individual.

12          THE COURT:  And do you know anything about what that

13     individual was accused of doing or having done?

14          JUROR NUMBER 1:  No.  And no names, nothing.  I

15     didn't -- other than they had just -- it was a blanket

16     statement in one of our directors meetings saying that a

17     couple of directors had been subpoenaed and were having to

18     testify, and it was just basically for coverage purposes and

19     for an individual that may have been at our Center of Hope.

20          THE COURT:  Okay.  And any of that information

21     discuss any details regarding what's believed to have

22     happened?

23          JUROR NUMBER 1:  No.  That -- that was pretty much

24     it.

25          THE COURT:  All right.  Any follow-up, Ms. Hucke?

1          MS. HUCKE:  No.

2          THE COURT:  Mr. Conder?

3          MR. CONDER:  Your Honor, I guess nothing about --

4   just the notice, I guess, if the Court would allow us to

5   discuss this later on, possibly knowing certain witnesses, if

6   that would impact things like that.  But I don't know if we

7   need to do that here.

8          THE COURT:  So you don't use up your time, I'm going

9   to give you the opportunity to identify the witnesses that you

10  plan to call.  And then I'll ask the ladies and gentlemen of

11  the panel if they recognize any of those.  And I'll do that

12  for both sides so you can get that.

13          Thank you, ma'am.

14          JUROR NUMBER 1:  Okay.

15      (End of sidebar.)

16          THE COURT:  Anyone else on the jury panel on the

17  south side that believe that they may have heard anything

18  about this matter?  If so, please raise your hand.  I don't

19  see any further hands.

20          All right.  Thank you, Counsel.

21          I neglected previously to ask this, so I'm going to

22  expand.  I talked to you about jury service and prior jury

23  service.  There also may be people that have been selected or

24  served on a grand jury.  Does anybody believe -- or has anyone

25  been selected to serve on a grand jury?  If so, please raise

1    your hand.  I don't see any raised hands.

2         All right.  I touched briefly on this, but I want to

3    verify, during the course of this trial and at the end of this

4    trial, I will instruct you as to the law that you will be

5    required to apply in considering and reaching a verdict in

6    this case.  Does anyone have any concerns as to their ability

7    to follow the law as instructed?  If so, please raise your

8    hand.  I don't see any raised hands.

9         Some of you may have had -- and I know -- I think

10   juror -- maybe it's Juror Number 25, I think you may have some

11   paralegal experience.  Anyone else that has any legal

12   experience or legal training?  If so, please raise your hand.

13   I don't see any raised hands.

14        And then let me ask you, ma'am, to the extent that

15   there would be any instructions of law that you would disagree

16   with, would you be able to set that disagreement aside and

17   follow the law as instructed to you by this Court?

18        And could we hand her a microphone.

19        Sorry.  Could you follow the law as instructed?

20        JUROR NUMBER 25:  Yes, sir.

21        THE COURT:  All right.  Thank you.

22        Let me ask at this time, if I could have counsel for

23   the United States identify or list the witnesses they plan on

24   calling in this case.  And I'm going to ask all of you to

25   listen carefully to those names.  And then we'll cover any of

1   them that we need to address.

2          Mr. Conder.

3          MR. CONDER:  Thank you, Your Honor.

4          Your Honor and ladies and gentlemen of the jury, the

5   United States would call Charles Dodge, II, from Arapahoe,

6   Wyoming.  Next, Alice Moss from Arapahoe, Wyoming.  Mark

7   Stratmoen, Fremont County Coroner.  Dr. Rob Palmer,

8   toxicologist in Colorado.  Bernadette Brown, Fremont County,

9   Wyoming.  Matthew Whiteplume, Arapahoe, Wyoming.  Bridget

10  Oldman, Fremont County, Wyoming.  WinterHawk Felter, Fremont

11  County, Wyoming.  Fatima Addison from Fremont County, Wyoming.

12  Little Sun Felter, also from Fremont County.  Irene Jenkins,

13  Fremont County.  Loren Shakespeare, Edd Shakespeare, both from

14  Fremont County.  Isaac Sitting Eagle, Fremont County.  FBI

15  Special Agent Chris Coble from the Lander branch office.

16  Jaclyn Garfinkle, FBI crime lab, Quantico, Virginia.  Donna

17  Oldman, Colorado.  Dionne Addison, Sheridan.  Donnell

18  Littleshield, Fremont County.  Jessica Guffey, Fremont County.

19  Dr. Michael Burson, Colorado.

20          THE COURT:  Let me ask, ladies and gentlemen of the

21  jury panel, any of those names -- do you recognize any of

22  those names?  If so, please raise your hand.  All right.  I

23  see two raised hands.  Don't be shy in raising your hands

24  because my vision isn't that good.  All right.  I see two.

25          Let me ask, Juror Number 9, of those names, what

1   names do you recognize?

2          JUROR NUMBER 9:  Being from Fremont County, I know

3   Mark Stratmoen is our coroner.

4          THE COURT:  All right.  Do you know him personally?

5          JUROR NUMBER 9:  No.

6          THE COURT:  And do you have any opinions one way or

7   another as to --

8          JUROR NUMBER 9:  No.

9          THE COURT:  -- his performance?

10         Next person.  Any others?

11         JUROR NUMBER 9:  The Oldman -- Oldman family, I do

12  have one student within the school district I work for I'm

13  sure is some relation somehow.  I do not work directly with

14  her.  She's in the high school, and I'm in the middle school.

15  But she was not on that list.  But I'm sure there's a family

16  tie in there somewhere.

17         THE COURT:  And any interactions with that that could

18  cause you to feel or view things one way or another with

19  regards to --

20         JUROR NUMBER 9:  No.

21         THE COURT:  All right.  Thank you.

22         I believe it was Juror Number --

23         MR. CONDER:  Your Honor, I apologize.  I omitted one

24  witness.  Alise Trosper from the Wind River Police Department.

25  Alise Trosper.  Sorry about that.

1          THE COURT:  Anyone recognize that name?  If so, raise

2    your hand.  I don't see any raised hands.

3          Juror Number 54, if you could hand the microphone to

4    her.

5          JUROR NUMBER 54:  It's just the same case with me

6    being from Fremont County.  I recognize many of the names, but

7    I don't have any personal knowledge of or interactions with

8    them.

9          THE COURT:  None of them are friends or relatives

10   or --

11         JUROR NUMBER 54:  No.

12         THE COURT:  All right.  And based upon the

13   recognition of those names, none of them would cause you to,

14   well, if that person testifies, there's no way I could believe

15   that or anything else?  You don't have any predisposition?

16         JUROR NUMBER 54:  No, Your Honor.

17         THE COURT:  Thank you, ma'am.

18         Anyone else recognize any of the witnesses identified

19   by the United States?  If so, please raise your hand.  I don't

20   see any raised hands.

21         I'd turn to the defense at this time to identify the

22   witnesses they anticipate that may be called.

23         MS. AMRAM:  Gina Reed, Natasha Keele, Colleen Rupp,

24   Cassandra Goggles, Thomas Brown, Bo Rush, Brian McVicker from

25   the FBI crime lab, Marsha Blackburn, Wanda Posey, Tara Brown,

1   Alvinita Oldman, Tanika Montoya, Rachel Fail, Jori Lamebull,

2   Monty Tabaho.

3            THE COURT:  Anyone on the jury panel recognize those

4   names?  If so, please raise your hand.  I don't see any raised

5   hands.

6            All right.  Thank you, Counsel.

7            Let me ask, have anyone or anyone close to you been a

8   victim of any violence in terms of domestic or otherwise?

9            Juror Number 19.

10           JUROR NUMBER 19:  Yes.  A friend of mine in Arizona

11  is currently going through a law -- legal proceedings to

12  protect herself from a former domestic partner who's been

13  violent.  And one of my closer students was murdered about a

14  year ago.

15           THE COURT:  All right.  Anything about those

16  situations that would cause you to have any difficulty to

17  fairly and impartially view the evidence in this case and

18  decide it based upon that evidence and that evidence alone?

19           JUROR NUMBER 19:  No.

20           THE COURT:  All right.  Thank you, sir.

21           JUROR NUMBER 19:  Thank you.

22           THE COURT:  Anyone else?  Juror Number 44.

23           JUROR NUMBER 44:  I experienced stalking at a

24  different part of my life.  I also worked with the advocacy

25  center in Sheridan as a volunteer.

1          THE COURT:  And do you still do that, ma'am, or was

2     that formerly?

3          JUROR NUMBER 44:  That was formerly.  I do not at

4     this time.

5          THE COURT:  And based upon your prior situation with

6     regards to stalking and working with the advocacy center, do

7     you have any concerns as to your ability to set those issues

8     aside and decide this case based solely on the evidence

9     presented to you in this case?

10         JUROR NUMBER 44:  No.  They don't affect anything.

11         THE COURT:  All right.  Thank you, ma'am.

12         Juror Number 10.

13         JUROR NUMBER 10:  My sister was raped when she was

14    young.

15         THE COURT:  All right.

16         JUROR NUMBER 10:  It should have no impact on my

17    ability to be impartial in this case.

18         THE COURT:  And, sir, where did those unfortunate

19    events occur?

20         JUROR NUMBER 10:  Green River, Wyoming.

21         THE COURT:  All right.  Thank you.  Anyone else?

22         Juror Number 9.

23         JUROR NUMBER 9:  Mine was discussed previously with

24    the domestic violence, but that was it.

25         THE COURT:  All right.  Fair enough.  Thank you,

1   ma'am.

2           Have any of you ever had occasion to call the police

3   for your own protection or for someone else's protection?  If

4   so, please raise your hand.

5           Juror Number 41.

6           JUROR NUMBER 41:  When I worked at Life Steps --

7           THE COURT:  I'm sorry.  It must be off.

8           JUROR NUMBER 41:  When I worked at Life Steps, we had

9   an incident where somebody came and tried to break into the

10  building.  And we also had an incident where some people came

11  in and stole food from the residents.

12          THE COURT:  All right.  Any concerns as to those

13  incidences causing you any difficulty in being able to fairly

14  and impartially consider the evidence in this case?

15          JUROR NUMBER 41:  No, sir.

16          THE COURT:  Thank you, ma'am.

17          Juror Number -- I know there was another juror I saw

18  over there.  Juror 34.

19          JUROR NUMBER 34:  I just have -- I just -- I had

20  quite a few foster children in my house, and there were a

21  couple that were out of control that I needed to call the

22  police on to help me control them.

23          THE COURT:  All right.  And anything about those

24  incidences that would cause you difficulty?

25          JUROR NUMBER 34:  No.

1          THE COURT:  All right.  Thank you, ma'am.

2          Juror Number 33.  Actually, did I skip someone?

3          Juror Number 44, did you raise your hand, ma'am?

4          JUROR NUMBER 44:  Yes, I did.  It was involved with

5    the stalking that I experienced.

6          THE COURT:  All right.  Thank you, ma'am.

7          And Juror Number 33 then, I believe.

8          JUROR NUMBER 33:  I called the police once on a child

9    that lived down the street that was beaten by his parents, and

10   the police did contact the parents.  And over the years,

11   there's been numerous cases where I've reported not directly

12   to the police but to my administration, and they contacted the

13   police.

14         THE COURT:  All right.  Anything about those

15   circumstances that would cause you any difficulty if selected

16   in this case?

17         JUROR NUMBER 33:  No.

18         THE COURT:  All right.  Thank you, ma'am.

19         Anyone else?  If so, please raise your hand.  I don't

20   see any other raised hands.

21         In this case you will be called upon as jurors, if

22   selected, to decide the facts and render a verdict based upon

23   the law as given by this Court.  In arriving at that verdict,

24   you will not be allowed and will be precluded from considering

25   any consequences of that verdict in the sense of any

1    punishment or otherwise.

2           Does anyone have any difficulty in saying, well,

3    jeez, if I don't know what the punishment is, then I can't

4    render a verdict?  Does everyone understand that the only

5    thing that they will be asked to do and only can do is render

6    a verdict as to guilt or innocence and not take into

7    consideration in doing so any punishment that could be

8    imposed?  Anyone have any concerns with that?  If so, please

9    raise your hand.  I don't see any raised hands.

10          In this case you'll also be instructed that your

11   verdict must be based upon the facts and can't be based upon

12   any sympathy, passion, or prejudice for any party or any

13   person.  Does anyone have any difficulty in deciding a verdict

14   without consideration of any passion, prejudice, or sympathy

15   for any party, person, or potential victim?  If so, please

16   raise your hand.  I don't see any raised hands.

17          Under our constitution, people that are charged with

18   a crime, we have the right to remain silent.  We don't have

19   any obligation to make any statements, answer any questions,

20   call any witnesses to prove our innocence.  A defendant is

21   presumed innocent unless and until the Government proves

22   beyond a reasonable doubt otherwise.  Does anyone have any

23   difficulty with that concept and that constitutional

24   requirement and presumption of innocence?  If so, please raise

25   your hand.  I don't see any raised hands.

1          In this case the defendant has no obligation to

2   testify.  And if the defendant chooses not to testify, you

3   cannot consider that in any way, shape, or form in determining

4   his innocence or guilt.  Does anyone have any difficulty in

5   understanding and applying that in terms of any verdict they

6   render in this case?  If so, please raise your hand.  I don't

7   see any raised hands.

8          Does anyone feel by the mere fact that Mr. Oldman is

9   sitting at that table that he must have done something wrong?

10   Does anyone feel that or believe that?  If so, please raise

11   your hand.  I don't see any raised hands.

12          In this case it is noted it will be the Government's

13   burden to prove that Mr. Oldman is guilty, and the presumption

14   of innocence will exist unless and until the Government does

15   so.  He won't be required to introduce any evidence

16   whatsoever, and the burden rests entirely on the Government.

17          Does anyone tend to believe that a defendant should

18   put on some evidence to be innocent?  Does anyone have that

19   belief?  If so, please raise your hand.  I don't see any

20   raised hands.

21          One minute.

22          Has anyone here ever been to the Wind River Indian

23   Reservation?  If so, please raise your hand.  And has anyone

24   had any negative experiences when they've traveled to the Wind

25   River Indian Reservation?  If so, please raise your hand.

1        Juror Number 2, if I could get the microphone to him.

2        JUROR NUMBER 2:  As I'm a truck driver, the Wind

3   River Reservation's on my route, all of Fremont County.  But

4   at one time I was away from my truck for just a minute and

5   seen a pretty wiped out native walking past my truck looking

6   inside the door to possibly step in and look around.  And I

7   just hollered at him and told him to get out of there.  And

8   that was the end of it.

9        THE COURT:  Given that experience, do you have any

10  concerns as to your ability to fairly and impartially consider

11  the evidence in this case and decide this case based upon

12  solely the evidence presented here --

13       JUROR NUMBER 2:  No.

14       THE COURT:  And any other experience you've had?

15       JUROR NUMBER 2:  No, not at all.

16       THE COURT:  Thank you, sir.

17       And ladies and gentlemen, something that I want to

18  emphasize to you in terms of responding in voir dire and in

19  terms of jury selection.  We're not here to judge you, but you

20  are here to judge these parties.  And because of that, it's

21  extremely important that you judge impartially without bias or

22  prejudice.  And we all have biases or prejudices.  The

23  question for today is, does that bias or prejudice impact your

24  ability to give these parties a fair and impartial trial,

25  consider the evidence, and decide it accordingly.  So I

1    appreciate your candor in terms of responding.

2            Anyone else have any experiences either way, negative

3    or positive?

4            One moment.

5            I'm going to expand this a little bit.  Does anyone

6    have friends or family members that live on the Wind River

7    Indian Reservation or any reservation, Indian reservation?  If

8    so, please raise your hand.  I don't see any raised hands.

9            MS. AMRAM:  Your Honor, I believe Number 19 had

10   raised his hand for this earlier.

11           THE COURT:  Juror Number 19.

12           JUROR NUMBER 19:  Yes.  As far as experiences with

13   the Wind River Reservation, my church did an outreach with a

14   little liturgical ceremony there, and -- at the last meeting

15   back in, I believe, October of last year.  It was a pleasant

16   experience.  There were no bad experiences, but it was a

17   positive experience on the reservation.

18           THE COURT:  All right.  Thank you, sir.

19           MS. AMRAM:  And, Your Honor, I believe --

20           THE COURT:  And Juror Number 10.

21           JUROR NUMBER 10:  I was wondering if I should speak

22   up.  I'm sure I have relatives there by genetics.  But my mom

23   was adopted when she was young, and her father died without me

24   ever even meeting my grandfather.

25           THE COURT:  All right.  Anything about that

1    experience that could impact your ability to decide this case

2    impartially?

3                JUROR NUMBER 10:  I don't believe so.

4                THE COURT:  Thank you, sir.

5                Juror Number 13?

6                JUROR NUMBER 13:  13.  As far as family members goes,

7    I got a brother-in-law who lives in a reservation in South

8    Dakota.

9                THE COURT:  Anything about that experience or his

10   experiences that would --

11               JUROR NUMBER 13:  None whatsoever, no.

12               THE COURT:  All right.  Thank you, sir.

13               Anyone else?  All right.  Thank you.

14               Let me ask you one particular final question.  Is

15   there any question that I have failed to ask you that you're

16   sitting there thinking, oh, boy, if the judge asks me that

17   question or if one of these lawyers asks me that question,

18   it's over.  Is there anything that is weighing on your mind

19   that would cause you to question your ability if seated in

20   either -- at either of these tables to get a fair and

21   impartial trial in this matter?  Does anyone have any

22   concerns?  If so, please raise your hand.  I don't see any

23   raised hands.  All right.  Thank you, ladies and gentlemen.

24               At this time I would recognize the United States for

25   follow-up voir dire.  Mr. Conder.

1          MR. CONDER:  Thank you, Your Honor.  Ladies and

2    gentlemen of the jury, it's my turn to tell you about me or

3    something like that.  So that's what I'm going to try to do

4    here.

5          My name's Jason Conder.  I'm an Assistant United

6    States Attorney, and I work in the Lander branch office.

7    Sitting here is Mikala Dawson.  She's a paralegal specialist.

8    She also works in the Lander branch office.  She's been there

9    25 years.  Sitting next to her is FBI Special Agent Chris

10   Coble.  She works out of the Lander branch office of the FBI.

11         I work for the United States Attorney's Office.  It's

12   the federal prosecutor for the District of Wyoming, which the

13   State of Wyoming and Yellowstone, even that little part that

14   goes into Idaho and Montana.  I don't think Idaho and Montana

15   like that, but Wyoming does.

16         My boss, the U.S. Attorney, is Mark Klaassen.  There

17   are three -- four offices in the District of Wyoming.  There's

18   one in Cheyenne.  That's the main office.  There's one here in

19   Casper.  There's the Lander office, and then there's a

20   Yellowstone office.  So that's who we are.

21         So the first question I would ask is, does anyone

22   know any of the folks that work at the U.S. Attorney's Office?

23   Would be in Cheyenne, Casper, Lander, or Yellowstone.  If

24   anybody knows of anybody that works for the U.S. Attorney's

25   Office?  No hands.

1          The next one would be -- and this -- for the folks

2     probably in Fremont County, but everybody in Lander, Wyoming,

3     there are several people that work for the FBI.  There are

4     five special agents and several other support staff, other

5     coordinator positions for the FBI.  Is there any of you ladies

6     and gentlemen that know any of the FBI agents in Lander,

7     Wyoming?

8          Juror Number 54.

9          JUROR NUMBER 54:  Do you want me to give you a name?

10         MR. CONDER:  Sure.

11         JUROR NUMBER 54:  Justin Kempf.

12         MR. CONDER:  And how do you know Justin Kempf?

13         JUROR NUMBER 54:  We lived across the street from him

14    when he first moved to town, and kids are friends.  We go to

15    the same church.

16         MR. CONDER:  And have you talked to Mr. Kempf about

17    this case or any case that he's worked?

18         JUROR NUMBER 54:  No.  Never.

19         MR. CONDER:  And would your relationship with him

20    impact your ability to sit fairly and impartially?

21         JUROR NUMBER 54:  No.  I don't think he'd like that

22    if it did.

23         MR. CONDER:  Thank you.

24         Anyone else?

25         This is the tough one.  I was going to ask who

1    watches TV, but we all watch TV.  So one thing that's on TV a

2    lot, are crime scene shows:  *CSI*, *Law & Order*, whatever the

3    du jour cop show is of the day.  And one of the things that it

4    seems like they always show is every single case has a

5    fingerprint, every single case has DNA, every single case has

6    an awesome prosecutor.  And none of those things are true.

7              So is there anyone, ladies and gentlemen, that

8    believes that forensic evidence is required in every single

9    case and that TV is accurate; that you can just walk into a

10   house and find all you want and have it done in 15 minutes?

11   Is there anyone that believes that forensic evidence is

12   absolutely required; that if there's no fingerprints, then

13   that's it?

14             Ladies and gentlemen, this case involves an

15   allegation of murder.  You will hear evidence, see evidence

16   that may be disturbing.  Do any of you have any issues,

17   worries, concerns, thoughts about how you may feel having to

18   listen to or see graphic images from a coroner, from a

19   pathologist?  Is there anybody?

20             I'm bouncing around here.  I apologize.  Is there

21   anybody, ladies and gentlemen, ever had a problem with alcohol

22   or a family member with alcohol that would cause you to doubt

23   your ability to sit impartially?

24             Ladies and gentlemen, oftentimes the Government may

25   enter into a plea agreement with a co-defendant who becomes a

1    witness.  And that co-defendant turned witness may testify and

2    can testify.  Are there any of you that have thoughts or

3    opinions about the Government entering plea agreements and

4    having defendants or co-defendants testify as witnesses?

5            Would any of you have trouble sitting in judgment

6    or -- sitting and listening fairly and impartially to somebody

7    who is in that situation?  Would you tend to believe them

8    immediately, or would you tend to disbelieve them immediately?

9            I don't mean to pick on anyone in particular, so I

10   apologize.  But I would ask Juror Number -- I want to make

11   sure I have my numbers right.  Juror Number 1.  You work for

12   the VOA; is that right?

13           JUROR NUMBER 1:  Correct.

14           MR. CONDER:  And are you familiar with the Center of

15   Hope detox center in Riverton?

16           JUROR NUMBER 1:  I am.

17           MR. CONDER:  And if there were witnesses or issues

18   from there, would they affect you?

19           JUROR NUMBER 1:  No.  It's a different program from

20   what I --

21           THE COURT:  I'm sorry.  Could we get her a

22   microphone?

23           JUROR NUMBER 1:  Okay.  I got it.

24           THE COURT:  Thank you.

25           MR. CONDER:  And so do you work in the same -- is it

1    the same program?

2          JUROR NUMBER 1:  No.  Separate county.  I oversee

3    Sheridan and Johnson Counties.

4          MR. CONDER:  Do you have the same management

5    structure?

6          JUROR NUMBER 1:  As?

7          MR. CONDER:  Let me rephrase that.  So would your

8    boss, were you working in Sheridan, be the same boss for

9    somebody working down in Riverton?

10          JUROR NUMBER 1:  In our current structure?  No.

11    It -- a month ago, yes, or two months ago, I guess it would

12    have been.

13          MR. CONDER:  And is there anything that if some of

14    those individuals came to testify or issues came up regarding

15    the Center of Hope in Riverton, would that impact your ability

16    to sit fair and impartially?

17          JUROR NUMBER 1:  No.

18          MR. CONDER:  And, ladies and gentlemen, when I ask

19    these questions, I always think back to when I was a kid and I

20    was 12 years old and I started reffing basketball.  That's a

21    bad idea to have a 12-year-old ref basketball.  But my dad

22    told me, he said, you always have to make sure you're

23    impartial.  When you're reffing a team, there's two ways you

24    can do it.  If you're really close to them, sometimes you're

25    harder on them than you should be, and just because you don't

1    want to look like you're biased.  So you're going to be harder

2    on them than you should be.  And the alternative is you're

3    lighter on them and give them all the calls.

4           Ladies and gentlemen, is there anything with regard

5    to your feelings about the federal government -- not the most

6    popular bunch right now, I get that -- but any feelings about

7    the federal government that you would think, I just can't

8    listen to them.  They're just wolves, bears, the shutdown.  I

9    can't handle it.  Whatever the Government's going to say, it's

10   just bad news, and feel one way or the other.  Is there

11   anybody that would be unable to do that?

12          Anybody like the federal government?

13          Juror Number 49, I was going to ask with regard to

14   your home, and you had to go to law -- take the lawsuit

15   against the home manufacturer, whatever it was, who was the

16   lawyer that was helping you?

17          JUROR NUMBER 49:  Lloyd Johnson.

18          MR. CONDER:  Is there anything about your interaction

19   with him that would make you favor lawyers, not favor lawyers,

20   anything like that that would impact you?

21          JUROR NUMBER 49:  No.  I mean, I -- I learned from

22   it, you know.  That's about it.

23          MR. CONDER:  Are there any of you, if a witness comes

24   in wearing orange and shackles and testifies as a prisoner,

25   would that impact your ability to sit fairly and impartially

1   in judgment of their testimony?  Anybody think, man, if he's

2   in orange and shackles, I'm not trusting a word that guy says?

3   Anybody think that?

4          Is there anyone out there who thinks if you were me,

5   I would ask this question, and he needs to know about this?

6   The Government needs to know about this.  The defendant needs

7   to know about this.  Are there any of you, as you sit there

8   today, trying to contemplate, boy, I better tell him that.

9   This might make a difference.  That might matter?  Anybody

10  have anything like that?

11         May I have a moment, Your Honor?

12         THE COURT:  You may.

13     (Discussion off the record.)

14         MR. CONDER:  Nothing further, Your Honor.  Thank you.

15         THE COURT:  Ms. Hucke, before I -- oops.  Before I

16  turn to you, there are two questions I forgot to follow up on

17  in my voir dire.  So I wanted to address those.

18         First, with regards to some of the exhibits in this

19  matter, and Mr. Conder alluded to it, you'll be required as

20  jurors, if selected to serve in this matter, to critically

21  view, analyze, and consider all the evidence.  And that will

22  include potentially photographs and/or graphic images.

23         Does anyone have any concerns as to their ability to

24  do so?  If so, please raise your hand.  All right.  I don't

25  see any raised hands.

1          The other thing, when he was talking about TV shows,

2     a lot of people have preset notions as to how jury trials are

3     and how cases are.  And one of those that I need to dissuade

4     is the lawyers that are in this courtroom are very capable and

5     strong advocates for their respective clients, but they're

6     also very professional.  And they will treat each other

7     civilly.  There won't be any throwing of books or yelling or

8     any rudeness or insolent behavior.  Does anyone believe that

9     in order to be an effective advocate for their clients that a

10    lawyer has to be rude or they have to be uncivil to the other

11    side?  If so, please raise your hand.  I don't see any raised

12    hands.

13         Thank you.  Ms. Hucke.

14         MS. HUCKE:  Good morning.  Does anyone here know what

15    people report to be their biggest fear?  Anybody have a guess?

16         Number 19.

17         JUROR NUMBER 19:  Public speaking.

18         THE COURT:  Public speaking.  Thank you.

19         Yes, public speaking is the number one most reported

20    fear.  I suffer from that as well, which seems confusing

21    because I've chosen a job to come up here and talk in front of

22    people.  So I always want to point that out.  I'm nervous to

23    be up here in front of you.  You can probably tell.  And I

24    really appreciate all of you who have answered questions,

25    shared your lives with us, and aspects of your lives, because

1   I know it's really a scary thing to do in a courtroom full of

2   people and lawyers and a judge.  So I really appreciate that.

3          And, really, I know Judge Skavdahl has talked about

4   this, but it's really important to know that we're not looking

5   to get a particular answer from anyone.  And I know that seems

6   kind of scary when you're out there and lawyers are asking you

7   these questions.  Where are they going?  What do they want?

8   But we really just want to know your thoughts and how you feel

9   about things, because it's important to know if this is the

10  right case for you to be on a jury.

11         Sometimes lots of cases come up, and there are

12  different cases where people would be wonderful as jurors.  I

13  know for me it would be hard for me to sit on an animal

14  cruelty case.  I would come into that case already having with

15  my own life experiences a hard time listening to all the

16  evidence.  And I wouldn't be a good juror for that.  Perhaps a

17  different case would be good for me.  So that's why we're

18  asking you these questions.  And I just want you to know there

19  are no wrong answers, and I really appreciate all of your

20  responses.

21         So I want to kind of touch on -- I know Judge

22  Skavdahl has asked you, but is anyone here familiar with the

23  term "beyond a reasonable doubt"?  Have you heard that before?

24  I see some nodding.

25         Juror 42.

1            JUROR NUMBER 42:  Yes, I'm familiar with the term.

2            MS. HUCKE:  Okay.  Where have you heard that term

3    before?

4            THE COURT:  Let me make sure we get him a microphone.

5    Sorry.

6            MS. HUCKE:  Sorry.

7            JUROR NUMBER 42:  Yes, I'm familiar with that term.

8            MS. HUCKE:  Where have you heard it?

9            THE COURT:  Both in courtrooms as well as on

10   television, et cetera.

11           MS. HUCKE:  On television.  What's your understanding

12   about how high a level of proof that is?

13           JUROR NUMBER 42:  Beyond a reasonable doubt, I mean,

14   that's -- I have to have no doubt in order to render a

15   verdict.

16           MS. HUCKE:  Okay.  Thank you.  I saw other people

17   nodding.  Who else has heard that term before?

18           Juror 49.

19           JUROR NUMBER 49:  I've heard it just in different

20   places.  I mean, my son having that arrest that they did with

21   the gun, I mean, they had to prove everything.  And it's just

22   all the evidence you have to just look into everything.

23           MS. HUCKE:  Uh-huh.  Thank you.

24           Anybody else?

25           Juror 25.

1            JUROR NUMBER 25:  In paralegal school.

2            MS. HUCKE:  Okay.  When you were in paralegal school,

3    did you learn about the different levels of proof?

4            JUROR NUMBER 25:  Yes.

5            MS. HUCKE:  And what's your understanding as to where

6    beyond a reasonable doubt would fall?  Like here's the

7    lowest --

8            JUROR NUMBER 25:  It's the highest.

9            MS. HUCKE:  It would be the highest, yeah.

10           Anybody else?  Has anybody else -- Juror 10.

11           JUROR NUMBER 10:  I believe it's just on television

12   and passing, which we said was kind of my understanding as

13   well.

14           MS. HUCKE:  Okay.  Has anyone not really heard that

15   before today or been familiar with it?  So everyone kind of

16   has an idea and has heard about it?

17           Are there any times that we will apply a high level

18   of burden in our own lives?  Can anybody think of an example?

19   It's kind of hard to think about.  Has anyone here ever jumped

20   out of a plane?  Is anyone brave enough to jump out of a

21   plane?  I know I'm not brave enough to do that.  Has anyone

22   here ever gone like bungee jumping?

23           Juror Number 25.

24           JUROR NUMBER 25:  As a paramedic, we're required to

25   do RAT training, or reach and treat, which is vertical rescue.

1        MS. HUCKE:  So you've done that?

2        JUROR NUMBER 25:  Yes.

3        MS. HUCKE:  Oh, my word.

4        JUROR NUMBER 25:  Hung off the side of a cliff.

5        MS. HUCKE:  And do you think that could be a

6   situation where when you're deciding if you're going to allow

7   yourself to do that, pretty much all doubts that you're going

8   to die are gone?  I mean, can you tell me about that?

9        JUROR NUMBER 25:  That first step is the hardest.

10  And you just have to have no doubt that your belayers are

11  going to catch you.

12       MS. HUCKE:  What do you do to make sure that they

13  will?

14       JUROR NUMBER 25:  I make sure that I'm harnessed in

15  correctly, that my belayers know exactly what they're doing,

16  and they can hear me when I say "belay on."

17       MS. HUCKE:  Uh-huh.  So you've done a lot of

18  background work to check into it and erase any doubts that you

19  would have that it would be safe.

20       JUROR NUMBER 25:  Right.  I look at all the facts.

21       MS. HUCKE:  You look at all the facts.

22       Okay.  Anybody else been in that situation?

23       Juror 10.

24       JUROR NUMBER 10:  Elitch's has a thing called XLR8R

25  where they drag you up six stories and drop you.  So you look

1    at everything really closely, especially when you're an

2    engineer, and say, okay, how is this all working?  It causes

3    you to kind of evaluate it before you get dropped.

4                 MS. HUCKE:  Yeah.  Definitely.

5                 Anybody else done that or been in that situation?

6                 And so Juror 49.

7                 JUROR NUMBER 49:  I actually, when I had my case for

8    my house, thinking I actually did all of the legwork before I

9    even had an attorney.  So I got as much evidence as I could

10   that I was right and they were wrong, even though I had to

11   listen to their side.  And, you know, so I agreed somewhat

12   with them.

13                MS. HUCKE:  Are there any other examples you can

14   think of similar to jumping out of a plane or skydiving that

15   you apply this level of proof for yourself in your life?

16                Has anyone ever had to make a really difficult

17   medical decision for themselves or for a loved one?

18                Juror 49.

19                JUROR NUMBER 49:  For my dad.

20                MS. HUCKE:  For your dad.

21                JUROR NUMBER 49:  Yeah.  We were asked if we wanted

22   him to keep on living on the respirator, and we decided not to

23   after a while.

24                MS. HUCKE:  Uh-huh.  Which is an extremely difficult

25   decision.

1          JUROR NUMBER 49:  Yes.  But it's better than him

2    suffering.

3          MS. HUCKE:  Uh-huh.  And how did you come to that

4    decision?  What did you rely on?

5          JUROR NUMBER 49:  He had been laying in the bed for

6    just I think like three weeks on the respirator, and nothing

7    was happening.  In fact, some of his vitals were going down,

8    so it was worsening.

9          MS. HUCKE:  So did you discuss his conditions with

10   his doctors?

11         JUROR NUMBER 49:  With the doctors, with my family.

12         MS. HUCKE:  And so you really carefully weighed all

13   of the options --

14         JUROR NUMBER 49:  Yeah.

15         MS. HUCKE:  -- talked to professionals, and then made

16   that decision at that point beyond any reasonable doubt that

17   you would have that that was the right decision.

18         JUROR NUMBER 49:  Yes.

19         MS. HUCKE:  Thank you for sharing that.

20         Anyone else put in that position with a family

21   member?

22         Juror 10.

23         JUROR NUMBER 10:  A couple years ago, my mom had -- I

24   don't know what it's called -- IDS or something like that, but

25   the arteries to your internal organs and your stomach got

1   blocked, and so she was in the hospital.  And they tried to do

2   some angioplastic type of stuff to her shoulder or something

3   and couldn't do it.  So they went in, did the surgery, and

4   came out and said that most of her bowels were dead.  And they

5   said that they could put her back together, but she basically

6   would starve to death over the next month and may never come

7   out of the coma.  So it was a tough decision.  My dad was

8   starting to have some memory issues, so we talked through it.

9   But we knew what she wanted and went ahead and told them not

10  to put her back together.

11             MS. HUCKE:  And that I'm sure was an extremely

12  difficult decision.  Thank you for sharing that.

13             Anyone else been in that position?  Has anyone else

14  been faced with like for themselves a decision they have to

15  make medically?  So I think that those are really great

16  examples of how high a burden this is and some examples of how

17  we apply it in our own lives, because the different levels of

18  proof, actually one below is called clear and convincing, and

19  there are proceedings where -- typically it happens in the

20  State.  The State can take someone's children away from them.

21  And they only have to prove clear and convincing evidence,

22  which is less than what the Government would have to prove

23  here.  Has anyone been in a situation or involved in any of

24  those kind of custody proceedings or known anyone who's been

25  involved in that with their children?

1           Juror 41.

2           JUROR NUMBER 41:  When I worked at Life Steps Campus,

3    some of our residents had an issue where they had the children

4    taken away from them or they were living there with us in

5    order to regain custody of their children.  And I attended

6    several hearings with residents and so forth.

7           MS. HUCKE:  Were you involved in any of the -- so you

8    attended some of the hearings?

9           JUROR NUMBER 41:  Yes.

10          MS. HUCKE:  And did you have any experience of the

11   clear and convincing level of proof?

12          JUROR NUMBER 41:  Yes.  They -- and I also was a

13   witness for the people who were getting -- trying to regain

14   their children as to -- I was asked, you know, how they were

15   coming along and their behaviors and, you know, if things had

16   improved in their lives and that sort of thing.

17          MS. HUCKE:  Okay.  So you got to see kind of an

18   example that the State still has to show a lot.

19          JUROR NUMBER 41:  Right.

20          MS. HUCKE:  It's not as high as like we said making a

21   decision to take a family member off of life support.

22          JUROR NUMBER 41:  Yes.

23          MS. HUCKE:  Thank you for sharing that.

24          Does anyone here feel that if someone didn't do it,

25   they would want to come here and tell you their side of the

1   story?  I know a lot of times, you know, I've been involved --

2   I have two children.  They get in scraps with each other, and

3   often -- both my husband and I try to get both sides of the

4   story to try to figure out what happened.  Does anybody have

5   any experience with that?

6           Juror 1, I see you nodding your head.

7           JUROR NUMBER 1:  Every day.

8           MS. HUCKE:  Can you tell me about that.

9           THE COURT:  I'm sorry.  Can I get her a microphone?

10          JUROR NUMBER 1:  Sorry.

11          THE COURT:  That's all right.

12          JUROR NUMBER 1:  On a personal level, two teenagers,

13  and one being in college and the other at home, it -- and my

14  job on a daily basis.

15          MS. HUCKE:  So do you feel like if you had just one

16  person coming with you, their side of the story, but you

17  didn't hear the other side, would that be hard for you to

18  figure out what you thought happened?

19          JUROR NUMBER 1:  Oh, absolutely.  No, I need to hear

20  all the facts and both sides, or it might even be a trifecta

21  before arriving at a decision.

22          MS. HUCKE:  When you say it's a trifecta, what's

23  that?

24          JUROR NUMBER 1:  Well, you might have three people

25  involved, so you got to get it all.

1        MS. HUCKE:  So you said you will have a really hard

2   time trying to figure out what you thought happened if you

3   didn't hear both sides of the story?

4        JUROR NUMBER 1:  Correct.

5        MS. HUCKE:  Does anyone else agree with Juror

6   Number 1?

7        Juror Number 9.

8        JUROR NUMBER 9:  So I deal with it on a regular basis

9   with middle school students because there's always some sort

10  of middle school drama, is what we like to call it, going on.

11  And a lot of times I'll have to pull kids out of class because

12  they're being disruptive or having an argument with another

13  classmate or something.  And, you know, pull them even aside

14  and see if they want to try to solve it on their own or do I

15  need to take it down to the principal's office to further

16  resolve it.

17        MS. HUCKE:  So you feel like you really need to hear

18  both sides to resolve it.

19        JUROR NUMBER 9:  Oh, sure.

20        MS. HUCKE:  Anybody else agree?  I saw some other

21  people agree.

22        THE COURT:  Juror 49, go ahead, ma'am.

23        JUROR NUMBER 49:  I have five boys.  So, yes, we have

24  to have both sides of the story because sometimes you don't

25  get both sides of the story.  So, yeah, you have to sometimes

1   figure it out on your own with what happened and what that one

2   said and what that one said.

3            MS. HUCKE:  And I think I saw a hand over here.

4   Juror 52.

5            JUROR NUMBER 52:  Yeah.  Being a teacher, I think we

6   get a lot of tattletaling or whatever or what happened on the

7   playground.  I usually like to hear both sides.  Or even with

8   my own children.  It's hard to just hear he did this to me,

9   and if they're silent, there's not a lot to go on.  So usually

10  you hear both sides, or you try to, or you hear whatever else

11  happened on the playground from whoever else was around to

12  make a decision.

13           MS. HUCKE:  Okay.  Anyone else?  I miss anyone else

14  with hands that agrees?

15           Is it Juror 22?

16           JUROR NUMBER 22:  Yeah.  Just beyond listening to the

17  children, you know, which is obviously a conflict, but even in

18  my business, the retail management business, and I've been in

19  it a long, long time, you have conflicts with employees that

20  you have to evaluate several different sides, you know, to see

21  if there was an issue or what the issue may be.  So

22  interesting enough, you're always getting two sides of the

23  story.  But oftentimes you try to gather as much information

24  as you can to make an evaluation what the situation is and how

25  to resolve it.  It also can be kids as well.

1          MS. HUCKE:  Did I miss anyone else's hands?

2          THE COURT:  And that was Juror Number 22, correct?

3          MS. HUCKE:  22.

4          Going back to Juror Number 1, you said when you're

5     trying to figure it out, that it's really difficult for you to

6     try to decide, I guess, who would be right when you only hear

7     one side; is that correct?

8          JUROR NUMBER 1:  Correct.

9          THE COURT:  So do you feel that if you were asked to

10    sit as a juror on this case and only got to hear one side of

11    the story, that because you've dealt with that with your kids

12    and that's hard for you to discern, would it be hard for you

13    to not take that as a factor if you don't hear from the other

14    side?

15         JUROR NUMBER 1:  It would be hard not hearing another

16    side.

17         MS. HUCKE:  Because you would want to know what they

18    have to say.

19         JUROR NUMBER 1:  True.

20         MS. HUCKE:  And would it be because -- would that be

21    something that would be difficult to necessarily set aside; it

22    would be nagging that I really wish I could hear from the

23    other side?

24         JUROR NUMBER 1:  Nagging, I don't know if that's the

25    right word.

1           MS. HUCKE:  Maybe I guess --

2           JUROR NUMBER 1:  Troublesome.

3           MS. HUCKE:  It would be troublesome.  Maybe tell me

4    about that.

5           JUROR NUMBER 1:  Well, you're only hearing one side.

6    I mean, I deal with employees every day.  And if one's saying

7    one thing and the other's not saying anything, out of fear,

8    whatever, I don't know, I mean, it's difficult to discern or

9    make a decision based off of one individual's opinion.  To me

10   it could potentially be subjective.  I guess it depends on the

11   facts.

12          MS. HUCKE:  And do you feel that even if the judge

13   was to say, I know that's troublesome for you, but you need to

14   set it aside, would that still be difficult for you to do

15   that?

16          JUROR NUMBER 1:  Wow.  You're really digging me.

17   Probably a little bit difficult, yeah.

18          MS. HUCKE:  Okay.  So I guess in this case, if you

19   weren't -- if you didn't hear the other side, do you feel like

20   perhaps this wouldn't be the right case for you to be on the

21   jury?

22          JUROR NUMBER 1:  Probably so, because I always feel

23   like something's been missing.

24          MS. HUCKE:  So you do feel that you said probably so,

25   you feel that something is missing.  So this wouldn't be the

1   right case for you?

2          JUROR NUMBER 1:  Probably not.

3          MS. HUCKE:  Okay.  And so because of that, it would

4   be hard for you -- you wouldn't be able to be necessarily fair

5   and impartial because you would really want to hear from the

6   other side.

7          JUROR NUMBER 1:  Correct.

8          MS. HUCKE:  Thank you for sharing that.

9          Your Honor, I would move to strike Juror Number 1 for

10  cause.  I think she's made it clear that she does have this

11  belief that she'd want to hear from the other side.  So we'd

12  ask that she be excused.

13         THE COURT:  Well, let me verify.  Juror Number 1, you

14  said "probably not."  And in this case, you'll be instructed

15  that if the defendant doesn't testify, and, in fact, the

16  defendant has no burden to produce any evidence.  The burden's

17  upon the United States.  If that's the case, can you follow

18  that instruction and decide this case based upon only the

19  evidence presented and not decide it based upon what you think

20  or what might be said by someone else?  In other words, the

21  fact that the defendant does not testify can't be used against

22  him or her?

23         JUROR NUMBER 1:  Oh, right.

24         THE COURT:  Could you follow that law and --

25         JUROR NUMBER 1:  Yes.

1           THE COURT:  -- decide this case accordingly?

2           JUROR NUMBER 1:  I can follow that law.  Yes.

3           THE COURT:  All right.  Well, I'll overrule the

4    objection -- or the -- I'll overrule the challenge for cause.

5           MS. HUCKE:  And, Juror Number 1, I really appreciate

6    you answering those.  I don't want you to feel -- I know you

7    feel like you're in the hot seat.

8           JUROR NUMBER 1:  It's okay.  I'm always there.

9           MS. HUCKE:  Does anyone agree that in a situation

10   where you didn't hear from the other side, it would be really

11   hard for you to set that belief aside that you'd want to hear

12   from the other side?

13          I know, Juror Number 9, you said you deal with this

14   often and you want to hear both sides.

15          JUROR NUMBER 9:  Yes.

16          MS. HUCKE:  Do you feel like it would be difficult

17   for you to not hear the other side in this case?

18          JUROR NUMBER 9:  I think it would be difficult, but

19   there are times where the other student isn't going to say

20   anything and you really have to go based on what you're --

21   what's laid out in front of you and make a decision based on A

22   and not A and B.

23          MS. HUCKE:  Okay.  Do you feel like it would be in

24   the back of your mind, well, if they're not telling me their

25   side, then they must be the guilty party?

1        JUROR NUMBER 9:  No.  I -- a few years ago I probably

2   would say that, yes, but sometimes they just don't want to say

3   anything.  And you can't say, oh, they're guilty because they

4   don't want to talk about it.

5        MS. HUCKE:  Okay.

6        JUROR NUMBER 9:  Because some people just don't want

7   to or aren't going to.

8        MS. HUCKE:  Thank you.  Juror 49, I know you had said

9   earlier that it would be difficult for you as well to not hear

10  both sides of the story.

11       JUROR NUMBER 49:  Right.  The only reason is you have

12  to go -- one person's going to tell you -- say, for instance,

13  my sons.  Two of them are fighting.  The third one was over

14  there.  He seen what happened, but he don't want to say

15  nothing.  So you have to go by the facts, and you have to

16  think about it before you're going to say, well, you're in

17  trouble.  You did it.

18       MS. HUCKE:  Do you feel like the person who didn't

19  speak up didn't speak up because they had something to hide?

20       JUROR NUMBER 49:  No, no.

21       MS. HUCKE:  Okay.  Juror 52, I know you previously

22  said in your job you deal with this as well.  Would it be

23  difficult for you to come to a decision without hearing the

24  other side?

25       JUROR NUMBER 52:  No, I don't think so.  You go with

1   what facts are there.  Just because someone doesn't talk, I

2   don't think it's because they're necessarily hiding something.

3   There's many reasons.  So I think it's human nature to want to

4   hear everything and to know everything, but I think that it is

5   very possible to take what's laid out there and come to a

6   conclusion based off of the facts that you have.

7            MS. HUCKE:  Thank you.

8            Does anybody disagree?  I think juror 52 said it's

9   kind of human nature to want to hear both sides.  Does anybody

10  disagree?  And, Juror Number 31, I see you nodding your head.

11           JUROR NUMBER 31:  You know, there's two sides to

12  every story.  You can't just believe one person.  I deal with

13  it with my 13-year-old niece all the time.  Oh, so-and-so did

14  this to me.  So-and-so did that.  You know, you got to hear

15  both sides because if it's only going to be one-sided, you

16  know, we ain't going to have -- you know, going to find the

17  person guilty.  So it's better to hear both sides and then

18  base your facts off that.

19           MS. HUCKE:  Okay.  So you would feel like you would

20  find a person guilty if you didn't get to hear their side of

21  the story?

22           JUROR NUMBER 31:  Well, if you hear both sides, and

23  then you can go to a verdict and then just make your decision

24  from that.

25           MS. HUCKE:  Do you feel like you would really need to

1  hear both sides?

2          JUROR NUMBER 31:  Oh, yeah.  Oh, definitely.

3          MS. HUCKE:  Okay.

4          JUROR NUMBER 31:  It can't be one-sided.

5          MS. HUCKE:  So if you only heard one side, and even

6  if the judge told you you have to set that belief aside, would

7  that be difficult for you to do?

8          JUROR NUMBER 31:  I'd prefer to hear both sides

9  instead of just one side.

10         MS. HUCKE:  So you said "I'd prefer."

11         JUROR NUMBER 31:  Yeah.

12         MS. HUCKE:  Would it be something that would be

13 difficult for you to come to a decision if you didn't?  Would

14 you be able to come to a decision if you only heard one side?

15         JUROR NUMBER 31:  Probably.  And I'd probably find

16 the person guilty.

17         MS. HUCKE:  Okay.  And so because of that, because

18 you'd feel so strongly, you would want to hear both sides --

19         JUROR NUMBER 31:  Exactly.

20         MS. HUCKE:  Do you feel that even if the judge asked

21 you to set that aside that you wouldn't be able to do that?

22         JUROR NUMBER 31:  Probably not, because I'd prefer to

23 hear both sides because, you know, a person's innocent until

24 proven guilty.  And if you could hear both sides and then you

25 could just determine your facts from there.

1          MS. HUCKE:  Okay.  So you said probably not.

2          JUROR NUMBER 31:  Yeah.

3          MS. HUCKE:  So it sounds like this is a really

4     strongly -- like you want to hear from both sides.

5          JUROR NUMBER 31:  Yes, I to.

6          MS. HUCKE:  And if you didn't, you would not be able

7     to come up with a fair and impartial decision.

8          JUROR NUMBER 31:  That's it exactly.

9          MS. HUCKE:  Okay.  Thank you.

10         Your Honor, I would move to strike Juror 31 for

11    cause.  I do believe that he has thoroughly stated his belief,

12    and it would be difficult -- he would be unable to come to --

13    be a fair and impartial juror for this case.

14         THE COURT:  Well, and the focus that I have in Juror

15    Number 31 is a defendant in our system of justice is not

16    required to say or testify or present any evidence.  And in

17    this case if the defendant did not testify and/or did not

18    present any evidence, would you hold that against him and not

19    be able to assess just the facts and evidence presented to you

20    and render a verdict based upon that?

21         JUROR NUMBER 31:  That's a kind of a tough question

22    right now.

23         THE COURT:  Well, do you have doubts as to your

24    ability to do that?

25         JUROR NUMBER 31:  Not really, no.  I mean, if it's

1    going to be one side, you know.

2         THE COURT:  Well, and there's going to be

3    cross-examination.  There's going to be direct examinations.

4    There will be witnesses that testify, and they'll be examined

5    by both sides.  But the defendant may not testify, and the

6    defendant may choose not to call any witnesses.  And under our

7    system, the fact that that defendant doesn't testify or

8    doesn't call any witnesses can't be used against him.  Can you

9    follow that law and not decide this case with -- at the back

10   of your mind thinking, well, because the defendant didn't

11   testify, he or she's guilty?

12        JUROR NUMBER 31:  Yeah, I probably -- I would be able

13   to, you know, follow that law.

14        THE COURT:  Do you have any doubts as to your ability

15   to follow that law?

16        JUROR NUMBER 31:  In a way, yes, I do have a doubt

17   because unless you hear both -- that, you know, like I said,

18   my opinion, you got to hear both sides.

19        THE COURT:  All right.

20        JUROR NUMBER 31:  Because I don't want to prove

21   somebody's guilty when they're innocent.

22        THE COURT:  Fair enough.  Based on that circumstance

23   and given the limitations, I will excuse Juror Number 31 for

24   cause.  Juror Number 31, if you'd go ahead and have a seat

25   over here on the north side of the room.

1           Let's go ahead and call a replacement for Juror

2   Number 31.

3           THE COURTROOM DEPUTY:  Juror Number 35.

4           THE COURT:  Juror Number 35, if I could have you take

5   Juror Number 31's spot.

6           And, ma'am, let me ask you a couple of questions

7   first before we resume.  You've heard all the questions

8   previously.  Are there any of those questions to which you

9   would respond?

10          JUROR NUMBER 35:  Yes, there are.

11          THE COURT:  And I think that microphone may be off.

12          JUROR NUMBER 35:  Is it off?  Thank you.  First of

13  all, my husband was raised on the Wind River Reservation.  He

14  is an enrolled Shoshone.  I've spent time up there, lots of

15  it, and I've never had a bad experience.  I have a

16  brother-in-law who lives on the reservation.

17          THE COURT:  All right.  Anything about that that

18  would cause you concern about being fair and impartial to both

19  parties in this matter?

20          JUROR NUMBER 35:  Not at all.

21          THE COURT:  Any other questions that you might be --

22  or that you would respond to?

23          JUROR NUMBER 35:  Yes.  I have an adult son who was

24  convicted of some drug charges about six years ago,

25  conspiracy, conspiracy to deliver, I think.

1            THE COURT:  Was that in federal or state court?

2            JUROR NUMBER 35:  It was I think circuit.  I'm trying

3     to think of the name of the judge.  It's a woman.  And it

4     wasn't in this courthouse.  I think it would have been local.

5            THE COURT:  All right.  And where would local be for

6     you?

7            JUROR NUMBER 35:  It would be in the other

8     courthouse.

9            THE COURT:  Are you from Casper?

10           JUROR NUMBER 35:  Yes.

11           THE COURT:  Okay.  And let me ask you, what's your

12    educational background?

13           JUROR NUMBER 35:  I have a bachelor's degree in

14    sociology.

15           THE COURT:  Your occupation?

16           Sorry, Ms. Hucke.

17           JUROR NUMBER 35:  I'm retired.  My husband's retired.

18           THE COURT:  And what are you retired from?

19           JUROR NUMBER 35:  I was a State of Wyoming employee

20    in the department of employment for 30 years.

21           THE COURT:  All right.  And did you -- did you do

22    workers' compensation or --

23           JUROR NUMBER 35:  No.  I worked well when I started a

24    long time ago.  It was Job Service, and now it's Workforce

25    Services.  But I worked in the Rock Springs local office, and

1    I placed people in jobs, helped employers find employees.  And

2    for a number of years, I worked in job training programs with

3    the disadvantaged.

4            THE COURT:  And your husband, what was the nature of

5    his work?

6            JUROR NUMBER 35:  He was an ironworker.

7            THE COURT:  Okay.  And in terms of any other

8    questions, have you ever served on a jury?

9            JUROR NUMBER 35:  No.

10           THE COURT:  Ever been part of the jury selection

11   process?

12           JUROR NUMBER 35:  Not the process.  A few years ago

13   for I think circuit or county court, I was in the pool, but I

14   never was -- well, I was never in the pool whenever I would

15   call in.  The case had been pled out, so that's as far as I

16   ever got.

17           THE COURT:  And you've heard the other questions.

18   Anything else that comes to mind?

19           JUROR NUMBER 35:  No.  I think that's it.

20           THE COURT:  If you think of anything else, don't

21   hesitate.  Let me ask you the last question before I'll allow

22   counsel to follow up.  Anything about what you've heard so far

23   that would cause you any concerns if you were seated at either

24   of these tables if you were selected as a juror to be fair and

25   impartial?

1          JUROR NUMBER 35:  No.  Nothing.

2          THE COURT:  All right.  Thank you, ma'am.

3          Mr. Conder, any follow-up questions for this jury?

4          MR. CONDER:  For this juror, none, Your Honor.

5          THE COURT:  Thank you.

6          Ms. Hucke, I'll let you resume.

7          MS. HUCKE:  Thank you.

8          I did notice, Juror 15, when you were previously

9   having a conversation about wanting to hear both sides of the

10  story, I really saw you nodding.

11         JUROR NUMBER 15:  I was mulling that over and trying

12  to come to that conclusion that it's not about where the

13  evidence comes from.  It's just as much as you can get is the

14  most important part.

15         MS. HUCKE:  Okay.  And kind of before mulling that

16  over, did you feel like you were someone who really wants to

17  hear both sides of the story?

18         JUROR NUMBER 15:  It's preferable, but, ultimately,

19  it's just amount of information more important than source.

20         MS. HUCKE:  Okay.  Thank you.

21         Anybody else agree with that?  And there's one thing

22  I forgot to do because I was so nervous when I got up here is

23  introduce myself and everyone else on our team.  My name is

24  Tracy Hucke, and I am an Assistant Federal Public Defender.

25  Seated next to me is my client, Arapaho Oldman.  Next to him

1  is my colleague, Galia Amram.  She's also an Assistant Federal

2  Public Defender.  Next I have Loana Dominguez, who is our

3  investigator; and Jessica Nyffler, who is our litigation

4  support specialist.  We are here for the State of Wyoming

5  [sic].  Our office is out of Cheyenne.  So I apologize that I

6  forgot to introduce all of us.

7          Does anyone here know any of us?  Have you ever met

8  any of us?  Do you have any experiences good or bad?

9          Okay.  Has anyone ever met anyone else in the -- do

10  you know anybody else in the jury panel today?

11          Let's start with Juror 15.

12          JUROR NUMBER 15:  I do know -- what's your number?

13          THE COURT:  Juror Number 3.

14          JUROR NUMBER 15:  I do know Juror Number 3.

15          MS. HUCKE:  And I saw Juror Number 3 raising his hand

16  as well.  How do you know each other?

17          JUROR NUMBER 15:  We do attend church together.

18          MS. HUCKE:  Okay.  Thank you.

19          Anyone else?

20          Juror Number 48.

21          We want to wait until you get the mic.

22          JUROR NUMBER 48:  Yes, I know Juror 43 and 37.

23          MS. HUCKE:  How do you know them?

24          JUROR NUMBER 48:  Fred and I have been friends for

25  about 40 years.  And Chris I met through kids.  So I've known

1    her for about ten, ten or so years.

2              MS. HUCKE:  Okay.  And I forgot to ask, Juror 15 and

3    3, is there anything about your relationships that you think

4    it would be hard for you to serve on a jury with the people

5    that you know?

6              I'm sorry.  Back to Juror 48.

7              JUROR NUMBER 48:  No, there's not.

8              MS. HUCKE:  Okay.  Juror 15 and -- is there anything?

9              JUROR NUMBER 15:  Huh-uh.

10             THE COURT:  And that was a no from Juror Number 3.

11   Thank you.

12             MS. HUCKE:  Juror Number 10, I saw you raise your

13   hand.

14             JUROR NUMBER 10:  The juror fourth from the left in

15   the front row.

16             MS. HUCKE:  And how do you know her?

17             JUROR NUMBER 10:  We're from the same town, and I

18   have some business relationships in the past.  And nothing

19   about that relationship would impact my ability to be

20   impartial.

21             MS. HUCKE:  Okay.  Thank you.  Juror Number 4, do you

22   agree?

23             JUROR NUMBER 4:  I do.

24             MS. HUCKE:  Anyone else?  Did I miss any other hands?

25             THE COURTROOM DEPUTY:  One minute, Counsel.

1          MS. HUCKE:  Okay.  What do you feel would be worse,

2     to convict an innocent man or let a guilty person go free?

3     Anybody have any thoughts on that?

4          Juror 33.

5          JUROR NUMBER 33:  Convict an innocent man.

6          MS. HUCKE:  You think it would be worse to convict an

7     innocent man?

8          JUROR NUMBER 33:  Yes, I do.

9          MS. HUCKE:  And I see some nodding.  Do other people

10    agree with that?  Does anybody disagree with that?

11         Juror 25?

12         JUROR NUMBER 25:  I think it's six of one, half dozen

13    of another.  It's just as bad to let the guilty person go as

14    it is to convict an innocent person.

15         MS. HUCKE:  Okay.  So you actually feel like both

16    situations are just as bad.

17         JUROR NUMBER 25:  (Nodding head.)

18         MS. HUCKE:  I see some nodding.  Does anybody agree?

19         Juror 22.

20         JUROR NUMBER 22:  I think both would be a tragedy.  I

21    think equal justice under the law.  So I think both would be a

22    tragedy.

23         MS. HUCKE:  Okay.  Thank you.

24         THE COURTROOM DEPUTY:  Counsel, time.

25         MS. HUCKE:  Can I just have a moment, Your Honor?

1        THE COURT:  Yes, you may.  And if there were any

2    other responsive or indications as to response to your

3    question, I'll allow follow-up to that.

4        MS. HUCKE:  I just wanted to make sure I didn't miss

5    any hands with the last question.

6        Okay.  Well, thank you all so much.  I really

7    appreciate all of your answers today.

8        THE COURT:  Counsel for the United States, do you

9    pass this panel, including the replacement for Juror

10   Number 31, for cause?

11       MR. CONDER:  Yes, Your Honor.  The United States

12   would pass.

13       THE COURT:  Ms. Hucke?

14       MS. HUCKE:  Yes, we do as well, Your Honor.

15       THE COURT:  Ladies and gentlemen of the jury panel,

16   I'll ask now that counsel exercise their peremptory

17   challenges.  While they do that, you're free to talk amongst

18   yourselves and one another about anything, the wind, the

19   Broncos, Clemson, Alabama, anything other than this case.  And

20   we're going to take a period of time.  And the lawyers are

21   going to confer and take care of some things.  We'll be back

22   to you at the conclusion of that.

23       Please don't leave.  If you need to go to the

24   restroom, you can do so, but please come right back, if you

25   would, please, and right back to where you are.  We'll go

1    ahead and exercise the peremptories.  Thank you.

2        (Pause in the proceedings.)

3            THE COURT:  Counsel, sidebar.

4        (At sidebar.)

5            THE COURT:  Okay.  Based upon the challenges for

6    cause -- oh, I'm sorry -- the challenges as to peremptory, I

7    have selected as jurors in this matter Juror Number 2, Juror

8    Number 4, Juror Number 58, Juror Number 9, Juror Number 52,

9    Juror Number 35 -- let me double-check because I'm off one.

10   No.  Juror 35, Juror Number 42, Juror Number 14, Juror

11   Number 21, Juror Number 40, Juror Number 22, and Juror

12   Number 30.

13           MS. AMRAM:  What happened to Juror Number 15?  Did we

14   get --

15           THE COURT:  One minute.  I think.

16           MS. HUCKE:  Yeah, he should be in there.

17           MS. AMRAM:  I don't think anyone struck him.

18           THE COURT:  I'm sorry.  I read the three as a five at

19   one point.  That's what happened.

20           Okay.  So back up.  Juror Number 8 will be Juror 14.

21   Juror Number 15 will be Juror Number 9.  Juror Number 21 will

22   be Juror Number 10.  Juror Number 40 will be Juror Number 11.

23   Juror Number 22 will be Juror Number 12.  The alternate will

24   be Juror Number 33.  Agree?

25           MS. AMRAM:  Yes.

1           THE COURT:  Mr. Conder, do you agree?

2           MR. CONDER:  Yes, Your Honor.

3           THE COURT:  And defense agrees?

4           MS. AMRAM:  Yes.

5           THE COURT:  So what we'll do is I'll go ahead and get

6    them seated.  We'll read to them the preliminary instructions,

7    and then -- well, I'll excuse the nonselected with the thanks

8    of the Court and the parties and then read to the ladies and

9    gentlemen of the jury after they're sworn in the preliminary

10   instructions.  We'll take an hour and a half recess and come

11   back with opening statements.

12          Time length for opening statement?

13          MR. CONDER:  I think I should get done in 30 minutes.

14          THE COURT:  30 minutes.  Good.

15          MS. HUCKE:  Yes.

16          THE COURT:  So you'll each have 30 minutes.  We'll

17   have the clock going.  But in the interim, I need to swear in

18   the coroner.  He missed his swearing in, I guess.  So I will

19   not do that obviously in front of the ladies and gentlemen of

20   the jury.  But after we take care of things and we recess,

21   I'll swear in the coroner.

22          MS. AMRAM:  And do you know how many witnesses you'll

23   call today?  So we can bring up our stuff.

24          MR. CONDER:  I guess I don't know.  So that would --

25          MS. HUCKE:  Do you have your order list?

1          MR. CONDER:  So an hour and a half -- probably won't

2     get back here until --

3          THE COURT:  We'll come back around 3:00, 3:15.

4          MR. CONDER:  I'd imagine we'd only get three

5     witnesses, maybe four.  So Mr. Dodge; Ms. Moss; Alise Trosper;

6     and Mark Stratmoen, the coroner who missed his swearing in.

7          MS. AMRAM:  Got it.  Thank you.

8        (End of sidebar.)

9          THE COURT:  All right.  Thank you, ladies and

10    gentlemen.  Could I have the following jurors come forward and

11    take the soft seats.  First, Juror Number -- Juror Number 2,

12    Juror Number 4, Juror Number 58, and Juror Number 9.

13         And then in the next row -- go ahead and arrange

14    them, Ms. Toner.  In the next row, Juror Numbers 52, 35, and

15    42.  And then the next row, if I could have Jurors Number 14,

16    15, 21.  And then in the next row, if I could have Jurors

17    Number 40 and 22.  And then I would take from the back row

18    Juror Number 33.

19         And I would ask at this time, counsel for the United

20    States, does the United States agree that the ladies and

21    gentlemen seated in the jury box are, in fact, the ladies and

22    gentlemen that have been selected to serve as jurors in this

23    matter?

24         MR. CONDER:  Yes, Your Honor.

25         THE COURT:  Does defense so agree?

1          MS. AMRAM:  Yes, Your Honor.

2          THE COURT:  We'll be right back with you ladies and

3    gentlemen.

4          Ladies and gentlemen of the jury panel, without your

5    presence here today, our system of justice doesn't work.  I

6    have to have sufficient jurors in the event that there's

7    challenges and/or problems in selection that require them to

8    be replaced.  I had more than I needed today, fortunately, but

9    I didn't want to go to the post office.  We have the greatest

10   system of justice in the world.  It is the greatest system of

11   justice because you citizens sit in judgment upon other

12   citizens, not kings, not governments, but citizens.  Without

13   your presence, without your service, our system would cease to

14   exist.

15         I thank you for being here today.  I thank you for

16   being good citizens.  And I wish you safe travels back, and we

17   will see you another time.  If I could ask you to stop by and

18   hand your lanyards to the clerk's office on your way out.

19   Thank you very much.

20         At this time, I would ask the Clerk of Court to

21   administer the oath to the ladies and gentlemen of the jury

22         (Oath administered.)

23         THE COURT:  Thank you, ladies and gentlemen.

24         Here's what we're going to do.  I'm going to read to

25   you some preliminary instructions so you'll have those in mind

1    when you come back.  We're going to take an hour and a half

2    recess, and we'll come back at 3:00.  And you'll hear -- we're

3    doing that so that the lawyers can finalize their preparations

4    for opening statements and get everything coordinated.  And

5    you can contact anyone that you need to to alert them as to

6    your being selected to serve.

7            One thing I don't want to forget is if any of your

8    employers have any questions about your service as a juror,

9    have them call me.  I won't have any problem talking to them

10   because you're entitled to serve without any type of

11   consequence.  So I want to make sure you understand that so

12   you can focus on the issues.

13           When you come back, we're going to hear the opening

14   statements of counsel.  The schedule that we'll plan on using

15   is that we'll probably go until 5:00, 5:30 in the evening.  We

16   may push a little bit further or be a little shorter depending

17   on where we are in the evidence or a witness that's on the

18   stand to get them off the stand overnight.  We'll start at

19   8:30 in the morning, and we'll take a midmorning recess or a

20   recess when you need one.  If you need one, just raise your

21   hand, and we'll take that recess so that you're not

22   uncomfortable and you're able to focus on the evidence.  We'll

23   then come back and present evidence until around noon.  I

24   don't think I have any other hearings scheduled, so I think

25   we're good.  So we'll probably take an hour for lunch and come

1    back.

2         If I do have any hearings that I have to handle,

3    we'll go into the lunch hour a little bit, and I'll excuse

4    you.  We'll come back early -- or I'll come back early and

5    deal with those matters, and you'll come back an hour later or

6    thereabouts.  We'll take an afternoon recess, unless otherwise

7    needed, and then we'll go until around 5:00 or 5:30 or

8    thereabouts.  So that's the schedule we'll try to maintain.

9         If there's any questions or issues you have, please

10   let Ms. Toner know.  But that's the plan.  And she'll also

11   give you a little orientation as to the jury room after we

12   finish these preliminary instructions.

13        We'll turn at this time to the preliminary

14   instructions, and ladies and gentlemen, you can follow along

15   on the screen in front of you.

16        A couple caveats.  First, counsel, may I get your

17   agreement as to the waiver of any need to separately report

18   the reading of these instructions by the court reporter,

19   Mr. Conder?

20        MR. CONDER:  Your Honor, the United States would

21   waive that.

22        THE COURT:  And Ms. Amram?

23        MS. AMRAM:  I agree.

24        THE COURT:  All right.  To the extent anything that I

25   say is contrary to the written word, unless I instruct

1    otherwise, the written word will control.

2              You also will have a copy of these instructions with

3    everything that is instructed to you when you go back for any

4    deliberation, so you need not memorize them.  I just want to

5    give you some information to begin with.

6         (Jury instructions read but not reported.)

7              THE COURT:  We'll take our first recess at this time.

8    And I want to instruct you that until this trial is over, you

9    are not to discuss this case with anyone, including other

10   jurors members or your family, people involved in the trial,

11   or anyone else.  You may not permit others to discuss the case

12   with you.  If anyone approaches you and tries to talk to you

13   about the case, please let me know about it immediately.

14             Do not read or listen to any news reports of the

15   trial.  If a newspaper headline or news broadcast catches your

16   attention, do not examine the article or watch or listen to

17   the broadcast any further.  The person who wrote or is

18   reporting the story may not have listened to all the

19   testimony, may be getting information from persons whom you

20   will not see here in court under oath and subject to

21   cross-examination.  The report may emphasize an unimportant

22   point or may simply be wrong.  You must base your verdict

23   solely and exclusively on the evidence received in court

24   during the trial.

25             Finally, you are reminded to keep an open mind until

1    all the evidence has been received and you have heard the

2    arguments of counsel, the instructions of the Court, and the

3    views of your fellow jurors.

4           If you need to speak to me -- speak with me about

5    anything, simply give a signed note to Ms. Toner or the

6    bailiff.  At this time, we'll take our lunch recess, and we'll

7    come back at 3:06 -- 3:05.  We'll round it.  At 3:05.  And

8    then we'll have opening statements at that time.

9           Please rise.

10   (The jury exited the courtroom at 1:36 p.m.)

11   (The following took place outside the presence of the

12   jury.)

13          THE COURT:  All right.  Go ahead and have a seat for

14   a moment.  Anything we need to take up before we come back for

15   opening statements, Mr. Conder?

16          MR. CONDER:  Not at this moment, Your Honor, no.

17          THE COURT:  Ms. Amram?

18          MS. AMRAM:  No, Your Honor.  We're going to confer

19   about the witness list for the marshals, and then we'll try to

20   have that back for you when -- at 3:00.

21          THE COURT:  All right.  As long as there's plenty of

22   time.  I believe they're all in Natrona County; is that

23   correct?

24          MS. AMRAM:  This is for witnesses who haven't -- they

25   weren't able to serve, and we were trying to limit it to see

1    if they could try again.

2         THE COURT:  Fair enough.  We'll then come back.

3    You'll each be allocated 30 minutes for opening statement, and

4    we'll set the clock so you can have that.  Please be mindful

5    of that.  If you hesitate and need five more minutes, now is

6    the time to ask, not then.

7         So any doubts, Mr. Conder?

8         MR. CONDER:  Heck, if you're going to give me an

9    extra five, I won't take it, but I'll take it to be safe.

10        THE COURT:  I'll give each side 35 minutes for

11   opening statements, and we'll come back.  And we'll stand in

12   recess until then.

13        (At 1:38 p.m., recess was taken until 3:09 p.m.)

14        (The following took place outside the presence of

15        the jury.)

16   THE COURT:  Thank you.  Before we be seated, let me ask,

17   are there any preliminary matters or issues we need to

18   address?

19        MR. CONDER:  The United States has an issue, Your

20   Honor.

21        THE COURT:  All right.  Go ahead and be seated.

22        MR. CONDER:  Your Honor, this morning, as the

23   Government was, along with the Court, picking a jury, a victim

24   witness coordinator, Vicki Powell, learned from Dr. Jackie

25   Nelson at the Lander -- she works for IHS, Indian Health

1    Services, that one of the United States' witnesses, Ms. Fatima

2    Addison, she is in the hospital.  She was admitted sometime

3    this weekend.  She has a life-threatening blood infection.

4    Ms. Addison has diabetes.  She recently had her right foot

5    amputated, and I think she's been struggling with that for

6    some time.

7            The United States Attorney's Office just recently

8    spoke to Dr. Nelson, and Dr. Nelson stated the following:

9    That this blood infection is life-threatening.  Can't make it

10   go any faster.  The earliest she could be released would be

11   Wednesday, but that's probably a pipe dream.  Most likely an

12   optimistic release date would be Thursday.

13           However, even when she's released, she will need an

14   IV catheter placed in her.  She will need that for four to six

15   weeks, and that will require antibiotics three times a day.

16   According to the doctor, she's lucid.  She's not doped up.

17   She understands and comprehends things.  And she's currently

18   at the Lander Valley hospital in Fremont County, Wyoming.

19           Your Honor, I recognize this is a unique and odd

20   circumstance.  But Ms. Addison was anticipated to testify for

21   the Government sometime tomorrow afternoon.  Likely that would

22   be a little delayed because of our current schedule, but it

23   looks like there's no way she can make it here in time.

24           Therefore, the United States would move under Rule 15

25   of the Rules of Criminal Procedure to continue trial

1    essentially before oral arguments, allow the parties to travel

2    to Lander, do a deposition of Ms. Addison.  The defendant by

3    rule would be entitled to be there.  It would be transcribed.

4    Essentially it would have all the trappings of a civil

5    deposition, and then we could come back and start trial.

6         Under Rule 15(a)(1), Your Honor, it states the Court

7    may grant the motion because of exceptional circumstances and

8    in the interests of justice.  There's a whole bunch of other

9    provisions.  It talks about the defendant being there unless

10   he waives it.

11        But at this time, Your Honor, based on these unique

12   circumstances, the United States feels that it has little else

13   to do but seek a continuance and try to obtain a deposition

14   and come back and get to trial as soon as possible.

15        THE COURT:  All right.

16        MR. CONDER:  And, Your Honor, just so the Court

17   knows, I also have a team of attorneys down at the U.S.

18   Attorney's Office looking into this.  One of the other options

19   possibly would be video testimony, video, live feed video.

20   However, as this Court's well aware, there's a Sixth Amendment

21   issue component to that.  There is a *Craig* case -- I believe

22   it's out of the Supreme Court -- and it talks about that it's

23   permissible mostly in child cases or other cases, but when

24   it's in the interests of public policy.

25        Your Honor, I must admit I have not had time to

1   thoroughly research that just because of the time crunch and

2   the late hour which this information was provided.  So that's

3   the position of the United States, Your Honor.  I apologize.

4         THE COURT:  All right.  Thank you.

5         Ms. Amram.

6         MS. AMRAM:  Your Honor, we are objecting to this.

7   Candidly, we just heard about this from Mr. Conder.  I've

8   never dealt with a Rule 15 request before.  I'm not familiar

9   with it, so we will need to research it if the Court is

10  considering it.  And I can do a more thorough objection once I

11  know what the law is about it.  But I did factually want to

12  inform the Court about a few things.

13        Fatima, I don't -- I don't think that she would meet

14  the criteria for the exceptional circumstances for a Rule 15

15  deposition for a number of reasons.  The Government has

16  witnesses who duplicate almost everything that she would

17  testify about.  She would say from her most -- her latest 302,

18  one thing she would be able to give the Government is that

19  both -- she would testify that both Whiteplume and Arapaho

20  Oldman were there that night; that she -- earlier in the

21  evening; that she basically hung out with them in the evening

22  before everybody went to the basement.  I will inform the

23  Court that we are not contesting that.  We are not going to

24  contest Arapaho Oldman was present on the evening before

25  Thanksgiving.  There are also multiple other witnesses the

 1    Government has as to that fact, including Bernadette Brown and

 2    Matthew Whiteplume.

 3           She would testify about this incident where she says

 4    that in the middle of the night, Matthew Whiteplume and

 5    Arapaho Oldman knocked on her door and asked for some mac and

 6    cheese and that Arapaho Oldman had blood on his shorts.  The

 7    Government has Matthew Whiteplume to testify about that.

 8           In addition, they have Bridget Oldman, who will

 9    testify that when she picked up Arapaho, that when she -- she

10    dropped a bottle of alcohol off for him, also in the middle of

11    the night that same night, and that when she did, he had blood

12    on his knuckles.  So it's not blood on his shorts, but I think

13    it's similar enough that it wouldn't count as exceptional

14    circumstances to have a deposition.  She would also, I

15    believe, testify to a statement that Arapaho Oldman allegedly

16    said he did it because BoMatt couldn't, referring, I believe,

17    to killing Dodge, is what the Government would argue.

18           But the Government now has multiple witnesses who

19    they've noticed in recent weeks who are going to say -- make

20    inculpatory statements about being involved in the murder of

21    Charles Dodge, including Donna Oldman, Dionne Addison, Jessica

22    Guffey, and then Bernadette Brown's testimony.  So they

23    don't -- she's not the only person who's going to say he made

24    some sort of incriminating statement saying that he was

25    involved.  Also, Bridget Oldman would be another witness they

1    have about that.

2         The other thing to note as to why it would not

3    justify exceptional circumstances, she also said -- she's not

4    all good for the Government.  She also said that Matthew

5    Whiteplume said, "I'm a killer.  I'm a killer."  She also says

6    that she was drinking heavily around this time.  There's

7    not -- and that there's a number of things she doesn't

8    remember.  She also does not recall ever seeing Bernadette

9    Brown there, which is a big problem because Bernadette Brown

10   is obviously one of the Government's key witnesses.

11        So I don't think she is a make-or-break witness for

12   the Government such that the Court should find exceptional

13   circumstances in this case in light of the other witnesses

14   they have who say the same or similar things to what she would

15   testify to.  So we would object.  We would ask that the trial

16   not be continued.  And, again, I don't have any law for the

17   Court because I just found out about this a few minutes ago.

18        THE COURT:  All right.  Well, Mr. Conder, what is the

19   critical nature of the testimony that the United States

20   believes would require the testimony of Ms. Addison?

21        MR. CONDER:  Your Honor, there are essentially three

22   prongs.  Ms. Amram articulated those.  First, Ms. Addison

23   would state that she is a neighbor to the house at 331 Great

24   Plains Road; that on the evening -- the evening before

25   Thanksgiving, Mr. Dodge and the defendant arrived in a white

1   truck.  She will state that they sat outside and drank for a

2   while, and then she left to a neighboring house to help get

3   ready for Thanksgiving.

4           The second would be, Your Honor, is what was stated.

5   During the early morning hours of Thanksgiving, Mr. Whiteplume

6   and Mr. Oldman went over to the neighboring house.  They asked

7   Fatima Addison for some mac and cheese.  She told them to go

8   away, and defendant had blood on his shorts.

9           Third, Your Honor, and probably most important, is

10  that after Mr. Dodge -- before Mr. Dodge's body had been found

11  on November 30, Fatima Addison would testify that she was

12  drinking with the defendant; that she was checking her phone,

13  looking at Facebook, and on Facebook she noticed that

14  Mr. Dodge was missing, because they'd been drinking with him a

15  few days ago.  She asked the defendant, "I wonder what

16  happened to him?"

17          In response, the defendant said, "I did it because

18  Mr. Whiteplume couldn't."

19          When asked, Fatima Addison would say that she took

20  that to mean the defendant said, "I killed him because Matthew

21  Whiteplume couldn't."

22          Those would be the essence of her testimony, Your

23  Honor.  It is accurate to say that she was intoxicated and she

24  does have impeachment issues, but that would be the crux of

25  it, Your Honor.

1          THE COURT:  All right.  Well, I've already impaneled

2     the jury and provided an oath to them.  I need to look at this

3     issue.  I need -- there are three potential solutions.  One is

4     tough luck.  Medicine is medicine, and issues are the issues.

5     If she can be here, fine.  If she can't, you'll have to prove

6     your case accordingly.

7          The other is -- another option is we arrange for you

8     to take a deposition of her, and I work in time for you to do

9     that.  But I need to know more in terms of her condition, when

10     the timing of that would be, et cetera.

11          The third is that we look at the ability to provide

12     it by video testimony.  I need to research that as well.  I

13     know that there's a Rule 43 presence requirement, but that

14     deals with sentencing and generally with change of pleas.  It

15     has -- there have been exceptions recognized in criminal

16     matters for witnesses by video.  Child issues are one, but

17     there are other exceptional issues.  But I need to look at the

18     criteria that would render things exceptional.  I don't know

19     if this does or doesn't constitute.  But at this point in

20     time, I want to go forward.  I know what I'm going to do

21     tonight.  And we'll go forward accordingly and address it

22     as -- tomorrow morning so we can determine if we take a recess

23     for a period of time to allow you to travel up there.

24          The other issue is, is, frankly, seeing what the

25     likelihood of having her transferred to Casper.  That would

1    make it easier for you all in terms of any kind of a

2    deposition or whatnot.  But I'll consider the options, and

3    we'll get back on it tomorrow morning on that.  And we'll go

4    forward at this point in time with opening statements.

5            Anything else we need to take up before we proceed

6    then, Mr. Conder?

7            MR. CONDER:  Nothing further, Your Honor.  And I

8    apologize for that.

9            THE COURT:  No.  It's not within your control.

10           Ms. Amram?

11           MS. AMRAM:  No, Your Honor.

12           THE COURT:  35 minutes will be allotted, and we'll

13   bring in the ladies and gentlemen of the jury.  Please rise.

14       (The jury entered the courtroom at 3:23 p.m.)

15           THE COURT:  Thank you, ladies and gentlemen.  Ladies

16   and gentlemen of the jury, once you hit your seats, please go

17   ahead and take them.  We stand out of respect for the ladies

18   and gentlemen of the jury.  So once you're there, it's a

19   little difficult to maneuver and whatnot.  So please feel free

20   to take your seat.

21           I apologize.  I do know how to tell time.  We had an

22   issue that no one anticipated that we needed to address

23   quickly.  So we will get that time back to you at some point.

24           At this time I would recognize the parties for

25   opening statement and I would recognize the United States.

1          Mr. Conder.

2          MR. CONDER:  Thank you, Your Honor.  May it please

3     the Court.

4          THE COURT:  Counsel.

5          MR. CONDER:  Counsel.

6          Ladies and gentlemen of the jury, on the night of

7     November 22, 2017, 36-year-old Charles Joseph Dodge, III, also

8     known as Chucky, ate dinner and hung out with his family.

9     Afterwards, he left the family home on foot in Arapahoe,

10    Wyoming.  He was headed towards Riverton.  He said good-bye to

11    him mom and dad for the last time.  Mr. Dodge never returned

12    home.  Eight days later, on November 30, 2017, Mr. Dodge's

13    dead and brutally beaten body was found hidden in a crawl

14    space of a home located at 331 Great Plains Road on the Wind

15    River Indian Reservation.

16         Mr. Dodge's body was discovered only when one of the

17    home's occupants thought the smell became too much and had

18    somebody call the police.  Authorities discovered Mr. Dodge's

19    face was disfigured beyond recognition.  His throat was cut

20    wide open, his body covered in bruises, cuts, and multiple

21    broken bones.

22         The evidence will show you that the last time

23    Mr. Dodge was seen alive, he was at 331 Great Plains Road, and

24    he was with the defendant, Arapaho Oldman, and the

25    co-defendant, Matthew Whiteplume.

1          It was late at night on November 22 when Mr. Dodge

2     arrived at 331 Great Plains with the defendant.  Initially,

3     Mr. Dodge, the defendant, Matthew Whiteplume, and others

4     stayed and drank outside.  At some point Mr. Dodge, the

5     defendant, Mr. Whiteplume, and others went into the basement

6     and continued drinking.  And that's when everything changed.

7          The defendant started to attack Mr. Dodge, and

8     Whiteplume joined in.  Whiteplume was punching, kicking,

9     stomping.  The defendant, punching with his fists, obtained a

10    weapon, beating Mr. Dodge about the head and body with the

11    weapon and later took a knife and cut his throat.

12         Mr. Dodge's dead body was left there on the floor,

13    just left there.  In the early morning hours of November 23,

14    the defendant walked out of the house at 331 Great Plains

15    Road, went to his friend who had brought him a bottle of

16    alcohol, told his friend, I think I just beat the shit out of

17    somebody, and had blood on his hands.

18         In the ensuing hours, the defendant desperately

19    called his sister for a ride.  A few hours later, his sister

20    picked him up at 331 Great Plains Road.  The defendant told

21    his sister, I'm in trouble.  I did it this time.

22         Ladies and gentlemen, there is no video of Mr. Dodge

23    being beaten and killed.  There is no *CSI* smoking gun.  But

24    there are witnesses.  The witnesses will tell you what they

25    saw, what they heard, and what they did.  Are their stories

1   exactly the same?  Of course not.  Are these witnesses

2   perfect?  Absolutely not.  Some of these witnesses have

3   serious alcohol addiction issues.  Their entire lives revolve

4   around their next drink.  Some of these witnesses have drug

5   addiction issues.  Some of these witnesses have criminal

6   records.  One of them is a co-defendant testifying pursuant to

7   a plea agreement.

8           So listen carefully, ladies and gentlemen.  Use your

9   good judgment.  And when you do, the evidence will show you

10  the following:  That 331 Great Plains Road is located on the

11  Wind River Indian Reservation; that the house at 331 Great

12  Plains has these stories, no garage.  The front door faces

13  Great Plains Road.

14          You walk up a wheelchair ramp.  You go in the front

15  door.  Inside the front door, there's a little living room

16  area here.  Behind that, a kitchen.  That's the back side.  To

17  the right when you walk in, stairwell goes upstairs, three

18  bedrooms and a bathroom there.  Just beyond the stairs that go

19  up, stairs that go into the basement.  And when you go into

20  the basement, the evidence will show when you hit the bottom,

21  you can basically see the whole basement.  It's unfinished,

22  concrete floor, no -- no Sheetrock on the walls, no paint

23  really.  Overhead joists, exposed electrical wires, plumbing.

24          To the left there's a furnace, washer and dryer over

25  here, two windows facing the backyard.  As you go around the

1   room, there's stuff.  You'll see.  There's stuff.  Along the

2   front, two more windows that face the front road.  There's a

3   freezer, a table.  And in this back corner, there's a crawl

4   space.  That crawl space is a couple feet off the ground.

5   You'll see pictures.  It's a couple feet wide, maybe 18 inches

6   to 2 feet wide -- tall, wide.  Once you get in that crawl

7   space, it's mainly a dirt floor with some concrete.  It's

8   uneven.  There's a lot of debris in there, and it's about 4 to

9   4 1/2 feet tall.  You can't stand up.

10        331, the house in question, is primarily occupied by

11  Edd and Loren Shakespeare.  They are uncles to Matthew

12  Whiteplume.  They are friends to the defendant, Arapaho

13  Oldman.  At this house, at 331, people come and go.  Drinking

14  is not uncommon, people showing up, looking for a drink and a

15  place to hang out.  It's not uncommon.

16        Ladies and gentlemen, you'll also hear that

17  Mr. Charles Joseph Dodge, III, Chucky, was 36 years old.  He

18  lived with his mother and father and other family members also

19  in another house in Great Plains.  You'll hear that on

20  November 21 and 22 of last year -- two years ago, he raked

21  leaves for a widow with his dad.  They got paid each day.

22        When they got done with their work on the 22nd,

23  Chucky and his dad went to Walmart, and Chucky bought some new

24  gloves.  After going to Walmart in Riverton, they went back to

25  their house in Arapahoe at Great Plains housing.  Chucky had

1   dinner with his family, hung out, stayed with them for a

2   while, and then he decided to head out to Riverton to get some

3   alcohol.  It wasn't uncommon.  He would walk towards town,

4   maybe catch a ride, get some alcohol, and come back home.

5            When he left, Chucky was wearing jeans, boots, a

6   black sweatshirt, maybe a coat.  He had his wallet, some money

7   from working, maybe some medications he had for a sore tooth.

8   But he didn't take his phone with him.

9            But Chucky never returned.  He never came home.  And

10  that was unlike him.  You'll hear from his family, his father.

11  It wasn't like him to not come home.  The next day was

12  Thanksgiving.  He didn't show up, so his family started to

13  worry.  They called police, reported him as a missing person.

14  They went to Facebook trying to find him.

15           On the same night, ladies and gentlemen, November 22,

16  2017, the evidence will show that the defendant got a ride

17  with Bridget Oldman and her son, WinterHawk at about 9:00 at

18  night on the 22nd.  The three of them went to the Big Wind

19  Casino just outside of Riverton.  At some point the defendant

20  left.  Later on that night, he arrived at 331 Great Plains

21  with Mr. Chucky Dodge.  As I said, Chucky, the defendant,

22  Mr. Whiteplume, and others stayed outside and drank.  At some

23  point they went inside.  They went down into the basement, and

24  that's when everything changed.

25           You'll hear from Bernadette Brown.  You will hear

1   that she uses methamphetamine; that she drinks alcohol; that

2   she's a felon, a drunk driving felon.  At some point -- but

3   you'll hear from her that at some time around Thanksgiving

4   2017, she was in the basement of 331 drinking with Chucky,

5   Mr. Whiteplume, the defendant, and some others.  She will tell

6   you that the group was drinking vodka.  While drinking vodka,

7   they talked about we can't get anything tomorrow.  The stores

8   are closed.  So Chucky took some vodka from the big community

9   bottle and put it in an empty bottle he had, put it in his

10  pocket to save it.  The group continued to drink.

11          Eventually, the community bottle ran dry.  At that

12  time the defendant told Chucky, Give me a shot.  Chucky

13  refused.  According to Bernadette, this enraged the defendant.

14  He began to attack Chucky with his fists, beating on him.  At

15  one point Mr. Whiteplume joining and kicking him.

16          Then at some point the defendant obtained a metal

17  object, and he began to beat Chucky Dodge until he was

18  unresponsive.  Bernadette Brown will tell you that Chucky was

19  still alive; that people put him into the crawl space and then

20  left.  She was left down there alone with him.  She kept

21  checking on him, as he was struggling to breathe, but he was

22  still alive.  Eventually, she left, but Chucky was still

23  alive.

24          She will tell you that in the ensuing weeks, she ran

25  into Matthew Whiteplume.  Matthew Whiteplume told her, We had

1    to slit that guy's throat.

2           From Matthew Whiteplume, you will hear that he was a

3    co-defendant; that he's testifying pursuant to a plea

4    agreement; and that he too drinks heavily and has alcohol

5    issues.  But he'll tell you that on the night before

6    Thanksgiving 2017, Mr. Dodge and the defendant arrived

7    together at 331.  Chucky, the defendant, and others were

8    drinking outside, and at some point they moved into the

9    basement.

10          When they moved into the basement, Mr. Whiteplume

11   went upstairs to get a hot toddy.  He went to warm some water

12   to help the alcohol as a chaser.  When he came back

13   downstairs, Mr. Whiteplume will tell you the defendant had

14   Chucky Dodge, belt around his neck, punching him.  The

15   defendant looked at Mr. Whiteplume and said, This is the --

16   one of the guys that beat you up.  This is one of the guys

17   that jumped you.  Mr. Whiteplume jumped in, immediately

18   started punching Mr. Dodge, started punching Chucky, asking

19   him who did it?  Who was with you?

20          You will hear from Whiteplume that at the time he

21   believed it.  He believed that Chucky was involved in some

22   earlier assault on him, and he wanted to hurt him.  He wanted

23   to find out who had helped.  A short time later, after

24   punching him, Whiteplume began to kick and stomp on Chucky.

25   While he was doing that, Whiteplume heard the defendant yell

1    out or say "equalizer."  Whiteplume will tell you that that

2    meant a weapon.  You will hear from Mr. Whiteplume that the

3    defendant continued to escalate the situation repeatedly

4    saying something to the effect of this guy is going to die

5    tonight.  During this time, the defendant told Whiteplume, Go

6    check the front door.  Shut out the light.  Whiteplume did it.

7    The defendant said, Put up a rug or put up a blanket over the

8    window facing the street.  Whiteplume did it.

9           You will hear that Whiteplume continued during this

10   time to punch and kick Chucky himself.  But Whiteplume will

11   tell you that at some point, the defendant took it too far.

12   Chucky begged for it to stop.  Whiteplume tried to get help

13   from his uncles, Edd and Loren, but they refused.

14          It was during this time Whiteplume saw the defendant

15   standing over Chucky, object in hand, beating him in the head

16   and body until Chucky was unconscious.  Whiteplume will tell

17   you that at that time Chucky was still alive.  Whiteplume drug

18   Chucky from where he lay saying he's starting to come out of

19   it, starting to regain consciousness, and helped him get into

20   the crawl space.  He put him in there, gave him a blanket.

21   Whiteplume said he was hoping to protect him.  The occupants

22   in the basement then moved upstairs.

23          At some point Whiteplume heard a noise, a commotion

24   from the basement.  He went downstairs.  He will tell you that

25   when he got downstairs, Chucky was out of the crawl space.

1    The defendant had Chucky by the hair.  The defendant turned to

2    Whiteplume with a kitchen knife in his hand, the handle

3    wrapped in a towel or a rag, handed it to Whiteplume, and

4    said, Handle your business.  Take care of your business.

5    Whiteplume will tell you he couldn't do it.  He couldn't bring

6    himself to do it, and he told the defendant that.

7            When he told the defendant that, the defendant said,

8    Turn away.  Go upstairs.  And the defendant pulled back

9    Chucky's head with his hair in his hand and started cutting

10   his throat.  They left Chucky's dead body laying on the floor.

11           Eventually that morning Whiteplume and the defendant

12   went their separate ways, but before they did, the defendant

13   told Mr. Whiteplume, I'll take care of the body.  Several days

14   passed, according to Whiteplume.  Chucky's body lay there just

15   loosely covered with a tent, Whiteplume waking every morning

16   wishing the body would be gone.  Then on the weekend of

17   November 25 and 26, Whiteplume enlisted the help of his sister

18   and her sister's boyfriend.  And his sister's Jori Lamebull,

19   and her boyfriend is Monty Tabaho.

20           The three of them, with socks on their hands, lifted

21   the body into the crawl space, dragging it in there.  They

22   then gathered up items from the basement that were covered in

23   blood or anything they thought that they should get -- gather

24   up and burn to ash, which they did.

25           Whiteplume will tell you that at some point later he

1  returned to the basement.  It looked like somebody had tried

2  to clean up, possibly with bleach.  Whiteplume will tell you

3  that at some time before the body was found, he and the

4  defendant and one of their friends crawled into the crawl

5  space to look at the body.

6          Ladies and gentlemen, you'll hear from more than just

7  Bernadette Brown and Mr. Whiteplume.  You'll hear from several

8  others.  You will hear from Bridget Oldman, and you will see

9  on her phone she and her son picked up the defendant from a

10 relative's house at about 9 p.m. on the 22nd.  They went to

11 the casino, and she will say -- tell you that the defendant

12 left.

13         Then at around 4:00 in the morning, she got a text

14 from the defendant saying, "Hey, I left a bottle in your car.

15 Can I come get it?"  At 4:30 Bridget and her other son showed

16 up at 331 Great Plains.  The defendant came out.  He had a

17 coat on, according to Bridget.  It didn't quite seem to fit

18 right.  It was too short in the sleeve.  The defendant came

19 out, got his bottle of vodka, and said, I think I beat the

20 shit out of someone.  And Bridget noticed he had blood on his

21 hands and wrists.

22         Ladies and gentlemen, you'll hear from Irene Jenkins,

23 the defendant's sister.  You will see her phone records that

24 on the 23rd, Thanksgiving morning, between 5:27 a.m. and

25 8:20 a.m., there were approximately 27 text messages, eight

1    phone calls, two voicemails.  Irene will tell you that during

2    the early morning of Thanksgiving, the defendant, Mr. Arapaho

3    Oldman, tried to contact her.  She tried to ignore him for a

4    while, but she couldn't.  When she finally talked to him -- or

5    texted him back, she said that the defendant told her he was

6    in trouble, to come pick him up.  So she did.  At about 8:20

7    on Thanksgiving morning, she picked up the defendant, took him

8    to another relative's house.  During that time the defendant

9    stated he was in trouble; he did it this time.

10         You'll hear from Donna Oldman and see phone records.

11   Donna is the defendant's ex-wife.  Her records show that on

12   Saturday, November 25th, 2017, at 2:00 a.m., the defendant

13   texted her.  And then at 3:00 a.m., he called her.  The

14   defendant asked Donna, said, "I'm in trouble.  I need help."

15   When Donna said, "What?" he said, "The worst a person could

16   do."  That's what he told her he was in trouble for.

17         You will hear from Loren Shakespeare.  He's one of

18   the occupants at 331.  He will tell you that on November 29,

19   he came out of his house.  He saw the defendant and his

20   girlfriend, Jessica Guffey.  Loren told the defendant, "Hey,

21   you're no longer welcome in our house when no one else is

22   here."  The defendant's response was, "Is that because of the

23   dead body?"

24         You will hear from Jessica Guffey, the defendant's

25   girlfriend.  She'll tell you that on the night before

1    Thanksgiving, the 22nd, she was with the defendant.  They

2    argued.  She went her separate way.  She spent Thanksgiving

3    and the weekend with her family, not to see the defendant

4    again until the 28th.  She said on the 28th she'll tell you

5    her and the defendant hung out, watched movies.

6            The next morning, the 29th, they went to Great Plains

7    Hall, got a Christmas loan.  And then they walked to a nearby

8    Great Plains housing.  They walked to Fatima Addison's house.

9    Fatima wasn't home.  So they walked next door to 331.  On the

10   walk over, the defendant told Jessica, "I'm a killer, babe.

11   I'm a killer."

12           They walk into the house at 331 Great Plains.  The

13   defendant goes downstairs.  Jessica stays upstairs.  The

14   defendant repeatedly tells her, "Come downstairs.  Come

15   downstairs."  Finally, Jessica goes downstairs.  She gets to

16   the base of the steps, and she sees the defendant standing

17   over by the crawl space.  The defendant lifts open the door,

18   spits inside, and says, "You stink."

19           Ladies and gentlemen, you will hear that Chucky's

20   body stayed in the house and crawl space until the evening of

21   November 30 when Loren Shakespeare told a neighbor, Alice

22   Moss, that there was a body in his house -- may be a body in

23   his house and it was starting to stink.  So Alice called the

24   police.

25           When the authorities arrived, they found Chucky's

1    body hidden in the crawl space.  Chuck's body was laying

2    facedown, his head away from the crawl space.  His pants, long

3    johns, underwear pulled down.  He was exposed.  His T-shirt

4    pulled up under his armpits, A white powder covering his

5    entire back.  That powder was later determined to be flour,

6    you'll hear.  He was also covered with a carpet, a tarp, and a

7    clear piece of plastic.  That's where he lay.

8            There was a small pool of blood in the crawl space.

9    In the basement, when the authorities arrive, they noticed the

10   basement was covered in food, clothing, trash, debris.  There

11   were blood -- apparent blood spots on the walls, on various

12   objects, on the floor.

13           Ladies and gentlemen, you'll hear from Mark

14   Stratmoen, the Fremont County coroner.  From him you'll hear

15   that Mr. Dodge had multiple massive blunt force injuries to

16   his head and sharp force injuries to his neck.  Mr. Dodge had

17   no wallet on him.  He had nothing to identify him, and he was

18   beaten so badly about the head and face the coroner could not

19   identify him without his dental record.

20           The coroner will tell you that based upon the small

21   amount of blood in the crawl space, it's his opinion that he

22   was not killed there.  The coroner will further tell you that

23   based upon pooling patterns of blood, known as lividity on

24   Mr. Dodge's body, that it's likely Mr. Dodge was killed

25   somewhere else and after he died later moved into the crawl

1   space.

2          From Dr. Burson, a forensic pathologist, you will

3   hear the cause of Mr. Dodge's death was a combination of blunt

4   force injuries to the head, sharp force injuries to the neck

5   completely cutting through the soft tissue and trachea.

6   Dr. Burson will tell you that either one of these injuries

7   standing alone, injuries to the head or injuries to the neck,

8   would have killed Mr. Dodge.

9          Dr. Burson will also tell you about several nonfatal

10  injuries.  Numerous wounds, including blunt force, sharp force

11  injuries to the head, neck, torso, arms, and legs.  That

12  includes a broken arm, a broken leg, and 11 broken ribs.

13         Ladies and gentlemen, there is no video of Mr. Dodge

14  being beaten and killed.  But the evidence will show you that

15  Mr. Dodge's blood is on the defendant's hands.  Mr. Dodge

16  arrived at 331 Great Plains Road with the defendant.  He was

17  last seen alive in the basement of 331 with the defendant and

18  Mr. Whiteplume.  Mr. Dodge was being kicked and stomped by

19  Mr. Whiteplume.  He was being punched, hit with a weapon and

20  his throat cut by the defendant.

21         While Chucky's family was looking for him, his

22  brutally beaten body lay there in the basement of 331.  The

23  defendant, during this time, told his ex-wife he was in

24  trouble, did the worst a person could do.  While Chucky's

25  family's looking for him, the defendant had his girlfriend

1    come downstairs.  He lifted up the crawl space door, spit

2    inside, and said, "You stink."

3             On the morning of November 23, the defendant walked

4    out of 331 Great Plains, got his bottle of alcohol, and he had

5    blood on his hands.

6             Ladies and gentlemen, once you have heard all the

7    evidence, the evidence will show you by proof beyond a

8    reasonable doubt that the defendant, Arapaho James Oldman,

9    killed Charles Joseph Dodge, III; that he did so with

10   premeditated malice aforethought; and that he did so by

11   hitting Mr. Dodge with a weapon, cutting his throat.  Ladies

12   and gentlemen, once you have heard the evidence, I will ask

13   you to find the defendant guilty of first degree murder and

14   aiding and abetting.

15            Thank you.

16            THE COURT:  Thank you, Mr. Conder.

17            Ms. Hucke.

18            MS. HUCKE:  May it please the Court.

19            THE COURT:  Counsel.

20            MS. HUCKE:  Counsel.

21            Mr. Dodge was brutally murdered, and you're going to

22   see that.  And the Government wants to know what happened to

23   him.  The Government has a duty to find out what happened to

24   him, to bring those responsible to justice.  They want justice

25   for him and his family.  We all do.

1         Soon after the murder, a woman named Bernadette Brown

2    came forward to the FBI and said that she was there that night

3    and that Arapaho Oldman did it.  The FBI tirelessly tried to

4    prove her right.  They interviewed countless witnesses.  They

5    subpoenaed Mr. Oldman's phone records.  They executed search

6    warrants.  They collected over 70 items that they sent to the

7    FBI crime lab in Quantico to test for DNA, trace evidence,

8    fingerprints, shoe prints.  When all this investigation came

9    back, it didn't point to Arapaho Oldman as the killer.

10         Now, don't get me wrong.  Mr. Oldman was there that

11   night, and he participated in a fight that happened earlier in

12   the evening.  But he did not kill Mr. Dodge.  The killer, the

13   man who beat Mr. Dodge to death and slit his throat, is

14   Matthew Whiteplume.

15         It was Whiteplume's DNA that was found on Mr. Dodge's

16   collar right near where his throat was slit, not Arapaho's.

17   It was Whiteplume, not Arapaho, who told Bernadette Brown that

18   Mr. Dodge's throat should be slit.  It was Whiteplume, not

19   Arapaho, who brutally kicked and punched Mr. Dodge's dead

20   body.  And it was Whiteplume, not Arapaho, who told his friend

21   Monty Tabaho that he should cut off Mr. Dodge's penis and

22   shove it in his mouth, not Arapaho.

23         He also ordered Mr. Tabaho to cut off Mr. Dodge's

24   head, and Mr. Tabaho did the best that he could to comply

25   because he was afraid of Whiteplume.  He was afraid that

1   Whiteplume would kill him just like he had killed Mr. Dodge.

2   And when all of that happened, Arapaho Oldman wasn't even

3   there.  It was Whiteplume, not Arapaho, who held a knife to

4   his sister's throat two days after it happened and afterwards

5   ordered her to help him clean up and put the body in the crawl

6   space.  Arapaho wasn't there.

7          After all of these witnesses finally came forward.

8   The Government charged Matthew Whiteplume also with aiding and

9   abetting first degree murder.  But they -- they were so

10  fixated on the original person that they thought did it, they

11  couldn't let go of that, and they continued with their charges

12  against Mr. Oldman.

13         Mr. Whiteplume saw this opportunity.  He knew that if

14  he went in there and he lied and he said that Arapaho slit

15  Mr. Dodge's throat, that he could get a cooperation deal.  And

16  you know what?  He did just that.  On Friday in this

17  courtroom, he came in and he pled guilty to aiding and

18  abetting second degree murder, and he's agreed to testify in

19  exchange for hopes of a lighter sentence.

20         Now, this man, this man who indisputably beat and

21  kicked Mr. Dodge's dead body, who ordered a terrified friend

22  to cut off his head, who said he wanted to remove Mr. Dodge's

23  penis and put it in his mouth, he is the one who is the only

24  person that's going to come in here and tell you that Arapaho

25  Oldman was the one who slit his throat.  No one else can tell

1   you they were there that night.

2          And even though he's going to tell you this, this is

3   contradicted by DNA evidence.  His DNA is on Dodge's -- the

4   collar of his shirt.

5          The other Government witness who's coming, Bernadette

6   Brown, the woman who initially came forward and told the FBI

7   she was there that night, she will tell you that she didn't

8   see who slit Dodge's throat; that she left before it even

9   happened; and that when she left, Mr. Dodge was alive.  She'll

10  also admit that she's lied repeatedly to the FBI to cover for

11  those that she cares for.  She lied about Monty Tabaho.  She

12  lied about a woman named Jessica Guffey.  And she's now lying

13  about Matthew Whiteplume so she can protect him.

14         At first she told the FBI that only Arapaho did it.

15  Then later she had to admit that Whiteplume was there also.

16  And she's close with Whiteplume.  She'll tell you that she

17  wanted an insurance settlement, and she decided to buy a car,

18  a Monte Carlo, and that she considered putting her car under

19  Whiteplume's name.  So we will show you that they know each

20  other and she's close with him.

21         You'll also learn that Bernadette and Monty and

22  Whiteplume, they have talked about this murder after it

23  happened.  They talked over Facebook Messenger, possibly calls

24  and texts.  They continued to talk to each other once Matthew

25  Whiteplume was in jail by using go-betweens so they could

1    avoid the recorded jail phone calls.

2            But despite all of this communication, the Government

3    has still remained fixated on Arapaho Oldman, so they never

4    even looked into the Facebook record.  They don't even have

5    those Facebook records between those people to even validate

6    or rule out if they were communicating with each other or not.

7            Now, I'm not going to tell you that Arapaho Oldman

8    was an angel that night.  He was there.  He participated in a

9    fight that happened earlier in the evening.  But he did not

10   kill Mr. Dodge.  He didn't slit his throat.  He didn't want

11   Mr. Dodge to die.  He didn't want to kill him.  And,

12   therefore, at the close of this case, we ask that you find

13   Mr. Arapaho Oldman not guilty.

14           THE COURT:  Thank you, Ms. Hucke.

15           Let us at this time turn to the evidence in this

16   matter, and the United States may call its first witness.

17           MR. CONDER:  Thank you, Your Honor.  The United

18   States would call Mr. Charles Dodge, II.

19           THE COURT:  Mr. Charles Dodge, II will come forward

20   and be sworn.

21      (The witness was sworn.)

22           THE COURTROOM DEPUTY:  Please state and spell your

23   name for the record.

24           THE WITNESS:  Charles Dodge, Junior.  C-H-A-R-L-E-S

25   D-O-D-G-E, J-R.

1          THE COURTROOM DEPUTY:  Please state your city of

2     residence and your occupation.

3          THE WITNESS:  I live at Number 35 Great Plains Loop

4     in Arapahoe, Wyoming, and I'm retired.

5          THE COURTROOM DEPUTY:  Thank you.

6               CHARLES DODGE, JR., GOVERNMENT'S WITNESS

7                        DIRECT EXAMINATION

8     BY MR. CONDER:

9     Q.  Good afternoon, Mr. Dodge.

10    A.  Good afternoon.

11    Q.  Mr. Dodge, you said you lived at Great Plains Loop.  Is

12    that in Great Plains housing?

13    A.  Yes, it is.

14    Q.  And is that on the Wind River Indian Reservation?

15    A.  Yes.

16    Q.  And who lives there with you at that house?

17    A.  My wife and my daughter and her husband.

18    Q.  And do you have a new guest in your house?

19    A.  Yes.  They've had a child.

20    Q.  A new grandbaby?

21    A.  Yeah.

22    Q.  How many children do you have, Mr. Dodge?

23    A.  I have -- well, three now.  I had four, but one is

24    deceased.

25    Q.  And who are your children, Mr. Dodge?

1   A.  My oldest son is Justin.  Then there was Charles, but he's

2   not there no more.  And Gabriel, and Rosa is my daughter.

3   Q.  And your son Charles, is he Charles Joseph Dodge, III?

4   A.  Yes.

5   Q.  And did he have a nickname that he went by that people

6   called him?

7   A.  They used to call him Chucky.

8   Q.  And you said Chucky is no longer with us; is that correct?

9   A.  No.

10  Q.  And how old was he when he died?

11  A.  I believe he was 36.

12  Q.  Mr. Dodge, are you a tribal member?

13  A.  Yes, I am.

14  Q.  And what tribe are -- what tribe?

15  A.  Northern Arapaho.

16  Q.  And how about your wife?

17  A.  She's enrolled in the Northern Arapaho tribe.

18  Q.  So Chucky, was he enrolled as well?

19  A.  Yes, he was.

20  Q.  Mr. Dodge, I'm going to direct your attention to the

21  screen in front of you.  It's marked as Government's Exhibit

22  1-1.  It should be the screen right below -- there.

23          THE COURT:  And this exhibit hasn't been admitted; is

24  that correct?

25          MR. CONDER:  That is correct, Your Honor.

1        THE COURT:  It's being shown just to the witness and

2   to counsel.

3   Q.  (BY MR. CONDER)  And, Mr. Dodge, just bear with us.  There

4   might be a technical difficulty.  It should be on your screen

5   momentarily.

6        THE COURTROOM DEPUTY:  I'll try again.

7        (Discussion off the record.)

8   Q.  (BY MR. CONDER)  Mr. Dodge, while they're trying to do

9   that, if you wouldn't mind, would you tell the ladies and

10  gentlemen of the jury a little bit about your son, Chucky.

11  Go ahead?

12  A.  Well, my son, he used to work as a horse breaker or ranch

13  hand most of his life, and he didn't hardly go out but mostly

14  working hard, staying home, helping me around the house.

15  Q.  Mr. Dodge, did Chucky have any children?

16  A.  Yes.  He has a daughter.

17  Q.  And how old is she?

18  A.  She would be about 17 now.

19       THE COURT:  All right.  Let's go ahead and restart

20  the system.  We're going to have to restart the system.  For

21  some reason technology is not working. Ms. Dawson, if you want

22  to try to --

23       MS. DAWSON:  For some reason my screen is not --

24       THE COURTROOM DEPUTY:  You have power.  Try to push

25  again.

1            MS. DAWSON:  Usually I can see a --

2            THE COURTROOM DEPUTY:  Is the blue light on?

3            MS. DAWSON:  Uh-huh.

4            THE COURTROOM DEPUTY:  Try disconnecting your HDMI

5   and reconnect.

6            THE COURT:  All right.  Let's go to the ELMO.  Turn

7   it back on and turn it off.

8            THE COURTROOM DEPUTY:  There.

9            THE COURT:  Ladies and gentlemen, I don't want to

10  have you sitting in here waiting for us to try to -- I want to

11  see if we can get this.  If we can't get it, we'll have to go

12  to paper, the old-fashioned way.  But let me go ahead and have

13  you at this time take a brief recess, and we'll be back in

14  five minutes.

15           Please rise.

16      (The jury exited the courtroom at 4:03 p.m.)

17      (The following took place outside the presence of the

18      jury.)

19           THE COURT:  Go ahead and have a seat and we'll see if

20  we can get this thing to work.

21      (At sidebar.)

22           THE COURT:  Everything works, and all of a sudden it

23  doesn't.  I'm going to have Ms. Bowline go visit with the

24  juror that needs the assistive listening device so she doesn't

25  have to take everything off all the time.  We need to make

1   sure she doesn't have it with her, so we don't want her

2   inadvertently hearing anything.  Any concerns having

3   Ms. Bowline show her how to do that, Mr. Conder?

4           MR. CONDER:  No.

5           THE COURT:  Ms. Amram?

6           MS. AMRAM:  No.

7           THE COURT:  We'll go ahead and do that and get this

8   restarted.

9       (At 4:06 p.m., a recess was taken until 4:13 p.m.)

10      (The following took place outside the presence of the

11      jury.)

12          THE COURT:  Thank you.  I note the presence of

13  counsel and the defendant.  Ladies and gentlemen of the jury

14  are absent.

15          Let's verify it works.

16          MS. DAWSON:  Was that right?

17          THE COURTROOM DEPUTY:  Yeah, I saw it.

18          THE COURT:  All right.  Okay.  Let's go ahead and

19  bring in the ladies and gentlemen of the jury.

20      (The jury entered the courtroom at 4:14 p.m.)

21          THE COURT:  Thank you.  Please be seated.

22          The bad news, ladies and gentlemen, is that I owe you

23  another five minutes of time.  The good news is that we got

24  the electronics working.  So we can go forward at this time.

25          Mr. Conder.

1          MR. CONDER:  Thank you, Your Honor.

2     Q.  (BY MR. CONDER)  Mr. Dodge, we were talking just a minute

3     ago about your son Chucky.  On the screen in front of you, I'd

4     direct your attention to what is marked as Government's

5     Exhibit 1-1.  Is -- do you recognize what that is?

6     A.  Yes, I do.

7     Q.  And what is that?

8     A.  It's a picture of my son.

9     Q.  And so that's a picture of your son Chucky?

10    A.  Yes.

11         MR. CONDER:  Your Honor, at this time the United

12    States would move to admit Government's Exhibit 1-1.

13         THE COURT:  Any objection?

14         MS. HUCKE:  No, Your Honor.

15         THE COURT:  Are your monitors working?

16    (Jurors nodding heads.)

17         THE COURT:  Exhibit 1-1 will be admitted.

18    (Government's Exhibit 1-1 received.)

19         MR. CONDER:  Your Honor, the United States would

20    request that it be published.

21         THE COURT:  It may be published to the ladies and

22    gentlemen of the jury and to me.

23         THE COURTROOM DEPUTY:  I don't have it either.

24    Q.  (BY MR. CONDER)  Mr. Dodge, when we were talking about --

25    you mentioned about some of the occupations your son Chucky

Dodge - Direct by Mr. Conder                    I - 171

1   had.  If you could again tell the jury what he did.

2   A.  He was a horse breaker and a ranch hand most of his life,

3   but during the summer he would fight fire when the -- when

4   they had the firefighting crews at Fort Washakie.

5   Q.  Thank you, Mr. Dodge.  Mr. Dodge, I would now again, to

6   the screen in front of you, direct your attention to what's

7   marked as Government's Exhibit 1-2.

8           THE COURT:  Exhibit 1-2 is being displayed only to

9   the witness and ladies and gentlemen -- to counsel, not to the

10  ladies and gentlemen of the jury.

11  Q.  (BY MR. CONDER)  Mr. Dodge, in looking at that, are you

12  familiar with what that is or can you tell what that is?

13  A.  It's a calendar.

14          MR. CONDER:  Your Honor, at this time the United

15  States would move to admit Government's Exhibit 1-2, which is

16  a calendar of November of 2017, indicating the 23rd is

17  Thanksgiving.

18          THE COURT:  Any objections?

19          MS. HUCKE:  No, Your Honor.

20          THE COURT:  Exhibit 1-2 will be admitted and may be

21  published.

22      (Government's Exhibit 1-2 received.)

23  Q.  (BY MR. CONDER)  Mr. Dodge, if you could, do you recall

24  the week of Thanksgiving of 2017?

25  A.  Yes, I do.

1    Q.  And if you could, walk through with the members of the

2    jury, what did you and your son do that week?  What did you

3    do?

4    A.  Well, we had a job about three days before Thanksgiving.

5    We were trying to make money for the Thanksgiving dinner.

6    Q.  And what were you guys doing?  What was the job?

7    A.  It was mostly just yard work and cleaning up corrals and

8    stuff like that.

9    Q.  And who were you doing that for?

10   A.  We were working for the O'Neill ranch, and that's Gail

11   O'Neill.

12   Q.  And how long have you known Mrs. O'Neill?

13   A.  About 20 years or so.

14   Q.  And how often does she call you for work?

15   A.  Off and on during the summer.  She has, like, branding in

16   the fall, separating.  But in the summer she would have her --

17   need her irrigation pipes laid out and in the fall picked up,

18   so she would call when she needed them.

19   Q.  And is there anyone -- does -- is Mrs. O'Neill married or

20   is she a widow, or do you know?

21   A.  I believe she's widowed.

22   Q.  So if you could, look at the day before Thanksgiving,

23   Wednesday the 22nd.  Do you recall what you and Chucky did

24   that day?  Did you work for Mrs. O'Neill that day?

25   A.  No.  We worked on the 21st, and then she said to come back

1  the next day to work again if we wanted to, the day before

2  Thanksgiving.

3  Q.  So the day before Thanksgiving you and Chucky went out and

4  worked for Mrs. O'Neill again?

5  A.  He -- he left that night, and he never came back.

6  Q.  Gotcha.  So if you could, so when you worked for

7  Mrs. O'Neill on the 22nd, what did you do when you got done

8  working?  Did you go anywhere?  Did you go to the store?

9  A.  Yeah.  We went to town and we bought some groceries, and

10  he got himself another pair of gloves.

11  Q.  He got some new gloves?

12  A.  Yeah, because he wanted to work the next day.

13  Q.  And so when you got the gloves and you went home, what did

14  you do the night before Thanksgiving?  What was going on in

15  your house?

16  A.  Nothing really.  We were all at the house, and Chucky said

17  that he was going to take a walk, and he left.  And that's the

18  last time I seen him.

19  Q.  And was that uncommon, for Chucky to take a walk?  Do you

20  know where he was walking to?

21  A.  No.  He used to walk around and visit people, and

22  sometimes he would walk to town.

23  Q.  And when you say "walk to town," what town would he walk

24  to?

25  A.  He would go to Riverton.

1  Q.  And what would he do in Riverton?  Why would he walk to

2  Riverton?

3  A.  Well, he used to go in and, like, buy himself a drink and

4  then come home.

5  Q.  So it wasn't uncommon for him to walk to Riverton and buy

6  some alcohol and come back?

7  A.  Well, he didn't do that very often, but, yeah, he would --

8  he would walk if he felt like it, I guess.

9  Q.  And do you recall what he was wearing when he left that

10  last -- on the 22nd?

11  A.  I believe he had on a black sweater and a black cap and

12  black jeans, and I believe he had his new gloves on.

13  Q.  Did he -- did Chucky have a wallet?  Did he usually keep a

14  wallet with him?

15  A.  Yes, he did.

16  Q.  And what kind of wallet did he have?

17  A.  He had a tooled-leather wallet.  It was black.

18  Q.  And do you know if he had any money still after working

19  for Mrs. O'Neill and after the stop to get gloves?

20  A.  He probably did because we worked -- I think it was a

21  ten-hour day, and she pays $10 an hour.  So I imagine he still

22  had some money.

23  Q.  And do you know if he had his phone with him when he left?

24  A.  No.  No, he didn't.

25  Q.  He didn't take it?

1    A.   No.

2    Q.   Did he have anything else with him?  Did he have any

3    medications or anything like that?

4    A.   Well, he had a toothache that he was supposed to go to

5    Jackson that weekend, that Friday, to have it extracted.  And

6    he had pain meds for that.

7    Q.   So when he left on the 22nd, was it dark out?

8    A.   Yes, it was.

9    Q.   Did he ever come back?

10   A.   No.

11   Q.   Did you and your family become worried?

12   A.   Yes.  But I thought that he would be back, so we waited a

13   while, and he never showed up.  So we went and reported him to

14   the Fort Washakie as missing, the Fort Washakie police

15   department.  And later on that day I went to the Riverton

16   Police Department and reported him as missing.

17   Q.   So you went to the police out at Fort Washakie and then

18   the Riverton police to report him missing?

19   A.   Yes.

20   Q.   Did you or your family do anything else to try and find

21   him?  Did you use the Internet or Facebook or --

22   A.   No, we didn't.

23   Q.   You --

24   A.   Later on, after I reported him missing, the K2 News come

25   out to my house, and they talked to me that morning.  And then

1    in the evening someone called in and told the police that

2    there was a body of someone.

3    Q.   And do you remember when that was?

4    A.   Let's see.  I'm not really sure.  I believe it might have

5    been around the 30th, 31st, somewhere around there.

6    Q.   Around the 30th?

7    A.   Yeah, somewhere around there.

8    Q.   So what did you hear?  What call did you get?

9    A.   No one called.  That house where -- where he was murdered

10   is just the right next housing to where we live.  And we seen

11   all the lights and everything that was going on over there and

12   kind of figured that might have been him.

13   Q.   Did the police tell you that night if they had found

14   Chucky?  What did they tell you?

15   A.   Well, we went over there to where they were, and they said

16   they found a body.  But they wouldn't tell -- give us no

17   information until -- I don't know.  I think it might have been

18   two or three days after.  That's when they confirmed for sure

19   that was his body.

20   Q.   So two or three days later they told you?

21   A.   Yeah.

22            MR. CONDER:  May I have a moment, Your Honor?

23            THE COURT:  You may.

24   Q.   (BY MR. CONDER)  Mr. Dodge, I just want to go back and

25   confirm.  So the night of Wednesday, the 22nd, that's when

1   Chucky walked off and never came home?

2   A.  Yes.

3   Q.  And he wasn't there for Thanksgiving dinner?

4   A.  No.  No, he wasn't.

5           MR. CONDER:  No further questions, Your Honor.

6           THE COURT:  All right.  Thank you.

7           Cross-exam.

8           MS. HUCKE:  No questions, Your Honor.

9           THE COURT:  All right.  Mr. Dodge, you may step down.

10          Is this witness released from any subpoena?

11          MR. CONDER:  Yes, Your Honor.

12          THE COURT:  All right.  Any need to keep him under

13  subpoena, Ms. Amram?

14          MS. AMRAM:  No, Your Honor.

15          THE COURT:  You're free to go, sir.

16          THE WITNESS:  Thank you.

17          THE COURT:  United States may call its next witness.

18          MR. CONDER:  Your Honor, the United States would next

19  call Ms. Alice Moss.

20          THE COURT:  Ms. Moss will come forward and be sworn.

21      (The witness was sworn.)

22          THE COURTROOM DEPUTY:  Please state and spell your

23  name for the record.

24          THE WITNESS:  My name is Alice Moss, A-L-I-C-E

25  M-O-S-S.

1         THE COURTROOM DEPUTY:  Please state your occupation

2    and your city of residence.

3         THE WITNESS:  I'm retired.  I'm retired, and I'm a

4    housewife.  I don't --

5         THE COURTROOM DEPUTY:  And where do you live?

6         THE WITNESS:  I live at 20 Great Plains Road,

7    Arapahoe, Wyoming.

8         THE COURTROOM DEPUTY:  Thank you, ma'am.

9              ALICE MOSS, GOVERNMENT'S WITNESS

10                   DIRECT EXAMINATION

11   BY MR. CONDER:

12   Q.  Good afternoon, Ms. Moss.

13   A.  Good afternoon.

14   Q.  Ms. Moss, you said you live on Great Plains --

15   A.  Yes.

16   Q.  -- Road?

17        Is that in the Great Plains housing?

18   A.  Yes.

19   Q.  And is that on the Wind River Indian Reservation?

20   A.  Yes, it is.

21   Q.  How long have you lived in Great Plains?

22   A.  51 years.

23   Q.  In the same house?

24   A.  Yes.

25   Q.  Who do you live there with?

1    A.   My husband.  We had -- we have five kids, but they're all

2    gone now.  They have their own homes.

3    Q.   And so have you lived in the Great Plains housing as long

4    as there's been Great Plains housing?

5    A.   Yes.

6    Q.   If you could, describe to the grand jury, what is Great

7    Plains housing?  What is it?

8    A.   It's a housing area.  There used to be ten houses there,

9    and now there's just two that are occupied.  The others were

10   torn down.  The other people that lived there are gone, passed

11   away.

12   Q.   So is it -- is it just like a neighborhood?

13   A.   Yeah.

14   Q.   And --

15   A.   There's another part to it now and more houses to the left

16   of my house.  I don't even know who lives there.

17   Q.   But over the course -- over the years they built more

18   houses --

19   A.   Yes.

20   Q.   -- and more houses?

21   A.   Yes.

22   Q.   Are there any kind of government or Indian Health

23   buildings near the Great Plains housing?

24   A.   Indian Health?

25   Q.   Like Great Plains Hall?

1    A.   Yes.   There's a clinic there.   There's a voc rehab.

2    There's an emerging school for Arapaho language.   Great Plains

3    Hall, where people gather for dinners and stuff.   There's Head

4    Start programs and I think Indian Child Welfare.

5    Q.   And is that all kind of within walking distance of --

6    A.   Yes.

7    Q.   -- each other the Great Plains housing and all those

8    buildings?

9    A.   Yes, it is.

10   Q.   Are you familiar with the house located at 331 Great

11   Plains Road?

12   A.   Yes.

13   Q.   And do you know whose house that is?

14   A.   My sister and her husband lived there.   And they're both

15   deceased, so their sons live there now.

16   Q.   And who is your sister?

17   A.   Laura Shakespeare.

18   Q.   And who are her sons?

19   A.   Loren and Edd Shakespeare.

20   Q.   So would they be your nephews?

21   A.   Yes.

22   Q.   And how long have Loren and Edd lived in that house with

23   their parents and without their parents?

24   A.   I think their mother passed away four years ago.   I don't

25   remember about their dad.   It's been a while.

1   Q.   And how long have the Shakespeares lived in that house?

2   A.   I would say about 40 years.

3   Q.   Do you keep in touch with Loren and Edd?

4   A.   With Loren I do, but Edd kind of keeps to himself.

5   Q.   Do you know if anyone else lives at 331?

6   A.   No, I don't.

7   Q.   Do other people stay or go there?

8   A.   Yes.  I've heard that.

9   Q.   Do you recall the date November 26th of 2017?

10  A.   Yes.

11  Q.   And why do you remember that date?

12  A.   Isn't it the date when there was a car accident --

13  Q.   And so --

14  A.   -- involving my sister and her husband.

15  Q.   So November 26th of 2017 would be a memorial for that

16  accident?

17  A.   Yes.

18  Q.   Do you recall Loren Shakespeare coming by your house on

19  November 30?

20  A.   Yes.

21  Q.   And do you remember why he stopped by?

22  A.   There was a knock at the door.  I was baby-sitting two

23  granddaughters.  And at the door there was Loren and Alfred

24  Spoonhunter, Junior, another nephew.  And I told them hello,

25  and they came in.  And Loren was visibly upset.  He was just

1   kind of moving around, and I said, "What's wrong."

2           He said, "Can you call 911?"

3           And I said, "What's wrong?  What's going on?"

4           And he said, "There's something wrong at my house,"

5   he said.  And my granddaughter at that time came up and asked

6   him about her cupcake.  I was cooling cupcakes; I made some.

7           And Alfred, Junior, in the meantime kept talking.  He

8   said, "There's a real strange, bad smell at his house, and he

9   wants the police over there."

10          And so I did call 911 and talked to a dispatcher.

11  They wanted to talk to Loren, so I handed the phone to him.

12  And he said, "They want you to take me over there when you see

13  a police car there."  So I said all right.  So when we seen

14  the red and blue lights there, then I drove him over.  And the

15  officer came over and said not to get off the car.

16  Q.  And let me stop you there, Mrs. Moss.  So you remember

17  calling a dispatcher?

18  A.  Yes.

19  Q.  And talking to them about Loren's predicament of the smell

20  in his house?

21  A.  Yes.

22          MR. CONDER:  Your Honor, at this time the United

23  States would move to admit and to present to the jury

24  Government's Exhibit 2-1, which is the 911 recording.

25          THE COURT:  Any objections?

1        MS. AMRAM:  No, Your Honor.

2        THE COURT:  Exhibit 2-1 will be admitted and may be

3    displayed or --

4        (Government's Exhibit 2-1 received.)

5        MR. CONDER:  And, Your Honor, before we do that, if

6    the Court would permit, Government's Exhibit 2-2 is a

7    transcript of that recording.  The United States would not

8    move to admit that as evidence but to simply publish it to the

9    jury for them to aid in listening to the recording.

10       THE COURT:  Any objections, Counsel?

11       MS. AMRAM:  No, Your Honor.

12       THE COURT:  All right.  I'll go ahead and allow that

13   to be distributed through the Clerk of Court.

14       Ladies and gentlemen, this transcript will serve as

15   an aid.  To the extent that what you hear is different than

16   what's on that transcript, it is what you hear that will

17   control.

18       (Playing audio recording.)

19   Q.  (BY MR. CONDER)  Mrs. Moss, having listened to that, was

20   that you on the recording?

21   A.  Yes, it was.

22   Q.  And is that the phone call you made on November 30?

23   A.  Yes, I did.

24       MR. CONDER:  May I have a moment, Your Honor?

25       THE COURT:  You may.

1          MR. CONDER:  No further questions of this witness,

2    Your Honor.

3          THE COURT:  All right.  Cross-exam.

4          MS. AMRAM:  No questions, Your Honor.

5          THE COURT:  All right.  May this witness be released

6    from any subpoenas, Mr. Conder?

7          MR. CONDER:  Yes, Your Honor.

8          THE COURT:  Ms. Amram?

9          MS. AMRAM:  Yes.

10         THE COURT:  Ma'am, you may step down.  You're free to

11   go.  Thank you.

12         MR. CONDER:  Your Honor, the United States would next

13   call Alise Trosper.

14         THE COURT:  All right.  Alise Trosper will come

15   forward and be sworn.

16      (The witness was sworn.)

17         THE COURTROOM DEPUTY:  Please state and spell your

18   name for the record.

19         THE WITNESS:  My name is Alise Trosper.  A-L-I-S-E,

20   last name, Trosper, is T-R-O-S-P-E-R.

21         THE COURTROOM DEPUTY:  Please state your occupation

22   and your city of residence.

23         THE WITNESS:  I am currently a school resource

24   officer at Wyoming Indian High School, and I live at Ethete,

25   Wyoming.

1        THE COURTROOM DEPUTY:  Thank you.

2            ALISE TROSPER, GOVERNMENT'S WITNESS

3                  DIRECT EXAMINATION

4   BY MR. CONDER:

5   Q.  Good afternoon, Officer Trosper.

6   A.  Good afternoon.

7   Q.  If you could tell the jury, what is a school resource

8   officer?  What do you do?

9   A.  I enforce the laws, the tribal laws, for the schools.  If

10  there's any criminal activity, child abuse cases, drug

11  activity, gang activity, and also we got an MOU agreement with

12  BIA where I help out with assisting on calls and stuff.

13  Q.  How long have you been a school resource officer?

14  A.  I started December 3rd of 2018.  Prior to that I was with

15  BIA for about -- a little over four years.

16  Q.  And if you could tell the jury, what does BIA stand for?

17  A.  Bureau of Indian Affairs.

18  Q.  So you were a police officer for them?

19  A.  Yes.

20  Q.  And where did you work?  Where was your duty station?

21  A.  Wind River.

22  Q.  And is that the Wind River Indian Reservation?

23  A.  Yes.

24  Q.  And where are you from?  Where'd you grow up?

25  A.  I grew up on the Wind River Reservation.  It's where I'm

1  from.

2  Q.  And if you could, what were your job duties as a BIA

3  police officer?

4  A.  Patrolled the Wind River Reservation, enforced the laws,

5  responded to calls, whether it be medical to crimes.

6  Q.  Were you working as a patrol officer on November 30, 2017?

7  A.  Yes.

8  Q.  And why do you recall that?

9  A.  What do I recall then?  Well, I was patrolling on the

10  reservation, and the call came in for 331 Great Plains about a

11  dead body smell in the crawl space.

12  Q.  And do you recall what time of day that was?

13  A.  I -- it was in the evening time.  I think it was like

14  around 1800 hours, or 6 p.m., somewhere around there.

15  Q.  Was it dark out?

16  A.  Yes.

17  Q.  And so you got the call.  What was your response to that

18  call?

19  A.  Well, I was pretty close near it.  I arrived on scene.  I

20  knocked on the door.  Nobody responded.  So I tried the

21  doorknob, and it was open.  In my experience prior to that,

22  that residence, sometimes people won't answer.  They just, you

23  know, will wait until we open the door, and they'll talk to us

24  then.

25          So I opened the door and announced as "police."

1    Nobody answered.  And then I didn't know what was going on,

2    because it was a 911 call with a dead body in the crawl space.

3    I didn't know if anybody else was in danger.  So myself and

4    Officer Imasa showed -- or cleared the house.  We didn't find

5    anyone.

6              And then we could smell a -- it was like decaying

7    flesh.  So we checked the whole house upstairs.  I checked

8    upstairs, and then we proceeded to go downstairs into the

9    basement.  And that's where we saw some items about the floor,

10   and there was a couple of cans that were indented and had

11   blood on them.  Then we saw blood, like, in the crawl space

12   opening, and then there was blood on that ledge.  And inside

13   the crawl space we couldn't really see anything.  It was just

14   a bunch of trash there.

15             So we stopped there, went outside, and that's when I

16   made contact with Alice Moss and Loren Shakespeare.  I can't

17   recall the other guy's name.

18   Q.  Okay.  And just backing up, so when you're down in the

19   basement, what did you note?  What did you see?  What did you

20   notice, and what did you do when you were down there?

21   A.  Well, the smell -- well, the smell was pretty bad, and the

22   blood and the indented cans of food, which led me to believe

23   that there was possibly a crime scene down there.  So we kind

24   of stopped and didn't want to mess up the crime scene, so we

25   stopped to get gloves, and I think we got masks for -- to

1    breathe.

2    Q.   And you said you talked to Loren Shakespeare?

3    A.   Yes, outside, outside of the residence.

4    Q.   And did he give you permission to go back in and --

5    A.   Yeah.  I talked to him, and he was telling us that he

6    could smell, like, a dead body smell in the crawl space.  I

7    said, "Let us -- will you let us search?"  And he said yes.

8    That was -- that's why he called.

9    Q.   The --

10   A.   So we grabbed our gloves and the masks and went back

11   inside the house.  And Officer Imasa went through the crawl

12   space and --

13            THE COURTROOM DEPUTY:  I'm sorry.

14   Q.   (BY MR. CONDER)  Go ahead.

15   A.   -- went into the crawl space and started looking through

16   all the items that were in the basement.  And the first -- the

17   first time he went through, he couldn't find anything.  Then

18   he finally started digging through the stuff a little bit

19   deeper, I guess.  Underneath the carpet he found a deceased

20   male.

21   Q.   He found a dead body?

22   A.   Yes.

23   Q.   What -- once that was discovered, what did you and officer

24   Imasa do?

25   A.   We stopped at that moment, and we contacted -- or our

 1  dispatch contacted the coroner and also the on-call agent.

 2  Q.  I would direct your attention to the screen in front of

 3  you and what's marked as Government's Exhibit Number 3-1.

 4          THE COURT:  It's being displayed to the witness and

 5  counsel only.

 6  Q.  (BY MR. CONDER)  Officer Trosper, do you recognize -- tell

 7  the -- do you know what that is?

 8  A.  331 Great Plains.

 9  Q.  And is that a photograph of 331?

10  A.  Yes.

11  Q.  And is it -- is that daylight or dark, the picture?

12  A.  Daylight.

13  Q.  Is that what it looked like when you got there?

14  A.  No.  It was dark.

15  Q.  But you've been out there, and that's what that house

16  looks like?

17  A.  Yeah, that's what it looks like.

18          MR. CONDER:  Your Honor, the United States would move

19  to admit Government's Exhibit 3-1.

20          THE COURT:  Any objections?

21          MS. AMRAM:  No, Your Honor.

22          THE COURT:  Exhibit 3-1 will be admitted and may be

23  published.

24      (Government's Exhibit 3-1 received.)

25  Q.  (BY MR. CONDER)  So, Officer Trosper, growing up on the

1   reservation and being a police officer, are you familiar with

2   the Great Plains housing area?

3   A.  Yes.

4   Q.  And the first question I would ask is, to help out the

5   jury, just estimate.  How far do you think Great Plains

6   housing is from Riverton?  You've made that drive before?

7   A.  Less than 10 miles, roughly maybe 8 --

8   Q.  Okay.

9   A.  -- if that.

10  Q.  And which direction is Riverton from the --

11  A.  It's east of Great Plains.

12  Q.  I would now direct your attention to what's marked as

13  Government's Exhibit 3-2.

14          THE COURT:  Exhibit 3-2 is being shown to the witness

15  and counsel only.

16  Q.  (BY MR. CONDER)  Could you look at that and describe what

17  that is and if you're familiar with it.

18  A.  That's Great Plains.

19  Q.  And is that an aerial photo of the Great Plains housing

20  area, or part of it?

21  A.  Yeah, partial.

22  Q.  And can you see 331 Great Plains in that photo?

23  A.  Yes.

24          MR. CONDER:  May I approach the witness, Your Honor?

25          THE COURT:  You may.  If you want to go ahead and

1   hand it to the Clerk of Court, she'll hand it on to the

2   witness.

3   Q.  (BY MR. CONDER)  Officer Trosper, you've been handed a

4   paper copy of Government's Exhibit 3-2.  And before we get on

5   to that, looking at the screen, is -- that aerial photo, is

6   that a true and accurate depiction of Great Plains housing,

7   that area, as you know it?

8   A.  Yes.

9        MR. CONDER:  Your Honor, the United States would move

10  to admit 3-2.

11       MS. AMRAM:  No objection.

12       THE COURT:  Exhibit 3-2 will be admitted and may be

13  published to the ladies and gentlemen of the jury.

14       (Government's Exhibit 3-2 received.)

15  Q.  (BY MR. CONDER)  Officer Trosper, on the paper copy, would

16  you be able to circle for the jury and place a black circle

17  around the house at 331 Great Plains?

18  A.  (Indicating.)

19       MR. CONDER:  Your Honor, at this time the United

20  States has received back from Officer Trosper 3-2 with a

21  circle on it.  The United States would move to admit it and

22  capture it and publish it to the jury.

23       THE COURT:  Any objections?

24       MS. AMRAM:  No, Your Honor.

25       THE COURT:  3-1 -- I'm sorry.  It's 3-2, which is the

1  one that's been marked on, will be admitted and may be

2  published.

3          MR. CONDER:  And, Your Honor, I would ask that we

4  have it be 3-2 and add an A to that so we don't get confused

5  later on.

6          THE COURT:  Any objections.

7          MS. AMRAM:  No, Your Honor.

8          THE COURT:  3-2 will be remarked as 3-2A, which is

9  the picture with the black circle on it.

10      (Government's Exhibit 3-2A received.)

11         MR. CONDER:  Thank you, Your Honor.

12  Q.  (BY MR. CONDER)  Officer Trosper, up on the overhead

13  there, the house with the black circle around it, that is 331

14  Great Plains; correct?

15  A.  Yes.

16  Q.  And that's where you went to the call on November 30,

17  2017?

18  A.  Yes.

19  Q.  Next I would direct your attention to the screen what's

20  marked as Government's Exhibit 3-3.

21         THE COURT:  This is just being shown to the witness

22  and counsel.

23         Ladies and gentlemen, are you seeing things come up

24  on your screens when I publish them?  No.  That's why we have

25  the big one, then, in the alternative.  Do you have blue

1   little lights on in the corners of your monitors?

2       (Jurors nodding heads.)

3           THE COURT:  Thank you.

4   Q.  (BY MR. CONDER)  Officer Trosper, in front of you is

5   what's marked as Government's Exhibit 3-3.  Do you know what

6   that is?

7   A.  Yes.

8   Q.  What is that?

9   A.  That's the Great Plains area.

10  Q.  Is that an aerial photo?

11  A.  Yes.

12  Q.  Again, is that a true and accurate depiction?

13  A.  Yes.

14          MR. CONDER:  Your Honor, the United States would move

15  to admit 3-3.

16          MS. AMRAM:  No objection.

17          THE COURT:  3-3 will be admitted and may be

18  published.

19      (Government's Exhibit 3-3 received.)

20          MR. CONDER:  Your Honor, at this time I would submit

21  a paper copy --

22          THE COURT:  All right.

23          MR. CONDER:  -- of 3-3A.

24          THE COURT:  It will be marked 3-3A and submitted to

25  the witness.

1   Q.  (BY MR. CONDER)  Officer Trosper, if you could take a look

2   at that again, that's the aerial photo of Great Plains

3   housing.  If you could, place a black circle around the house

4   that's located at 331 Great Plains Road.

5   A.  (Indicating.)

6              MR. CONDER:  Your Honor, at this time the United

7   States has received back 3-3A, circled by Officer Trosper.

8   The United States would move to admit and publish.

9              THE COURT:  Any objection?

10             MS. AMRAM:  No objection.

11             THE COURT:  3-3A will be admitted and may be

12  published.

13      (Government's Exhibit 3-3A received.)

14  Q.  (BY MR. CONDER)  Officer Trosper, showing you on the

15  overhead, again, if you could, in that photograph, on the top

16  right-hand side of the picture, it looks like there's a bunch

17  of cars parked and some bigger buildings.  What is that?

18  A.  One is Great Plains Hall; the other is the Arapahoe

19  clinic.

20  Q.  And those are just kind of government buildings?

21  A.  Yes.

22  Q.  And the house with the black circle, again, that's 331

23  Great Plains?

24  A.  Yes.

25  Q.  Thank you.  Officer Trosper, I would next direct your

1    attention to your screen and what's marked as Government's

2    Exhibit 3-4.  Could you tell the -- or are you able to

3    identify what that is?

4    A.  Yes.

5    Q.  And what is that?

6    A.  It's Great Plains housing area, 17 Mile, and Left Hand

7    Ditch Road.

8    Q.  Is that a true and accurate depiction of that area as you

9    know it?

10   A.  Yes.

11   Q.  And there are various things marked on that photograph.

12   Are those describing places?  Are those accurate?

13   A.  Oh, it's the tribal WIC and the social services, but the

14   other two are correct.

15   Q.  We'll now go to -- look at Government's Exhibit 3-5.

16        THE COURT:  And, Counsel, did you want to hold off on

17   3-4?

18        MR. CONDER:  Yes.

19        THE COURT:  All right.  Very well.

20   Q.  (BY MR. CONDER)  Officer Trosper, if you could, look at

21   3-5.  Are you aware of what that is?

22   A.  Yes.

23   Q.  What is that?

24   A.  It's Great Plains.

25   Q.  Is that a true and accurate depiction?

1    A.  Yes.

2    Q.  And again, there are some markings on there.  Are those

3    markings in the correct place, or is it wrong?

4    A.  Just those same two.

5    Q.  Okay.  So they're in the wrong spot?

6    A.  Yes.

7            MR. CONDER:  May I have a moment, Your Honor?

8            THE COURT:  You may.

9        (Discussion off the record.)

10           MR. CONDER:  No further questions at this time, Your

11   Honor.

12           THE COURT:  All right.  Thank you.

13           Cross-exam.

14           MS. AMRAM:  No questions, Your Honor.

15           THE COURT:  All right.  May this witness be released

16   from any subpoena?

17           MR. CONDER:  Yes, Your Honor.

18           THE COURT:  Ms. Amram?

19           MS. AMRAM:  Yes, Your Honor.

20           THE COURT:  Ma'am, you may step down.  You're free to

21   go.

22           THE WITNESS:  Thank you.

23           THE COURT:  United States may call its next witness.

24           MR. CONDER:  Your Honor, the United States would call

25   Fremont County Coroner Mark Stratmoen.  Your Honor, I would

1    note that Mr. Stratmoen may be a while.  I'm just telling the

2    Court.  Not that I want to stop, but I'm just giving the Court

3    a heads-up.

4         THE COURT:  What's the anticipated length of his

5    exam?

6         MR. CONDER:  I believe at least an hour, Your Honor,

7    at the very least.

8         THE COURT:  All right.  Ms. Amram, will you

9    cross-exam?

10        MS. AMRAM:  Some, Your Honor, yes.

11        THE COURT:  Let's go ahead and get started.  We'll go

12   until about 5:15 or thereabouts or where you find a good place

13   to rest.  If I thought we could get him off tonight, I'd do

14   that, but under the circumstances, ladies and gentlemen,

15   you've had a long day, so we'll take a recess around 5:15.

16      (The witness was sworn.)

17        THE COURTROOM DEPUTY:  Please state and spell your

18   name for the record.

19        THE WITNESS:  Mark Stratmoen, M-A-R-K

20   S-T-R-A-T-M-O-E-N.

21        THE COURTROOM DEPUTY:  Please state your occupation

22   and your city of residence.

23        THE WITNESS:  I'm the coroner of Fremont County, and

24   my city of residence is Riverton, Wyoming.

25        THE COURTROOM DEPUTY:  Thank you.

1      MARK STRATMOEN, GOVERNMENT'S WITNESS

2           DIRECT EXAMINATION

3  BY MR. CONDER:

4  Q.  Mr. Stratmoen, you indicated that you're the Fremont

5  County coroner.  How long have you been the county coroner?

6  A.  I was elected four years ago, and I'm just starting my

7  second term.

8  Q.  And when did you start your second term?

9  A.  As of today.

10  Q.  How many folks work in your office at the Fremont County

11  coroner?

12  A.  We have three people total in the office, including me

13  myself, a chief deputy, and one other deputy.

14  Q.  And how long have you been the -- have you been in the

15  Fremont County coroner's office, not just as the coroner but

16  in the office?

17  A.  As of this weekend, I've been working in the coroner's

18  office in Fremont County for 20 years.

19  Q.  And what type of training and education did you receive to

20  get this job?

21  A.  To be elected as a county official, there's no specific

22  requirements to run for coroner.  However, once you are

23  elected, you have to be state certified by taking Coroner

24  Basic at the Wyoming Law Enforcement Academy and, to maintain

25  that certification, get at least 20 hours of continuing

1    education every two years.

2    Q.  And before you got elected and when you were working under

3    the prior county coroner, what were your job duties?  What did

4    you do?

5    A.  I was a regular deputy for 16 years before I was elected

6    coroner, and seven of those years I was chief deputy.

7    Q.  And so if you could tell the jury, just what does a county

8    coroner do?

9    A.  The main responsibilities of a county coroner are to

10   investigate deaths that fall under his jurisdiction.  The main

11   duties are to identify the deceased, to determine a cause of

12   death, a manner of death, and to provide for -- and to make

13   sure notification of next of kin has been completed.

14   Q.  And generally, how do you get involved in -- how do you

15   get -- how do you get called?

16   A.  We get dispatched through the Fremont County Sheriff's

17   Office when a report of a death is called in to them.

18   Q.  And do you cooperate and work with law enforcement?

19   A.  Yes.  In Fremont County I work with the Lander Police

20   Department, the Riverton Police Department; as far as state

21   agencies, the Wyoming Highway Patrol, state Division of

22   Criminal Investigation if they're involved.  And Fremont

23   County also has very large reservation included in it, so I

24   work with the Bureau of Indian Affairs police, the Wind River

25   Police Department, and the FBI.

1    Q.  So when you get a call that there's a body somewhere, what

2    do you do, and what happens when your work's done?  How is

3    your work done?

4    A.  Our work -- once we're dispatched to a scene, the first

5    thing is to, of course, figure if it is coroner jurisdiction.

6    And then working with the different law enforcement agencies,

7    we do our own investigations, which includes our scene

8    investigation, may include an autopsy.  We review medical

9    records.  We look at the other agency reports.  It's quite a

10   cooperative operation.

11   Q.  And do you -- does your office issue the death

12   certificate?

13   A.  Yes.  In the state of Wyoming, either a physician or a

14   coroner are the only people that can certify a death.

15   Q.  And if you could, what is a death certificate?

16   A.  Death certificates are prepared and filed and maintained

17   by the state Department of Vital Records.  It is basically a

18   certification that gives the basic facts of a death, including

19   the manner and cause of death, the date and time if known,

20   some basic demographics as far as ancestry.  It also includes,

21   if it's a suspicious death or a nonnatural death, a brief

22   outline of the circumstances.

23   Q.  And just an estimate, how many callouts or cases do you

24   get called out on a year?

25   A.  We average, in Fremont County, about 150 cases a year.

1   Q.  And with regard to body recovery and death scene

2   investigations, how many do you think you've gone a part of?

3   A.  Our database doesn't track everybody that goes on a case,

4   so in the 20 years I couldn't tell you exactly the total

5   number of cases I've been on.  However, we do track who is the

6   chief investigator for a case, and so I've been the lead

7   investigator on well over 750 cases, including over 280

8   nonnatural cases.

9   Q.  And when you say nonnatural, what does that mean?

10  A.  Nonnatural would include homicide, suicide, accident, and

11  a category called undetermined, where no regular manner of

12  death has been able to be discovered.

13  Q.  And have you had the opportunity to provide training in

14  this field?

15  A.  Yes.  Over the course of my career, I will regularly offer

16  training or be asked to provide training at different seminars

17  or training for other coroners or law enforcement.

18  Q.  And have you received any certification or professional

19  accreditations?

20  A.  Other than the certifications to maintain my state

21  certification, I was also certified as a medical-legal death

22  investigator for the federal DMORT, which is a mass fatality

23  response team for Region 8 that includes things like I was

24  deployed to Hurricane Katrina and the aftermath of that.

25  Q.  What did that certification and training entail?

1    A.   That deals more with working as a team and working with a

2    lot of the response teams that most people would be familiar

3    with in terms of the response to a hurricane, the numbers of

4    mass fatalities that have to be investigated, retrieved,

5    identified, and determined if it is -- if their manner of

6    death is as a result of whatever action that occurred or event

7    that occurred or was it the result of something that -- say, a

8    homicide that occurred during the hurricane, things like that.

9    Q.   And do you participate in any professional groups or

10   associations regarding your coroner work?

11   A.   I'm currently president of the Wyoming Coroner's

12   Association.  I'm just finishing up having been appointed to

13   the governor's task force on organ donation, and I formerly

14   was in the federal team.  I resigned when I was elected

15   coroner.

16   Q.   And have you ever written any articles or publications in

17   the field of death investigations?

18   A.   I've written three books on death investigation:  one

19   concerning the difficulties of investigating deaths that turn

20   out to be undetermined; one regarding the statutes, the

21   Wyoming law, procedures, and recommended policies for

22   coroners; and one that was a study of the forensics involved

23   in historic coroner inquests.

24   Q.   I would now point your attention to the screen in front of

25   you and what's marked as Government's Exhibit 4-1.

1  Mr. Stratmoen, are you familiar with what that is?

2  A.  Yes.  That would be the résumé that I gave to you.

3  Q.  Is that -- is your résumé current and accurate as --

4  A.  It's accurate at the time that was made in November of

5  2018, but we still have had cases, so my numbers have gotten

6  bigger since the ones that are on there.

7          MR. CONDER:  Your Honor, at this time the United

8  States would move to admit 4-1.

9          THE COURT:  Any objections?

10         MS. HUCKE:  No objection.

11         THE COURT:  4-1 will be admitted and may be published

12 to the ladies and gentlemen of the jury.

13     (Government's Exhibit 4-1 received.)

14         MR. CONDER:  Your Honor, at this time, based upon

15 Mr. Stratmoen's experience, the United States would move to

16 admit him as an expert in death investigations.

17         THE COURT:  All right.  He may testify to the extent

18 that he is qualified, subject to objection.

19 Q.  (BY MR. CONDER)  Mr. Stratmoen, on November 30, 2017, were

20 you called out to assist?

21 A.  Yes.

22 Q.  And if you -- do you recall who called you?

23 A.  I would have been dispatched by the Fremont County

24 Sheriff's Office.

25 Q.  And do you recall what the call was about?

1    A.   The call originally came in as there was a possible

2    deceased located in a crawl space at a house located out on

3    the reservation.

4    Q.   And so once you learned this, what did you do?

5    A.   My procedure would be that I would get in my vehicle and

6    then proceed to the scene.

7    Q.   And did you do that?

8    A.   Yes, I did.

9    Q.   And did anyone else go with you or anyone from your

10   office?

11   A.   On receiving the call that this was someone that was

12   possibly located in a crawl space beneath a house, confined

13   space recoveries and investigations can be complicated and

14   quite involved.  So I also notified my chief deputy and my

15   other deputy to also respond.

16   Q.   And so did you end up going to 331 Great Plains?

17   A.   Yes, I did.

18   Q.   And do you recall what time it was?

19   A.   I believe I was dispatched about 6:30 in the evening.

20   Q.   And so once you got there, just generally, what did you

21   learn?  What did you observe?

22   A.   Standard procedure when we arrive at a scene is that we

23   confer with the law enforcement that is on the scene, get a

24   general assessment of what's going on.  And in this case other

25   investigators had not arrived yet, so we wait until all the

1    necessary investigators from the other agencies arrive.

2    Q.   And once that -- did that happen?

3    A.   Yes.

4    Q.   And once that happened, what did you do?

5    A.   Standard procedure is that we discuss what we know outside

6    of the scene and then decide on what the best approach would

7    be.  The scene belongs to law enforcement.  The body basically

8    belongs to the coroner as far as jurisdiction.  But we all

9    discuss in detail how best to approach a situation.  And then

10   the first thing that usually occurs after that and did in this

11   case was that we do just a very basic walkthrough of the

12   general scene to assess what we're up against, what are we

13   going to need, what sort of materials, and how best to

14   approach the subject at hand.

15   Q.   And when you got there, once you spoke with law

16   enforcement, what did you observe about the house upon

17   arrival?  Walk us through what you saw on the outside.

18   A.   When I got there, BIA officers already had a cordon of

19   scene tape around the house to establish a perimeter.  We did

20   not enter the house, of course, until the other investigators

21   arrived.  The one thing that I can do and that we did in this

22   case was that we can start by taking peripheral pictures at a

23   distance around a building, and I did do that.

24   Q.   And I would show you if you'd look at the screen in front

25   of you what's marked as Government's Exhibit 4-2.  Are you

1    familiar with that?

2    A.  Yes.

3    Q.  And what is that?

4    A.  That would be the front of the house at 331 Great Plains

5    Road.

6    Q.  And is that a true and accurate depiction of the scene as

7    you saw it that night?

8    A.  Yes.

9           MR. CONDER:  Your Honor, the United States would move

10   to admit and publish 4-2.

11          MS. HUCKE:  No objection.

12          THE COURT:  4-2 will be admitted and may be published

13   to the ladies and gentlemen of the jury.

14       (Government's Exhibit 4-2 received.)

15   Q.  (BY MR. CONDER)  Mr. Stratmoen, looking at Government's

16   Exhibit 4-2, is that the front side of the house or the back

17   side of the house?

18   A.  That's the front side of the house, the house that is

19   facing west, towards the street.

20   Q.  And is that the front door?

21   A.  Yes.  That's the front door and main entry to the home.

22   Q.  At this time, Mr. Stratmoen, I'd point your attention to

23   what's marked as Government's Exhibit 4-3 in front of you on

24   the screen.  Do you recognize that?

25   A.  Yes, I do.

1   Q.   And what is that?

2   A.   That would be the rear side of the house, opposite of the

3   previous view.

4   Q.   And is that a true and accurate depiction of the scene as

5   you saw it that night?

6   A.   Yes, it is.

7           MR. CONDER:  Your Honor, the United States would move

8   to admit and publish 4-3.

9           MS. HUCKE:  No objection.

10          THE COURT:  4-3 will be admitted and may be published

11  to the ladies and gentlemen of the jury.

12      (Government's Exhibit 4-3 received.)

13  Q.   (BY MR. CONDER)  Mr. Stratmoen, with regard to

14  Government's Exhibit 4-3, were you able to eventually go

15  inside this residence?

16  A.   Yes, I was.

17  Q.   And so once you got in and -- looking at this photo, do

18  you know where those windows on the bottom picture -- there's

19  two windows.  Where do those go to?

20  A.   Yes.  The interior of the house is of a construction that

21  has kind of a half basement.  The foundation comes up a ways,

22  and then those two bottom windows are sitting on top of the

23  foundation to the basement and actually are accessed from the

24  basement.

25  Q.   So those two bottom windows would be the basement --

1    A.   Yes.

2    Q.   -- windows.

3          Going back -- I apologize for that -- to 4-2, similar

4    question.  Those windows on the bottom right side of the

5    photograph, where do those windows go to?  Are those basement

6    window as well?

7    A.   Yes, they are basement windows.

8    Q.   Next I would direct your attention to 4-4 on the screen in

9    front of you.  And are you familiar with that?

10   A.   Yes, I am.

11   Q.   And what is that?

12   A.   That would be the single level of the split-level home,

13   again looking at it from the front side of the home.

14   Q.   And is that a true and accurate depiction?

15   A.   Yes, it is.

16         MR. CONDER:  Your Honor, the United States would move

17   to admit 4-4 and publish.

18         MS. HUCKE:  No objection.

19         THE COURT:  4-4 will be admitted and may be

20   published.

21      (Government's Exhibit 4-4 received.)

22   Q.   (BY MR. CONDER)  Mr. Stratmoen, is this -- this photo, is

23   this at the front door or the back door, the side door?  Where

24   is that?

25   A.   That would be the front door.  That is an entry into the

1    main living area.

2    Q.   And do you recall how many doors were in that house?

3    A.   Directly opposite, on the other side of the house or the

4    back side, there is also another door that leads out to the

5    backyard.

6    Q.   I would now direct your attention in front of you to

7    what's marked as 4-5.  Are you familiar with that photograph?

8    A.   Yes, I am.

9    Q.   And is that a true and accurate depiction?

10   A.   Yes, it is.

11        MR. CONDER:  Your Honor, the United States would move

12   to admit 4-5 and publish.

13        MS. HUCKE:  No objection.

14        THE COURT:  4-5 will be admitted and may be

15   published.

16        (Government's Exhibit 4-5 received.)

17   Q.   (BY MR. CONDER)  And, Mr. Stratmoen, again, is this the

18   front door that you previously described in 4-4?

19   A.   Yes.  It is just a closer view.

20   Q.   So was there a time when you were at the scene you were

21   able to go through, and did go through that front door?

22   A.   Yes, I did, later on.

23   Q.   And once you went through that front door, could you

24   describe to the jury what you saw.

25   A.   Basically the living area of the home was in not too bad

1    of shape, relatively unkempt, somewhat messy, not very good

2    housekeeping, with standard furniture and other personal

3    property that you would expect to see in a living room area.

4    Q.  I would direct your attention to what's marked as

5    Government's Exhibit 4-6 in front of you.  Are you familiar

6    with that?

7    A.  Yes, I am.

8    Q.  And what is that?

9    A.  That's standing just inside the front entry in the

10   previous photo, and we're looking into the living area and on

11   through into the attached kitchen.

12   Q.  And is that a true and accurate depiction?

13   A.  Yes, it is.

14        MR. CONDER:  Your Honor, the United States would move

15   to admit 4-6.

16        MS. HUCKE:  No objection.

17        THE COURT:  4-6 will be admitted and may be published

18   to the ladies and gentlemen of the jury.

19        (Government's Exhibit 4-6 received.)

20   Q.  (BY MR. CONDER)  Mr. Stratmoen, again, that's a photograph

21   of you walking in the front door?

22   A.  Yes.  That would be the scene as we walked in the front

23   door as we would have seen it that evening.

24   Q.  And that is the living area with the couch there and the

25   cooler?

1    A.   Yes.

2    Q.   And then what's behind that?

3    A.   Behind that you can see an open area into an open

4    kitchen-dining area.

5    Q.   And I would now direct your attention to 4-7.  And is that

6    a photograph?

7    A.   Yes.  That would be another view of the living room area

8    from probably a few steps farther in from the front door.

9    Q.   And is that a true and accurate depiction of the scene you

10   saw that night?

11   A.   Yes, it is.

12        MR. CONDER:  Your Honor, the United States would move

13   to admit and publish 4-7.

14        MS. HUCKE:  No objection.

15        THE COURT:  4-7 will be admitted and may be published

16   to the ladies and gentlemen of the jury.

17        (Government's Exhibit 4-7 received.)

18   Q.   (BY MR. CONDER)  Again, Mr. Stratmoen, is that a

19   continuing view of the living room?

20   A.   Yes, it is.

21   Q.   And is that the same condition as you saw it that night?

22   A.   Yes, it is.

23   Q.   And again, in the back, would that be the kitchen you

24   described?

25   A.   Yes, a little bit wider view of the kitchen.

1    Q.  Next I would direct your attention to 4-8.  And is 4-8 a

2    photograph?

3    A.  Yes.

4    Q.  And is that a true and accurate depiction?

5    A.  Yes, it is.

6          MR. CONDER:  Your Honor, the United States would move

7    to admit 4-8 and publish.

8          THE COURT:  4-8 will be admitted and may be

9    published.

10    (Government's Exhibit 4-8 received.)

11    Q.  (BY MR. CONDER)  Mr. Stratmoen, if you could tell the jury

12    what 4-8 is a photo of.

13    A.  What you're seeing here is we're now standing pretty much

14    in the living room, and you're looking again into and seeing a

15    small dining area with an attached kitchen.  You have a

16    stairway off to the right that goes up to the top level of the

17    split level.  Right beyond that you have a stairway that goes

18    down into the basement.  And then straight against the far

19    wall is the door that leads to the outside and the backyard.

20    Q.  I would now direct your attention on to what's marked as

21    4-9.  And is that a -- on just the screen in front of you, is

22    that a photograph?

23    A.  Yes, it is.

24    Q.  And is it a true and accurate depiction of --

25    A.  It is.

1    MR. CONDER:  Your Honor, the United States would move

2    to admit 4-9 and publish as well.

3          MS. HUCKE:  No objection.

4          THE COURT:  4-9 will be admitted and may be published

5    to the ladies and gentlemen of the jury.

6    (Government's Exhibit 4-9 received.)

7    Q.   (BY MR. CONDER)  Again, if you could, Mr. Stratmoen,

8    describe what that's a photograph of.

9    A.   Again, in this view you're standing a little bit farther

10   into the living room and looking towards the south wall of the

11   living room and kitchen area.  Starting with the left, you see

12   just a little bit of the rear exit door.  There's a closet,

13   then again the door going to the basement area, and then the

14   stairway going up to the top level of the split level.

15   Q.   Thank you.

16         MR. CONDER:  Your Honor, the United States would just

17   note for the Court that we have several more questions, and

18   the United States is willing to continue to proceed but just

19   wanted to make the Court aware if the Court wanted me to stop.

20         THE COURT:  Is this an easy spot for you to stop?

21         MR. CONDER:  As good as any, Your Honor.  We could

22   pick up with 4-10 tomorrow.

23         THE COURT:  All right.  We will begin with 4-10

24   tomorrow morning.

25         Ladies and gentlemen, we'll take -- easy for me to

1    say.  We will take our evening recess at this time.  I'll

2    remind you of the recess instruction.

3            Don't talk about this case with anyone.  Don't allow

4    anyone to talk to you about this case.  You may simply tell

5    your family that you are on jury duty and have been selected

6    to serve in a case and you will discuss all the details after

7    you've completed your duties as a juror and the verdict has

8    been received.

9            In the interim, please don't read any articles or

10   watch any news reports concerning this matter.  You may only

11   consider that evidence introduced from this courtroom during

12   this trial.

13           Please don't discuss this case or begin deliberating

14   this case until you've heard all the evidence, the

15   instructions of law by this Court, the arguments of counsel,

16   and the thoughts of your other jurors.

17           So we'll stand in recess until 8:30 a.m. tomorrow

18   morning, and we'll resume with Exhibit 4-10.  Have a good

19   night.

20           Please rise.

21       (The jury exited the courtroom at 5:22 p.m.)

22       (The following took place outside the presence of the

23       jury.)

24           THE COURT:  Mr. Stratmoen, you may take a seat or

25   step down if you wish.

1          THE WITNESS:  Thank you.

2          THE COURT:  Anything we need to address before we

3    return tomorrow morning at 8:30 a.m., Mr. Conder?

4          MR. CONDER:  Nothing for the United States.

5          THE COURT:  Ms. Amram?

6          MS. AMRAM:  No, Your Honor.

7          THE COURT:  All right.  I'll continue my research

8    regarding the issue, and I'll try to have an answer for you in

9    the morning.

10          MR. CONDER:  Thank you, Your Honor.

11          THE COURT:  Have a good evening.

12        (Proceedings concluded at 5:22 p.m., January 7, 2019.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, ANNE BOWLINE, Court Reporter in the state of

4    Wyoming, a Registered Merit Reporter and Certified Realtime

5    Reporter, do hereby certify that I reported by machine

6    shorthand the proceedings contained herein on the

7    aforementioned subject on the date herein set forth, and that

8    the foregoing 215 pages constitute a full, true and correct

9    transcript.

10          Dated this 1st day of May, 2019.

11

12

13

14                    _____/s/ Anne Bowline_____

15                         ANNE BOWLINE
                      Registered Merit Reporter
16                   Certified Realtime Reporter

17

18

19

20

21

22

23

24

25