217

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

UNITED STATES OF AMERICA,     Case No. 18-CR-20-SWS

       Plaintiff,

                        Casper, Wyoming
   vs.

                        Volume II

ARAPAHO JAMES OLDMAN,

                        January 8, 2019
     Defendant.            8:34 a.m.

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE
AND A JURY OF TWELVE AND ONE ALTERNATE

---

APPEARANCES:

For the Plaintiff:     MR. JASON M. CONDER
                    United States Attorney's Office
                    P.O. Box 449
                    Lander, Wyoming  82520

For Defendant Oldman:  MS. GALIA Z. AMRAM
                    MS. TRACY RACICOT HUCKE
                    Office of the Federal Public Defender
                    214 West Lincolnway, Suite 31-A
                    Cheyenne, Wyoming  82001

Court Reporter:      MS. ANNE BOWLINE, RMR, CRR
                    111 South Wolcott Street, Room 217
                    Casper, Wyoming  82601
                    (307) 235-3376

*Proceedings recorded by stenography; transcript produced by computer-aided transcription.*

218

<u>I N D E X</u>

<u>GOVERNMENT'S WITNESSES</u>                                      <u>PAGE</u>

MARK STRATMOEN
    Direct Examination (Resumed) by Mr. Conder        229
    Cross-Examination by Ms. Hucke                    262
    Redirect Examination by Mr. Conder               267
ROBERT BRUCE PALMER
    Direct Examination by Mr. Conder                 274
    Cross-Examination by Ms. Hucke                   294
    Examination by the Court                         305
    Cross-Examination (Resumed) by Ms. Hucke         310
    Direct Examination (Resumed) by Mr. Conder       311
BERNADETTE BROWN
    Direct Examination by Mr. Conder                 318
    Cross-Examination by Ms. Amram                   339
    Redirect Examination by Mr. Conder               365
MATTHEW TERRANCE WHITEPLUME
    Direct Examination by Mr. Conder                 371
    Cross-Examination by Ms. Hucke                   432
    Redirect Examination by Mr. Conder               465
BRIDGET OLDMAN
    Direct Examination by Mr. Conder                 470
WINTERHAWK FELTER
    Direct Examination by Mr. Conder                 493
LITTLE SUN FELTER
    Direct Examination by Mr. Conder                 500

| <u>GOVERNMENT'S</u><br><u>EXHIBITS</u> | <u>DESCRIPTION</u> | <u>IDENTIFIED</u> | <u>RECEIVED</u> |
|---|---|---|---|
| 4-10 | photo of hallway and stairs | 230 | 230 |
| 4-11 | photo of kitchen | 230 | 230 |
| 4-12 | photo of kitchen | 230 | 230 |
| 4-13 | photo of kitchen | 230 | 230 |
| 4-14 | photo of dining room table | 231 | 230 |
| 4-15 | photo of basement door | 233 | 232 |

219

| | | | |
|---|---|---|---|
| 4-16 | photo of basement stairs | 233 | 232 |
| 4-17 | photo of basement stairs | 233 | 232 |
| 4-18 | photo of basement stairs | 233 | 232 |
| 4-19 | photo of basement stairs | 233 | 232 |
| 4-20 | photo of basement | 233 | 232 |
| 4-21 | photo of basement | 233 | 232 |
| 4-22 | photo of basement | 234 | 232 |
| 4-23 | photo of basement | 234 | 232 |
| 4-24 | photo of basement | 234 | 232 |
| 4-25 | photo of basement | 234 | 232 |
| 4-26 | photo of basement | 234 | 232 |
| 4-27 | photo of basement | 234 | 233 |
| 4-28 | photo of basement | 236 | 236 |
| 4-29 | photo of basement | 236 | 236 |
| 4-30 | photo of basement | 236 | 236 |
| 4-31 | photo of basement | 237 | 236 |
| 4-32 | photo of basement | 237 | 236 |
| 4-33 | photo of basement | 238 | 236 |
| 4-34 | photo of basement | 238 | 236 |
| 4-35 | photo of basement | 238 | 236 |
| 4-36 | photo of basement | 238 | 236 |
| 4-37 | photo of basement | 238 | 236 |
| 4-38 | photo of basement | 238 | 236 |
| 4-39 | photo of basement | 239 | 236 |
| 4-40 | photo of crawl space | | 236 |

| | | | |
|---|---|---|---|
| 4-41 | photo of crawl space | | 236 |
| 4-42 | photo of crawl space | 241 | 241 |
| 4-43 | photo of crawl space | 242 | 241 |
| 4-44 | photo of crawl space | 242 | 241 |
| 4-45 | photo of crawl space | 242 | 241 |
| 4-46 | photo of crawl space | 244 | 244 |
| 4-47 | photo of crawl space | 245 | 244 |
| 4-48 | photo of boot | 245 | 244 |
| 4-49 | photo of boot | 245 | 244 |
| 4-50 | photo of boot | 245 | 244 |
| 4-51 | photo of boot | 245 | 244 |
| 4-52 | photo of body | 247 | 247 |
| 4-53 | photo of body | 248 | 247 |
| 4-54 | photo of body | 249 | 247 |
| 4-55 | photo of body | 249 | 247 |
| 4-56 | photo of body | 251 | 247 |
| 4-57 | photo of space where body had been | 251 | 247 |
| 4-58 | photo of face | 253 | 254 |
| 4-59 | photo of face | 254 | 255 |
| 4-60 | photo of face | 255 | 255 |
| 4-61 | photo of neck | 255 | 255 |
| 4-63 | photo of body | 259 | 259 |
| 4-64 | photo of body | 259 | 259 |
| 4-65 | photo of body | 259 | 259 |

| 4-66 | photo of body | 259 | 259 |
|------|---------------|-----|-----|
| 4-67 | Dodge death certificate | 260 | 260 |
| 4-68 | Addison death certificate | 262 | 262 |
| 5-1 | Palmer curriculum vitae | 277 | 278 |
| 5-2A | toxicology report | 290 | 291 |
| 6-1 | photo of crowbar | 368 | 369 |
| 7-1 | photo ID | 422 | 423 |
| 7-2 | photo of sock on basement floor | 423 | 424 |
| 7-3 | Whiteplume plea agreement | 374 | |
| 7-4 | diagram of basement | 382 | 382 |
| 8-1 | summary of calls and texts | 481 | 482 |
| 8-2 | video of Bridget Oldman's phone with texts | 482 | 482 |
| 8-3 | video of Bridget Oldman's phone with texts | 491 | 491 |
| 8-4 | video of Bridget Oldman's phone with texts | 491 | 491 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|----------------------|-------------|------------|----------|
| 38 | judgment | 364 | |
| 39 | judgment | 363 | 364 |
| 462 | Riverton Police Department records | 449 | |
| 476 | recording of Whiteplume interview | 436 | |

| 489 | recording of Whiteplume interview | 443 | |
| 494 | recording of Brown interview | 360 | |
| A | sketch of weapon | 350 | 352 |

223

1        (Proceedings commenced at 8:34 a.m., January 8, 2019.)

2        (The following took place outside the presence of the

3     jury.)

4        THE COURT:  Thank you.  Please be seated.  I note the

5     presence of defendant, presence of his counsel, and counsel

6     for the United States.

7        A couple of housekeeping matters.  First, yesterday

8     there was a discussion regarding reasonable doubt.  I wanted

9     for the record to note in rejecting the request by the

10    defense, the Court would cite the parties to *United States v.*

11    *Petty*, P-E-T-T-Y, 856 F.3d 1306, wherein the Tenth Circuit

12    discussed the appropriateness of the beyond a reasonable doubt

13    instruction as given by the Court.

14        The second item is the summary of phone calls,

15    messages.  Have you had a chance to confer with each other on

16    that?  Mr. Conder?

17        MR. CONDER:  Your Honor, previously we have but not

18    recently.  So I apologize for that, Your Honor.

19        MS. AMRAM:  I received some materials and summaries

20    in discovery this morning that I haven't had a chance to look

21    at, but I want to make sure that's everything.  But if we

22    could talk and I could confirm at lunch.

23        MR. CONDER:  And, Your Honor, those witnesses

24    wouldn't testify until we've had a chance to talk, so we'll

25    talk before then.

1      THE COURT:  Very well.  The third thing I have is in

2  regards to Ms. Addison.  Any further developments or further

3  insights based upon your evening research, Mr. Conder?

4      MR. CONDER:  Your Honor, I have not heard anything

5  this morning.  Ms. Jacobson from the U.S. Attorney's Office

6  has been in contact with Ms. Jackie Nelson and is hoping to

7  give an update to me and as the day progresses.  So we have

8  not heard anything yet today other than what I informed the

9  Court in the Government's motion, that she does have a blood

10  infection, a bone infection, that she cannot be transported

11  even by ambulance.

12      And attendant, the reason -- the anticipated

13  potential release date of Wednesday is based, according to

14  Dr. Nelson, on subsequent testing.  If that subsequent testing

15  comes back on Wednesday as positive, then Ms. Addison may be

16  released subject to certain conditions and terms and things

17  like that.  But that's all the Government knows today, Your

18  Honor.

19      THE COURT:  All right.  Anything further regarding

20  that, Ms. Amram?

21      MS. AMRAM:  Your Honor, I did just want to briefly

22  inform the Court I did receive the Government's motion last

23  night, and the only additional information I wanted to present

24  to the Court, other than what I discussed yesterday about why

25  I don't think she's an essential witness because of all of the

1    other witnesses, was there does appear to be a requirement in

2    the case law about basically that this is the only option.

3         And Ms. Addison has been sick for some time.  In

4    her -- I believe it was the last interview she had with the

5    Government, which was a few weeks ago or a month ago, they

6    picked her up from the hospital.  And I could be wrong about

7    the dates.  I could pull the 302 if the Court wants.  But they

8    picked her up from the hospital.  She got tired during the

9    interview, and they had to stop the interview because she was

10   tired.  At that point she'd already had her foot amputated.

11        So they've known that she's been sick for a while,

12   and they could have requested a deposition earlier with more

13   notice.  At this point we don't even -- we didn't even have a

14   day's notice before trial.  They requested it during trial.  I

15   understand that she was recently hospitalized, but this seems

16   to be different.  If you had a witness who was in a car

17   accident two days before trial or was in a car accident on

18   their way to court and there would have been no way of knowing

19   that they could have been unavailable, whereas here the

20   Government was on notice that she was really sick.

21        So for that reason we object both to taking the

22   deposition, and then if the Court allows that, we will make a

23   subsequent objection to its admission at trial.

24        THE COURT:  All right.  Here's what we'll do.  I'd

25   cite the parties to *U.S. v. Yates*, 438 F.3d 1307.  That's

1    Y-A-T-E-S.  It's a 11th Circuit opinion discussing the

2    appropriateness of witness testimony by means of a two-way

3    videoconference and whether or not it violates the defendant's

4    Sixth Amendment rights.

5             In that case they found that under certain

6    circumstances and based upon certain findings, the Court may

7    allow such testimony.  But to do so, the Court must hold an

8    evidentiary hearing and find that the denial of physical

9    face-to-face confrontation at trial is necessary to further an

10   important public policy and that the reliability of the

11   testimony is otherwise assured.

12            What I will do is I would ask the United States, if

13   they wish to pursue the testimony of Ms. Addison, they will

14   need to arrange for Dr. Nelson to appear by video or otherwise

15   and testify in an evidentiary hearing outside the hearing of

16   the jury as to Ms. Addison's circumstances and limitations.

17   And then we will look at whether or not that evidentiary basis

18   supports allowing the testimony by video teleconference.

19            That raises the other issue of the ability to do so.

20   I don't know what facilities they would have, but that will be

21   another question in terms of any coordination of that.

22            A Rule 15 deposition, I believe it -- it is

23   problematic in a number of ways.  First and foremost, I'm not

24   about to direct that we suspend proceedings, send everyone up

25   there, including a defendant in custody, to sit in a hospital

1    room for a deposition.  That's not in the public interest or

2    in the -- anyone's safety or -- it's just not feasible.

3           The car wreck issue, it might be that certainly they

4    knew that she was ill, but they didn't know that she was going

5    to be hospitalized and tied to various treatment and

6    limitations.  It's one thing for her to get tired and maybe

7    need to go to the hospital for a checkup, but it's a whole

8    nother thing for her to be put into the hospital and have a

9    life-threatening condition that would be potentially

10   problematic if she were to be removed from the hospital.

11          So while certainly there was a higher risk of her

12   potential for not being available, I don't think that the

13   circumstances are such that it was reasonable to anticipate

14   the need to take a Rule 15 deposition prior to trial.

15          That being said, look at that case.  Confer with

16   Dr. Nelson.  And what we'll do is either lunch, evening,

17   sometime when we're not using the jury's time, we'll take up

18   that evidentiary hearing so that we can determine the

19   parameters of and necessity of doing so.

20          Mr. Conder, anything else?

21          MR. CONDER:  No, Your Honor.  The United States would

22   agree and has read that case, and that is an accurate

23   representation of what needs to occur.  So the Government will

24   get on it.

25          THE COURT:  All right.

1        MS. AMRAM:  Your Honor, can I make sure I got the

2  cite right.  Was it 413 F.3d 1307?

3        THE COURT:  Yes, ma'am.

4        MS. AMRAM:  And I would ask that the Court -- for the

5  Government to produce discovery for the evidentiary hearing,

6  which would be Fatima Addison's medical records from her

7  hospitalization.  I'm not asking for all of her medical

8  records ever, which I'm sure are voluminous, but the records

9  since she's been hospitalized so we can adequately

10  cross-examine the doctor if the evidentiary hearing happens.

11        THE COURT:  I would ask that any medical records that

12  the United States has be provided to the defense so they may

13  adequately question Dr. Nelson.

14        All right.  Anything else we need to take up before

15  we resume?

16        The testimony -- I will advise you that we have

17  figured out the annotator removal was problematic, which shut

18  down the jury and various other monitors, but we have bypassed

19  that.  So all the monitors are working.  The annotator still

20  isn't working, but we will work on that later.  But at least

21  we have the ability to use everything short of that.

22        So we should be ready to go.  Let's bring in the

23  ladies and gentlemen of the jury.

24      (The jury entered the courtroom at 8:44 a.m.)

25        THE COURT:  Thank you.  Please be seated.  Good

1    morning, ladies and gentlemen of the jury.  We have fixed the

2    snafu that led to the absence of your monitors, and I'm

3    hopeful that they will work and that our timing will be a

4    little better as we progress.

5             That said, at this time, Mr. Conder, the United

6    States may re-call its witness.

7             MR. CONDER:  Thank you, Your Honor.  The United

8    States would call Fremont County Coroner Mark Stratmoen.

9             THE COURT:  And I would ask that he be administered a

10   new oath, having slept on the last.

11        (The witness was sworn.)

12             MARK STRATMOEN, GOVERNMENT'S WITNESS

13                 DIRECT EXAMINATION (RESUMED)

14   BY MR. CONDER:

15   Q.  Mr. Stratmoen, we left off last night talking about some

16   photographs at the main level of the house at 331 Great Plains

17   Road.  Do you recall that?

18   A.  Yes, sir.

19   Q.  And in preparing to testify today, did you have an

20   opportunity to review Government's 4-10, 4-11, 4-12, 4-13, and

21   4-14?

22   A.  Okay.

23   Q.  Did you have a chance to review those, and were they true

24   and accurate depictions of the scene as you saw it that night

25   on November 30, 2017?

1    A.  Yes, sir.

2            MR. CONDER:  Your Honor, the United States would move

3    publish to the jury 4-10, 4-11, 4-12, 4-13, 4-14.

4            THE COURT:  Any objections?

5            MS. HUCKE:  No objections.

6            THE COURT:  4-10, 4-11, 4-12, and 4-13 will be

7    admitted.

8            MR. CONDER:  And 4-14.

9            THE COURT:  And 4-14 as well.

10        (Government's Exhibits 4-10, 4-11, 4-12, 4-13,

11        and 4-14 received.)

12           MR. CONDER:  Thank you, Your Honor.

13   Q.  (BY MR. CONDER)  Mr. Stratmoen, I'd direct your attention

14   first to 4-10.  If you could, tell the jury what that is,

15   where that is, what you're looking at.

16   A.  That photo was taken from pretty much the area between the

17   living room and the kitchen, looking at the stairway that goes

18   up to the split -- upper split level.

19   Q.  And now 4-11 -- or -- or, yeah, 4-11.

20   A.  That would be looking at the direction on the north side

21   of the kitchen.

22   Q.  And 4-12?

23   A.  Looking at the northeast corner of the kitchen.

24   Q.  And 4-13?

25   A.  And looking toward the east, that is the dining table

1   that's in the area just south of the kitchen.

2   Q.   And in that photograph, on the right-hand side it shows

3   there's a door.  Is that the front door or the back door?

4   A.   That would be the back door.

5   Q.   Next, 4-14.

6   A.   That would be the surface of the dining room table at a

7   little closer view.

8   Q.   So once you entered the house at 331 Great Plains Road,

9   once you walked through the main level, where did you go next?

10   A.   We would have then proceeded to the basement area.

11   Q.   And how did you get down there?  Describe what you did,

12   what you saw, and the layout.

13   A.   Basically we entered down the stairs on our initial

14   walkthrough very carefully, just to get an overview of the

15   general layout and see what we were dealing with as far as the

16   investigation.

17   Q.   And when you got down there, just generally, what did you

18   see?  Environmental conditions?  Was it hot?  Was it cold?

19   A.   The area was cool but comfortable.  There was one open

20   window on the west side of the basement.  The front door had

21   been opened for a time too.  So the interior of the house was

22   probably not at its normal maintenance temperature.  The

23   basement was extremely cluttered with different degrees of

24   property in piles, somewhat poor housekeeping generally.  The

25   furnace was operational, which was maintaining the temperature

1   even though the windows were open.  And generally there was,

2   we immediately noticed, a certain amount of biologics in a

3   portion of the basement.

4   Q.   And what do you mean by "biologics"?

5   A.   Biologics are something that looks like it may be apparent

6   blood.  And that was confined for the most part to what we saw

7   that was in the northwest corner of that portion of the

8   basement.

9   Q.   And, Mr. Stratmoen, in preparing to testify here today,

10  did you have an opportunity to view Government's Exhibits 4-15

11  through 4-27, showing entry to the basement and the general

12  layout of the basement?

13  A.   Yes, sir.

14  Q.   And were those photographs true and accurate of the

15  basement as you saw it that night on November 30?

16  A.   Yes, sir.

17         MR. CONDER:  Your Honor, at this time the United

18  States would move to admit and publish Government's

19  Exhibit 4-15 consecutive through 4-27.

20         THE COURT:  Any objections?

21         MS. HUCKE:  No, Your Honor.

22         THE COURT:  Exhibits 4-15 through 4-27 will be

23  admitted and may be published.

24     (Government's Exhibits 4-15, 4-16, 4-17, 4-18,

25       4-19, 4-20, 4-21, 4-22, 4-23, 4-24, 4-25, 4-26,

1       and 4-27 received.)

2    Q.  (BY MR. CONDER)  So, Mr. Stratmoen, first looking at 4-15,

3    describe for the jury what that is a photo of.

4    A.  There we are looking at the entry to the basement that's

5    just south of the kitchen, between the living room and the

6    kitchen area.

7    Q.  And 4-16?

8    A.  There we're still standing at the top of the stairs and

9    looking down the stairs towards the basement.

10   Q.  And 4-17?

11   A.  This would be a photo from approximately halfway down the

12   stairs, looking at the landing towards the bottom.

13   Q.  And 4-18?

14   A.  This would be at the very base of the stairs.

15   Q.  And 4-19?

16   A.  And then this is standing in the basement, looking

17   backwards towards the stairway going back up into the kitchen.

18   Q.  And 4-20?

19   A.  This would be looking over towards the northeast corner of

20   the basement.  You have the furnace there on the left-hand

21   side and a laundry setup over on the east side, against the

22   east wall of the basement area.

23   Q.  And 4-21?

24   A.  This is another view looking towards the east wall of the

25   basement.

1   Q.   And 4-22?

2   A.   This is a view from a little farther back, looking at the

3   southeast corner of the basement.

4   Q.   And 4-23?

5   A.   Now we're looking at the south wall of the basement.

6   Q.   And 4-24?

7   A.   And now we're looking at the southwest corner of the

8   basement.

9   Q.   And 4-25?

10   A.   Looking and rotating just a little bit more towards the

11   north, still looking at the west wall of the basement.

12   Q.   And 4-26?

13   A.   Standing a little farther back, still looking at the

14   southwest corner of the basement.

15   Q.   And 4-27?

16   A.   And this is looking over towards -- more towards the

17   northwest corner of the basement.

18   Q.   And so if you could, walk through the jury again the --

19   you talked about you got down there.  Where did you go when

20   you get down there?  Where do you wander around?  What are you

21   looking at?

22   A.   Initially, on the first basic walkthrough with the

23   investigators, we generally just go down, observing and being

24   very careful to see what we're coming up with, looking around

25   the whole area, seeing what areas are of concern that may have

1   evidence or significant items that need to be paid attention

2   to.  We saw that there was obviously more biologics of

3   interest in this particular corner.

4          And then as far as the stage of the investigation,

5   once we get a general overview of what we're dealing with,

6   then we all back out and discuss once more how we're going to

7   approach the scene.  As coroner investigators, we then stage

8   and stand by while the law enforcement investigators then go

9   down.

10         And as you can see in this particular picture, there

11  are now some yellow evidence markers.  Those are marked -- to

12  mark things that are of maybe significance that need to be

13  paid attention to, maybe collected later.  And they're also

14  there for the investigators, especially when we come back to

15  do a recovery, that we're careful not to disturb or alter any

16  of those positions until they can be collected forensically

17  and in a proper evidentiary manner.

18  Q.  Thank you.  So again, in preparation for testifying here

19  today, did you have an opportunity to review Government's

20  Exhibits 4-28 through 4-41, showing additional photos of the

21  basement?

22  A.  Yes, sir.

23  Q.  And were they true and accurate of the scene as you saw it

24  that night on November 30?

25  A.  Yes, sir.

1        MR. CONDER:  Your Honor, the United States would move

2   to admit and publish 4-28 through 4-41.

3        THE COURT:  All right.  Exhibits 4-28 through 4-41

4   will be admitted and may be published.

5        (Government's Exhibits 4-28, 4-29, 4-30, 4-31,

6        4-32, 4-33, 4-34, 4-35, 4-36, 4-37, 4-38, 4-39,

7        4-40, and 4-41 received.)

8   Q.  (BY MR. CONDER)  Mr. Stratmoen, first looking at 4-28,

9   what is that a photo of?

10  A.  This is a photo looking north in the basement, standing

11  over near the west wall.  Looking towards the north, there's

12  an obvious crawl space entrance.

13  Q.  And that's zoomed in.  Is that what you're referencing as

14  the crawl space?

15  A.  Yes, sir.

16  Q.  And did you take measurements or do you have a rough

17  estimate as to how wide that door is, how tall it is?  How did

18  you open it?

19  A.  I did not take measurements of that.  I estimate that it's

20  roughly 3 to 4 feet off the floor level.  Those sort of

21  measurements are usually not done by our office.

22  Q.  And 4-29?

23  A.  That would be looking at the table that was near that

24  corner of the basement.

25  Q.  And 4-30?

1   A.   That would be looking again at the northwest corner of the

2   basement off to the right.  The blanket that's hanging

3   directly in the center of the photograph is against the west

4   wall.

5   Q.   And in that photograph there, in 4-30, on the left-hand

6   side it seems there's an upright appliance.  Did you have an

7   opportunity to find out what that was?

8   A.   That is a standard refrigerator.

9   Q.   Was it -- did you check it to see if it was a refrigerator

10  or see if it was a freezer?

11  A.   I don't recall if it was a refrigerator or a freezer, but

12  we did check it for contents.

13  Q.   And do you recall what was in there?

14  A.   Some extremely spoiled meat.

15  Q.   Next I would show you what's marked as 4-31.

16  A.   That is standing now behind the table and looking again

17  towards the northwest corner of the basement.

18  Q.   And 4-32?

19  A.   A slightly different angle of the same view of the

20  basement.

21  Q.   And in that corner -- it would be almost the center of the

22  picture -- the corner of -- the basement corner, it appears

23  there's stuff on the wall and on the blanket.  Is that what

24  you were referencing earlier when you talked about

25  biologicals?

1   A.   Yeah.  That would be a good example of what we saw that

2   was concentrated more in this corner of the basement.  We

3   refer to it as biologics because it appears to be blood, but

4   our office does not do the testing to determine whether it

5   actually was or not.  But it certainly looks like human blood.

6   Q.   And the next would be 4-33.

7   A.   That would be a more close view of that corner.

8   Q.   And 4-34?

9   A.   That's another closer view of the same corner.

10  Q.   And 4-35?

11  A.   A little slightly different angle of the same corner,

12  looking more at the blanket that's hanging on the west wall.

13  Q.   And 4-36?

14  A.   And again a little closer view with a little better view

15  of the possible biologics that are almost towards the very

16  corner of the basement.

17  Q.   And 4-37?

18  A.   An even closer view of the same view.

19  Q.   And 4-38?

20  A.   In this picture the blanket that was hanging on the wall

21  is being held away so we can see a little better view on the

22  possible biologics that are in that corner.

23  Q.   And, Mr. Stratmoen, looking at this picture where the

24  blanket is lifted up, are you able to identify anything about

25  where that blanket was and the possible biologics on the wall

1    as well as the possible biologics on the blanket?

2    A.   Yes.   Right here the marker that is labeled 14, there is a

3    smear or a swipe of possible blood that was obscured by the

4    blanket when it was down.   And that is generally sort of in

5    relation to what was apparent when the blanket was hanging

6    down.   In other words, that swipe is pretty close to what we

7    could see before the blanket was moved.

8    Q.   So based upon your training and experience, would you

9    conclude that whatever that is, the biologics put there, were

10   put there when the blanket was hanging down?

11   A.   All of what we were observing at that time appeared to be

12   generally of the same age.

13   Q.   And next I would show you what's marked as Government's

14   4-38.   Oh, I redid it myself.   It's Government's 4-39.

15   A.   That would be a very close-up view of the northwest corner

16   of the basement.

17   Q.   And we'll stop looking at photographs for a minute and

18   we'll start talking about, so you got the call.   You hear that

19   there's a body in the house, possibly in the crawl space.

20   You've walked in through the main level, gone down into the

21   basement.   Tell us about what happens next, about getting in

22   the crawl space.

23   A.   At this point in time, we had not seen a body yet.   But

24   just by general observations of the amount of biological

25   matter that we're seeing, especially in that corner of the

1   basement, there's obviously some event that has occurred that

2   is of great concern.

3   Q.   And did you keep looking, and what did you find?

4   A.   At this point, especially with this photograph that was

5   taken once the markers had been set out for the cautionary

6   areas, the next procedure then would have been to search out

7   and try and locate actual remains.

8   Q.   And did you do that?  Did you search out and actually

9   locate some remains?

10  A.   Yes, we did.

11  Q.   And where did you go?  What did you do?  What did you see?

12  A.   At this point we made preparations to enter the crawl

13  space.  The initial report was that that was the location of

14  the body, although we had not entered it yet.  And in order to

15  do that, even from our first initial entry into the house, we

16  were all wearing protective boots.  In order to enter the

17  crawl space, we then put on protective Tyvek coveralls.  And

18  of course the entire time we're in the house, we're wearing

19  gloves.  And then once it was determined that we were going to

20  go in there, then myself, one of my deputies, and Special

21  Agent Justin Kempf entered the crawl space.

22  Q.   And if you could, tell the jury what happened when you

23  entered the crawl space.  First tell us, what's it like inside

24  the crawl space?  How's the floor?  How tall is it?

25  A.   The crawl space beneath -- that's beneath the single-level

1   section on the north side of the home, I estimate it's roughly

2   4 to 4 1/2 feet from floor to the joists.  There's a lot of

3   utilities and piping and that sort of stuff along the ceiling.

4   There's an uneven, unpaved dirt, gravel, some cement floor.

5   It's filled with an enormous amount of debris, trash, personal

6   property, other things like that.  During my initial look and

7   once that entryway was opened, I could not observe a body just

8   from looking in the wooden entrance.

9   Q.  And again, in preparing to testify here today, were you

10  able to review Government's Exhibits 4-42 through 4-45,

11  showing the crawl space?

12  A.  Yes, sir.

13  Q.  And were those true and accurate depictions of what you

14  saw on November 30?

15  A.  Yes, sir.

16      MR. CONDER:  Your Honor, the United States would move

17  to admit 4-42 through 4-45.

18      MS. HUCKE:  No objection.

19      THE COURT:  Exhibits 4-42 through 4-45 will be

20  admitted and may be published.

21      (Government's Exhibits 4-42, 4-43, 4-44, and

22      4-45 received.)

23  Q.  (BY MR. CONDER)  Mr. Stratmoen, first looking at 4-42,

24  could you describe that to the jury.

25  A.  This would be the view once the entryway panel is lifted

1  up.  Looking directly into the crawl space, you can observe a

2  certain amount of trash of obvious different ages that are

3  scattered about in there.  Over to the right-hand side there's

4  a blue-green Samsonite suitcase that is open and unfolded.

5  And then along the bottom edge of the entryway on the cinder

6  blocks, there's a considerable amount of biologic material.

7  Q.  And then Government's Exhibit 4-43.

8  A.  This would be a close-up view of the probable biologics

9  that we saw on the entryway going into the crawl space.  It's

10  notable that there was enough of an amount there at some point

11  in time to dribble out towards the front.

12  Q.  And is that the highlighted area in that photograph?

13  A.  Yes, sir.

14  Q.  Okay.  Referencing next Government's Exhibit 4-44.

15  A.  This is looking a little bit farther and over to the east.

16  You get a little better view of that Samsonite suitcase that I

17  noted earlier.  You can see the cement bases of the supports

18  for the floor joists and get a little better idea of the

19  confined space that we would have to be working in.

20  Q.  And next, Government's Exhibit 4-45.

21  A.  This is a closer view of some of the materials that were

22  on the floor of the crawl space.

23  Q.  And then if we could, we'll stop looking at photos for a

24  while and just discuss.  So once you're in there, you've

25  lifted the crawl space door.  You've looked around, and from

1  the outside you can't see a body; is that correct?

2  A.  Right.

3  Q.  And then so what do you do?  You can't -- with your

4  flashlight looking in there, what do you do next?

5  A.  Well, the next thing we obviously have to do is to climb

6  inside and start looking among the debris to see what we can

7  find.

8  Q.  And what did you find?  What did you do?

9  A.  Once I got in there, while nothing was apparently visible,

10  there was a considerable more amount of materials that was

11  piled over towards the east side.  Once I moved the Samsonite

12  suitcase, I could see a boot.

13  Q.  And what kind of boot?

14  A.  A general work-type boot.

15  Q.  And what did that tell you?  What did you think when you

16  saw the boot?

17  A.  Well, that definitely indicated that there was the

18  possibility of a body then under the debris.  So then we

19  entered the area and started working around uncovering what

20  may be under the materials that we saw.

21  Q.  And if you could describe to the jury, what did you remove

22  and what did you see, each layer?  If you recall, once you

23  removed it, what did you see?

24  A.  Of the three of us that were in there, I moved in the

25  farthest into the crawl space.  And there was a considerable

1   amount of layering of materials on where the body might be.  I

2   assigned my deputy to take photographs at that time of the

3   process as we started uncovering things and then very

4   carefully started peeling back the layers.  There was carpet.

5   There was some old blankets.  There was plastic.  And then the

6   more we uncovered, then we could start to see that there was

7   an actual human body concealed underneath all the debris that

8   we found in there.

9   Q.  And if you could, once you found -- well, let me back up.

10        In preparation for trial, were you able to review

11  Government's Exhibits 4-46 through 4-51?

12  A.  Yes, sir.

13  Q.  And were those true and accurate of the scene that you saw

14  that night on November 30?

15  A.  Yes, sir.

16        MR. CONDER:  Your Honor, the United States would move

17  to admit Government's Exhibits 4-46 through 4-51.

18        MS. HUCKE:  No objection.

19        THE COURT:  All right.  Exhibits 4-46 through 4-51

20  will be admitted and may be published.

21     (Government's Exhibits 4-46, 4-47, 4-48, 4-49,

22     4-50, and 4-51 received.)

23  Q.  (BY MR. CONDER)  Mr. Stratmoen, looking at 4-46, could you

24  describe for the jury what that is.

25  A.  That view is looking towards the east side of the crawl

1  space.  The south wall that's between the open part of the

2  basement and the crawl space is seen on the right-hand side of

3  the photo.  And this is the sort of materials that were

4  covering the body as they were initially found.

5  Q.  And --

6  A.  Over to the left, that's my knee in a Tyvek suit over

7  there as I'm getting ready to start peeling back the layers.

8  Q.  And then 4-47?

9  A.  That's just a close-up view of the top layer.

10  Q.  And 4-48?

11  A.  That is a view of the boot that I observed once I removed

12  the Samsonite suitcase and a little closer-up view of that.

13  Q.  And 4-49?

14  A.  Here is we're starting to just initially uncover.  You can

15  see that there's not only a boot but we're seeing the bottom

16  of a pair of jeans, which indicates that the boot is

17  definitely attached possibly to human remains.

18  Q.  And 4-50?

19  A.  Just another view of the same.

20  Q.  And 4-51?

21  A.  A little angle differently of the same view with a little

22  bit more uncovered, showing a pair of jeans and part of a leg.

23  Q.  Thank you.  Again, we'll stop looking at photographs for a

24  minute and discuss.  So once you've pulled all of these layers

25  off, what do you find?  What do you see?

1    A.   When we got down to a certain point, we did discover that

2    the body was covered with a white powdery material.  At that

3    point, not knowing what the substance was, as far as those

4    sort of things I'm familiar with, it could be anything at that

5    point.  We thought maybe it might be industrial lye, which is

6    used in farm and ranch areas to accelerate biological

7    degradation in privies and outhouses.

8          That material especially, since it was unknown, could

9    be caustic.  It could be a hazard.  So we took a pause for a

10   moment and made sure we all got breathing masks on to try and

11   prevent any powdery materials from being inhaled, because that

12   stuff is not good, depending on what it is, since it was

13   unknown at the time.

14   Q.   And so once you addressed the precautionary measures for

15   this powder, could you describe to the jury, what was the

16   position of the body?  What was the condition?  How was it

17   clothed?  What did you see?

18   A.   Once we got the layers all peeled back and found and had a

19   good view of the position of the body, the body was lying

20   parallel to that south wall of the crawl space.  The floor in

21   that area was uneven, but the body was at a slightly head-down

22   angle, facedown.  And there were signs of obvious trauma.  And

23   so then the next step that we would do is to try and examine

24   the body in the position as it is, as best we can, prior to

25   attempting any recovery.

1   Q.  And so upon your examination of the body as is, what were

2   you able to determine?  What did you examine?

3   A.  We had an obvious deceased.  There were injuries that were

4   observed.  The preparations were made for the recovery at that

5   point.

6   Q.  Okay.  And again, in preparation for testifying here

7   today, were you able to review Government's Exhibits 4-52

8   through 4-57?

9   A.  Yes, sir.

10  Q.  And were those true and accurate depictions of what you

11  saw that night?

12  A.  Yes, sir.

13          MR. CONDER:  Your Honor, the United States would move

14  to admit and publish 4-52 through 4-57.

15          MS. HUCKE:  No objection.

16          THE COURT:  All right.  Exhibits 4-52 through 4-57

17  will be admitted and may be published.

18      (Government's Exhibits 4-52, 4-53, 4-54, 4-55,

19      4-56, and 4-57 received.)

20  Q.  (BY MR. CONDER)  First, Mr. Stratmoen, we'll look at 4-52.

21  Would you describe to the jury what that is.

22  A.  This is another view of -- as we're uncovering, we've

23  removed several layers, including the plastic, as you see

24  there.  There remains one more layer of carpet.  The Tyvek'd

25  and gloved person that you see over to the left-hand side of

1   the photo is me.  And you can also see the white powdery

2   material that we observed covering the body at that time and

3   the top of the jeans.

4   Q.  And 4-53?

5   A.  Now the carpet that was in the previous photo has been

6   removed, and you have a little bit better view of the amount

7   of powder that was covering the body when we discovered it.

8   Q.  And did you notice anything once you got this far in

9   uncovering the layers?  Were you able to identify any injuries

10  at the time or --

11  A.  There was an obvious injury seen in this photo to the

12  upper arm.  And in observing that, in my experience that

13  appears to be a postmortem injury.

14  Q.  And what do you mean, "a postmortem injury"?

15  A.  A postmortem injury means that the injury, the laceration

16  or whatever injury it is, probably occurred most likely after

17  death.

18  Q.  And how are you able to tell that?

19  A.  When we're looking at injuries, injuries that occur at or

20  before the time of death have obvious bleeding, and also there

21  will be a certain perfusion of blood into the tissues around.

22  Depending on how long before death, there will be a certain

23  amount of discoloration or bruising.  At least on initial

24  examination, this particular injury did not appear to be

25  associated with any external bleeding and appeared more to be

1   where some sharp object cut the tissue and it is simply

2   separated.  So the presumption in those cases, pending further

3   examination, is that this is possibly a postmortem,

4   after-death injury.

5   Q.  And next looking at Government's 4-54.

6   A.  That's a closer-up view of the positioning of the

7   deceased's hand and right arm, which was folded underneath him

8   and coming out to the left side, and also the degree of powder

9   that had been poured on top of the body.

10  Q.  And next, 4-56 -- or 4-55?

11  A.  This is a view looking more lengthwise along the body.

12  And there are several things that are observable when we first

13  uncovered the body in this, notably the inconsistent lividity.

14  Q.  And what do you mean by that?  What is lividity, and what

15  is inconsistent lividity?

16  A.  Lividity is -- the medical term is rigor mortis.  We refer

17  to this as lividity.  Once after death and the heart has

18  stopped pumping, the blood in the tissues tends to settle to

19  the lowest point due to gravity.  It'll -- say a person is

20  lying in one position.  That'll mean that obviously it'll head

21  towards the lowest point.  The external sides and tissues will

22  take on a reddish or a purplish coloration, almost like the

23  level of water in a bathtub, as -- you know, to show the

24  lowest point versus the highest point.

25          Lividity tends to set after three to six hours.  In

1    other words, if the body is not moved, that blood in the

2    tissues becomes sort of permanently fixed.  If a body is

3    recently dead and we find it and you see the coloration of

4    lividity on the lower portions positioning of the body and you

5    push your fingers into it, it'll blanch out and refill.  If

6    you push your fingers on it and it doesn't blanch out, that

7    means it is what we call set or fixed, which means that on

8    average the body has been deceased for around three to six

9    hours.

10          Those figures are very temperature dependent.  Heat

11   tends to accelerate the body processes after death.  Cooler

12   temperatures tend to slow them down.  But it does give us a

13   range of idea as far as how long after death we may be

14   discovering a body and observing it.

15          In this case, in this photo you can see lividity is

16   to the upper portion of the body.  You can also see down

17   towards the line of the pants and the underwear there that

18   there is a definite absence of coloration from where the belt

19   line was.  And what happens is that if a body is moved after

20   lividity has set, the lividity tends to stay in the position

21   it was fixed at.

22          So this immediately told me when we uncovered the

23   body, that the body had been moved from one place to another,

24   or at the very least it had been flipped, that the body was

25   deceased long enough lying on its back for lividity to fix.

1   At the time that lividity fixed, the pants were up.  So this

2   definitely tells us that -- and it's one of the things that we

3   look for as a standard part of investigation, is to look at

4   the lividity to determine if the body had been moved at all

5   between the time of death and the time that we discover it.

6   And in this case it -- there's unquestionable lividity that's

7   on the top side, the opposite of the place it should have been

8   seen if the person had died in this position.

9   Q.  And next we'd look at Government's 4-56.

10  A.  This is a picture looking at the facedown upper body, the

11  T-shirt.  There's a black T-shirt that is pulled up.  The left

12  hand is obviously folded up that way, and again another view

13  of the amount of powder that was placed on the body.

14  Q.  And next, 4-57?

15  A.  Once we had documented and observed everything we could

16  with the body in the position that it was found, then we

17  brought in a body bag, laid it out, and proceeded to flip the

18  body over onto its back into the body bag.  And then this

19  particular picture is looking at the position where the face

20  was, and there is an obvious area of probable blood at that

21  location.

22  Q.  And based upon that probable blood, are you able to make

23  any determinations about -- or opinion about whether that body

24  was killed there or brought there or any opinions on that?

25  A.  The human body has about 5 liters of blood in it, and with

1    the amount of trauma to the blood -- or to the body and the

2    amount of bleeding that would have occurred, especially with

3    the body being in a slight head-down angle, if the body had

4    been killed in this position and in this place, you would have

5    seen a lot more here.  And especially in conjunction with the

6    amount that we were seeing in the northwest corner of the

7    basement, our presumption and our conclusion, together with

8    the lividity that -- issues that we were seeing, was that the

9    body was probably killed outside of the crawl space and moved

10   into this area at some later time period.

11   Q.  And so we'll stop looking at photographs for a minute.

12   Once you roll the body over, you have the body bag there, what

13   do you see?  What do you notice?

14   A.  There was obvious massive and dramatic trauma to the face

15   and neck of the deceased.  Again, with the amount of trauma

16   that we were seeing, the smaller area of blood was

17   inconsistent with those injuries having occurred at that

18   specific location.  When you see injuries of that nature, one

19   of the things that we're trying to do as coroners is to

20   determine the manner of death.  We now are at a point where we

21   have obviously not a suicide, obviously not an accident.  And

22   so we have more positive information that this is definitely a

23   homicide.

24   Q.  And based upon your observations of -- if you could

25   describe to the jury what you notice of the face, head, neck

1    area.

2    A.   There were massive blunt-force and sharp-force injuries

3    that caused a tremendous amount of distortion to the face.

4    Specifically, we usually leave the generalized and specific

5    descriptions to the forensic pathologist, but there was

6    obvious massive trauma.   The -- throughout this whole

7    investigation, we had been hopefully working towards that this

8    maybe was the subject of a missing person that had been

9    missing for about a week.   That individual I had seen photos

10   of.   The trauma to the face and the neck was to such a massive

11   degree that there was no way at that time that we could

12   determine who this person was.   So for our purposes from this

13   point on until positive identification could be made, we

14   considered it a John Doe.

15   Q.   And I will -- Mr. Stratmoen, I'll have you refer to your

16   screen and look at what's marked as Government's Exhibit 4-58.

17   And are you familiar with that?   What is that?

18   A.   Yes, sir.   That is a picture once we have rolled the

19   deceased over, looking at the face and neck, mostly towards

20   the left side.   And you can see the amount of trauma and

21   disfiguration that we observed.

22   Q.   And is that photo a true and accurate depiction of what

23   you saw on November 30, 2017?

24   A.   Yes, sir.

25           MR. CONDER:   Your Honor, the United States would move

1    to admit and publish 4-58.

2           MS. HUCKE:  No objection.

3           THE COURT:  Exhibit 4-58 will be admitted and may be

4    published.

5        (Government's Exhibit 4-58 received.)

6    Q.  (BY MR. CONDER)  And again, if you could describe to the

7    jury what you are looking at.

8    A.  What we're looking at is we have some sort of sharp-

9    force -- in other words, cutting -- injuries to the neck.

10   They are extremely deep.  There is a good amount -- even with

11   the amount of blood and disfiguration, you can see there's a

12   certain amount of bruising and discoloration to the face.  The

13   features are distorted.  And this photo is an obvious example

14   of why we considered this person a John Doe at this point.

15   Q.  And next I would move next to Government's Exhibit 4-59.

16   Were you able to review that photograph as part of your

17   preparation for testimony here today?

18   A.  Yes, sir.

19   Q.  And was it true and accurate?

20   A.  Yes, sir.

21          MR. CONDER:  Your Honor, the United States would move

22   to admit 4-59.

23          MS. HUCKE:  No objection.

24          THE COURT:  All right.  Exhibit 4-59 will be admitted

25   and published.

1      (Government's Exhibit 4-59 received.)

2   Q.  (BY MR. CONDER)  Could you describe for the jury what

3   that's a photo of.

4   A.  That is a little closer view of the face of the subject.

5   There is obvious distortion to the facial structure, the

6   facial features.  We're seeing possible both blunt-force and

7   sharp-force injuries.

8   Q.  And next, do you recall reviewing Government's 4-60 and

9   4-61?

10  A.  Yes, sir.

11  Q.  And were those true and accurate photos of what you saw on

12  the night of November 30?

13  A.  Yes, sir.

14      MR. CONDER:  Your Honor, the United States would move

15  to admit and publish 4-60 and 4-61.

16      MS. HUCKE:  No objection.

17      THE COURT:  Exhibits 4-60 and 4-61 will be admitted

18  and may be published.

19      (Government's Exhibits 4-60 and 4-61 received.)

20  Q.  (BY MR. CONDER)  First I would have you look at 4-60.

21  Could you tell the jury what that is.

22  A.  That is a photograph that was taken at more of a

23  straight-on angle to the face.

24  Q.  And 4-61?

25  A.  And that is a little closer photograph of the damage to

1    the neck tissues.

2    Q.   All right.   And we'll stop looking at photographs for a

3    while.   Mr. Stratmoen, you indicated you couldn't identify

4    this body.   You said it was a John Doe.   Were you eventually

5    able to identify who it was?

6    A.   Yes, we were.

7    Q.   And how did you go about doing that?   What did you do?

8    A.   As far as the missing persons report goes, one of the

9    features that the family had described of the individual was

10   that he was missing a portion of an ear from an injury some

11   years ago.   So we did note on examination at this time that

12   this individual was missing a portion of an ear.   That is not

13   considered positive identification, but it at least is a

14   presumptive bit of evidence that can lead us to what we need

15   to obtain to try and find a positive identification.

16          In this case, later on our office obtained medical

17   records on Mr. Dodge.   We obtained dental records on

18   Mr. Dodge.   Fortunately for us, Mr. Dodge had a dental exam in

19   the same month earlier, so we had a very good set of dental

20   records and x-rays to compare postmortem, or after death, to

21   this person that we are working with.

22          And based on the medical records and some surgeries

23   that he had had, an ankle reconstruction and plate placed, and

24   11 points of comparison between his previous dental records

25   and what we saw at the autopsy and on dental exam, and the

1   smaller items like the missing portion of the left ear, we

2   were forensically able to positively identify this as Charles

3   Dodge.

4   Q.   Thank you.  Do you recall -- on November 30 when you --

5   when you found Mr. Dodge, do you recall what he was wearing

6   and the condition of his clothes?

7   A.   The condition of the clothes was in disarray a bit.  On

8   the front portions there was a certain amount of probable

9   biologics.  When we found him in the crawl space, the T-shirt

10  had been pulled up.  The jeans had been pulled down.  As noted

11  previously, we could tell that originally when the body had

12  been deceased for a while, the jeans were probably up because

13  of the lack of coloration from where the belt line pressure

14  was.  He had boots on.  And --

15  Q.   And did you notice anything, any injuries to other parts

16  of his body, the torso, other parts of the body?

17  A.   Yes.  There were multiple injuries that were observed to

18  the arms, the chest.  Our procedures at this point were, as in

19  most cases when the coroner's office has a death, we take them

20  to our morgue to do a thorough, extensive external exam, draw

21  toxicology, and that sort of thing.

22          But the procedures in any suspicious death is that we

23  recover them as intact and undisturbed as possible.  So while

24  we observe injuries, we do not clean the body.  We do not

25  remove anything.  We leave the clothes as they are.  We put

1   them into a body bag, seal it with an evidence seal at the

2   scene, and secure it for transport for autopsy so everything

3   is as undisturbed as possible when the forensic pathologist

4   opens that evidence seal and starts the autopsy exam.

5   Q.  And in speaking of that, before you were able to identify

6   Mr. Dodge by his teeth and other means, did you look -- make a

7   cursory look and see if there was a wallet or personal items

8   that would identify him?

9   A.  Normally in a regular case, we would check the pockets.

10  The coroner is responsible for anything that is found on or

11  with the body.  In this case, since we're treating it as a

12  John Doe, I made just a cursory patdown of the pants to see if

13  there was a wallet or an ID.  We did not find anything at that

14  time.

15  Q.  Thank you.  Again, in preparation to testify here today,

16  were you able to look at Government's Exhibit Numbers 4-63

17  through 4-66?

18  A.  Yes, sir.

19  Q.  And were those photos true and accurate of what you saw on

20  the night of November 30?

21  A.  Yes, sir.

22          MR. CONDER:  Your Honor, the United States would move

23  to admit 4-63 through 4-66.

24          MS. HUCKE:  No objection.

25          THE COURT:  Exhibits 4-63 through 4-66 will be

1  admitted and may be published.

2       (Government's Exhibits 4-63, 4-64, 4-65, and

3       4-66 received.)

4  Q.  (BY MR. CONDER)  Mr. Stratmoen, first looking at 4-63, if

5  you could tell the jury what that is.

6  A.  This is a photo from after we had rotated the body onto

7  its back.  And it's still in the crawl space, laying on the

8  body bag, and it is a photograph of the right side of the

9  deceased.

10 Q.  And 4-64?

11 A.  This is a photograph of the deceased in the body bag.  In

12 this case, this would have been after we had managed to remove

13 him from the crawl space and laid it on the floor, where we

14 did one more set of photographic documentation before we

15 actually closed and sealed the bag.  And it shows the lower

16 portions of the legs and the jeans and how they are down,

17 pulled down a bit.

18 Q.  And 4-65?

19 A.  This is a view from the other side, looking at the same

20 thing, showing a little bit more of the body as a whole.

21 Q.  And 4-66?

22 A.  This would be another view of the lower legs and boots.

23 Q.  And next we'll move along and talk about, so once you got

24 the body in the body bag, what do you do?

25 A.  Once we have finished with our final documentation, which

1    is mostly at this point photography, then the body bag is

2    closed.  We use an evidence seal on the zippers to seal it.

3    It's marked.  And then we remove it from the location into the

4    coroner vehicle and transport it to our morgue in Lander,

5    where it is secured in our coroner morgue pending arrangements

6    for autopsy.

7    Q.  And did you deliver this body to autopsy?

8    A.  Yes.  In this case I personally went with my deputy and

9    transported the body to Loveland, Colorado, where our contract

10   pathologist resides and does his work, and was there for the

11   opening of the bag and the autopsy procedure.

12   Q.  So did there come a time as the Fremont County coroner did

13   you issue a death certificate in this matter?

14   A.  Yes, sir.

15        MR. CONDER:  And I would at this time move to admit

16   4-67, the death certificate in this matter, Your Honor, and

17   move to admit and publish.

18        MS. HUCKE:  No objection.

19        THE COURT:  Exhibit 4-67 will be admitted and

20   published.

21      (Government's Exhibit 4-67 received.)

22   Q.  (BY MR. CONDER)  So again, Mr. Stratmoen, you mentioned

23   yesterday, but if you could refresh the jury, what is a death

24   certificate?  What are we looking at here?

25   A.  Okay.  Death certificates are issued and filed with the

1   Department of Health Vital Records.  They are the official

2   certification of a death that is either signed off by a

3   physician or the coroner.  In the case of a suspicious or

4   nonnatural death, it has to be certified by a coroner.  And

5   this in particular, this is the certificate of death that was

6   filed for Mr. Charles Joseph Dodge, III.

7   Q.  And looking at that it provides information.  When it says

8   on there -- I think there's a spot for time of death.  What

9   does that mean?

10  A.  Time of death is listed on this certificate as unknown.

11  Generally the time of death, especially in coroner cases, we

12  do not have the luxury that a physician does on an attended

13  death of being there at the time of death.  So our time of

14  death is determined by the investigation, by interviews.

15  Basically you only can know the time of death if it is

16  observed.

17         From that point, we talk in terms of ranges.

18  Depending on the evidence, maybe I can determine that the time

19  of death occurred at such and such a time plus or minus a few

20  hours.  In the case of Mr. Dodge, the only evidence we had at

21  the time of certification is we knew when he was last seen

22  alive and we know when he was found.  We know from the

23  evidence, like the rigor and the lividity of the body, that he

24  had been dead when we found him for better than 48 hours due

25  to the condition of the body, in our experience.

1          But that still left us a range of days.  And when you

2     cannot determine it down to a specific time frame within 24

3     hours, then the time of death will be unknown, and the date of

4     death will be referred to as the date found.

5          MR. CONDER:  Thank you.

6          May I have one moment, Your Honor?

7          THE COURT:  You may.

8       (Discussion off the record.)

9     Q.  (BY MR. CONDER)  Mr. Stratmoen, one last thing.  As the

10    Fremont County coroner, were you able to -- or do you recall

11    issuing a death certificate for Mr. Lonestar Addison?

12    A.  My chief deputy actually issued that death certificate.

13         MR. CONDER:  Your Honor, at this time the United

14    States would move to admit Government's Exhibit 4-68.

15         THE COURT:  Any objections?

16         MS. HUCKE:  No objection.

17         THE COURT:  Exhibit 4-68 will be admitted and may be

18    published.

19       (Government's Exhibit 4-68 received.)

20         MR. CONDER:  Your Honor, the United States has no

21    further questions of Mr. Stratmoen.

22         THE COURT:  All right.  Cross-exam.  Ms. Hucke.

23                         CROSS-EXAMINATION

24    BY MS. HUCKE:

25    Q.  Good morning.  So you were testifying a little bit about

1    the process you use to determine when someone died.  And in

2    this case it's safe to say that he had been dead when you were

3    there for at least 48 hours; correct?

4    A.  That would be a good realm of scientific certainty, yes.

5    Q.  Okay.  And you -- the only other information that you have

6    to determine from -- 48 hours from when he was reported

7    missing would just be that time frame?

8    A.  Correct.

9    Q.  And there were no indications that you saw by observing

10   the body that would give you any more information to narrow it

11   down within those days; is that correct?

12   A.  No.  Like I say, we knew when he was last seen alive or

13   reported to have been seen alive, and we know when we found

14   him.  We can go back a little bit, but he had been missing, I

15   believe, for a little -- a week or a little better.  So you're

16   still talking about a several-day period where he could have

17   died at any point of that time.

18   Q.  Okay.  And are there some factors that come into play

19   which could make a body decompose faster or slower?

20   A.  Yes.  The processes that occur after death are extremely

21   environmental and temperature dependent.  The -- for example,

22   if it's summertime and temperatures are 90 degrees, the

23   processes are accelerated.  If the temperatures are below

24   freezing, the processes are slowed down.  The processes do

25   continue to occur at a rate even in a temperature such as the

1   morgue cooler, which we keep it at about 40 degrees.

2           And based on the environment when I was at the scene,

3   I would estimate that that was approximately -- based on the

4   weather at the time of that time of year and the fact that the

5   heater in the house was working, crawlspaces beneath a house

6   generally average about 40 degrees as a standard.  So we're

7   looking at an above-freezing time frame to at least use for

8   our estimates on time of death.

9   Q.  Okay.  But you have no real way of knowing -- from when he

10  was reported until about 48 hours until you were there,

11  knowing when he passed away?

12  A.  No.

13  Q.  You had testified that when you first uncovered the body,

14  that there was an obvious injury; correct?

15  A.  Yes.

16  Q.  And that injury was on, I think, the back bicep of the

17  left arm?

18  A.  Yes.

19  Q.  And it appears to you that that injury occurred after the

20  person had passed away?

21  A.  It appeared that way, yes.

22  Q.  And I know that you testified as far as viewing the face

23  that there was lots of disfigurement.  Did you view the face

24  and neck at any time from when you sealed the body bag in the

25  crawl space to then when you were at the pathologist's morgue?

1   A.   No.   Once the bag is sealed, then it does not get unsealed

2   until the pathologist opens it at autopsy.

3   Q.   Okay.   And you sealed the bag while you were in the crawl

4   space?

5   A.   We sealed the bag just right outside the crawl space,

6   after we finished our final photographing documentation.

7   Q.   Okay.   So you really had a short period of time to view

8   the head and the neck from being in the crawl space and then

9   removing the body?

10  A.   Yeah.   We were -- we were probably in the crawl space for

11  a good two to three hours, so we had considerable time to look

12  at it.   But I -- I don't know what you would call a lot, but

13  we did get a good look and photographed it.

14  Q.   And when you were reviewing the neck, were you able to

15  determine if any of those injuries happened after death?

16  A.   No.   As far as the facial and the head injuries go, as I

17  noted before, we do not clean the body or do any detailed

18  handling or manipulation or examination at the scene before we

19  seal it.   We're basically just doing photographic

20  documentation.   The detailed analysis of the injuries is left

21  to the forensic pathologist.

22  Q.   But you could tell and it seemed very clear to you that

23  this person had died and was lying on their back for some

24  period of time after they died?

25  A.   I can't say exactly how long he was on his back.   I just

Stratmoen - Cross by Ms. Hucke                          266

1    can say that it was a range of probably three to six hours,

2    because that is the average time for lividity to set, before

3    he was moved and then flipped over on -- to be facedown.

4    Q.   How many people did it take for you to actually remove the

5    body from the crawl space?

6    A.   In the crawl space there was Agent Kempf from the FBI,

7    myself, and my deputy.  For the most part, the three of us

8    managed to get it to the point where we could exit that

9    opening, and then there's other people on the outside that

10   maneuver it out that opening and then onto the floor once we

11   are out there.

12   Q.   And so your experience of really taking several people to

13   remove the body from the crawl space, do you think it would be

14   unlikely that one person would be able to throw a body into

15   the crawl space on their own?

16   A.   Judging by the weight and the size, I would say it's

17   probably highly unlikely that one person could have positioned

18   that body in that crawl space.

19            MS. HUCKE:  Okay.  Can I just have a moment, Your

20   Honor?

21            THE COURT:  You may.

22       (Discussion off the record.)

23            MS. HUCKE:  We have no further questions.

24            THE COURT:  All right.  Redirect, Mr. Conder?

25            MR. CONDER:  Just a few questions, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MR. CONDER:

3    Q.  Mr. Stratmoen, I just want to be clear.  When you said

4    that from the time you found the body on November 30, looking

5    back, based on rigor and lividity, it's 48 hours plus;

6    correct?

7    A.  Yes, sir.

8    Q.  But you you're not saying 48 hours from the 30th is when

9    he was killed?  It's just at least that point to the last time

10   he was seen?

11   A.  Yeah.  We're just looking at an outside range of from what

12   we can tell from the physical condition of the body, we can go

13   back and know that the body had been dead for a certain amount

14   of time but not specifically between the last time he was

15   seen.  We can't narrow it down any farther than that.

16   Q.  And so in looking at lividity and rigor, that's what

17   you're able to do.  Are there others who can use other

18   techniques to determine timing?

19   A.  What we base our conclusions on is the standard time

20   frames.  Rigor, for example, releases and completely

21   disappears from the body in 36 to 48 hours.  Again, that's

22   temperature dependent.  So if you come upon a body that is

23   totally relaxed and rigor is gone, you can say that you're

24   looking at the body has been dead at least 48 hours, or

25   probably two days.  That in conjunction with the other factors

1    is where we establish the ranges that we're talking about.

2    Q.   And with regards to lividity, if an individual was --

3    passes away, if an individual dies, they go facedown, they're

4    facedown for a while, and then they go onto their back and

5    they stay on their back, where will lividity set if they're

6    only on their face for an hour and then they're put on their

7    back?

8    A.   If, say, somebody collapses and is lying on the floor,

9    once the heart stops, lividity starts because the force of

10   gravity starts to appear and work towards the lower portions

11   of the body almost immediately, because the heart is not

12   pushing things in the circulation anymore.

13        If lividity has not set -- say the body is discovered

14   after one to two hours, maybe three hours, depending on

15   temperature -- and you turn the body, lividity will then shift

16   and remove itself from where it was to again toward -- seek

17   the lowest portions of the body.  And that's why once it

18   sets -- the body continues to have fluids.  Fluids move.  The

19   decomposition process is ongoing.  Fluids still move within

20   the body.  It's not like everything freezes.  We're just

21   talking about lividity, which is mostly a surface

22   manifestation of the soft tissues.

23        Once that sets, for example, even at autopsy, which

24   occurred a couple days after we were at the scene, the

25   lividity may fade a little bit, but you can still see the

1   posterior lividity even after the body had been sitting face

2   up for a while.  In other words, things still move a little

3   bit, but once it sets, it stays for quite a while in the

4   position that it's set at.

5   Q.  And in mentioning -- in this case you indicated you took

6   the body down to Loveland, and the pathologist did the

7   autopsy.  Without going too much into it, what does the

8   forensic pathologist do, just generally?  As a general

9   overview, what steps does he take?  What actions does he take?

10  A.  Generally the forensic pathologist is a physician that is

11  certified in that specialty.  What they will do is at that

12  point in time, especially in a nonnatural case like this and a

13  suspicious death, they will document everything as they see it

14  once the bag is open.  Then they proceed to methodically

15  examine the body.  They examine what the clothing is.  They

16  will then remove the clothing.  In this case all of the

17  clothing was kept by the FBI's evidence.

18          And then they once again look at the body and analyze

19  and document all the injuries and specifics.  Then they clean

20  the body to get a good unobstructed view of the injuries,

21  document things again, and start to analyze the various

22  injuries versus as to are they blunt-force, are they

23  sharp-force injuries?  Sharp force would be like a knife edge.

24  Blunt force could be any object that strikes things, anything

25  that's a blunt object.

1           And they're also looking at the totality of the

2   injuries and the condition of the body to see what is the

3   cause of death.  They are working for us in order to give us

4   an extreme detailed analysis of the various injuries, and

5   which especially in this case, since there were so many

6   injuries, which of those injuries is possibly the fatal

7   injury.  Is it the lacerations to the neck?  Is it the

8   blunt-force trauma to the head?  Is it a combination?  But

9   they will define it down and in great detail, sometimes being

10  able better to associate antemortem, or before death, injuries

11  versus postmortem injuries.

12          They'll then do an internal examination of the body.

13  They'll open up the skull and examine the brain to see if

14  there are injuries from the outside that pass into the inside.

15  Is there some sort of a natural process that is contributing?

16  Like, for example, just because a person falls down the

17  stairs, did they actually die of a heart attack rather than

18  from the fall?  And they help us define exactly what the

19  manner and cause of death is.

20  Q.  And as part of that autopsy, did they take any -- draw any

21  blood, do any toxicology?

22  A.  Yes.  If it was not a suspicious death, our office does

23  the toxicology.  In a suspicious death, especially, or any

24  death that requires an autopsy, the pathologist then obtains

25  the toxicology samples and runs them along with the other

1   testing that he does.

2           MR. CONDER:  No further questions, Your Honor.

3           THE COURT:  All right.  Thank you.  May this witness

4   be released from any subpoenas?

5           MR. CONDER:  Yes, Your Honor.

6           THE COURT:  Ms. Hucke?

7           MS. HUCKE:  Yes, Your Honor.

8           THE COURT:  Sir, you may step down.  You're free to

9   go.

10          THE WITNESS:  Thank you.

11          MR. CONDER:  Your Honor, the United States would next

12  call Dr. Palmer.

13          MS. AMRAM:  Could we take a bathroom break?

14          THE COURT:  We'll go ahead and take a five-minute

15  recess.

16          Ladies and gentlemen of the jury, I'll remind you of

17  the recess instruction.

18          Please rise.

19      (The jury exited the courtroom at 9:58 a.m.)

20      (The following took place outside the presence of the

21      jury.)

22          THE COURT:  Any matters we need to address before we

23  resume, Mr. Conder?

24          MR. CONDER:  Your Honor, the only -- the United

25  States would submit to the Court that the parties have a joint

1    stipulation on the various trial matters, and I would submit

2    that to the Court.  It's been signed by the United States --

3    oh, and, Counsel, we'll get --

4                MS. AMRAM:  Oh, sorry.

5                THE COURT:  All right.

6                MR. CONDER:  And we'll submit that to the clerk, Your

7    Honor.

8                THE COURT:  Anything else, Ms. Amram?

9                MS. AMRAM:  No, Your Honor.

10               THE COURT:  All right.  We'll stand in recess for

11   five minutes.

12           (At 9:59 a.m., a recess was taken until 10:09 a.m.)

13           (The following took place outside the presence of the

14           jury.)

15               THE COURT:  Thank you.  I note the presence of

16   parties, presence of counsel, absence of the ladies and

17   gentlemen of the jury.

18               Anything we need to address before we go to the next

19   witness?  Mr. Conder?

20               MR. CONDER:  Nothing.

21               MS. AMRAM:  Your Honor, I just --

22           (Reporter interruption.)

23               MS. AMRAM:  I had asked your clerk if we need to

24   renew our objection to Ms. Moss, if we had a standing

25   objection or not.

1          THE COURT:  And you will have a standing objection as

2     to the designation issues.  In terms of any foundational

3     issues or as in terms of any grounds in terms of the opinions

4     offered, you'll have to make those as they arise.

5          With regards to experts, that reminds me.  You may

6     elicit expert opinions after you lay the foundation, but I'm

7     not going to recognize them as an expert per se.  And if there

8     are objections, then I'll expect the opposing party to make

9     objections as to their opinions.  As I read the rules of

10    evidence, the Court is not required to and I don't want to put

11    an imprimatur that says, "Yes, this is an expert on such and

12    such."  So I'll allow the parties to object if they believe

13    that expert is not qualified.

14         We'd go ahead and bring in the ladies and gentlemen

15    of the jury.

16      (The jury entered the courtroom at 10:12 a.m.)

17         THE COURT:  Thank you.  Please be seated.

18         The United States may call its next witness.

19         MR. CONDER:  Thank you, Your Honor.  The United

20    States would call Dr. Robert Palmer.

21         THE COURT:  Dr. Palmer will come forward and be

22    sworn.

23      (The witness was sworn.)

24         THE COURTROOM DEPUTY:  Please state and spell your

25    name for the record.

1          THE WITNESS:  My first name is Robert, standard

2     spelling.  Middle name is Bruce, B-R-U-C-E.  Last name is

3     Palmer, P-A-L-M-E-R.

4          THE COURTROOM DEPUTY:  Please state your occupation

5     and your city of residence.

6          THE WITNESS:  I'm a clinical toxicologist, and I live

7     in Greeley, Colorado.

8               ROBERT BRUCE PALMER, GOVERNMENT'S WITNESS

9                         DIRECT EXAMINATION

10    BY MR. CONDER:

11    Q.  Good morning, Dr. Palmer.

12    A.  Good morning.

13    Q.  What is a clinical toxicologist?  What does that mean?

14    A.  A clinical toxicologist deals with poisonings, overdoses,

15    snake bites, things like that in a clinical setting.  That is,

16    we care for people who -- we actually provide patient care for

17    people who have suffered those incidents.  And then in

18    addition to that, we also deal many times with postmortem

19    results, results that involve sampling and measurement of

20    various drugs and compounds in the body after death.

21    Q.  And so that's what a clinical toxicologist does.  What

22    does a plain old toxicologist do?

23    A.  Well, there are a lot of different types of toxicologists.

24    Some of them deal with environmental issues and are called

25    environmental toxicologists.  Some of them -- for example, the

1    classic forensic toxicologist is an individual who works in a

2    laboratory in a medical --

3         (Reporter interruption.)

4    A.   Sorry.  60 with gusts to 90.  A forensic toxicologist

5    typically works in a laboratory analyzing samples from a

6    medical examiner's office.  They don't generally have patient

7    contact.  A developmental toxicologist may deal with how

8    various chemicals and such affect the development of the

9    fetus, whether it's in an animal model or people.  So there

10   are a number of different types of toxicologists.

11        THE COURT:  Good job.  Thank you, Doctor.

12   Q.   (BY MR. CONDER)  And what type of schooling did you obtain

13   to become a toxicologist?

14   A.   That was a long and storied career there.  I completed a

15   bachelor's degree in chemistry with a minor in music

16   performance at the University of Idaho.  Went on to graduate

17   school at the University of Washington in Seattle, where I

18   completed a master's and a Ph.D. in organic medicinal

19   chemistry, which is basically the chemistry of how drugs do

20   what they do.

21        Following that I did a postdoc in medical school at

22   the University of Washington on opioid pharmacology and

23   medicinal chemistry.  After that I went to the University of

24   New Mexico as professor in the medical school and pharmacy

25   school for several years and then in 2000 moved Colorado and

1  completed another postdoctoral fellowship in clinical

2  toxicology.  At the completion of that fellowship, I sat for

3  the board examination and became board certified in clinical

4  toxicology.

5  Q.  So how long have you been working as a toxicologist?

6  A.  I worked for about a year on staff at the Rocky Mountain

7  Poison Center in Denver and then moved into private practice

8  about 13 years ago -- or excuse me -- 16 years.  So it's been

9  about 17 years that I've been a toxicologist full-time.

10 Q.  All right.  And have you ever taught a -- taught

11 toxicology-related topics?

12 A.  Oh, yes, yes.  I -- while I was on the faculty at the

13 University of New Mexico, I was a faculty in the toxicology

14 division.  And even now every spring -- or excuse me -- every

15 fall semester I teach a clinical toxicology course for the

16 doctor of pharmacy students at the University of Wyoming.  I

17 still maintain a faculty appointment at the University of

18 Colorado in the School of Medicine and teach residents and

19 toxicology fellows, doctors that have completed their training

20 and are working to become toxicologists, and residents,

21 usually in emergency medicine and pediatrics as well.

22 Q.  And are you a member of any professional organizations or

23 boards or committees to be a toxicologist?

24 A.  I am, several of them.  There's the American Board of

25 Applied Toxicology, and I sat on their board of directors for

1    two elected terms.  Then there is the American Academy of

2    Clinical Toxicology, which is the largest clinical toxicology

3    organization in the world.  And my -- I was on the board of

4    directors or board of trustees for that, and then for the past

5    two years I was the elected president of that organization.

6    Q.  And have you ever written any articles or books with

7    regard to toxicology, chemistry?

8    A.  I have.  I've published about 50 or so peer-reviewed

9    papers in scientific and medical journals.  And between

10   authoring chapters, editing books, coauthoring books, things

11   like that, about two dozen or so book authors.

12   Q.  And do you have any patents?

13   A.  I have three patents that were granted having to do with

14   tumor imaging, and I have one that's pending having to do with

15   a device used to wash chemical contaminants out of the eyes.

16   Q.  And, Dr. Palmer, I'd direct your attention to the screen

17   and what's marked as Government's Exhibit 5-1.

18   A.  My screen's blank, sir.

19   Q.  It'll come up.

20   A.  Okay.  Yes.

21   Q.  And are you -- what is that?

22   A.  That is the first page of my CV.

23   Q.  And is that true and accurate?

24   A.  It is.

25        MR. CONDER:  Your Honor, at this time the United

1    States would move to admit Government's Exhibit 5-1.

2              MS. HUCKE:  No objection.

3              THE COURT:  All right.  No objection.  That was

4    Ms. Hucke.

5    Q.  (BY MR. CONDER)  Dr. Palmer, if you could --

6              THE COURT:  I'm sorry.  I was trying to --

7    Ms. Bowline is having a hard time seeing who is speaking over

8    there so I wanted to announce who it was.  Exhibit 5-1 will be

9    admitted.

10       (Government's Exhibit 5-1 received.)

11             MR. CONDER:  I apologize, Your Honor.

12             THE COURT:  My fault.

13   Q.  (BY MR. CONDER)  Dr. Palmer, if you could explain to the

14   jury, what does a toxicologist have to do with measuring or

15   looking at drugs and alcohol in a person's system?

16   A.  Well, my role is primarily interpretive.  That is, there's

17   a laboratory that does the analysis and produces the results,

18   and then my job is to interpret those results to determine

19   whether they were perhaps causative or contributory to the

20   cause of death or whether the results are consistent with the

21   history of what took place, a variety of things like that.

22   But my role is more interpretive than analytical.  I don't do

23   the actual analysis.

24   Q.  And if you could, describe to the jury in general terms

25   the nature and impact of alcohol intoxication on a person's

1    physical capabilities or abilities.

2    A.   Sure.  When an individual drinks alcohol, as the blood

3    alcohol increases, I think we all know the extent of

4    intoxication gets worse.  So there's a parallel between the

5    rising blood alcohol and rising intoxication.  The types of

6    effects that alcohol has I'm sure we've all seen before.

7    People begin to slur their speech, have difficulty balancing,

8    have difficulty with fine motor skills.  Obviously many have

9    difficulty driving if that happens.  And again, as the blood

10   alcohol increases, the -- those effects tend to get worse.

11        In someone who has a very heavy drinking history,

12   many times blood alcohol that would dramatically affect

13   someone who is alcohol naive, a nondrinker, they can have a

14   much higher blood alcohol if they're tolerant to the alcohol

15   and still not look as drunk.

16   Q.   Okay.  And what about marijuana?  What -- could you

17   describe the general nature and impact of marijuana on a

18   person.

19   A.   Sure.  When someone uses marijuana, it can affect a

20   variety of different systems in the body.  It causes a little

21   bit of an increase in heart rate, causes the conjunctiva, or

22   the lining of the eye, to get red and get bloodshot eyes.

23   Some people it reduces anxiety; other people it increases

24   anxiety.  Some people it gets rid of nausea and vomiting;

25   other people it causes nausea and vomiting.  It certainly

1  causes in many cases disorientation or sometimes even a little

2  bit of a removal from the situation, so people feel like

3  they're maybe not fully part of what's going on around them, a

4  little bit of dissociation.

5  Q.  And if you could, a little slower.  How are alcohol levels

6  measured in a person's body?

7  A.  Alcohol is typically -- I'm going to try and keep this

8  slow.  Alcohol is typically measured in blood using a device

9  called a gas chromatograph.  And what happens is a sample in a

10  sealed vial is heated, and then that air that's on top of the

11  liquid inside the vial is sampled.  It's run through a tube at

12  a specified rate and specified temperature that causes it to

13  separate from everything else and then is detected by a

14  certain type of detector as a peak.  And from that the

15  laboratory is able to determine the concentration of alcohol

16  in the blood.  And that's called head space -- for sampling

17  that head space above the liquid in a vial, it's call head

18  space gas chromatography.

19  Q.  And in laymen's terms, how does a person measure one's

20  alcohol level?

21  A.  There are two unit systems that are typically used for

22  measuring blood alcohol.  There's the one that we're most

23  familiar with with respect to, for example, DUI legislation,

24  and that's measured in grams per deciliter.  So that .08 that

25  everyone refers to as the legal limit, the statutory legal

1    limit for driving, is in grams per deciliter.  In the

2    hospital, because we just can't have things be the same, we

3    measure it in milligrams per deciliter.  So .08 actually

4    becomes 80.  There's a difference of 1,000.

5    Q.  And on the street and out of hospital and out of the lab,

6    would someone on the street refer to those numbers as blood

7    alcohol concentration?

8    A.  Typically, yes.

9    Q.  And with regard to marijuana levels, how are marijuana

10   levels tested and measured?

11   A.  Marijuana use is typically determined by measurement of a

12   few different compounds.  There's the primary compound which

13   is responsible for the intoxicating effects of marijuana which

14   it -- it is called delta-9-tetrahydrocannabinol.  We'll call

15   it THC.  THC is usually measured in blood using a similar sort

16   of device to what I described for the gas chromatography

17   except the detector's a little bit different.  It uses

18   something called mass spectrometry to measure the exact amount

19   of the compound that's present.

20            There are other compounds which are metabolites of

21   THC that are also typically present when someone has used

22   marijuana.  And what a metabolite is, it's just the way the

23   body changes that one compound -- in this case the THC -- to

24   more efficiently get rid of it.  Some of those metabolites are

25   active; in other words, they still have some activity.  They

1   still cause some effect.  Others are not.

2   Q.  So would it be safe to say that the delta-THC-9 -- the

3   delta-9-THC level measures a person's intoxication or

4   impairment or -- well, I'll let you explain.

5   A.  THC does not follow a direct parallel nearly as well as

6   alcohol does in terms of blood level versus level of

7   impairment.  The higher the THC concentration, likely the more

8   impaired you are, but it does not quite match as well as

9   alcohol intoxication or a blood alcohol concentration do.  So

10  it's a little bit more variability with each individual.

11  Q.  And so when a person consumes alcohol or drugs like

12  marijuana and then they stop consuming, what does the body do

13  with that?

14  A.  The alcohol and any other drug -- be it marijuana or

15  anything else -- will be first absorbed into the blood, and

16  then it gets distributed sometimes out into the various body

17  tissues, and then it gets eliminated.  Alcohol stays pretty

18  much with what's called total body water, so it stays mostly

19  in the blood, and it's eliminated primarily through the urine.

20          THC is metabolized in the liver, converted into a

21  number of other different compounds.  Some of those compounds

22  are eliminated in the urine.  That's what we would detect if

23  you were doing, for example, a urine drug screen in an

24  employment capacity.  Some of those compounds are eliminated

25  in the bile, and a small amount of that THC actually

1  partitions into what's called adipose tissue, which is

2  basically body fat.

3  Q.  So once these chemicals -- alcohol, marijuana -- goes into

4  the system, if a person stops consuming it -- they stop

5  smoking, they stop drinking -- what happens to their levels of

6  alcohol, the BAC level?  What happens?

7  A.  The BAC level, or blood alcohol concentration levels,

8  declines at quite a predictable rate, and in adults that's

9  usually between 10 and 20 milligrams per deciliter per hour.

10 So if you have somebody with a blood alcohol of 120, which

11 would be .120, it's -- about every hour you're going to lose

12 20 or so out of that 120.  So the first hour it would go down

13 to about 100 and then 80 and so on.

14        THC, you have a very high peak as soon as you start

15 smoking.  The blood concentration of THC peaks very quickly,

16 usually within about ten minutes of smoking, and then it

17 declines quite quickly.  When it comes down, it typically

18 comes down into the single digits -- like 1, 2, 3, 4 range --

19 within about an hour, and then it can hang out at low numbers

20 for a little bit longer than that.

21 Q.  And you've mentioned DUIs and BACs.  What's a high level

22 for THC, and how is it measured?  What's the nomenclature?

23 A.  The unit system that is used for THC measurement is

24 nanograms per milliliter.  So we're getting into smaller and

25 smaller numbers.  But in the state of Colorado, where I live,

1  we do have some legislation that relates to blood THC

2  concentrations while people are driving.  It's similar to the

3  per se statute that you have for blood alcohol with the .08,

4  but it's not exactly the same.  It's called permissive

5  inference.  The difference isn't important.  The necessity is

6  that the individual have a blood THC concentration of about

7  5 nanograms per milliliter, is the number that's put forward.

8          The challenge with that is if someone is arrested for

9  driving under the influence of THC, we have that 5 nanograms

10  per milliliter cutoff.  THC is eliminated so quickly that many

11  times by the time the suspect is processed and the blood is

12  collected and everything else, that number has dropped down.

13  Even though it may have been above 5 at the time of the

14  arrest, it's now quite a bit lower.

15  Q.  So if somebody had -- if a person had their blood tested

16  and their nanograms per milliliter of the delta-9-THC was

17  above 50, what would that tell you in terms of when they last

18  smoked, timewise?  Would it be days?

19          MS. HUCKE:  Objection, Your Honor, under 702 and 703.

20          THE COURT:  Well, I'll sustain as to foundation at

21  this point in time.

22          MR. CONDER:  Okay.

23  Q.  (BY MR. CONDER)  Dr. Palmer, you were talking about

24  measurements of time and THC-9.

25  A.  Yes.

1    Q.   How is it -- explain how you can determine time when a

2    person smoked and the measurement.   How do you go about

3    determining that?

4    A.   Well, with the rate of elimination, the speed with which

5    the THC is cleared from the blood, the higher numbers are

6    going to be earlier in the time course of smoking.

7    Q.   And why is that?

8    A.   Because the THC is very rapidly eliminated from the blood.

9    Q.   And based upon your training and experience, why is that?

10   Are you familiar with any studies or any literature that will

11   discuss that and talks about rates of dissipation?   Like you

12   said alcohol was 20.   What about marijuana, the THC-9?

13   A.   Oh, sure.   There are -- there are lots and lots of papers

14   that have been published on THC.   It's called kinetics, the

15   change in concentration with respect to time.   A number of

16   studies that have been published on that.   I have several of

17   them in the notebook I walked in with.

18          Generally speaking, if you are smoking marijuana, you

19   have that initial very high peak within about ten minutes, and

20   then you're down well below 20 within the hour.   And it will

21   then be a little bit more -- be eliminated slightly more

22   slowly after that.

23   Q.   And is there a correlation like, for example, an hour per

24   nanogram per milliliter?

25   A.   It's a little different with THC than for alcohol, and it

1    has to do with something called order of kinetics.  The amount

2    of alcohol that is eliminated over a given period of time, I

3    gave the number of 10 to 20 milligrams per deciliter per hour.

4    That's what's called zero-order kinetics, and that's a

5    specified amount of drug being eliminated over a specified

6    period of time.

7            Most drugs -- and THC is similar to most drugs rather

8    than alcohol; alcohol's kind of an exception in a lot of

9    ways -- undergo what's called first-order kinetics, where it's

10   not a specified amount that's eliminated over time.  It's a

11   percentage of the total amount.  And that's where we come up

12   with things -- a term that you may have heard called

13   half-life, which is the amount of time it takes to go from one

14   concentration to half that concentration.

15   Q.  So with regard to delta-9-THC levels in a person, if you

16   have someone that you have a measured level of -- for example,

17   let's just say 25 --

18           MS. HUCKE:  Objection, Your Honor.  I don't believe

19   that the proper foundation has been laid at this point, and we

20   continue the objection under 702 and 703.

21           THE COURT:  I'll overrule the objection at this point

22   given the nature of the question.  I believe we're going to

23   still foundation issues.  Go ahead.

24   Q.  (BY MR. CONDER)  So, Dr. Palmer, if you could, explain to

25   the jury, you talked about half-life and the kinetics.  So

1   just say, for example, somebody has a nanograms per milliliter

2   of 25.  First of all, what does that tell you in and of itself

3   when you say that?  You look at that and you go what?

4   A.  Well, the first thing it tells you is obviously the

5   individual has been exposed to THC, been exposed to marijuana.

6   The 25 would be suggestive of being early in the time course,

7   within the first couple hours, at most, of having been

8   exposed.  And there's probably some biological effect.

9   Remember, the permissive inference level for driving in

10  Colorado is 5, and we're looking at 25 in an individual, so

11  there's probably going to be some biological effect.

12  Q.  And you've talked about dissipation and dissipation rates.

13  So explain physiologically, if you can, how the marijuana,

14  this THC-9, dissipates.  What does it do in the blood?  What

15  does it do in the body?  How does that leave?

16  A.  How does it leave?  What happens is the THC is circulated

17  in the bloodstream, and it goes through the liver.  All of the

18  blood eventually goes through the liver.  There are a series

19  of enzymes in the liver that start to break down that THC,

20  convert it into things that the body can more readily get rid

21  of.  That's really the whole point of metabolism, is to

22  convert things into compounds that are more easily dispensed

23  with or gotten out of the body.

24          When it's metabolized, those metabolites that are,

25  created, some of them are going to exit the body in the urine.

1  Some are going to exit the body through the bile, and a small

2  percentage of the THC is going to sort of diffuse out of  the

3  bloodstream and into the fat tissues.  And when you see some

4  cases about people saying, well, you can test positive for

5  marijuana for a month after you've used it, what you're

6  looking at is actually that really slow leaching of small

7  amounts of that THC from the fat tissue back into the blood,

8  which is a relatively slow process.  But the concentrations

9  are quite low.

10  Q.  And why the difference between fast release and slow

11  release?

12  A.  The fast release is the metabolism while it's in the

13  bloodstream and going through the liver and being filtered

14  into the kidneys and into the urine.  That's relatively quick.

15  The slow release is that leaching of that proportion of the

16  THC that went into the fat back into the bloodstream, where it

17  then undergoes the same elimination rate or same elimination

18  processes that the other THC did.  It's just that that

19  leaching of that small amount from the fat back into the blood

20  is slow.

21  Q.  So based upon your training and experience, how many times

22  have you measured -- looked at a THC level, nanograms per

23  milliliter --

24  A.  Milliliter.

25  Q.  -- and determined -- tried to gauge timing, timing with

1   regard to consumption of marijuana based upon the test level

2   results?

3   A.   That's a frequent question.   That comes up all the time,

4   particularly in Colorado.   I mean, we get to deal with that a

5   lot.   Usually it's in cases of driving impairment or somebody

6   who was injured as either a driver or a pedestrian.

7   Q.   And in those cases how do you go about determining what --

8   so if, for example, a person was stopped driving and their

9   nanograms per milliliter was a .7 or a 7 --

10  A.   7 or .7?

11  Q.   7.   I apologize.   I'm used to the alcohol.

12  A.   Yeah.

13  Q.   So it's 7.   What would you do with that?   What do you

14  determine?

15  A.   Well, in that circumstance they are above the 5 nanograms

16  per milliliter cutoff.   The difference between per se like .08

17  with alcohol and the permissive inference is essentially that

18  the individual who's accused is allowed to try and defend

19  themselves and demonstrate that they were not in fact impaired

20  by that -- that drug, as opposed to alcohol, where if you're

21  .08, you're done.   You don't really get to defend that case or

22  prove that you weren't impaired.   At 7 they were likely

23  impaired.

24  Q.   And when you make that determination and you extrapolate

25  time, trying to determine how fast the THC dissipates through

1   the body, what types of studies do you rely on or types of --

2   going back to your training and experience, what do you reach

3   into to help you make that determination?

4   A.   There are a variety of studies on driving and cannabis

5   use.   There are a variety of studies on dosing and kinetics as

6   far as THC is concerned.  A lot of the studies demonstrate

7   that even if you're below, say, that 5 nanogram per mill

8   cutoff, that impairment persists quite a bit longer than that.

9   It's just that this -- that's what the legislature decided to

10  use.  But most of the -- or a number of the studies are

11  sponsored by the federal government -- National Highway

12  Traffic Safety Administration, the National Institutes of

13  Health -- as well as other academic and public researchers.

14  Q.   So based upon your training and experience, relying on

15  these studies, generally, could you describe if a person was

16  tested and they were above 50 nanograms per milliliter, could

17  you determine was it hours or days when they last consumed

18  marijuana?

19  A.   It would have been within hours.

20  Q.   You're able to determine toxicology levels -- for example,

21  BAC, THC-9 -- from a dead person?

22  A.   Blood alcohol and THC in the blood can be measured in

23  someone who's deceased, yes.

24  Q.   And, Dr. Palmer, I'd have you look at your screen what's

25  marked as Government's Exhibit 5-2A.

1    A.  Yes.

2          MR. CONDER:  Your Honor, at this time the United

3    States would move to admit 5-2A.

4          MS. HUCKE:  No objection.

5          THE COURT:  Exhibit 5-2A will be admitted and may be

6    published to the ladies and gentlemen of the jury.

7          (Government's Exhibit 5-2A received.)

8    Q.  (BY MR. CONDER)  Dr. Palmer, what is -- what is that?

9    A.  This is a report from NMS Labs, which is a reference

10   laboratory in Pennsylvania, on peripheral blood analyses that

11   were conducted on decedent Mr. Charles Dodge.

12   Q.  And in the positive findings, it states, "Ethanol result:

13   156."

14   A.  Correct.

15   Q.  What does that mean?  Turn that into BAC so we can

16   understand it.

17   A.  That is blood alcohol using the units that we'd use in the

18   hospital, in health care, the 156.  So if we divide that by

19   1,000 to get to the normal set of the units that we're used to

20   dealing with in the public sector, that's .156, which is shown

21   on the next line down on the lab sheet.

22   Q.  And you said that the rate of dissipation for alcohol is

23   standard, .02 -- or not -- .2 -- or 20?

24   A.  20, .02.

25   Q.  I'm sorry.  So, for example, just hypothetically, a 156,

1  after an hour what would that generally be, not all the time?

2  A.  Yeah.  And there is going to be a little bit of

3  variability.  People are who less experienced drinkers tend to

4  be a little bit slower than that.  People who are very heavy

5  drinkers may eliminate alcohol somewhat faster than that.  But

6  in general, if you're looking at a .156 one hour later, it

7  should be around .13, .136.

8  Q.  Thank you.  And the next three lines, it talks about first

9  11-hydroxy-delta-9-THC.  What's that?

10  A.  11-hydroxy-delta-9-THC is a metabolite of THC.  It's

11  something that's created from THC in the liver, and it is one

12  of the active metabolites.  So it does have some of the

13  effects that parent THC has on the body.  And it's actually

14  pretty close to as potent as parent THC itself, but there's

15  generally not all that much present.  Usually it's about

16  10 percent of the amount of THC.

17  Q.  And the next one, delta-9-carboxy-THC?

18  A.  Delta-9-carboxy-THC, sometimes referred to as THC acid, is

19  an inactive metabolite.  That's the one that we typically

20  measure in urine for, like, drug employment screens and things

21  like that.

22  Q.  And does that measure the relative high on that one?

23  A.  The result for that one was 61 nanograms per milliliter.

24  It doesn't determine biological effect in terms of whether or

25  not the individual is high because it's pharmacologically

1   inactive.  It doesn't do anything.

2   Q.  And finally, the last one, the delta-9-THC, what does that

3   result state?

4   A.  That result states that it's greater than 50 nanograms per

5   milliliter.

6   Q.  And so again, the delta-9-THC, is that what we've been

7   talking about, the measuring of the intoxicating effect of

8   marijuana essentially?

9   A.  It is.

10  Q.  And when that says "over 50" does that mean it could be 51

11  or 65 or 75?

12  A.  It could be 51, 65, 75, 200.  It's just greater than 50.

13  The lab did not quantify it more specifically than that.

14  Q.  And with regard to a delta-9-THC level of greater than 50

15  in Mr. Dodge's body, are you able to determine or make an

16  opinion about when the last time was he consumed marijuana?

17  Was that days ago or hours ago?

18              MS. HUCKE:  Objection, Your Honor, under 702 and 703.

19              THE COURT:  All right.  Ladies and gentlemen of the

20  jury, I'm going to excuse you for a minute.  There's a legal

21  issue that I need to address that doesn't concern you, but

22  it's going to take a moment, so I'm going to go ahead and let

23  you have a recess.  I'll remind you of the recess instruction.

24  You'll be right back here in a moment.

25              Please rise.

1       (The jury exited the courtroom at 10:47 a.m.)

2       (The following took place outside the presence of the

3       jury.)

4            THE COURT:  Go ahead and have a seat.

5            So, Counsel, as I understand this, at this point in

6   time, the question here is how insightful is delta-9-THC as to

7   time of consumption.  I don't see it as to time of death.  But

8   let me -- Ms. Hucke, any cross-exam that you wish to do

9   foundational at this point in time I'll allow you to do to

10  point out the arguments regarding admissibility.

11                          CROSS-EXAMINATION

12  BY MS. HUCKE:

13  Q.  And so with a cutoff of over 50, you just previously

14  stated you have absolutely no way to determine what exactly

15  the level was; is that correct?

16  A.  That's true, yes.

17  Q.  So you'd stated the level could be 200, it could be 61, it

18  could be any number above 50?

19  A.  That's correct.

20  Q.  And so is there a cutoff where a number is so high that --

21  is there actually a cutoff number or can that just -- if

22  someone just smokes a lot of pot in one sitting, can that go

23  to, like, 1,000?

24  A.  I don't know that I've ever seen one personally that's

25  1,000, but I've certainly seen them into the several hundred

1    range.

2    Q.  Okay.  And is there a point where the level could be so

3    high that it's actually toxic or could cause death to a

4    person?

5    A.  That's really -- a really interesting question.  The

6    likelihood of death from just exposure to marijuana alone in

7    the absence of anything else -- and I'm not counting, for

8    example, somebody being high and involved in a traffic

9    accident or something like that.  But just death due to the

10   THC alone, that's highly, highly unusual.  The only place

11   where I've seen an individual with THC concentrations so high

12   that death was really a concern was in babies who had gotten

13   into edibles, toddlers who had gotten into edibles and we

14   needed to intubate -- put them on a ventilator -- to support

15   their respiratory function.

16   Q.  So how much marijuana would need to be consumed for

17   someone to reach a level of 50?

18   A.  Not -- not a great deal depending upon the timing.  Is it

19   okay if I talk with my hands for just a minute?  As the blood

20   concentration goes up, it reaches a peak and then comes down

21   again.  So if you are smoking just a regular joint, let's say

22   that you had a peak concentration of 150.  You could have had

23   a 50 on the way up; you could have a 50 on the way down.

24   Q.  Okay.  So there's no really good way of knowing how much

25   marijuana someone had smoked or consumed when you look at a

1   level, like, above 50?

2   A.   Not really.  We can't really determine the dose.  But with

3   a -- the dose is really less important from a clinical

4   standpoint.

5   Q.   But in a situation where someone consumed a very large

6   amount of marijuana and their levels could be over 200 at some

7   point, there's no way that you could tell how much was

8   consumed as far as the levels based on this finding?

9   A.   In terms of the dose, that would be very hard to determine

10  for a specific individual.  You know, you may be able to say

11  that if a group of people also smoked exactly the same

12  concentration THC joints, then you could have, you know, a

13  mean with some standard errors on it.  But they do fluctuate a

14  little bit for an individual.  It is difficult to establish a

15  specific dose for an individual.

16  Q.   Okay.  And so how would you calculate a time of death of

17  four to six hours in this case?

18  A.   I wasn't actually calculating a time of death.  My comment

19  was that the blood THC in an individual who is smoking -- and

20  we'll just use a living person throughout this example -- goes

21  up and then comes back down.  When it comes back down, it's

22  down quite low -- into the single digits -- within about two

23  to three hours.  So down three, four, five, something like

24  that.

25          That clearance stops if someone dies.  So they're no

1    longer eliminating the drug once they're dead because the

2    blood's not circulating through the liver.  It's not being

3    metabolized.  It's not be distributed.  So someone who has a

4    THC concentration of greater than 50 nanograms per milliliter

5    and is dead, that would be suggestive of earlier rather than

6    later in proximity to the -- to the time of smoking.

7    Q.  And what factors affect how quickly someone could

8    metabolize the THC?

9    A.  Well, there are a number of them.  It doesn't seem to be

10   as affected by dose.  In other words, if you use a large dose

11   first and a lower dose, the peak with the large dose will be

12   higher, but the elimination is about the same rate.  Enzyme

13   activity could explain some variability.  In some people the

14   relative body fat may affect it as well.

15          But in general, there's not a great deal of

16   fluctuation in terms of the elimination rate.  The fluctuation

17   is typically in the peak concentration; in other words, how

18   high they go.  Experienced smokers tend to be more efficient

19   as far as the efficiency of smoking is concerned than somebody

20   who is a novice.  So an experienced smoker oftentimes will

21   have somewhat higher concentrations than a novice smoker.

22   Q.  And you said enzyme activity would be a factor.

23   A.  Yes.

24   Q.  Could you explain that.

25   A.  Sure.  Not -- most of us humans have pretty much the same

1   enzymes, but because of our various genetic makeups, some

2   people's enzymes work a little faster than others' do.  Some

3   people have less efficient enzyme activity than others.  So if

4   the enzyme activity is more efficient, that would mean it

5   would -- it would munch up the THC much more quickly.

6   Q.   What factors would give someone efficient enzymes as

7   opposed to enzymes that aren't as efficient?

8   A.   That's genetics.

9   Q.   And does -- the environment that someone's in, could that

10  also be a factor?

11  A.   I suppose if you looked at something that would decrease

12  blood flow to the liver, then you could have a situation where

13  the drug would be cleared less quickly.  Somebody who has lost

14  a lot of blood and is no longer having as much blood flow

15  through the liver could do it; obviously somebody who's dead,

16  where there's no blood flow through the liver.  Somebody who

17  is profoundly hypothermic, I could postulate there might be

18  some decrease in metabolism because blood flow through the

19  liver has slowed.

20  Q.   So if someone who is hypothermic, that would mean they

21  were cold.  So if they're cold, that could slow down the

22  amount that -- the time that it would be processed out?

23  A.   It -- true, but not cold like walking across the street

24  this morning cold, cold like pathologically hypothermic, as in

25  somebody's who's fallen through the ice into the river in the

1    middle of winter, very, very cold.

2    Q.  If someone was injured, could that be a factor?

3    A.  It could, particularly with profound blood loss.

4    Q.  So having profound blood loss would be a factor that would

5    actually slow down the rate of the body metabolizing the THC?

6    A.  It could, but it's not -- it's going to -- it's not going

7    to create any more THC; it's just going to cause it to not be

8    eliminated.

9    Q.  And if somebody had an injured liver and their liver

10   wasn't functioning properly, that could be a factor as well?

11   A.  I'm not sure -- are you talking about someone with a

12   disease like hepatitis, or are you talking about someone with

13   a traumatic injury to the liver?  I'm not sure what you're --

14   Q.  I guess both, if somebody has a disease or they have

15   trauma to the liver.

16   A.  I'm not sure that a disease -- an infectious disease like

17   hepatitis would necessarily affect the kinetics.  In terms of

18   an injury, if we're talking about something that reduces blood

19   flow to the liver, I think that would be the primary issue.

20           MS. HUCKE:  Okay.  Can I just have a moment, Your

21   Honor.

22           THE COURT:  You may.

23       (Counsel confer.)

24   Q.  (BY MS. HUCKE)  And have you had the opportunity to review

25   the autopsy report in this case?

1   A.  I have.

2   Q.  And so you're aware that Mr. Dodge suffered severe

3   injuries?

4   A.  He did.

5   Q.  And so I'm going to give you a hypothetical.  If you have

6   someone who is beaten severely, who is still alive but is in

7   40-degree temperature, could that be a situation that would

8   slow the rate of the metabolizing?

9   A.  It would slow it maybe to some extent, but it's not going

10  to eliminate it.

11  Q.  But it would slow it?

12  A.  Perhaps a little, yes.

13      (Counsel confer.)

14  Q.  (BY MS. HUCKE)  And so what -- in those factors, in that

15  situation, what would the rate be?  You said it would be

16  slower, so what would be the rate?

17  A.  I can't give you a definitive number on that because with

18  the hypothetical, there are obviously a lot of variables.  The

19  important point with respect to that, though, would be that

20  there would likely be residual concentrations on the low end

21  that would still be present.  But as long as there's still

22  blood going through the liver, that metabolism is still going

23  to take place, and you're still on the order of, you know, a

24  couple hours.

25  Q.  Okay.  What studies have you reviewed to back up that

1    opinion?

2    A.  Sure.  How would you like -- do you want me to hand you

3    this or just read them?

4    Q.  You can read them.

5          THE COURT:  If you would identify the title of any

6    learned treatise you rely on.

7    A.  There is a study in pigs by a French group.  The first

8    author's name is Brunet, B-R-U-N-E-T, and the title of the

9    paper is "Postmortem Redistribution of THC in the Pig."

10   That's in the *International Journal of Legal Medicine* from

11   2010.

12         There is another paper by Marilyn Huestis -- that's

13   H-U-E-S-T-I-S -- called Blood "Cannabinoids I Absorption of

14   THC and Formation of 11-Hydroxy-THC and THC Acid During and

15   After Smoking Marijuana."  There is another paper -- oh, I'm

16   sorry.  That is in the *Journal of Analytical Toxicology*, 1992.

17         There is a paper by Karschner, K-A-R-S-C-H-N-E-R,

18   called "Do Delta-9-THC Concentrations Indicate Recent Use in

19   Chronic Cannabis Users?"  That's in *Addiction*, 2009.  And

20   there are a few others as well.

21   Q.  (BY MS. HUCKE)  So going back to the pig study, what was

22   the methodology that they used, and what were the findings?

23   A.  The findings were that they had a series of 15 pigs, and

24   they dosed them with THC -- it was given intravenously.  There

25   are obvious limitations for a smoking study with pigs.  But it

1  was given intravenously.  The kinetics are about the same as

2  with smoking.  You have a high peak and then a rapid decline.

3        They let the THC equilibrate in the pigs for two

4  hours.  The pigs were then sacrificed and the concentrations

5  of the various constituents measured.  The results were that

6  they were able to demonstrate that the kinetic profile in

7  living pigs was very similar to the kinetic profile in living

8  humans for THC.  They also demonstrated that the -- there was

9  some difference in concentration between the various analytes

10 when the pig was dead versus when the pig was alive, a

11 phenomenon called postmortem redistribution.

12       MS. HUCKE:  Okay.  Can I just have a moment, Your

13 Honor?

14       THE COURT:  You may.  While you're taking that

15 moment -- well, go ahead.

16    (Counsel confer.)

17 Q.  (BY MS. HUCKE)  So, Dr. Palmer, with these studies that

18 you cited --

19 A.  Yes.

20 Q.  -- where in any of these studies did they address the rate

21 at which THC would be metabolized for someone who's been

22 severely injured, who's in 40 degrees, who was -- is there any

23 studies that directly address that rate?

24 A.  Directly addressing that issue, there are not.  That's

25 based on what happens to liver blood flow during trauma, in my

1    education, experience, and dealing with other compounds in a

2    similar fashion.

3         (Counsel confer.)

4    Q.  (BY MS. HUCKE)  And, Dr. Palmer, I know that you are a

5    Ph.D., but you're not an M.D., a medical doctor?

6    A.  I'm not.

7    Q.  Where in your training and experience do you have about

8    liver trauma?

9    A.  35 years as a paramedic and board certification in

10   clinical toxicology.

11   Q.  But you're not a medical doctor?

12   A.  No, I'm not.

13        (Counsel confer.)

14   Q.  (BY MS. HUCKE)  Okay.  And I understand that you have

15   training as a paramedic, but as a paramedic, you don't get

16   training on liver trauma?

17   A.  Sure we do.

18   Q.  You get training on the effects of trauma to the liver?

19   A.  We get training on massive blood loss regardless of what

20   the issue is.  And if that's a lacerated liver, then that can

21   certainly be the case.

22   Q.  Can you explain that training as far as the effects on the

23   body for trauma -- of trauma to the liver.

24   A.  Oh, sure.  When an individual suffers something like a

25   lacerated liver and -- or massive blood loss, blood pressure

1    drops, heart rate goes up, and they enter a condition that we

2    would refer to as hypovolemic shock.  When that happens, the

3    body shunts the blood flow to the vital organs -- the brain,

4    kidneys, and heart -- in order to maintain vital functions at

5    the expense of other less vital organs at that time.

6    Q.   So what would be the methodology in a case as I asked

7    previously of the rate at which THC is metabolized in the body

8    for someone who has been severely injured, is in 40-degree

9    weather -- temperature, and is still alive for a prolonged

10   period of time?

11   A.   That would be a difficult -- obviously, that would be an

12   impossible study to do in a human for, you know, a variety of

13   ethical and legal reasons.  But it probably could be done in

14   an animal model.  I've not seen it done.  I was working with

15   the hypothetical that you provided.

16          The amount of decrease in metabolism is going to be

17   related to the amount of decrease in blood flow through the

18   liver.  So if you have somebody who is -- has been injured and

19   the blood flow has decreased a small amount, there's not going

20   to be that great a difference in the metabolism.  If, on the

21   other hand, you have someone who has been so severely injured

22   that the blood flow is almost zero through the liver, they're

23   not going to live very long.

24          THE COURT:  I'm going to cut to the chase on this.  I

25   understand where you're going.

1                     EXAMINATION

2     BY THE COURT:

3     Q.   But, Doctor, let me ask you a couple of questions.  And

4     I'm going to oversimplify this, and forgive me.

5     A.   Yes, sir.

6     Q.   Is there a limit or a standard level of saturation that

7     human beings can take?  In other words, is there at -- after

8     smoking a joint, or whatever the heck you want to call it, is

9     there a set or determined saturation level that that person

10    will have uniformly?

11    A.   Saturation, are you talking about --

12    Q.   The level of delta-9-THC.

13    A.   It depends on the amount of THC in the joint that was

14    smoked.  But the peak is typically on the order of 75 to 200,

15    250.

16    Q.   And in this, alls we know is it's above 50 in this case?

17    A.   Correct.

18    Q.   Are there variables that affect that saturation rate of

19    delta-9-THC from human to human?

20    A.   There are.  Smoking efficiency is one.  The -- obviously

21    the quality of the marijuana that's used.  That with higher

22    THC concentration will give higher THC concentration in the

23    blood.

24    Q.   And I understand as you look at it, there is a -- based

25    upon kinetics and half-lifes, there is a standard rate of

1    reduction of the delta-9-THC from a human being after

2    consumption?

3    A.   It -- there are actually two of them, but yes.

4    Q.   But they vary?

5    A.   Right.  The first one is -- and I'm afraid I'm going to

6    have to talk with my hands.

7    Q.   Go ahead and use your hands.

8    A.   When the peak goes up and comes down, it's a very steep

9    decline with that first part.  Then there's the slower decline

10   that I talked about with the leaching of the THC coming back

11   in from the fat.

12   Q.   After you get below 5 nanograms?

13   A.   Right.  That's much -- a much shallower slope, so that

14   elimination is much longer.  When people refer to elimination

15   half-life of THC and use numbers of 24 or 36 hours, they're

16   referring to what's called the beta elimination half-life,

17   which is that real shallow piece at the end, not the steep

18   part at the beginning, which is called the alpha elimination

19   rate.

20   Q.   But there is no set saturation rate for human beings?  In

21   other words, there's no -- everybody that smokes, no matter

22   how much you smoke, if you're tested 30 minutes after that,

23   you're going to be at 200 nanograms of delta-9?

24   A.   Yeah, it doesn't work quite that -- it doesn't correlate

25   quite that well in reality.

1    Q.  All right.  And as I understand it, have you ever -- well,

2    let me back up before I forget this thought.  The postmortem

3    on the pigs in 2010, they gave a dosage to those pigs that was

4    a set and identified amount of dosage; correct?

5    A.  They did.

6    Q.  So you knew what their blood concentration level was at

7    the beginning?

8    A.  Yes.

9    Q.  And then you could correlate at the end what the blood

10   concentration of THC-delta-9 was?

11   A.  Right.

12   Q.  We don't have that here, do we?

13   A.  Correct.

14   Q.  In terms of the -- well, have you ever offered an opinion

15   or been allowed to offer an opinion as to time of death based

16   upon THC-delta-9 levels in relationship to consumption of

17   marijuana?

18   A.  I -- with respect, Your Honor, I don't think that's what

19   I'm doing today.

20   Q.  Well, I guess what -- let me state what I understand that

21   you're offering, and then you can tell me how I'm

22   misinterpreting it.

23   A.  Sure.

24   Q.  As I understand it, given the nanograms of greater than 50

25   in Mr. Dodge's blood at the time of the toxicology, which

1  would reveal the level at the time of death that his body quit

2  processing --

3  A.  Yes.

4  Q.  -- you would opine that he had consumed marijuana within a

5  relatively short period of time -- short, as in hours -- prior

6  to being deceased because of the level of delta-9-THC is above

7  5, it -- we know it's above 50 but we don't know how far above

8  50 --

9  A.  Right.

10 Q.  -- that peak that comes down from consumption.  And so

11 your opinion would be that we know that he smoked marijuana

12 within a relatively short period of time before he died?

13 A.  Correct.

14 Q.  All right.  But factors that go into that would be where

15 that peak was in terms of the quality of the THC that he'd

16 consumed and the amount he consumed; correct?

17 A.  To the extent that that would define what the peak value

18 was, the rate of decline is still the same.  It's still going

19 to be a very, very rapid decline whether you came from 200 or

20 you came from 60.  You're still going to be down almost to

21 zero.

22 Q.  But it's not like blood alcohol in the sense of every one

23 hour you get a .02 reduction?

24 A.  No, it's not.  It's an entirely different order of

25 kinetics.  The blood alcohol is zero-order kinetics.  That's a

1  set amount per unit of time.  The THC is first-order kinetics,

2  which is a certain percentage over a unit of time.  And that's

3  where we get half-life.

4  Q.  But you still have to know what you start at to use that

5  percentage to reduce and determine where you were?

6  A.  Other than -- if you want to determine the exact

7  half-life, you'd need at least two points to get the exact

8  half-life in an individual.  But regardless of where that peak

9  is, within one to two hours you're going to be down in the

10  very, very low numbers because you're going to be switching

11  from that alpha elimination to that more shallow beta

12  elimination.

13  Q.  When you say very, very low numbers, what are you talking

14  about in terms of nanograms?

15  A.  In looking at the studies, they were often below 1.  It

16  was detectable by the laboratory, but it's, you know, 25, 50

17  times less than what a 50 would be if we were even dealing

18  with a 50 in this case.

19  Q.  But we don't know that it's 50 to some number greater than

20  50?

21  A.  Right.  But regardless of what the peak is -- and it's

22  demonstrated in these studies that regardless of what the peak

23  is, that alpha elimination is so fast that within a couple of

24  hours, you're switching from that alpha curve to that beta

25  curve.  And the beta curve is the one with the very low

1    numbers in it.

2    Q.   And have you ever offered an opinion or been allowed to

3    offer an opinion as to, based upon the delta-9-THC level, the

4    time frame from which the test was taken or an estimate or

5    opinion as to the length of time that expired between the

6    blood test or in this case death and consumption of THC?

7    A.   I've not been asked that specific question before.  But

8    the only logical way to interpret that number with respect to

9    the kinetic studies would be that this was in relative close

10   proximity to when the marijuana was used.

11           THE COURT:  All right.  Anything further, Ms. Hucke?

12           MS. HUCKE:  Yes, Your Honor.

13                   CROSS-EXAMINATION (RESUMED)

14   BY MS. HUCKE:

15   Q.   So, Dr. Palmer, what is the rate of THC dissipation with

16   someone who has massive blood loss?

17   A.   That's again going to be determined by how much blood goes

18   through the liver, because that's where the metabolism takes

19   place.

20   Q.   So you would have no way of knowing what the rate would be

21   in that situation?

22   A.   Other than it would be proportional to whatever the blood

23   flow is, yeah, that's correct.

24   Q.   And in the pig study, did they test the dissipation rate

25   in any pigs who had suffered blood loss?

1   A.   They did not, not in that particular study.

2   Q.   And is there any study out there that tests the rate of

3   dissipation for anybody who suffered physical trauma or liver

4   trauma or blood loss?

5   A.   For THC, I've not looked for that specific issue.  There

6   are studies that do that for other drugs and demonstrated

7   proportional for -- to hepatic blood flow, or blood flood

8   through the liver.

9   Q.   But there's no study that you know of with this situation

10   that gives the rate of dissipation?

11   A.   Not that I can give you off the top of my head.  I, again,

12   haven't looked for that, but it's basic physiology.

13          MS. HUCKE:  Nothing further, Your Honor.

14          THE COURT:  Mr. Conder, anything further with regards

15   to that?

16          MR. CONDER:  Your Honor, just to hopefully clear up

17   one thing.

18                 DIRECT EXAMINATION (RESUMED)

19   BY MR. CONDER:

20   Q.   Dr. Palmer, if -- you stated -- the judge asked if you get

21   up to a high level, and you said 250 --

22   A.   Okay.

23   Q.   So if a person is 250 and another person is 100 --

24   A.   Yes.

25   Q.   -- would their rates going down be different to get down

1    to the beta level?

2    A.   Not appreciably.  They'd be roughly the same.

3    Q.   And would that be a difference of hours, an hour or two

4    hours?

5    A.   Oh, probably less than that.

6    Q.   If a person dies, they stop dissipating drugs and alcohol?

7    A.   Largely, yes.  There can be some movement between tissues,

8    but they're no longer eliminating it.  You're effectively

9    stopping a stopwatch at that point.

10   Q.   And is it safe to say that if you're injured, that may

11   affect the rate of dissipation, but it will not eliminate

12   dissipation altogether?

13   A.   That's correct, yes.  As long as there's still some blood

14   going through the liver, it'll still be metabolized.

15   Q.   And the rate at which that would be in an injured person,

16   that's still -- that's -- severely injured but still alive,

17   would their rate of dissipation be dramatically different?

18   Would it be on the level of two hours' difference or days'

19   difference, recognizing there may be a difference?  But what's

20   the degree of difference?

21   A.   Well, it's going to be proportionate to the blood flow

22   through the liver again.  If you have somebody who is injured

23   enough to survive for a period of days, I would expect that

24   that alpha phase would still be largely the same.  The beta

25   phase might be prolonged quite a bit.  If you're talking about

1   somebody who has received such massive injuries that they're

2   going to have almost no hepatic blood flow, that individual is

3   unlikely to live for a period of days without appropriate

4   medical care.

5             MR. CONDER:  Your Honor, the United States has

6   nothing else.

7             THE COURT:  All right.  Well, there are -- first of

8   all, I mean, I think that the issues as to, you know,

9   temperature and blood loss are certainly probative and would

10  go to the issues as to the weight and the impact that might

11  have.  But what I fundamentally have a problem with here is --

12  and it may be just simply my lack of understanding and

13  appreciation, but if there was further study that could

14  confirm in terms of, regardless of dosage, a nanogram level of

15  X would always be at that level or below after a period of

16  time.

17            There are too many factors adding in there as well at

18  this time.  Based upon the Court's limited knowledge and

19  information, there are too many factors and too many

20  components and a lack of specificity in part on the

21  delta-9-THC test to allow an opinion to be given as to the

22  relative time frame within which marijuana consumption was

23  made by Mr. Dodge relative to his death, whatever time that

24  was.

25            I just don't see sufficient reliability based upon

1    the lack of correlation and testing.  So I'll sustain the

2    objection as to any opinion as to the relative time of death

3    related to consumption of marijuana by Mr. Dodge.

4              MR. CONDER:  Your Honor, just a clarification.  Would

5    the Court permit the United States to ask, upon the jury's

6    return, to discuss timing issues in general, not in relation

7    to Mr. Dodge but the notion that in a living person, somebody

8    testing over 50 nanograms per milliliter would take hours and

9    not days to dissipate that level and leave it at that?

10             THE COURT:  Well, he's already testified as to, you

11   know, those issues, so I won't let him go back into that.

12             MR. CONDER:  Okay.

13             THE COURT:  He can be cross-examined as to impacts

14   that could affect the time of -- issues concerning blood loss

15   and temperature.  But he's already in -- I would allow him

16   to -- he's already said that, you know, based upon my careful

17   notes, that that timing would -- levels of certain amounts

18   above 5 or whatnot show fairly recent use, not specific time

19   frame as to use.  And that's as far as I would allow.

20             MR. CONDER:  Thank you, Your Honor.  And may I ask --

21   and I'm not sure where I was, but I don't know that I got into

22   the notion of what I just asked Dr. Palmer now, does

23   dissipation stop upon death.

24             THE COURT:  You may ask that.  I think that's

25   standard science, and there's certainly no question about

1    that.  There's some anomalies, as he noted, but you may ask

2    him about that.

3                 MR. CONDER:  Okay.

4                 THE WITNESS:  Your Honor --

5                 THE COURT:  I'm going to ask you to go ahead and

6    speak with counsel if you want.  Let's take two minutes.

7         (At 11:24 a.m., a recess was taken until 11:28 a.m.)

8         (The following took place outside the presence of the

9         jury.)

10                THE COURT:  Thank you.  I note the presence of the

11   ladies and gentlemen -- counsel and the defendant, absence of

12   the ladies and gentlemen of the jury.

13                Any matter we need to take up before we resume?

14   Mr. Conder?

15                MR. CONDER:  Nothing from the United States, Your

16   Honor.

17                MS. HUCKE:  No, Your Honor.

18                THE COURT:  Go ahead and be seated.  Thank you.

19                Let's go ahead and bring in the ladies and gentlemen

20   of the jury.

21        (The jury entered the courtroom at 11:30 a.m.)

22                THE COURT:  Thank you.  Please be seated.  Ladies and

23   gentlemen of the jury, I apologize for the delay.  It's my

24   fault.  Blame me.  I owe you time.  I don't know how I'm going

25   to do that, but I'll continue to do what I can.

1          Mr. Conder -- oh, and, defense counsel, make sure you

2    have a microphone right close to you when you make any

3    objections, because they're having difficulty hearing you.

4          Go ahead, Mr. Conder.

5          MR. CONDER:  Thank you, Your Honor.

6    Q.  (BY MR. CONDER)  Dr. Palmer, when we left off, we were

7    talking dissipation rates of blood and alcohol in a human

8    body.  If a person dies and previously consumed drugs or

9    alcohol, do they stop dissipating?  Does the alcohol and drugs

10   in their system stay what they were when they died?

11   A.  They stop eliminating.  The actual concentrations of the

12   drugs may change somewhat after death due to the chemical

13   processes that take place in a body after death.  Alcohol

14   typically remains about the same.  Other drugs can change a

15   little bit in concentration after death.

16   Q.  So if a person dies, their BAC, it'll stop absorbing and

17   stop dissipating, and it'll stay what it was when they died?

18   A.  Pretty close, yes.

19   Q.  If somebody's injured due to trauma, some sort of injury,

20   would their body still eliminate alcohol?

21   A.  Yes.

22   Q.  And would it matter if they were -- the nature of the

23   injury, would that matter?

24   A.  Not much.  Alcohol is not eliminated through the liver.

25   That's not the primary route of elimination of alcohol.

1   Q.   Where is alcohol eliminated from?

2   A.   The kidneys.

3   Q.   So as long as a person is still alive, they would be

4   dissipating and eliminating alcohol?

5   A.   Yes.

6           MR. CONDER:  No further questions, Your Honor.

7           THE COURT:  All right.  Thank you.

8           Cross-exam.

9           MS. HUCKE:  We don't have any questions, Your Honor.

10          THE COURT:  All right.  May this witness be released

11  from any subpoenas?  Mr. Conder?

12          MR. CONDER:  Yes, Your Honor.

13          MS. HUCKE:  Yes, Your Honor.

14          THE COURT:  You may step down.  You're free to go.

15  Thank you, Doctor.

16          All right.  The United States may call its next

17  witness.

18          MR. CONDER:  Your Honor, the United States would call

19  Bernadette Brown.

20          THE COURT:  Ms. Brown will come forward and be sworn.

21      (The witness was sworn.)

22          THE COURTROOM DEPUTY:  Please state and spell your

23  name for the record.

24          THE WITNESS:  Bernadette Brown.

25          THE COURTROOM DEPUTY:  And spell it, please.

1           THE WITNESS:  B-E-R-N-A-D-E-T-T-E  B-R-O-W-N.

2           THE COURTROOM DEPUTY:  Please state your occupation

3    and your city of residence.

4           THE WITNESS:  Fremont County.  I just --

5           THE COURTROOM DEPUTY:  And your occupation.

6           THE WITNESS:  Housekeeping.

7              BERNADETTE BROWN, GOVERNMENT'S WITNESS

8                      DIRECT EXAMINATION

9    BY MR. CONDER:

10   Q.  Good morning, Ms. Brown.

11   A.  Good morning.

12   Q.  You said you lived in Fremont County.  In particular,

13   where do you live?  Not your address.

14   A.  In Riverton.

15   Q.  In Riverton.  And where did you grow up?

16   A.  Ethete.

17   Q.  And is that on the Wind River Indian Reservation?

18   A.  Yes.

19   Q.  And are you an enrolled tribal member?

20   A.  Yes.

21   Q.  And what tribe are you a member of?

22   A.  Arapaho.

23   Q.  Any did you grow up on the Wind River Indian Reservation?

24   A.  Yes, I did.

25   Q.  Where did you go to high school?

1   A.   I went to Wyoming Indian Elementary and then Wind River

2   for high school.

3   Q.   Thank you.  Do you have any children?

4   A.   Yeah.  I have five boys.

5   Q.   Ms. Brown, do you use alcohol?

6   A.   Yes, I do.

7   Q.   And do you use drugs?

8   A.   Yes.

9   Q.   You're -- you're not under the influence here today, are

10  you?

11  A.   No.

12  Q.   Okay.  I'm going to go back a little bit, a few years.  Do

13  you remember in 2012 getting a DUI conviction in Fremont

14  County?

15  A.   Yes.

16  Q.   And did that turn into a felony DUI?

17  A.   Yes.

18  Q.   Are you familiar with the house located at 331 Great

19  Plains Road?

20  A.   Yes.

21  Q.   And how do you know that house?

22  A.   I went to a party there.  I partied there.

23  Q.   And when did you party there?

24  A.   I partied there the past summer and then I partied there

25  again in November.  I can't remember the exact date.

1   Q.   Did you party there around Thanksgiving in 2017?

2   A.   Yes.

3   Q.   And when you say you were partying, what were you doing?

4   A.   We were drinking alcohol and doing methamphetamine.

5   Q.   And who's "we"?  Who else was there with you?

6   A.   There was me, Arapaho, Tara, Monty Tabaho, BoMatt -- or

7   Matthew Whiteplume, and I can't remember the other person.  I

8   didn't really know those -- I didn't really know those people

9   very good.  The only one I really knew was Monty and BoMatt

10  and Tara.

11  Q.   And when you say BoMatt --

12  A.   Bernard Whiteplume.

13  Q.   Do you know a Matthew Whiteplume?

14  A.   Yeah.

15  Q.   All right.  And who's Matthew Whiteplume?

16  A.   BoMatt.

17  Q.   Okay.

18  A.   That's what we call him.

19  Q.   So you call him Bernard "BoMatt" --

20  A.   BoMatt, yeah.

21  Q.   -- Matthew Whiteplume?

22  A.   Yeah.

23  Q.   It's all the same guy with many names?

24  A.   Yeah.

25  Q.   Do you know an individual named Mr. Charles Dodge or

1   Chucky Dodge?

2   A.   Yeah.  He was there too.  It was the first time I ever met

3   him.

4   Q.   When you were partying that night was the first time you

5   ever met him?

6   A.   Yeah.  I didn't know him before.

7   Q.   And you said Arapaho.  Arapaho who?

8   A.   Oldman.

9   Q.   And how do you know Arapaho Oldman?

10  A.   I met him before at Dina and Duane Bell's house in Beaver

11  Creek.

12  Q.   So you'd met him before this night you were partying?

13  A.   Uh-huh.

14  Q.   And do you recognize Mr. Oldman here in the courtroom

15  today?

16  A.   I don't really see him.  No, I don't see him.  I can't...

17  Q.   And how did you know Mr. Arapaho Oldman?

18  A.   I just met him over at Dina and Duane's before, when I was

19  drinking over there.

20  Q.   How did you get to know him?

21  A.   I don't really know him.  I just partied with him.

22  Q.   But how did you know his name was Arapaho Oldman?

23  A.   Because that's what they -- they introduced me to him.

24  Q.   And if you could pull your microphone a little closer.

25  Roll up on your chair there.

1          THE COURT:  It'll pull down as well.

2          THE WITNESS:  I can't even reach the floor from this

3     chair.

4          THE COURT:  If you reach on the right side of that

5     chair, there should be a little lever.  If you pull it up --

6          THE WITNESS:  Oh, okay.

7          THE COURT:  -- you can adjust that if you wish and

8     just stand up and do it.

9     Q.  (BY MR. CONDER)  So, Ms. Brown, when you indicated you met

10    Arapaho Oldman, how did you know his name was Arapaho Oldman?

11    A.  Because they introduced me.

12    Q.  And who introduced you?

13    A.  BoMatt.  But Dina and Duane introduced me before.  I see

14    him.  I couldn't see before.

15    Q.  So is he here in the courtroom today?

16    A.  Yes, he is.

17    Q.  Could you describe where he's sitting and what he's

18    wearing.

19    A.  He's sitting on the left-hand side, and he's got a gray

20    sweater and glasses on.

21    Q.  And is -- that gentleman sitting where you just described,

22    is that the Arapaho Oldman you met at the Bells' and partied

23    with around Thanksgiving?

24    A.  Yes.

25    Q.  Okay.  So you were at 331 Great Plains.  You're partying,

1  drinking, doing meth with Mr. Whiteplume, Mr. Oldman, Chucky

2  Dodge --

3  A.  Chucky.

4  Q.  All right.  Where were you guys at?

5  A.  We were in the basement.

6  Q.  Did you start out in the basement, or did you start out

7  somewhere else?

8  A.  We were upstairs -- me, Tara, BoMatt, and Monty -- and

9  then we went down to town, came back, and then we went into

10 the basement.

11 Q.  And what were you doing in the basement?  What was going

12 on down there?

13 A.  We were drinking, just visiting, partying.

14 Q.  And who was all down in the basement at that time again?

15 A.  Me, Arapaho, Monty, Charles.  Tara and BoMatt were

16 upstairs, and then Tara left, and BoMatt came by himself.

17 Q.  You said Tara left the house --

18 A.  She didn't leave.  She was upstairs.

19 Q.  And Mr. Whiteplume was in the basement?

20 A.  Yeah.

21 Q.  So in the basement was you --

22 A.  Uh-huh.

23 Q.  -- Chucky Dodge --

24 A.  Yes.

25 Q.  -- the defendant, Arapaho Oldman --

1    A.   Yes.

2    Q.   -- and Mr. Whiteplume?

3    A.   Uh-huh.

4    Q.   And who else was down there?

5    A.   Monty, and there was another girl there.  What was her

6    name?  I think it was Jessica.  Jessica Guffey.

7    Q.   Okay.  So what happened?  What were you guys drinking?

8    A.   Vodka, BV.

9    Q.   What kind of vodka were you drinking?

10   A.   Fleischmann's.

11   Q.   Does Fleischmann's go by a nickname?

12   A.   I don't know.

13   Q.   Is there -- have you ever heard of red cap?

14   A.   Yeah.

15   Q.   What's red cap?

16   A.   Fleischmann's.  Monty Tabaho, he had Potter's.

17   Q.   So Potter's is red cap?

18   A.   Yeah.  And then I had blueberry -- the blueberry ales.  I

19   had a couple six-packs of that that I brought.

20   Q.   What was Mr. Dodge doing?  Was he drinking as well?

21   A.   Yeah.  He was sitting on the side of me, and he was

22   drinking.

23   Q.   Was he doing any drugs?

24   A.   No.

25   Q.   Was he smoking pot?

1  A.   Yeah.   We were smoking weed and drinking, but he didn't do

2  any of the methamphetamine.

3  Q.   Okay.   So what happened when you're down in the basement?

4  What are you guys talking about?   What's going on?

5  A.   Oh, just -- I don't know.   I was just talking to Charles,

6  or Chucky, and we were just all drinking, talking to each

7  other.

8  Q.   Was everybody getting along?

9  A.   Yeah.

10  Q.   Did that ever charge?

11  A.   Yeah, it did.

12  Q.   And how did it change?

13  A.   Well, Arapaho started being mean to Chucky.   And I just --

14  I went upstairs, and the next thing, I came down and they were

15  all fighting.   They were all fighting and stuff.   Not they,

16  but Arapaho was fighting with -- he was trying to push Monty

17  to do some stuff to Chucky.

18  Q.   Let's back up here a little bit.   What do you mean when

19  you said Arapaho was being mean to Chucky?

20  A.   He was just -- he was yelling at him and stuff and -- I

21  didn't know.   I didn't know what was really even going on.   I

22  didn't know.

23  Q.   What was he yelling at him for?

24  A.   I don't know.   They just -- I don't know.

25  Q.   Ms. Brown, do you remember talking to the FBI in the past?

1    A.   Yeah, I do.

2    Q.   Do you remember talking to them about the group drinking

3    down in the basement at 331 and somebody mentioned they

4    couldn't get alcohol?

5              MS. AMRAM:   Objection; leading.

6    A.   Yeah, they couldn't get alcohol.

7              THE COURT:   I'll sustain the objection as to leading.

8              Go ahead and reask the question.

9    Q.   (BY MR. CONDER)  Ms. Brown, when you were down in the

10   basement drinking, do you recall how long you drank?

11   A.   Yeah.  For like a day and a half.  I was there from

12   Saturday till Sunday.  And then Chucky had brought a half a

13   gallon in, and he poured some in a half pint bottle or a pint

14   bottle, and he was keeping it for himself because he said he

15   wouldn't be able to buy alcohol until Sunday.  And then we ran

16   out, and then Arapaho asked him if -- he said, "Give me that

17   shot bro," and he said no.  And that's when I went upstairs,

18   and that's when I came back and Arapaho was fighting Chucky

19   over that half pint.

20   Q.   And what do you mean?  Could you describe how was Arapaho

21   fighting with --

22   A.   He was trying to get the bottle out of his pocket, because

23   he put the bottle inside his -- in the inside pocket.

24   Q.   And when you say fighting, were there punches?

25   A.   Yeah, there was punches.  And then when I came back down,

1  Chucky was on the floor, and they had a -- he was hitting him

2  with this piece of bar or orange metal bar.

3  Q.   And who's "he"?  Who was --

4  A.   Arapaho.

5  Q.   Who was he hitting?

6  A.   He was hitting Charles Dodge.

7  Q.   And did you see how many times he hit him?

8  A.   Probably about four times.  And then he started pushing

9  Monty around, telling Monty, "Come on, punk.  Come on.  Hit

10 him."  So Monty was doing -- helping him.

11 Q.   Did you see Mr. Whiteplume in the basement at this time?

12 A.   Yeah.  He was down there too.  And then I jumped on

13 Chucky, and I was like, "Leave him alone now.  That's enough."

14        And then Arapaho was like, "Get the F off him."

15        And BoMatt came -- I mean, I don't know what you guys

16 call him.  I call him BoMatt.  He came and he pulled me up,

17 and he was like, "Just let the homeboy handle it."

18 Q.   And did Mr. Whiteplume do anything?  Did he punch or kick?

19 A.   No, he didn't.

20 Q.   Do you remember --

21 A.   Yeah.  He had -- he had no shoes on, because I remember

22 when I was covering Chucky, his foot came under my foot, and

23 he pulled me up.  And he was like, "Just let the homeboy

24 handle it."  I remember him kicking him a couple times, but he

25 didn't -- he didn't even have no shoes on or anything.

1  Q.  So Mr. Whiteplume kicked Chucky a few times?

2  A.  A couple times.

3  Q.  So let's back up here a little, Ms. Brown.  When the

4  defendant, Mr. Oldman, asked Mr. Dodge for the bottle, asked

5  Chucky for a bottle, Chucky refused.  What was Arapaho

6  Oldman's response?  What did he do?  What did you see?

7  A.  He got angry.  He got mad.  He got angry.

8  Q.  And did he act -- did he act on his anger?

9  A.  Yeah.

10  Q.  How did he act on his anger?

11  A.  He -- he hit on Chucky.

12  Q.  What do you mean, he hit on him?

13  A.  He punched him.

14  Q.  Where did he punch him?

15  A.  In the face.

16  Q.  Did he punch him more than once?

17  A.  Yeah.

18  Q.  Did he knock Chucky to the ground?

19  A.  Yes, knocked him on the floor.

20  Q.  What did he do?  What did Mr. Oldman do when Chucky was on

21  the floor?

22  A.  He started kicking him and he started talking to Monty,

23  yelling at Monty.

24  Q.  What was he yelling at him?

25  A.  He was telling him to "Come over here and F him up."

1   Q.  And did he say what he meant by that?  Did he -- did he

2   ask for anything?  Did he do anything?

3   A.  Yeah.  He asked him to go get something, and that's when

4   he came down with that yellow -- that orange -- it was like an

5   orange bar thing.  And I just seen him get over him and start

6   hitting him.  He hit him about four times with it.

7   Q.  So Mr. Oldman asked Monty -- and that's Monty Tabaho;

8   correct?

9   A.  Yes.

10  Q.  So Mr. Oldman asked Monty to go get a bar or --

11          MS. AMRAM:  Objection; leading.

12          MR. CONDER:  I apologize.

13          THE COURT:  Go ahead and restate the question.

14  Q.  (BY MR. CONDER)  So Mr. Oldman told Monty Tabaho -- what

15  did he tell him?  What did he say?

16  A.  He just said, "Go get --" I don't know.  I couldn't

17  remember either.  I'm sorry.  I can't remember.  He just went

18  up the stairs and came back and came down with an orange bar

19  with, like, two things on the end.  And then Monty -- or

20  Arapaho grabbed it and he just got over Chucky and he hit him,

21  like, four times with it.

22  Q.  Okay.  And what happened to Chucky once he was hit with

23  this bar?

24  A.  He was on the floor.  He was laying on the floor.  He

25  couldn't get -- couldn't get back up.  He was already all

1   bloody.  His face was already all blood.  And I asked Monty --

2   I was like, "Quit doing that."  I was like, "Stop."  But

3   Arapaho was pushing Monty around, calling him a punk and

4   making him do stuff to Chuck.

5   Q.  Did there come a time that they stopped?

6   A.  Yeah.

7   Q.  And what was Chucky's condition then?

8   A.  He was hardly even breathing.  He was like gurgling and --

9   because they all went upstairs, and I was telling him, "Come

10  on.  Come on."

11  Q.  And let's back up here a little, Ms. Brown.  So Chucky's

12  on the floor, and you described him being hit.  The hitting

13  stops.  What does Chucky look like?  What does his face look

14  like?

15  A.  It's -- his face is all swollen and bloody.

16  Q.  Was he bloody?

17  A.  Yeah.

18  Q.  Could he talk?

19  A.  No.

20  Q.  But he was breathing?

21  A.  Yeah.  He was barely breathing.

22  Q.  So when they stopped, did Chucky just stay there, or did

23  he go somewhere?

24  A.  He just stayed there.  He couldn't even get up.

25  Q.  Did they do anything to him?  Did -- Mr. Oldman,

1    Mr. Whiteplume, Mr. Tabaho, did they do anything?  Did they

2    move him?

3    A.  Yeah.  They put him in that crawl space, in that crawl

4    space in the basement.

5    Q.  And who put him in that crawl space?

6    A.  BoMatt and Arapaho.

7    Q.  And BoMatt, again, that's Mr. Whiteplume?

8    A.  Yeah.

9    Q.  And what did they do when they put him in there?

10   A.  Arapaho unplugged that freezer, and he said, "Open

11   this --" or, "Unplug this fucker so they won't -- in case he

12   rots, they won't smell him."

13   Q.  And who said that?

14   A.  Arapaho.

15   Q.  And so once Mr. Whiteplume and the defendant got -- put

16   Chucky in the crawl space, what did they do?

17   A.  I don't know.  They went upstairs, and I left.  I checked

18   out of there.

19   Q.  When did you check out?

20   A.  I hitchhiked out.  It was still kind of dark when I left.

21   Q.  Did you stay down there by yourself for a while?

22   A.  Yeah.

23   Q.  What did you do when you were down there by yourself?

24   A.  I tried to get Chucky to get up, but I just told him,

25   "Come on.  Let's go before they come back."  But he was like

1    gurgling, and I couldn't lift him out of there.

2    Q.  Was his throat cut?

3    A.  His throat wasn't cut when I was there.

4    Q.  So his throat was not cut?

5    A.  No, not while I was there.  He was just beat up real bad.

6    Q.  And were you down there -- how long do you think you were

7    down there alone with Mr. Dodge?

8    A.  I don't know.  It seemed like a long time.

9    Q.  How many times did you check on him?

10   A.  Like, three times.  I was just trying to make him get up.

11   I was waiting for it to get light because I didn't want to

12   hitchhike out of there.  It was kind of scary out there.  I

13   didn't want to hitchhike because it was still dark out.

14   Q.  When you left, was Chucky still breathing?

15   A.  Yeah, kind of.  He was like gurgling barely.

16   Q.  Did you ever touch him or feel him?

17   A.  Yeah.

18   Q.  Why'd you do that?

19   A.  Because it was cold in that crawl space, and I was

20   trying -- I was trying to pull him out.  But I couldn't even

21   lift him up.

22   Q.  Did you ever get him out?

23   A.  No.

24   Q.  When you were down there and you saw the defendant, Monty,

25   and the bar, what was Mr. Whiteplume doing?

1  A.  He was just trying to pull -- he was trying to make him

2  stop.  He was trying to stop Arapaho, but Arapaho was real

3  mad.

4  Q.  Was there a time when Mr. Whiteplume said, "We ought to

5  cut his throat?"

6         MS. AMRAM:  Objection; leading.

7         THE COURT:  Sustained.

8  A.  No, but --

9         THE COURT:  Hold on, ma'am.

10         Go ahead and ask another question.

11  Q.  (BY MR. CONDER)  When -- when the defendant,

12  Mr. Whiteplume, and Monty went upstairs, do you know if they

13  left the house, or did they stay there?

14  A.  I don't know if they left or not.

15  Q.  So as far as you knew, you were -- you were the only one

16  in the basement?

17  A.  Yeah.  I was down there with him by myself.

18  Q.  And you said when Monty went to get the bar -- or do you

19  know where he -- where did Monty go?  What did you see?

20  A.  I just seen him run up the stairs and then run back down,

21  come back down.  He was, like, just running around, just doing

22  what Arapaho told him to do.

23  Q.  And what color was the bar?

24  A.  It was orange.

25  Q.  And how would you describe that?

1    A.  It was probably like about this long, and it's got two

2    little things on the end.  That's the end I seen.  And it,

3    like, had orange paint or something on it.  It was...

4    Q.  You mentioned something about a freezer.  What -- what

5    were you talking about?  What's -- what happened with the

6    freezer?

7    A.  Well, there was a freezer in the basement, in his

8    grandma's basement, in BoMatt's grandma's basement.  And I

9    just seen Arapaho -- he said, "Unplug this freezer so they

10   won't smell this fucker rot."

11   Q.  Did you ever hit Chucky?

12   A.  No.

13   Q.  Did you kick him?

14   A.  No.

15   Q.  Did you try to hurt him?

16   A.  No.  That was the very first time I ever met him.

17   Q.  How was he acting that night?

18   A.  He was just a real quiet guy, like a shy guy.  He was just

19   visiting and just -- it was mostly just me and him talking.

20   He asked me what Browns I came from.  And I didn't really

21   hardly know any of those people, but I was just there because

22   somebody took my heater, stole my propane tank from my house,

23   so I didn't have anywhere real warm to stay.

24   Q.  So do you have a problem with alcohol?

25   A.  Yeah, I think I do.

1  Q.  Because of that problem with alcohol, do you ever go to

2  detox?

3  A.  Yes.

4  Q.  And do you remember going to detox on December 3rd of

5  2017?

6  A.  Yes, I do.  That's when BoMatt came in and he asked

7  where -- "Is Bernadette Brown here?"

8       And Ronnie Brown said, "Yes.  She's --" I was laying

9  on the mat, and he said, "Bernadette, somebody wants you out

10 here."

11      So I came out, and BoMatt was standing out there.

12 And he was like, "Come on.  I got to talk to you.  We need to

13 take off from here.  Somebody else wants to talk to you."

14 Q.  So did you take off with him?

15 A.  Yes.

16 Q.  Where'd you guys go?

17 A.  We walked up the hill and up to Smith's.

18 Q.  And did you guys drink?

19 A.  Yes.

20 Q.  What did you talk about when you were drinking?

21 A.  We just talked about what happened.

22 Q.  What did you talk about?  What did you say?

23 A.  He just -- I just asked him, and he was like, "I don't

24 know."

25      He said -- I think -- I just asked him -- I was like,

1    "Does anybody remember me being there?"

2              And he's like, "Yeah, they do."  He's like, "So you

3    better watch out, because Arapaho's nephews will probably be

4    looking for you."

5              And I was like, "Well, I didn't do nothing."

6              He was like, "Yeah, but they think you're the one

7    that snitched."

8              And I said, "I didn't even tell nobody," because I

9    didn't even talk about it or anything after that morning I

10   left.

11             And then he's like, "Well, I think they --" he said,

12   "I think he had to slice that nigga's throat --" oh, he said,

13   "I had to slice that nigga's throat."

14   Q.   That what's Mr. Whiteplume said?

15   A.   Yes.

16   Q.   Do you remember the first time you talked to the FBI, on

17   December 8?

18   A.   Yeah.

19   Q.   At that time you never mentioned Monty being there?

20   A.   Because he's my friend, and he said that he was going to

21   talk to you guys himself.

22   Q.   Okay.  Explain that.  Why didn't you tell -- when you

23   spoke to the FBI on December 8 --

24   A.   Because Monty was -- Monty didn't -- he wasn't really --

25   he was, like, forced to do that stuff.  He's not -- he's not

1    that kind of person.  But with Arapaho pushing him and stuff,

2    that's why he did that.

3    Q.  And did you talk to Monty about what he -- what did he

4    tell you about what he was going to do?  Did Monty say what he

5    was going to do?

6             MS. AMRAM:  Objection; calls for hearsay.

7    Q.  (BY MR. CONDER)  Why did Monty --

8             THE COURT:  Go ahead.  Reask the question.

9    Q.  (BY MR. CONDER)  Did Monty ask you to keep quiet?

10   A.  Yeah, he did.

11   Q.  Did he tell you why?

12            MS. AMRAM:  Objection; calls for hearsay.

13            THE COURT:  I'll sustain.  I'll sustain.

14            MR. CONDER:  Okay.  Sorry, Your Honor.

15   Q.  (BY MR. CONDER)  So when you talked to the FBI again in

16   November of this year, why did you tell -- tell them this time

17   about Monty being there?

18            THE COURT:  And, Counsel, just so that the record

19   will be clear, when you say "this year" --

20            MR. CONDER:  2018.  Sorry.  Thank you, Your Honor.

21   A.  Because I -- while my boyfriend went to jail with him,

22   Joey Van Vleet, he talked to him.  And he's like, "Monty

23   said --"

24            MS. AMRAM:  Objection; calls for hearsay.

25            THE COURT:  I'll sustain as to hearsay of what her

1   boyfriend said or Monty said to her boyfriend.

2   Q.   (BY MR. CONDER)  But you didn't tell the FBI about Monty

3   until November of 2018?

4   A.   Yeah.

5   Q.   Ms. Brown, when you were down in that basement, did

6   Mr. Whiteplume hit Chucky with the bar?

7   A.   I don't -- I don't recall that.  I just remember Arapaho

8   hitting him and Monty kicking him and stuff.  I don't think

9   BoMatt -- I just remember him kicking him twice.  I just --

10  but I never seen BoMatt hit Chucky with that bar.

11  Q.   And when you left that morning, was it still dark?

12  A.   Yes.

13         MR. CONDER:  May I have a moment, Your Honor?

14         THE COURT:  You may.

15      (Discussion off the record.)

16         MR. CONDER:  No further questions, Your Honor.

17         THE COURT:  All right.  Thank you.

18         Cross-exam.

19         MS. AMRAM:  Your Honor, I do expect it to be somewhat

20  long, and I am worried about breaking in the middle for lunch.

21  Could we take lunch now, or should we break during

22  cross-examination?

23         THE COURT:  Why don't you go ahead and start and

24  we'll see where we go.

25         Ladies and gentlemen of the jury, is it all right if

1   we take a late lunch?  Anyone have a concern?  I don't want to

2   have someone with a diabetic concern or something.

3           All right.

4                         CROSS-EXAMINATION

5   BY MS. AMRAM:

6   Q.  Good afternoon, Ms. Brown.

7   A.  Good afternoon.

8   Q.  My name is Galia Amram, and I'm one of Arapaho Oldman's

9   lawyers.

10  A.  Okay.

11  Q.  I know you talked with Mr. Conder about your meth use, and

12  I wanted to talk to you about that a little more.

13  A.  Uh-huh.

14  Q.  The first time that you talked to the FBI, that was on

15  December 8th of 2017.  Do you remember that?

16  A.  Yes.

17  Q.  And you were talking to them about your ex-boyfriend?

18  A.  Uh-huh.

19  Q.  Because he was accused of molesting your niece.  Do you

20  recall that?

21  A.  Yes.

22  Q.  Okay.  And you told him that you'd been on a four-day meth

23  binge?

24  A.  Uh-huh.

25  Q.  Do you recall that?

1          THE COURT:  And, ma'am, if I could have you say "yes"

2    or "no" because "uh-huhs" are tough --

3    A.  Oh, yes.

4    Q.  (BY MS. AMRAM)  And it was at the end of that interview

5    you called the agent back and said you had something to tell

6    them about a murder?

7    A.  Uh-huh, yes.

8    Q.  And that was not the first time that you'd used meth?

9    A.  No.

10   Q.  And you've used meth with various people in this case.  So

11   you've used meth with Tara Brown?

12   A.  Yes.

13   Q.  And on the night this happened, as you told Mr. Conder,

14   you were using meth?

15   A.  Yes.

16   Q.  You also used meth again on December 2nd of 2017?

17   A.  Yes.

18   Q.  Okay.  And you talked with Mr. Conder about how sometimes

19   you go to detox?

20   A.  Yes.

21   Q.  You went into detox on December -- November 29th of 2017.

22   Do you remember that?

23   A.  Yes.

24   Q.  And then you went into detox again on December 2nd of

25   2017, so a few days later?

1   A.   Yes.

2   Q.   And then you -- do you remember being discharged on the

3   morning of December 3rd of 2017?  That was a few days after --

4   the day after you'd gone in.

5   A.   Yes.

6   Q.   And then you came back later that afternoon.  You'd drunk

7   after you left, and you came back again --

8   A.   Uh-huh.

9   Q.   -- on December 3?

10   A.   Yes.

11   Q.   And then that was the time, on December 3, that you left

12   with Whiteplume?

13   A.   Uh-huh.

14   Q.   Now, I know you talked about using meth on the night that

15   you were with Mr. Dodge, but you also were drinking alcohol?

16   A.   Yes.  We all were.

17   Q.   You all were.  Okay.  And you told the FBI you think you

18   were an eight out of ten in terms of how drunk you were that

19   night?

20   A.   I never told them.

21   Q.   You never told them that?

22        Now, you were at 331 Great Plains for, you said, I

23   think it was a day and a half?

24   A.   Yeah.

25   Q.   And is it fair to say that you were using meth and

1   drinking throughout that time period?

2   A.  We all were.

3   Q.  And is the timeline of what happened when somewhat

4   confusing to you?

5   A.  No.

6   Q.  So you didn't tell the FBI you were confused on the

7   timeline of what happened during the time you were there?

8   A.  No.

9   Q.  So you have talked to the FBI a number of times in this

10  case; correct?

11  A.  Like, three times, four times.

12  Q.  So you talked to them on December 8?

13  A.  Yes.

14  Q.  And then you talked -- and that was first with the agent

15  that you talked to about --

16  A.  Swanson.

17  Q.  Yeah, about your boyfriend?

18  A.  Yes.

19  Q.  And then you -- on that same day you talked to Agent

20  Coble?

21  A.  I don't think it was on the same day.

22  Q.  And is that Agent Chris Coble right there?

23  A.  Yes, it is.

24  Q.  And then you talked to them again almost a year later, on

25  November 19th of 2018?

1    A.   Yes.

2    Q.   And then you talked to an Agent Warren from the FBI on

3    December 18th of 2018?

4    A.   No.

5    Q.   You did not?

6    A.   No.

7    Q.   Would it refresh your recollection to look at an FBI

8    report about what happened on December 18, 2018, about whether

9    or not you talked to the FBI then?

10   A.   Sure.

11   Q.   I'm going to hand you two reports.

12        (Counsel confer.)

13   Q.   (BY MS. AMRAM)  So you don't need to read these whole

14   things, but if you could look at them and just tell me if it

15   helps you remember whether or not you talked to the FBI and --

16   A.   The only one I talked to was Swanson and Chris Coble.

17   Q.   Okay.  And so you remember talking to them, but you're not

18   sure about Agent Warren?

19   A.   Huh-uh.

20   Q.   Okay.  Now, I -- there's been different things that you've

21   told the FBI during the times that you've talked to them.

22   A.   Uh-huh.

23   Q.   And Mr. Conder asked you about Monty, about how you had

24   not told the truth about Monty initially.  So I'm going to go

25   through some of those with you.  So let's talk about first

1   when you talked to the FBI in November.  So you were -- do you

2   remember being at the Walmart when you saw Matthew Whiteplume

3   and Tara Brown?

4   A.  I didn't see them at the Walmart.  I stopped at the

5   Walmart before -- after I got off from cleaning the houses

6   that day.  I stopped at Walmart, and then I went home, and I

7   was coming back.  But I didn't have no heater, no way of

8   heating my house.  I stopped there again.  I got me a

9   bottle -- a traveler of red cap vodka, and then I was up by

10  the co-op.

11  Q.  Okay.  I apologize.  So you were up at the co-op when you

12  saw them?

13  A.  I was walking, and they pulled over and picked me up.

14  Q.  And you know Matthew Whiteplume well?

15  A.  Yes.

16  Q.  And you guys are cousins?

17  A.  Yes.

18  Q.  And you're close to Mr. Whiteplume?

19  A.  Yeah, I -- we're cousins.  I mean, we party and stuff

20  together, but I'm closer to Tara than I am him.

21  Q.  Okay.

22  A.  And she's a cousin too.

23  Q.  Okay.  And did you talk to the FBI about when you had

24  got -- were able to buy a Monte Carlo?

25  A.  Did I talk to them when I was able to buy a Monte Carlo?

1    Q.  Yeah.  Did you buy a Monte Carlo at some point?

2    A.  Yes.

3    Q.  And you thought about putting that in Matthew Whiteplume's

4    name?

5    A.  No.

6    Q.  You never --

7    A.  I never.

8    Q.  So you never told the FBI that you thought about putting a

9    Monte Carlo in Matthew Whiteplume's name?

10   A.  No.

11   Q.  So did Mr. Whiteplume and Ms. Brown pick you up?

12   A.  Yes.

13   Q.  And where did you go first?

14   A.  We stopped at River City Bar, and then we went out to

15   Great Plains.

16   Q.  And you -- did you go to Angela Duran's house?

17   A.  Yes.  We went over there.  She fed us, and then we went

18   back over to Matt's grandma's, Matthew's grandma's.

19   Q.  And at Angela Duran's house you bought some meth?

20   A.  No.  I already had meth.

21   Q.  So Angela's son didn't sell you meth there?

22   A.  No.  I already had it.  I sold him some.

23   Q.  Okay.  And then did you go back to Riverton to get more

24   alcohol?

25   A.  Yes.

1  Q.  And then did you go to a different house in Great Plains

2  housing?

3  A.  No.

4  Q.  You didn't?

5  A.  Huh-uh.

6  Q.  Did you go to a burned-out house at some point in Great

7  Plains housing?

8  A.  Oh, yeah.  We took Tara over there to that burned-out

9  house.  There was a burned house there, and they just had a

10 blanket on that back room, and that's where everybody was

11 sitting there.

12 Q.  And you used meth there?

13 A.  Yes.

14 Q.  And the group that was there at the burned-out house was

15 you, Tara Brown, Matthew Whiteplume, Monty Tabaho, and Arapaho

16 Oldman?

17 A.  Yes.

18 Q.  And it was daylight during that time?

19 A.  Yes.

20 Q.  And you also saw Chucky at the burned-out house?

21 A.  Yes.  He came over.  Then he rode back over to BoMatt's

22 grandma's with us.

23 Q.  And then while you were all -- while this group was at the

24 burned-out house, you were doing meth and drinking alcohol?

25 A.  Yes.

1   Q.  And then you left the burned-out house, and you went to

2   331 Great Plains?

3   A.  Yes.

4   Q.  And then at some point the group of people went to the

5   basement of 331 Great Plains?

6   A.  Yes.

7   Q.  And that included you, Arapaho Oldman --

8   A.  Me, Arapaho, Monty, Tara, and BoMatt.

9   Q.  And Jessica Guffey was there as well?

10  A.  Yes.  And then Star Addison came from -- I think he was

11  next door somewhere.  He came from somewhere.  He was down

12  there for a bit.

13  Q.  Now, the first time that you talked to the FBI about this,

14  you were not honest with them about who was at the house; is

15  that correct?

16  A.  Yes.

17  Q.  So you didn't tell them that Monty was there?

18  A.  No, I didn't.

19  Q.  And you didn't tell them that Jessica Guffey was there?

20  A.  No.

21  Q.  And was that because you wanted to protect Monty?

22  A.  Yes.

23  Q.  And it was because you wanted to protect Jessica?

24  A.  Yes.

25  Q.  And after the murder happened, you talked to Monty.  You

1   talked to Monty about it; is that correct?

2   A.  Yes.

3   Q.  And that conversation -- there was conversations on

4   Facebook Messenger about that?

5   A.  Yes.

6   Q.  And you told the FBI that you-all had talked about the

7   murder on Facebook Messenger?

8   A.  Yes.

9   Q.  And you also talked to Matthew Whiteplume about the

10  murder?

11  A.  That was at the detox -- when we took off from detox.

12  Q.  Okay.  And did you also talk with Matthew Whiteplume over

13  Facebook Messenger?

14  A.  No.

15  Q.  And in addition to the meth and the alcohol, were you also

16  snorting Wellbutrin?

17  A.  No.  They didn't buy it, and I don't snort --

18  Q.  So other people were, but you were not?

19  A.  Huh-uh.

20          THE COURT:  And that's a "no," ma'am?

21          THE WITNESS:  "No."

22          THE COURT:  Thank you.

23  Q.  (BY MS. AMRAM)  Now, at some point while the group was at

24  331 Great Plains, did Jessica Guffey and Arapaho get in a

25  fight?

1  A.  Yes.

2  Q.  And Jessica ended up being picked up by a woman named

3  Carol?

4  A.  Yes.  She didn't leave with her because Arapaho took her

5  shoes away from her.

6  Q.  So Carol came to 331 Great Plains --

7  A.  She came to buy some Wellbutrin from somebody, and Jessica

8  asked her for a ride, but Arapaho took her shoes from her.

9  Q.  So Jessica stayed at 331 Great Plains?

10  A.  Yes.

11  Q.  And Carol came and went but did not stay?

12  A.  Yeah.  She didn't stay there.  She just came to buy those

13  pills.

14  Q.  Okay.  Now, so let's talk about when the beating started.

15  You told Mr. Conder that Matthew Whiteplume didn't hit --

16  didn't hit Chucky; is that correct?

17  A.  No, I didn't see him hit him at first.

18  Q.  Did you tell the FBI on November 19 that BoMatt jumped on

19  Chucky and got blood all over him?

20  A.  No.  I jumped on him.  I put myself over him because I

21  didn't want him -- Arapaho hitting him any more.

22  Q.  Okay.  So you're saying Mr. Whiteplume never jumped on

23  Chucky?

24  A.  No.

25  Q.  Now, you said he kicked him without -- you told Mr. Conder

1    that he kicked him and he didn't have shoes on.

2    A.   Yeah.   I know he didn't have any shoes on because when I

3    jumped on Chucky and covered him and told him to stop, I had

4    blood on my coat and on my boots.   And BoMatt came and reached

5    his foot was underneath me, and I seen that he just had socks

6    on.

7    Q.   Okay.   And did you tell the FBI before that Mr. Whiteplume

8    kicked Chucky in the head two times?

9    A.   Yeah.   He did.   He kicked him a couple times.

10   Q.   And that was in the head?

11   A.   Uh-huh.

12   Q.   Now, you talked with Mr. Conder about a weapon that

13   Arapaho used to beat Chucky.

14   A.   Yes.

15   Q.   When you met with the FBI on November 19, you drew a

16   picture of that weapon.   Do you remember that?

17   A.   Yeah, I remember.

18        MS. AMRAM:   So can we pull up -- it's JERS Exhibit A

19   just for the witness, please, Your Honor.

20        THE COURT:   It's being displayed to the witness only

21   and counsel.

22   Q.   (BY MS. AMRAM)   So you described the weapon as a 12- to

23   18-inch-long orange wrench-type tool with a flipping 90-degree

24   head at the end meant to fit over and remove tire lugs.   Do

25   you remember giving that description?

1   A.  Yeah.  This is the one that Monty brought in.  But then

2   they used that big old long one, like this, that had the --

3   that had the little thing on the end.

4   Q.  So do you --

5   A.  This one was still laying on the thing in that basement,

6   but they used that big old long thing.

7   Q.  Okay.  So do you recall telling the FBI that this was the

8   weapon that was used to assault --

9   A.  Yeah.  That one was too.

10  Q.  Okay.  So there were two weapons used to assault Chucky?

11  A.  Yeah.  This one right here was black.  It wasn't orange.

12  I don't know.  I was kind of -- I mean, I was pretty

13  intoxicated and stuff there that night --

14  Q.  Okay.

15  A.  -- or that morning.

16  Q.  Is this picture the picture you drew for the FBI of the

17  weapon?

18  A.  Yeah.

19  Q.  Of the wrench weapon?

20  A.  Yeah.

21       MS. AMRAM:  Okay.  I would ask to admit JERS Exhibit

22  A into evidence.

23       MR. CONDER:  No objection.

24       THE COURT:  All right.

25       MS. AMRAM:  And then I would ask to publish to the

1    jury.

2          THE COURT:  Exhibit A will be admitted and published

3    to the ladies and gentlemen of the jury.

4          (Defendant's Exhibit A received.)

5          MS. AMRAM:  Thank you.  You can take that down.

6    Q.  (BY MS. AMRAM)  Now, Monty was the first person to hit

7    Chucky with the weapon?

8    A.  No.  Arapaho was.  He hit him four times.  He was standing

9    over him, hitting him.

10   Q.  So you never told the FBI that Monty was not the first

11   person to hit him with the weapon?

12   A.  No.  Arapaho was.

13   Q.  Monty -- did you tell the FBI that Monty hit Chucky

14   multiple times with the weapon?

15   A.  Yeah.  Because Arapaho was pushing him around, calling him

16   a punk, telling him what to do.

17   Q.  And Chucky was trying to block Monty's blows?

18   A.  Yes.

19   Q.  But he was unable to do so?

20   A.  Yes.

21   Q.  Because of how big Monty was?

22   A.  No.

23   Q.  And was Monty also kicking Chucky in his torso?

24   A.  Yes.  But he was -- he wasn't trying.  It was -- Arapaho

25   was pushing him around, and he was making him do -- do that.

1    That's why --

2    Q.  Do you remember telling the FBI that Monty was kicking

3    Chucky in the torso?

4    A.  Yes.

5    Q.  Do you remember telling the FBI that Arapaho, Monty, and

6    BoMatt beat Chucky until he was unresponsive?

7    A.  Yes.

8    Q.  So BoMatt did participate in the beating?

9    A.  Yeah.  He kicked him twice in the head.

10   Q.  Now, at some point you saw Monty with a knife?

11   A.  Yes.

12   Q.  You did not see Arapaho with a knife?

13   A.  I don't -- I seen Monty with it, but I didn't see him use

14   it.

15   Q.  Okay.  Now, you -- at some point Arapaho and

16   Mr. Whiteplume left the house; correct?

17   A.  Yes.

18   Q.  And you stayed with Chucky in the basement?

19   A.  Yeah.  I was just sitting there waiting for it to get

20   light so I could leave.

21   Q.  And then when you left, they had not come back?

22   A.  No.

23   Q.  And when you left, Chucky had not been -- his throat had

24   not been slit?

25   A.  No, it wasn't.

1   Q.  And he had not been stabbed?

2   A.  No, he wasn't be stabbed or his throat wasn't slit when I

3   left.  He was just beat real bad.

4   Q.  And Lonestar Addison was present as well?

5   A.  He was there for a while.  He came in there, and he had a

6   half a gallon too.

7   Q.  Now, when you were in the basement while the beating was

8   going on, Matthew Whiteplume suggested slitting Chucky's

9   throat?

10  A.  Yes.

11  Q.  And then later on at Center of Hope, when you saw him on

12  December 3, he said he slit his throat?

13  A.  Yes.

14  Q.  Now, when you were first interviewed by the FBI on

15  December 8, you told them that only Arapaho beat Chucky.  That

16  wasn't true; right?

17  A.  No.

18  Q.  And that was to protect Monty?

19  A.  Yes.

20  Q.  And to protect Whiteplume?

21  A.  Yes.

22  Q.  You also told the FBI that Arapaho threw Chucky in the

23  crawl space all by himself; is that true?

24  A.  No.

25  Q.  It's not true that Arapaho put him in the crawl space by

1    himself?

2    A.  No.

3    Q.  But it is what you told the FBI when you talked to them

4    the first time?

5    A.  Yeah, because I was trying to protect Monty and BoMatt.

6    Q.  And in earlier times you told the FBI that Arapaho grabbed

7    the wrench by himself, but in fact Monty handed it to him?

8    A.  Yeah.

9    Q.  And that was to protect Monty?

10   A.  Yes.

11   Q.  Now, on December 18th of 2018, when you were interviewed,

12   you told the FBI that Arapaho and Monty beat Chucky, but you

13   didn't say that Whiteplume beat him.  And that was not true;

14   correct?

15   A.  Well, BoMatt kicked him twice.  That's all I seen him, was

16   kicking him twice in the head.

17   Q.  So he kicked him, not beat him?

18   A.  Yeah.

19   Q.  You also talked -- told Agent Warren that you hadn't

20   talked to Matthew Whiteplume since the murder, but that --

21   A.  I don't even know who Agent Warren is.  I don't remember

22   talking to an Agent Warren.

23   Q.  And when you talked to the FBI on December 18, you told

24   them that you hadn't talked to Matthew Whiteplume.  But that's

25   not true; correct?

1   A.  I didn't talk to him until he came and got me at the

2   detox.

3   Q.  And you also lied to the FBI about Jessica Guffey's

4   presence in the basement?

5   A.  Yes, at first I did.

6   Q.  And that was because Ms. Guffey asked you not to?

7   A.  No, she didn't ask me not to.  We just hung out before,

8   and she's -- she's a friend of mine.

9   Q.  Did she promise that if you didn't tell about her being

10  there, she wouldn't tell about you being there?

11  A.  Yes.

12  Q.  Now --

13          THE COURT:  Counsel, are you at a transition point?

14          MS. AMRAM:  I could -- I can, sure.  That's fine.

15          THE COURT:  Or do you have some more?

16          MS. AMRAM:  I have more, but I'm happy to take a

17  break now.  That's totally fine.

18          THE COURT:  Ladies and gentlemen, we'll go ahead and

19  take our lunch recess.  We'll take an hour recess and be back

20  at 1:30.  I'll remind you of the recess instruction.  Have a

21  good lunch.

22          Please rise.

23      (The jury exited the courtroom at 12:29 p.m.)

24      (The following took place outside the presence of the

25      jury.)

1          THE COURT:  Any additional matters we need to address

2     before we come back from lunch?  Mr. Conder?

3          MR. CONDER:  Nothing from the United States, Your

4     Honor.

5          THE COURT:  Ms. Amram?

6          MS. AMRAM:  No, Your Honor.

7          THE COURT:  Thank you.  We'll stand in recess for

8     lunch.

9       (At 12:30 p.m. a recess was taken until 1:36 p.m.)

10      (The following took place outside the presence of the

11      jury.)

12          THE COURT:  Thank you.  I note the presence of

13     counsel, presence of the defendant, absence of the ladies and

14     gentlemen of the jury.

15          Any matters we need to address before we bring in the

16     ladies and gentlemen of the jury?  Mr. Conder?

17          MR. CONDER:  Briefly, Your Honor.  I would just give

18     an update on the matter regarding --

19          THE COURT:  Go ahead and have a seat.

20          MR. CONDER:  I'm sorry, Your Honor.  The matter

21     regarding Ms. Fatima Addison.  I spoke over the lunch hour

22     with Dr. Kim Donahue.  She's a family medicine provider for

23     Indian Health Services in Fremont County.

24          She indicated basically, Your Honor, that Fatima

25     Addison was checked into the hospital on January 4 late in the

1   afternoon.  During the course of her stay -- she's still

2   there -- they've determined that she has a bacterial blood

3   infection and a bone infection.  The doctor said she has a

4   33 -- the type of bacterial infection has a 33 percent

5   mortality rate.  It indicates -- or she indicated, Your Honor,

6   that at this time, the medical best prognosis option is to

7   amputate Ms. Addison's leg below the knee or at the knee.

8            Apparently last night when this information was

9   relayed to Ms. Addison, she became extremely upset due to

10  multiple factors.  And so she is now currently on some sort

11  of -- I guess I would describe it generally as some

12  antidepressant, loosely speaking, Your Honor.  Anyway, the

13  doctor said that based upon this medication, she would not be

14  safe to drive, that it's unknown whether she would even be

15  able to make informed-consent medical decisions based upon

16  taking those pills and the current situation.

17           So I guess what I'm trying to say, Your Honor, is

18  everything's in flux.  I have an IT team from the United

19  States seeing if they can hook up a video with the hospital.

20  But at the current moment, it doesn't appear that she would be

21  competent to testify, and it would obviously present major

22  hurdles to do so over the video.

23           Having said that, Your Honor, if the Court wanted, in

24  the off chance that things got better, Dr. Donahue would be

25  able after-hours for a telephone hearing if necessary.  I

1   guess we can cross that bridge when we get there, but I wanted

2   to give the Court an update.  And we're juggling that chainsaw

3   as fast as we can.

4             THE COURT:  Fair enough.  Well, here's what I see if

5   things would change in terms of her medical condition and her

6   alertness.  Then you could alert the Court and we'll look at

7   it.  But at this point in time, it wouldn't appear that it

8   would be an available option regardless, given her current

9   psychological state.  Is that a fair summary?

10            MR. CONDER:  Yes, Your Honor.

11            THE COURT:  So we'll cross that bridge if it presents

12  itself.

13            In the meantime, anything else, Ms. Amram?

14            MS. AMRAM:  No, Your Honor.

15            THE COURT:  All right.  Sorry I broke up your exam,

16  but I wanted to use every ounce of time.

17            MR. CONDER:  Your Honor, should we have the witness

18  come back in before the jury?

19            THE COURT:  Let's go ahead and bring the witness back

20  in and put her on the stand.

21            MS. AMRAM:  Your Honor, we did want to ask, is it

22  possible to raise her chair?  We can't see her face over here.

23  I don't know if that's possible.

24            THE COURT:  Let's go ahead and have her first adjust

25  the chair a little bit.

1      (Discussion off the record.)

2          THE COURT:  Let's go ahead and bring in the ladies

3   and gentlemen of the jury.  Please rise.

4      (The jury entered the courtroom at 1:41 p.m.)

5          THE COURT:  Thank you.  Please be seated.

6          I'll remind the witness you're still under oath.

7          Cross-exam.

8   Q.  (BY MS. AMRAM)  Good afternoon, Ms. Brown.

9   A.  Good afternoon.

10  Q.  You mentioned earlier that the only time you spoke to

11  Matthew Whiteplume after the murder was at the detox.

12  A.  Yes.

13  Q.  But he called you on December 8 and threatened you;

14  correct?

15  A.  Yes.

16  Q.  Okay.  He said, "You better keep your fucking mouth shut,

17  bitch, because the FBI's fucking -- what the fuck it -- I

18  don't even know," he said.  "I don't even know if it's the

19  FBI."  Is that what he said to you?

20  A.  Yes.

21  Q.  And then at the detox he threatened you there as well?

22  A.  No.  He just asked me to go with him, that somebody else

23  wanted to talk to me.  And he asked me if -- he said they

24  thought I was the one who snitched.

25          MS. AMRAM:  Okay.  Can we play 494.

1       THE COURT:  All right.  Has this been admitted?

2       MS. AMRAM:  It's for impeachment, but it's the

3   transcript -- it's the record of her interview with the FBI.

4   But I can show Mr. Conder a transcript.

5       THE COURT:  Any objections?

6       MR. CONDER:  No, Your Honor.

7       THE COURT:  All right.  Go ahead and play.

8   (Playing recording.)

9   Q.  (BY MS. AMRAM)  Ms. Brown, is that your voice?

10  A.  Yes, it is.

11  Q.  And is that you recounting what Mr. Whiteplume said to you

12  at detox?

13  A.  Yes.

14  Q.  And you mentioned earlier that you did not speak to

15  Mr. Whiteplume on Facebook Messenger after the murder; is that

16  correct?

17  A.  Yes.

18  Q.  Did you tell -- did you tell the FBI that you spoke to

19  Mr. Whiteplume on Facebook Messenger between his release from

20  the jail and his subsequent rearrest?

21  A.  I didn't -- we didn't talk about the murder, but we

22  just -- he just said he needed to talk to me.

23  Q.  He said he needed to talk to you?

24  A.  He asked me if I mentioned anybody or if I told them, and

25  I said, "No, I didn't talk to nobody about it."

Brown - Cross by Ms. Amram                                362

1   Q.   Okay.  And you also spoke to Monty Tabaho through an

2   intermediary, Jody?

3   A.   Yes.

4   Q.   And was that because Monty Tabaho was in jail at the time?

5   A.   Yes.

6   Q.   And his jail visits were recorded?

7   A.   I don't know.

8   Q.   And his jail calls were recorded?

9   A.   I don't know.

10  Q.   Did you need to talk to him through an intermediary so

11  that nobody would be able to hear what you were talking about?

12  A.   No.

13  Q.   Okay.  Did you receive a letter from Jody that provided

14  instructions for how to contact -- how to have contact with

15  Monty Tabaho while he was in the jail?

16  A.   Yes.

17  Q.   And the clothes that you were wearing the night that

18  Chucky was beaten, those were bloody; is that correct?

19  A.   Yes.  My coat and my boot had blood on it.

20  Q.   Okay.  And your pants as well?

21  A.   I don't know if my pants did, but I know my boots.  The

22  side of my boot did and the front of my coat.

23          MS. AMRAM:  I'm sorry.  One second, Your Honor.

24          THE COURT:  All right.

25      (Counsel confer.)

1   Q.  (BY MS. AMRAM)  And, Ms. Brown, in 2013 you were convicted

2   of falsely reporting a crime?

3   A.  2013?  I don't remember that.  I was in prison, I think,

4   in 2013.

5              MS. AMRAM:  Can we just show the witness and counsel

6   Exhibit 39?

7              THE COURT:  All right.  Exhibit 39's being displayed

8   only to the witness and counsel.

9   Q.  (BY MS. AMRAM)  Do you see that?

10  A.  (No response.)

11             MS. AMRAM:  Can you scroll through there.

12  Q.  (BY MS. AMRAM)  Do you see that second page, Ms. Brown?

13  A.  Yes, I do.

14  Q.  Is that your name in the top left corner?

15  A.  Yes, it is.

16  Q.  And is that your year of birth?

17  A.  Yes.

18  Q.  And is that a judgment of conviction for a crime of

19  falsely reporting a crime?

20  A.  Yeah.  I do remember that.

21  Q.  Okay.  And that was for calling 911 and reporting fake

22  crimes?

23  A.  No, it wasn't a fake crime.  It was an assault, but he had

24  already tooken off.  I do remember that.

25             MS. AMRAM:  Your Honor, I would seek to move to admit

1    Exhibit 39 into evidence.

2             THE COURT:  Any objections?

3             MR. CONDER:  Your Honor, it looks to be authentic, so

4    I would have no objection.

5             THE COURT:  Exhibit 39 will be admitted.

6         (Defendant's Exhibit 39 received.)

7             MS. AMRAM:  Can we pull up Exhibit 38 to counsel and

8    the witness, please.  Oh, I'm sorry I should have published

9    it.  I'm sorry.  I forgot.

10            THE COURT:  Yes.

11            MS. AMRAM:  Can we put 39 back up?

12            THE COURT:  All right.  Exhibit 39 is being published

13   to the ladies and gentlemen of the jury.

14            THE COURTROOM DEPUTY:  Do we have that?

15            MS. AMRAM:  No.  And for some reason my paper copy's

16   missing, but I will get it to you.

17            THE COURT:  All right.

18            MS. AMRAM:  Thank you, Your Honor.

19            Can we pull up Exhibit 38 to counsel and the witness.

20            THE COURT:  It's being limited to counsel and the

21   witness.

22            MS. AMRAM:  And can we scroll forward, please, to the

23   next -- nope.  Can you go back up.  There.  Stop.

24   Q.  (BY MS. AMRAM)  And, Ms. Brown, can you just review that,

25   please, on your screen.

1          THE COURT:  To yourself.

2    Q.  (BY MS. AMRAM)  And, Ms. Brown, just let me know when

3    you're done.

4    A.  Okay.  I remember this.

5    Q.  And that was for calling 911 and reporting a dead body in

6    a city park, a second call reporting a rape, and a third call

7    reporting people dealing meth?

8    A.  Yeah.  That was Maggie -- I don't remember her name, but

9    she was the one that had my phone.  And when the cops got

10   there, they said it came from my number.  And I did have my

11   phone back, but she was the one using it.  She had it clear on

12   the other side of the park.

13   Q.  But did you plead guilty to that?

14   A.  Yeah, I did, because it was my phone.

15          MS. AMRAM:  Just one second, please, Your Honor.

16          THE COURT:  All right.

17          MS. AMRAM:  Thank you, Your Honor.  No further

18   questions.

19          THE COURT:  All right.  Redirect.

20                    REDIRECT EXAMINATION

21   BY MR. CONDER:

22   Q.  Ms. Brown, you mentioned earlier -- you referenced Tara,

23   Tara Brown.

24   A.  Yes.

25   Q.  Who is she?  Is she attached to somebody, somebody's

1   girlfriend?

2   A.   It's BoMatt's girlfriend.  She was with BoMatt.

3   Q.   So --

4   A.   She's my cousin, yeah.  They're related from different

5   sides of the family.

6   Q.   You mentioned at some point that -- and I was a little

7   confused about this -- somebody was snorting Wellbutrin?

8   A.   Yes.

9   Q.   And who was snorting Wellbutrin, where, and when?

10  A.   Star Addison, Tara.  The only ones that weren't snorting

11  it was me and Charles.

12  Q.   So it was the night Chucky got hit, got --

13  A.   Yeah.

14  Q.   And you weren't snorting it and he wasn't?

15  A.   No.

16  Q.   You said that Matthew Whiteplume kicked Chucky a few

17  times.  What color -- I know you said socks.  What color?

18  What color were the socks?

19  A.   White.  White with gray tips on them.

20  Q.   You mentioned there were two weapons.

21  A.   Yeah.  That small one that he had was black, that Monty

22  had the first time was black.  And then -- because that one

23  was when they were right by that freezer.  And then the other

24  one was a big long orange thing with the two things on the

25  bottom.  But I didn't see the other part because Arapaho had

1    it in his hand when he was over hitting him.

2    Q.  Let's walk through that.  So the first weapon defense

3    counsel showed you there was a -- your drawing?

4    A.  Yeah.

5    Q.  So where was that picked up?

6    A.  It was right there in that basement by -- I think there

7    was like a hot water heater over here and some other stuff.

8    It was right there.  It was a black thing.  It was like a lug

9    thing.  It had that knot on it, and you turn it.  It was like

10   a lug wrench thing.

11   Q.  And who picked that up?

12   A.  Monty did.

13   Q.  And what did he do with it?

14   A.  He gave it to Arapaho.

15   Q.  And what did Arapaho do with it?

16   A.  He hit Chucky twice in the side of the head with it.

17   Q.  And then when did this other -- this other bar come into

18   play?

19   A.  Monty took off upstairs, and he came down the steps with

20   it.

21   Q.  And how did you -- where were you?  How did you see all

22   this?

23   A.  I was trying to stop it.  I was telling BoMatt to tell him

24   to knock it off.  And I was standing there with BoMatt by the

25   end of the steps because that's where me and Chucky were.  We

1   were kind of off, like, by ourselves.

2   Q.  So how close -- how close were you to Monty when he ran up

3   and came back down?

4   A.  I was standing right on the side at the bottom of the

5   steps.

6   Q.  So within 5 feet?

7   A.  Yeah.

8   Q.  And what did you see?  What did he have in his hand?

9   A.  He had a big long orange bar like that.

10  Q.  I would have you look down at your monitor at what's

11  marked as Government's Exhibit 6-1.

12          THE COURT:  It's being shown to the witness only.

13  Q.  (BY MR. CONDER)  It may take a second, Ms. Brown.

14  A.  Okay.

15          THE COURT:  And, ladies and gentlemen, and anyone in

16  the court, to the extent you have any phones, let's go ahead

17  and make sure that they're on silent.

18  Q.  (BY MR. CONDER)  Is that a photograph that you're looking

19  at, 6-1?

20  A.  Yes.

21  Q.  And does that photograph look familiar?

22  A.  Yes, it does.

23  Q.  And why does that look familiar?

24  A.  That's the bar that he was hitting him with.

25  Q.  And that's the bar that who was hitting who with?

1    A.   Arapaho was hitting Charles with it.

2    Q.   And how can you be sure?

3    A.   Because I was there, and I seen him do it.

4              MR. CONDER:  Your Honor, at this time the United

5    States would move to admit 6-1 and publish.

6              MS. AMRAM:  No objection.

7              THE COURT:  Exhibit 6-1 will be admitted and may be

8    published.

9        (Government's Exhibit 6-1 received.)

10   Q.   (BY MR. CONDER)  So is this the bar that Monty went

11   upstairs and got?

12   A.   Yes.

13             MS. AMRAM:  Objection; leading.

14   Q.   (BY MR. CONDER)  Ms. Brown, you --

15             THE COURT:  Let's back up.  I'll sustain the

16   objection.  Go ahead and reask the question and in a

17   nonleading form.

18   Q.   (BY MR. CONDER)  Ms. Brown, when Monty went upstairs and

19   came back down, what did he have in his hand?

20   A.   This bar right here.

21   Q.   And what did he do with that bar?

22   A.   He gave it to Arapaho.

23   Q.   And what did Arapaho do with it?

24   A.   He started hitting Chucky with it.

25   Q.   And how many times did he hit him?

1    A.   Four times.

2    Q.   How many?

3    A.   Four.

4    Q.   Four.  And where was he hitting him?

5    A.   In the face.

6    Q.   On December 3, when you were at detox with Matthew

7    Whiteplume and he told you that Lonestar was going to, quote,

8    "F you up" --

9    A.   Yes.

10   Q.   Who's Lonestar?

11   A.   It's their friend, I guess.

12   Q.   What's his --

13   A.   Lonestar Addison.

14   Q.   Lonestar Addison?

15   A.   Uh-huh.

16   Q.   And was he there that night?

17   A.   Yeah.  He was there for a little while.  I guess he lived

18   next door or somewhere in that neighborhood right there, one

19   of those big houses right by Matt's grandma's.

20           MR. CONDER:  May I have a moment, Your Honor?

21           THE COURT:  You may.

22           MR. CONDER:  No further questions, Your Honor.

23           THE COURT:  All right.  May this witness be released

24   from any subpoena?

25           MS. AMRAM:  Yes, Your Honor.

1           MR. CONDER:  Yeah.

2           THE COURT:  You may step down, ma'am.  You're free to

3    go.

4           The United States may call its next witness.

5           MR. CONDER:  Your Honor, the United States would call

6    Matthew Whiteplume.

7           THE COURT:  Mr. Whiteplume will come forward and be

8    sworn.

9         (The witness was sworn.)

10          THE COURTROOM DEPUTY:  Please state and spell your

11   name for the record.

12          THE WITNESS:  Matthew Terrance Whiteplume.  Spell it?

13   M-A-T-T-H-E-W  T-E-R-R-A-N-C-E, Whiteplume,

14   W-H-I-T-E-P-L-U-M-E.

15          THE COURTROOM DEPUTY:  Please state your occupation

16   and your city of residence.

17          THE WITNESS:  Right now I'm an inmate.

18          THE COURTROOM DEPUTY:  And your residence?

19          THE WITNESS:  Riverton, Wyoming.

20          THE COURTROOM DEPUTY:  Thank you.

21       MATTHEW TERRANCE WHITEPLUME, GOVERNMENT'S WITNESS

22                     DIRECT EXAMINATION

23   BY MR. CONDER:

24   Q.  Good afternoon, Mr. Whiteplume.

25   A.  I'm sorry.

1    Q.  If you could, make sure you speak into the microphone so

2    we can all hear you.

3            Mr. Whiteplume, where are you from?

4    A.  I'm from around Riverton, Wyoming.  Arapahoe, Wyoming.

5    Q.  And did you grow up on the Wind River Indian Reservation?

6    A.  Yes.  I grew up until about sixth, seventh grade.  Then I

7    started going to school at different places.

8    Q.  And are you an enrolled tribal member?

9    A.  Yes, Northern Arapaho tribe.

10   Q.  What's your education?

11   A.  13.  Just a year of college.  That's all.

12   Q.  And where did you go to school?  Where did you get the one

13   year of college?

14   A.  Clackamas Community College.

15   Q.  Where is that?

16   A.  In Oregon City, Oregon.

17   Q.  What did you do after school?

18   A.  Joined the military.

19   Q.  What branch of the military?

20   A.  The Army.

21   Q.  And what'd you do for the Army?

22   A.  Infantry.

23   Q.  And how long were you in the infantry?

24   A.  Seven years, eight months.

25   Q.  Were you ever deployed?

1   A.   Yes.

2   Q.   Where were you deployed?

3   A.   I had two overseas tours -- or two combat tours and one

4   overseas tour.

5   Q.   Where was those?

6   A.   Iraq, Korea, and Iraq.

7   Q.   And did you sustain any injuries while in the military?

8   A.   Yes.

9   Q.   And what are those?

10  A.   TBI, traumatic brain injury, and PTSD and anxiety,

11  depression.

12  Q.   Let me ask you this:  Were you wounded in -- were you

13  wounded in the line of duty?

14  A.   Yes.

15  Q.   What happened?

16  A.   I -- I don't remember.  It was -- I hear different

17  stories, but to put it on paper, it was about -- I just got

18  hurt.

19  Q.   Was it -- did something explode or something like that?

20  A.   Yeah, it was a explosion.  They said it was mortar.

21  Q.   The mortar?

22  A.   Uh-huh.

23  Q.   How long have you been out of the military?

24  A.   About seven years, going to be.

25  Q.   And why'd you leave?

1    A.  I got out.  I'm -- my grandma was sick, and she was like

2    my mom, but trying to save my marriage too.

3    Q.  And, Mr. Whiteplume, you're currently wearing orange and

4    handcuffs.  Are you incarcerated?

5    A.  Yes, sir.

6    Q.  And where are you incarcerated?

7    A.  At Natrona County Detention Center.

8    Q.  And why are you incarcerated?  Have you pled guilty to an

9    event?

10   A.  Yes.

11   Q.  And did you enter into a plea agreement with the United

12   States?

13   A.  Yes.

14   Q.  Mr. Whiteplume, I'd have you look at your screen and

15   you'll see what's marked as Government's Exhibit 7-3.  Is that

16   a plea agreement between you, Mr. Matthew Whiteplume, and the

17   United States?

18   A.  Yes.

19   Q.  And did you sign that plea agreement?

20   A.  Yes.

21   Q.  And did you have a lawyer with you when you signed that

22   plea agreement?

23   A.  Yes.

24   Q.  And did your lawyer sign that plea agreement as well?

25   A.  Yes.

1   Q.  And by entering into that plea agreement, did you plead

2   guilty to aiding and abetting second degree murder?

3   A.  Yes.

4   Q.  Was that what you were originally charged with?

5   A.  No.

6   Q.  Were you originally charged before that with first degree

7   murder and aiding and abetting murder?

8   A.  Yes, sir.

9   Q.  And as part of your plea agreement, were you allowed to

10  plead guilty to a lesser included offense of aiding and

11  abetting second degree murder?

12  A.  Yes, sir.

13  Q.  And have you in fact pled guilty to that charge?

14  A.  Yes, sir.

15  Q.  And when was that?  Do you recall?

16  A.  About a week ago.

17  Q.  Where was that?

18  A.  It was here.

19  Q.  And as part of that plea agreement, did you agree to

20  cooperate and testify on behalf of the United States

21  truthfully?

22  A.  Yes.

23  Q.  And by doing so, are you hoping for a lesser sentence?

24  A.  Yes.

25  Q.  What is your sole obligation under the plea agreement as

1    to testifying?

2    A.   To be truthful and honest.

3             MR. CONDER:  Your Honor, at this time the United

4    States would move for the *Davis* instruction.

5             THE COURT:  Sidebar, Counsel.

6        (At sidebar.)

7             MR. CONDER:  I'm sorry.

8             THE COURT:  Help me out.  *Davis*?

9             MR. CONDER:  The instruction we submitted to the

10   Court that provides the testimony about co-defendants.  It's

11   to be considered -- basically that you're not to consider it

12   one way or another, no good, no bad.  It's just a witness.

13            THE COURT:  I don't have my packet.  Do you have a

14   copy of that?

15            MR. CONDER:  Yeah.  We'll get it right now.

16            MS. AMRAM:  I didn't hear the original question.

17            THE COURT:  Asking for a *Davis* instruction as to the

18   statements of co-defendant.

19            If you'll grab it.

20            MR. CONDER:  Yes, Your Honor.

21            THE COURT:  Any objections to that?

22            MS. AMRAM:  I know we proposed one that was the --

23   there was one that -- there was a Tenth Circuit one on, like,

24   if --

25        (Reporter interruption.)

1      MS. AMRAM:  Oh, sorry.  I know we proposed one that

2   was like for either accomplices or co-defendants, to review it

3   with caution.  But I'm not sure; that might be something

4   you're supposed to do at the end of the case.  I'm not clear.

5         THE COURT:  Mr. Conder.

6         MR. CONDER:  Your Honor, generally the practice of

7   this district is that the Court would instruct on the *Davis*

8   instruction at the time that this witness testifies so that

9   the jury has that with them now.  At the conclusion of the

10  evidence, when the Court instructs them finally, then they get

11  the instruction that Ms. Amram described.

12        THE COURT:  All right.  I'll read it to them.  It's

13  basically the Tenth Circuit pattern instruction.  I'll read it

14  now and will tell them they'll got a copy of that in their

15  packet as well.

16        MS. AMRAM:  All right.

17     (End of sidebar.)

18        THE COURT:  Ladies and gentlemen of the jury, I

19  apologize.  The Government has called as one of its witnesses

20  an alleged co-accomplice who was named as a co-defendant in

21  the indictment, as previously noted.  The Government has

22  entered into a plea agreement with this co-defendant providing

23  for a recommendation of a lesser sentence than the

24  co-defendant would likely otherwise receive.  Plea bargaining

25  is lawful, proper, and the rules of the court expressly

1    provide for it.

2            An alleged accomplice, including one who has entered

3    into a plea agreement with the Government, is not prohibited

4    from testifying.  On the contrary, the testimony of an alleged

5    accomplice may by itself support a guilty verdict.  You should

6    receive this type of testimony with caution and weigh it with

7    great care.  You should never convict a defendant upon the

8    unsupported testimony of an alleged accomplice unless you

9    believe the testimony beyond a reasonable doubt.  The fact

10   that -- the fact that an accomplice has entered into a guilty

11   plea to the offense charged is not evidence of the guilt of

12   any other person.  Under no circumstances should the evidence

13   of an accomplice's guilty plea be used by you as evidence of

14   the guilt of the defendant.

15           You'll receive a copy of this instruction in the

16   packet that will be given to you at the close of the case.

17           Mr. Conder.

18           MR. CONDER:  Thank you, Your Honor.

19   Q.  (BY MR. CONDER)  Mr. Whiteplume, do you have family on the

20   Wind River Indian Reservation?

21   A.  Yes, sir.

22   Q.  And who is that?  Mom, sister, brothers?

23   A.  All my family.  My mother, my brothers, my sister, my

24   grandma.

25   Q.  And when you live on the reservation, where do you live?

1   Where do you stay?

2   A.   Mostly at my grandma's house.

3   Q.   And who is your grandma, and what's the address?

4   A.   It was Grandma Laura Shakespeare.  Address is 331 Great

5   Plains.

6   Q.   And is your Grandma Laura still with us?

7   A.   No.

8   Q.   When did she pass away?

9   A.   Last year, several years back.

10   Q.   Mr. Whiteplume, do you drink alcohol?

11   A.   Yes.

12   Q.   And back in 2017 how often did you drink alcohol?

13   A.   About three, four times a week.

14   Q.   And how did you get your alcohol?

15   A.   I get -- I get disability from the military, and I work

16   too, feed cows from time to time.

17   Q.   And how much do you think you'd drink on average in a day?

18   A.   At least a traveler.

19   Q.   So I'm going to show you --

20          THE COURT:  Counsel, let me ask you one thing.  He

21   said, I believe, "At least a traveler."

22          MR. CONDER:  Gotcha.

23          THE COURT:  Can you --

24   Q.   (BY MR. CONDER)  Mr. Whiteplume, what's a traveler?

25   A.   It's about the size of a fifth.  750 milliliters or

1   something.

2   Q.   So it's the size of alcohol that you'd buy?

3   A.   Yes.   That, half gallons and stuff.

4   Q.   And I would show you what's marked and admitted into

5   evidence as Government's Exhibit 4-2, and I would publish

6   that.

7          THE COURT:   Exhibit 4-2 is being published to the

8   ladies and gentlemen of the jury.

9   Q.   (BY MR. CONDER)   Mr. Whiteplume, do you recognize that?

10  What is that?

11  A.   That's the front of my grandma's house.

12  Q.   And that's the house at 331 Great Plains?

13  A.   Yes, sir.

14  Q.   And who lives there?

15  A.   My Uncle Juju, my Uncle Loren, my sister, myself.

16  Q.   And your Uncle Juju, does he go by another name?

17  A.   Edd Shakespeare.

18  Q.   Edd?

19  A.   Yes, sir.

20  Q.   And your sister, what's her name?

21  A.   Jori Lamebull.

22  Q.   And looking at this photograph marked as 4-2, on the top

23  right, the window on the top right of the house on the far

24  right of the picture, whose bedroom is that?

25  A.   It's Loren Shakespeare's.

1    Q.   And the next window to the left?

2    A.   Edd Shakespeare.

3    Q.   And is that the front of the house?

4    A.   That's the front of the house, sir.

5    Q.   Thank you.  I now show you what's marked as Government's

6    Exhibit 4-3.  Do you recognize that?

7    A.   Yes, sir.

8    Q.   What is that?

9    A.   That's the back of the house.

10   Q.   And so in this photograph, looking at the top right,

11   there's a window.  What's that a window to?

12   A.   That's a window to the bathroom.

13   Q.   And then the window on the top level to the left of the

14   bathroom window, what's that?

15   A.   That's my grandma's window.

16   Q.   And who stays in your grandma's room if she's passed away?

17   A.   Just different people.

18   Q.   And what about those windows on the bottom?  There's two

19   windows.  Where do those windows go to?

20   A.   They go to the basement.

21   Q.   So when you lived in that house at 331, where did you

22   stay?

23   A.   The basement.

24   Q.   So the basement was your room?

25   A.   Yes, sir.

1   Q.  I'm going to show you what's marked as Government's

2   Exhibit 7-4, just you.  Do you recognize that?

3   A.  Yes, sir.

4   Q.  And what is that?

5   A.  That's a drawing of the basement.

6   Q.  And is that a drawing of your basement?

7   A.  Yes, sir.

8   Q.  And did you make that drawing?

9   A.  No, sir.

10  Q.  But is it accurate?

11  A.  Just missing a window.

12  Q.  It's missing a window.  Okay.  Where would the window be

13  on there?

14  A.  By the washer and dryer.

15  Q.  Okay.  Other than that, is it accurate?

16  A.  Yes, sir.

17          MR. CONDER:  Your Honor, at this time the United

18  States would move to admit Government's Exhibit 7-4, with the

19  recognition that there should be a window above the washer and

20  dryer.

21          MS. HUCKE:  No objection.

22          THE COURT:  Exhibit 7-4 will be admitted and may be

23  published.

24      (Government's Exhibit 7-4 received.)

25  Q.  (BY MR. CONDER)  So, Mr. Whiteplume, in this basement,

1  this diagram, you indicated there should be a window behind

2  the washer and dryer; is that right?

3  A.  It actually should be just like right -- right below the

4  washer and drying when you're looking at the paper.

5  Q.  Right across from the other window basically?

6  A.  Yes.  Yes, sir.

7  Q.  Where did you stay in here if you -- did you have a bed?

8  Where did you sleep?

9  A.  There was a bed down there at the time.

10  Q.  And by "bed," what was your bed?  Did you have a frame and

11  a box springs?

12  A.  No, just a big mattress.

13  Q.  And where was that mattress?

14  A.  It was by the nightstand.

15  Q.  So over where there's that empty space by the chair on the

16  north -- the nightstand in the -- in the corner there --

17  A.  Yes, sir.

18  Q.  -- in between the table?

19  A.  Yes, sir.

20  Q.  Thank you.  So who comes over to the house?  Who's -- are

21  there regular people that come over and hang out there?

22  A.  There's regulars and there's people that -- my uncle's

23  friends and some people I don't even know sometimes.

24  Q.  And what do people do when they come over to 331?

25  A.  Mostly to drink, do drugs, stuff like that.

1   Q.   Do you know Arapaho Oldman?

2   A.   Yes, sir.

3   Q.   And how do you know Arapaho Oldman?

4   A.   He's -- my family took him in.  My uncle took him as a

5   brother.

6   Q.   How long have you known him, yearswise?

7   A.   Since I was a kid.

8   Q.   And are you related to him?

9   A.   Not by blood.

10  Q.   Do you take him as family, though?

11  A.   Yes, sir.

12  Q.   You guys hang out often?

13  A.   Yes, sir.  When he's around.

14  Q.   Is Arapaho Oldman here in the courtroom?

15  A.   I can't see.  I can't see him.  No, sir.

16  Q.   Do you need glasses?  I see you squinting.

17  A.   I need glasses, sir.

18  Q.   You need glasses?

19  A.   Yes.

20  Q.   Do you have glasses?

21  A.   Not -- I got glasses.  I see him right there.  Sorry.  I

22  see his glasses right there.

23  Q.   And where is he sitting, and what is he wearing?

24  A.   He's right there, head shaven, has glasses on.

25  Q.   Did you say head shaven and glasses on?

1    A.  Yes, sir.

2    Q.  I'm going to show you what's -- let me back up.  Let me do

3    this.  I'm going to have you look at the screen and what's

4    marked as Government's Exhibit, I believe, 1-2.  It's a

5    calendar of November 2017.

6           THE COURT:  It's being shown to the witness only.

7    It's already been admitted, though, hasn't it?

8           MR. CONDER:  Yes, Your Honor.  It's been admitted.

9           THE COURT:  I'll go ahead and display it to the

10   ladies and gentlemen of the jury.

11   Q.  (BY MR. CONDER)  So looking at that calendar, the 23rd was

12   Thanksgiving.  Do you recall anything happening on the 26th of

13   November, 2017?

14   A.  I had my grandma's memorial dinner.

15   Q.  So on the 26th of November you had a memorial dinner for

16   your grandma?

17   A.  Yes, sir.

18   Q.  Do you remember what you were doing on November 22, 2017?

19   A.  Yes.  I was recovering.  I was sleeping at my grandma's.

20   Q.  What were you doing at your grandma's?

21   A.  Just sitting there watching TV, drinking.

22   Q.  And was it daylight when you were doing this?

23   A.  Yes, sir.

24   Q.  And who were you with?  Was anyone with you?

25   A.  Uncle Juju, Uncle Loren.  People were coming in, but when

1   I woke up --

2        (Reporter interruption.)

3   A.   My Uncle Loren was sitting next to me.  That's it.

4   Q.   (BY MR. CONDER)  So you were there with your Uncle Loren

5   and your Uncle Edd, also known as Juju?

6   A.   Yes, sir.

7   Q.   What were they doing?

8   A.   They were -- they were -- Uncle Edd was in his room.

9   Uncle Loren was sitting next to me, watching TV with me.

10  Q.   Was there anyone else there?

11  A.   I remember hearing Lonestar Addison and his company with

12  him, Bernadette Brown, in the basement.

13  Q.   What were they doing down there?

14  A.   I don't know.  Drinking most likely, smoking weed.

15  Q.   So Bernadette Brown and Lonestar Addison were in the

16  basement, drinking and smoking weed?

17  A.   Yes, sir.

18  Q.   So that's who was there at the house when it was daylight.

19  What happened when it got dark?

20  A.   When it got dark it was pretty much the same people.  I

21  fell asleep in between there.  I was taking medications for

22  spider bites, but I was drinking too.  And I woke up.  Uncle

23  Loren was still sitting watching TV with me.  I was sitting

24  back and recovering.

25  Q.   So you were sitting there, you were taking medication for

1   your spider bites, and you were with your Uncle Loren.  Who

2   showed up when it was dark?

3   A.  I just -- I just heard footsteps coming up -- footsteps

4   coming up the side of the walkway in front.  And then my Uncle

5   Loren got up.  He looked out.  He seen -- he walked outside,

6   and later -- he later -- Arapaho Oldman opened up the door,

7   pointed down, and said, "You got a bottle?" and asked me for a

8   shot.  So I got up, put my shoes on, and I walked outside.

9   Q.  When you walked outside, who was out there?

10  A.  I know it was Mr. Oldman; Chucky, Charles Dodge; and some

11  other people, but those are the two ones I noticed.

12  Q.  So Arapaho Oldman was there and Charles Dodge was there?

13  A.  Yes, sir.

14  Q.  Did you know Charles Dodge?

15  A.  Not before, no.  I seen him around but never -- a couple

16  words here and there but really wasn't friends to hang out and

17  stuff.

18  Q.  And did you talk to Chucky?

19  A.  Yes.  I was talking to him.  He showed me his -- he was

20  talking to me -- he was working out at Arapahoe Ranch, and he

21  showed me his work gloves.  We went around and used the rest

22  room, and he talked about going back to work.

23  Q.  So he showed you his gloves, and you talked about work?

24  A.  Uh-huh.

25  Q.  How were things going?  Were you getting along with him?

1    A.   Yes.  We were -- we were standing there talking, getting

2    along.

3    Q.   Was Chucky a regular over at your house, over at 331?

4    A.   No.

5    Q.   Had he ever been there before?

6    A.   If he was ever there before, he wasn't there with me.

7    Q.   So that was the first time you'd seen him at 331?

8    A.   That was the first time I'd seen him at 331.

9    Q.   Did he show up with Mr. Oldman?

10   A.   Yes, sir.

11   Q.   And do you know how they got there?

12   A.   I just heard a vehicle.  I didn't see a vehicle, though.

13   Q.   So did you hear a vehicle?

14   A.   Yes, sir.

15   Q.   So you heard a vehicle and then --

16   A.   And then they walked up.  So they came in one vehicle.  My

17   Uncle Loren was the one that looked out.

18   Q.   So once Chucky's there, the defendant, Mr. Oldman, you,

19   who else is there?  What are you guys doing?

20   A.   It was me, Juju, Loren.  Someone was passing around a

21   joint, smoking outside. Fatima walked up for a little while,

22   and then she walked away.  Somebody had the idea to go into

23   the basement.

24   Q.   And who is Fatima?

25   A.   Fatima Addison is my auntie.

1    Q.   And where does she live?

2    A.   She lives at the house right next to us.  There's an empty

3    spot there but then her house.

4    Q.   So she's the next-door neighbor?

5    A.   Yes.

6    Q.   Is everyone drinking alcohol outside?

7    A.   Except for my Uncle Edd Shakespeare.  He was smoking weed.

8    Q.   Was Chucky smoking weed?

9    A.   Yes, he was smoking weed too.

10   Q.   Do you guys recall what you were drinking?  You were

11   drinking alcohol, but what kind?

12   A.   When they showed up -- when they come in that -- when they

13   showed up, when they pointed at the ground, it was vodka, red

14   cap vodka.  Opened up the vodka, used the rest room, came

15   around the corner at the feet of the entrance right there at

16   the very beginning.  That's when -- that's when we started

17   talking to him and he talked to me about his work and all this

18   and that.  But between me and him we drank a pint of BV.

19   Q.   And that would be you and Chucky?

20   A.   That would be me and Chucky.

21   Q.   Who brought the vodka?  Do you know?  The red cap.

22   A.   I don't know.  It was already by the door when I came out.

23   Most likely it was Mr. -- Mr. Oldman and Chucky.

24   Q.   And how was the mood out there?  Everybody getting along?

25   A.   Yes.  Everybody was getting along then.

1   Q.   Did you guys stay outside?  What'd you do?

2   A.   No.  We went into the basement.

3   Q.   Who went into the basement?

4   A.   Most of us did.  Most of us went to the basement.

5   Q.   And was there anybody else in the basement when you got

6   there?

7   A.   When we got there, yeah.  There was already some people in

8   the basement, people walking down.  And me -- I could explain

9   it from my point of view.  There's a lot of people there and

10  then other people that was having -- I can explain from my

11  point of view.

12  Q.   So you went down in the basement?

13  A.   I went down in the basement, and there was other people

14  down there.  There was some -- people were just talking and

15  bullshitting and shit.  I'm sorry for cussing.  I'm sorry for

16  cussing.  But when we was down there drinking and everything,

17  everybody -- you know, everybody was getting along.  I mean,

18  you couldn't really tell how much time was going by, how much

19  time was there.

20          But somebody had an idea to make a toddy, so I went

21  upstairs to make a hot toddy, and I was boiling water.  And

22  over there I was just sitting back, and you could just hear

23  people conversating amongst themselves.  And I wasn't even --

24  I just was waiting for the water to get done.  And then once

25  the water got done, I poured it in, I put sugar in it, and

1   then I walked downstairs.  I -- I really couldn't give a full

2   example of how long that water took to boil, but it took -- it

3   took a while.

4   Q.  Let me stop you there, Mr. Whiteplume.  So why did you go

5   upstairs to boil water?

6   A.  To make a hot toddy.

7   Q.  And why were you having -- why a hot toddy?

8   A.  It just helps get it in your bloodstream quicker, better.

9   You can hold it down.

10  Q.  Is that why you add sugar to it?

11  A.  Yes, sir.

12  Q.  So does it -- do you think it gets you drunk quicker or

13  drunk better?

14  A.  Just helps your stomach hold down the liquor.

15  Q.  So you went upstairs to boil water to make a hot toddy.

16  Did you do that in the kitchen of the house at 331?

17  A.  Yes, sir.

18  Q.  And how long do you think that took?

19  A.  I don't know, sir.

20  Q.  A couple minutes?

21  A.  It took a while, sir, for the water to boil.

22  Q.  So once you got the water boiled, what did you do?

23  A.  I put it -- I put it in a cup, put sugar in it.

24  Q.  Did you -- when you went upstairs to boil this and -- boil

25  the hot water for your toddy, did you take a bottle of alcohol

1    with you?

2    A.  No, sir.

3    Q.  All right.  So once you boiled the water, you put it in

4    your cup with the sugar, what do you do?

5    A.  Walk it back downstairs.

6    Q.  And what do you see when you go downstairs?

7    A.  I walk -- when I walk downstairs and I get downstairs, I

8    put the cup on the table.  And as I started going to the -- as

9    I started going to the table with -- with -- looking for my

10   pill bottles, my sleeping pills.  And when I was -- when I

11   looked up, I just seen -- I just seen Mr. Oldman punching

12   Chucky Dodge.  He already had a belt around his neck and

13   grabbing him by the hair.

14   Q.  And how's the lighting in that basement?

15   A.  There's just lighting.  There's one that works by the

16   stairs.

17   Q.  So do you recall where was Mr. Oldman standing with

18   Chucky?

19   A.  He was standing by the chair.

20   Q.  And I would show you Government's Exhibit Number 7-4.  So

21   he was standing by the chair on the top of that diagram?

22   A.  Yes, sir.  He was standing to the lower left corner.

23   Q.  And describe, what did you see?

24   A.  I seen him -- like I said, he was holding him by the hair

25   with a belt around his neck.  And then I asked why he was

 1  beating him up, why he was hitting him, and he said that was

 2  one of the guys that jumped me.

 3  Q.  And let's back up here.  What happened to you?  You got --

 4  what do you mean you got -- that somebody jumped you?

 5  A.  That -- he said that that was one of the guys that jumped

 6  me.

 7  Q.  Okay.  Were you jumped?  Did you get beat up earlier?

 8  A.  Yes, sir.

 9  Q.  What happened to you, and when did it happen?

10  A.  I really don't remember the days that it happened, but it

11  was a few weeks before.

12  Q.  Had somebody beat you up a few weeks before?

13  A.  Yes, sir.

14  Q.  Did you get hurt?

15  A.  Yes, sir.

16  Q.  And so you said Mr. Oldman has -- Chucky has a belt around

17  his neck?

18  A.  Yes.

19  Q.  And he -- is he hitting him?

20  A.  Yes.

21  Q.  With his fists?

22  A.  With -- when I see him, when he hit him, he hit him with

23  his hand, like the throat.

24  Q.  And he -- what did he tell you?  Mr. Oldman.  What did

25  Mr. Oldman tell you?

1  A.  He told me that this is one of the people that jumped me.

2  Q.  And so once you heard that, what did you do?

3  A.  I got mad.  It put me in the hospital.  So I was mad.  I

4  went and as I punched him -- as I was punching him, I was

5  asking him if he was one of the people that jumped me and if

6  so, I was asking him who he was with.

7  Q.  How many times did you punch him?

8  A.  Seeing how mad I was, it was quite a few.  I was asking

9  him the questions.

10 Q.  Where were you punching him?

11 A.  I was punching him with blows along the jawline.

12 Q.  Were you punching him in the face and head?

13 A.  I was punching him behind the ear and body shots.  It's

14 a --

15      (Reporter interruption.)

16          THE COURT:  You said it's a -- you said punching him

17 behind the ear and body shots.  It's a --

18          THE WITNESS:  It's an earshot.

19          THE COURT:  All right.

20          THE WITNESS:  It's a nerve behind the ear.  Boxers,

21 you know, when they get punched in the jaw.

22          THE COURT:  It's a nerve shot?  There's a nerve?

23          THE WITNESS:  Yes.

24 Q.  (BY MR. CONDER)  What was Chucky doing when you were

25 hitting him?

1  A.  He was -- he was reaching for that -- he was reaching

2  for -- behind his -- behind his -- kind of like -- I can't --

3  I'm sorry.  I got this on.  I can't give a full description.

4  But he was reaching up, trying to grab Arapaho's hand.

5  Q.  So he was trying to grab the belt around his neck?

6  A.  Yes, sir.

7  Q.  And so how did Mr. Oldman have the belt on Chucky's neck?

8  Was it like a dog leash?  Is that what it looked like?

9  A.  It was just a regular brown belt.

10  Q.  And he had it wrapped around his neck?

11  A.  Uh-huh.

12  Q.  And holding it from above?

13  A.  Yes, sir.  He was -- he was still -- he was still sitting

14  down in the chair.

15  Q.  What did you tell Chucky?  Did you tell him he could

16  leave?  Did you talk to Chucky about -- did you question

17  Chucky if he beat you up?

18  A.  Yes.  I questioned him.  I questioned him, asked him when

19  I was punching him.

20  Q.  And what was his response?

21  A.  He was -- he was telling me it wasn't him, it wasn't him.

22  And I was still asking him while I was punching him.  And then

23  we're talking about still at the chair; right?  Because I

24  punched him on more than one occasion.  I kicked him.

25  Q.  Gotcha.  So let's talk about that.  Were you angry?

1   A.  Yes, very.

2   Q.  Did you --

3   A.  I --

4   Q.  Did you want to hurt Chucky?

5   A.  I wanted to find out who was with him.

6   Q.  Did you tell him that he wasn't going to leave the

7   basement until he told you?

8   A.  That was -- yes.  But he was already moved around by then.

9   There had been more than one occasion by the time I asked him

10  that question.

11  Q.  Okay.  So walk us through what happened.  Go ahead and

12  tell us.  Mr. Oldman has a belt around his neck.  You start

13  punching.  Walk us through what happened from there.

14  A.  He's by the chair.  He had him right there by the chair.

15  I punched him.  I was punching him and stuff like that and

16  everything.  And he told me to go check and make sure the door

17  was closed.  So I go up and check, but the door is closed

18  right there.  And I come back down, and he's by the table and

19  by that first round pole.  He's right there.  And I come

20  around, and Arapaho already has him right there.

21          And so I stomped him a couple more times.  And I told

22  him -- I asked him -- I kept asking him who all was with him.

23  "Who all was with you?"  And -- and he wouldn't tell me.  He

24  told me it was two youngsters, two youngsters that beat me up.

25          And after a while, after a while after seeing them,

1   you know, it sounded like somebody came through the door

2   again, so I went back up and checked the door again.  And I

3   came back down, and he was kind of by the dryer, by the dryer

4   and that pole.

5         And I asked him again why he -- there and then,

6   that's when it kind of hit me, you know.  I never seen this

7   guy be a knucklehead.  I've seen a lot of knuckleheads, you

8   know, on the res, people doing this and that, you know.  And

9   when I see this guy, he's always talking about working on a

10  ranch or doing something.  I never heard of him jumping

11  anybody, beating anybody up, or acting like a gangster.  So --

12  but right around then Arapaho pulls out a knife.

13  Q.  What did this knife look like?

14  A.  It looked like -- I couldn't see the handle.  He had a

15  wash rag around it.

16  Q.  And then what happened?  What did Mr. Oldman do with the

17  knife?

18  A.  I tried to -- I tried to stop him.  By then some people

19  were telling him to stop by then.  You know, he slammed me.

20  Q.  What did he do to you?

21  A.  He slammed me.

22  Q.  What does that mean?

23  A.  He just grabbed me by my shoulders.  I went up, tried to

24  get help, and he slammed me, you know.

25  Q.  And let me be clear on this.  Mr. Oldman slammed you?

1    A.   Yes, sir.

2    Q.   And by that you mean, did he hit you or shove you?

3    A.   No.  He slammed me, like grabbed me by the shoulder and

4    slammed me.

5    Q.   So he rammed his shoulder in you?

6    A.   Two hands on my fucking shoulders.  Sorry.

7    Q.   Gotcha.  So what happened when Mr. Oldman slammed you?

8    A.   That -- I went up to go get help.  But before that -- see,

9    I'm trying to talk to you guys.  When I'm hitting him and I'm

10   kicking him and -- but when I took him from the chair, when I

11   went up and I came back down, he was by the table.  But then

12   that's when I was kicking him.

13          Arapaho Oldman also instructed me to put a blanket up

14   by the window right there.  I put a blanket on the window and

15   stuff and come back.  And I'm still asking him who was all

16   with him and everything like that, and I was still kicking

17   him.  I was, like, you know stomping him, not a kick.

18          And then I come back down after that to that spot

19   right there.  After he slammed me, I ran back up.  I went to

20   go get my Uncle Loren just sitting in the -- sitting in the

21   white sofa.  He was acting like he was asleep.  I could tell

22   he wasn't asleep.  He crossed his legs and crossed them back

23   over.  So I went back down.  I mean, my uncles, I was raised

24   by them.  I drank with them.  I mean, he sucker-punched me too

25   sometimes.  He fights me too sometimes when he's drunk.

1          MS. HUCKE:  Objection, Your Honor.

2          THE COURT:  I'll sustain at this point.

3   Q.  (BY MR. CONDER)  And let's back up, Mr. Whiteplume.  So I

4   want to make sure we're all talking about the same thing here.

5   So originally you come down from the hot toddy?

6   A.  Yes, sir.

7   Q.  You see Mr. Oldman with the belt around Chucky's neck over

8   by the chair?

9   A.  Yes, sir.

10  Q.  He tells you that this is one of the guys that jumped you,

11  and you start punching him on the body and the head and the

12  ear?

13  A.  Yes, sir.

14  Q.  And at that time -- and you're asking Chucky about if he

15  jumped you, if he's one of the ones that beat you up?

16  A.  Yes, sir.

17         MS. HUCKE:  Objection, Your Honor.  Leading.

18         THE COURT:  Well, I'll allow some guidance.  We've

19  gone over this testimony.  I'll overrule the objection at this

20  point.  Go ahead.

21  Q.  (BY MR. CONDER)  So you moved from the -- you mentioned

22  that Mr. Oldman and Chucky moved from the chair over closer to

23  the table and that first pole, that circle there in front of

24  the furnace; is that correct?

25  A.  No.  He was by the stairs and that first pole right there.

1    Q.   Downstairs --

2            THE COURT:  Counsel, let me ask -- sir, where are the

3    stairs?

4            THE WITNESS:  When you come down, the furnace is

5    right here and the pole is right here.  This is one of the --

6    somewhere there actually.

7            THE COURT:  So it's next to the furnace?

8            THE WITNESS:  No.  It's right here.  It's right

9    around here.

10           THE COURT:  All right.

11   A.   That first pole, that table, that's what I was talking

12   about.  If I could see the pictures, I could show you better.

13   Q.   (BY MR. CONDER)  Okay.  Let's hold on a second,

14   Mr. Whiteplume.  We're going to zoom in.  Are those little

15   lines there the stairs?

16   A.   That's the stairs.

17           THE COURT:  All right.  Thank you.

18   Q.   (BY MR. CONDER)  Thank you.  So you move from the chair to

19   another spot in the basement, over where you just described,

20   close to the stairs.  So what happens there?

21   A.   (No response.)

22   Q.   Let me stop right there.  During this time from the chair

23   to the second part -- so there's the first part and now the

24   second part -- does Mr. Oldman say anything to Chucky?  Is he

25   talking to him?

1    A.  Yes, but I didn't hear what he was saying to him.

2    Q.  Gotcha.  So go ahead and tell us about the second part,

3    after the chair and now --

4    A.  After -- after I go up and check the door, turn off the

5    light, I come back down, and that's when he was laying there.

6    He's dragging -- he's taking him -- he's getting him -- how

7    he's getting him there, I don't know.  I don't know if he's

8    dragging him.  I don't know if he's getting up and walking by

9    himself or pushing him, but he -- he was moving him around.

10           And he -- when he told me to put that blanket up, I

11   put that blanket up.  I put it on the blanket -- on the house

12   right there because it's right by the porch.  It's right by

13   the street.  So when I come back and I'm kicking him, that's

14   when I'm still asking him.  I'm still asking him who all was

15   with him, who he was with.  And that's when he started telling

16   me it was two youngsters.  I don't know how he heard it was

17   two youngsters.

18   Q.  So then what happened?  He tells you -- Chucky tells you

19   that it wasn't him; it was some youngsters.  What happens

20   after that?

21   A.  It sounded like -- I said -- that's when I pointed out it

22   sounded like the door opened.  The door came open.  I went

23   back to that door because that door, it blows open.  There's

24   no -- there's no handle there, no knob or nothing that goes

25   into the door.  So I went back up and checked the door again,

1   and I seen him.  He moved him again.  He was by that dryer and

2   by -- that's the third time.  That's the third time.  And I

3   punched him several more times, started asking him -- asking

4   him, you know, who was with him.  And around that time, around

5   everything, you know, he's not telling me because he didn't do

6   it.  I mean, I was -- I was pissed when I started hitting him

7   and asking him questions.

8   Q.  So at that time, Mr. Whiteplume, you're punching your --

9   still punching and kicking Chucky?

10  A.  Yes, sir.

11  Q.  And what's Mr. Oldman doing?

12  A.  He's just -- when I step back and I -- I finally stop,

13  stopped kicking and stopped punching him, and I asked him

14  again, and that's when I seen the knife.  That knife, like I

15  said, the knife, I couldn't see the handle.  It had a wash rag

16  around it.

17  Q.  And what did you think when you saw the knife?

18  A.  I'm thinking, oh, shit.  Like I said, it was an, oh, shit

19  moment for me.  I just -- this shit is going to start getting

20  real.

21  Q.  So before that time, before Mr. Oldman had a knife in his

22  hand with this rag around it, had he said anything to you or

23  to Chucky about what was going on, about anything?  Was he

24  talking?  What was he saying?

25  A.  Well, all I heard was a couple times when I was kicking

1  him, I heard, "Get him.  Kick him."  But I was -- I was
2  focused.  I was mad.
3  Q.  Did he say anything -- so you said at some point during
4  all this you told Chucky he wasn't leaving until he told you
5  who helped him; is that right?
6  A.  That's right.
7  Q.  And at some point when you're down in the basement from
8  this first, second, the third attack, did Mr. Oldman say
9  anything about Chucky leaving?
10  A.  No.  By then -- by then he's really -- he was already
11  saying, "This motherfucker's going to die tonight."
12  Q.  And who said that?  Mr. Oldman said that?
13  A.  Mr. Oldman said that.
14  Q.  Did he say that before he pulled out the knife?
15  A.  No.
16  Q.  Once he pulled out the knife?
17  A.  Once he pulled out the knife, I know shit's getting real
18  and everything.
19  Q.  But let me ask you this:  So when did he say, "This MFer's
20  going to die tonight"?  When was that said?  Was that after
21  the knife or later in the evening?
22  A.  No, that was -- that was around that time frame.
23  Actually -- no.  It was around that time frame when he started
24  saying that, but he's saying it throughout the whole night.
25  Around that third incident is when I could hear stuff.

1  Like -- like I said, I'm pissed.  I'm all liquored up.  I've

2  been taking pills for my spider bites.  I mean, when that's

3  going on, when that's going on and I seen the knife and I seen

4  everything, like I said, oh, shit.  That's when, you know, I

5  put my hand across his chest, and he slammed me.  I don't know

6  if that was like a fucking sign of disrespect or -- I'm sorry

7  for cussing.

8  Q.  So once you got slammed, you --

9  A.  Like I said, from then and there -- I don't know if I'm

10 jumping ahead of you.  I feel like I'm jumping ahead of you

11 all the time.

12 Q.  I just want you to tell me what happened.  So when

13 Mr. Oldman pulls out a knife, you try to put your arms across,

14 he slams you.  Is that when you went to get help from your

15 Uncle Loren?

16 A.  Yes, sir.

17 Q.  So did your Uncle Loren come help?

18 A.  No, he didn't come help.

19 Q.  So what did you do?

20 A.  I went back down.

21 Q.  What'd you see when you went back down?

22 A.  When I came -- when I got down, he had him dragged back by

23 the table again.  I don't know.  See, it's not just -- because

24 these situations -- this didn't happen like I go up and I go

25 back down.  I'm going up and I'm trying to talk to people.

1   I'm trying to get them to come help.  They're not moving.

2   They're not budging.  They're acting like they're asleep.  So

3   I'm explaining the situation.  I don't know if I'm getting

4   ahead of him or if I'm losing you guys in this conversation

5   too.

6   Q.  Mr. Whiteplume, just try to focus on just answering the

7   question.  So when you go back upstairs, you talk to your

8   Uncle Loren.  He won't help you.  You go back downstairs.  You

9   said Mr. Oldman had moved Chucky?

10  A.  Yes, sir.

11  Q.  Where did he move him to?

12  A.  He had moved him back by that table by the stairs.

13  Q.  Okay.  So he's by the table.  What do you see?  What's

14  going on?  Just tell us what's going on.  What do you see?

15  A.  I see -- when I come back down that time, I come back down

16  and I look, and all I see is a shadow.  It's a figure of him,

17  but I see him standing over him.  He had a weapon in his hand.

18  I see two swings.  I think, oh, shit.  I go back upstairs to

19  my Uncle Juju.  My Uncle Juju's not drinking.  He's not a

20  drinker.  He's probably the only one that could try to talk

21  some sense into him.

22  Q.  So did your Uncle Juju help you?

23  A.  No.

24  Q.  What'd he tell you?

25  A.  He really didn't say nothing.  He just kind of pawned it

1   off as -- pawned it off as, "Shit, somebody's getting beat

2   up."

3   Q.  So he didn't come help you?

4   A.  No, he didn't come help he.

5   Q.  So where did you go?  Your Uncle Edd, your Uncle Juju, he

6   won't help you.  So where do you go?  What do you do?

7   A.  I go back down.

8   Q.  What do you see when you go back down?

9   A.  When I go back down, it's -- he's pretty fucked up.

10  Arapaho's talking to whoever he's talking to.  I see he's

11  fucked up.

12  Q.  Let me stop you there.  Who is "he"?  Are you referring to

13  Chucky?

14  A.  Yes --

15  Q.  And --

16  A.  -- Chucky.

17  Q.  And what's wrong with him?  Like, is he -- you said he's

18  F'd up, but what's wrong with him?  Describe what you see.

19  Like what does his face look like?  What's wrong with him?

20  A.  I could just -- I could just tell after the window --

21  after I locked that window -- there's no light in there.  The

22  light is on this side.  There's a beam right there.  I don't

23  know if you guys looked at all the pictures.  There's a beam.

24  You can see shadows and stuff by where that light is.

25          He -- he's fucked up.  He's trying to get up.

1   He's -- I'm sorry for cussing, but he was --

2          THE COURT:  Mr. Whiteplume, as opposed to the F word,

3   can you physically describe what the situation was that you

4   observed him to have.

5   A.  He was -- he lost his equilibrium.  He couldn't keep his

6   balance.  He couldn't get on all fours.  He's trying -- he's

7   trying to --

8   Q.  (BY MR. CONDER)  He's trying to get up?  Chucky's trying

9   to stand up?

10  A.  He's laying there.  He gets up and goes down.  He's -- I

11  mean, you guys ever see anybody get knocked down and they're

12  trying to get up?  They fall back over.

13  Q.  That's what Chucky was doing?

14  A.  Yes.

15  Q.  And so what did you do next?  Just tell us.  You see that

16  and -- let me back up.  What's Mr. Oldman doing?

17  A.  He's -- I don't know.  He's talking to other people that

18  was there.  My focus wasn't on the other people.

19  Q.  So Mr. Oldman's talking to other people.  You don't know

20  who he's talking to?

21  A.  He was talking to Lonestar.  He was talking to Bernadette.

22  Q.  So what do you do?

23  A.  I'm focused on -- I'm thinking, oh, shit, you know, like,

24  what's going to happen?  I mean, why's he talking to them over

25  there and talking and everything?  You know, I don't -- the

1    only thing I could think of was get him out of sight, out of

2    mind.  By doing that, get him out of sight, out of mind.  The

3    crawl space is the only thing right there.  They were standing

4    by the stairs, the only way up, the only way out.  So I'm just

5    trying to get him out and everything and put him in the crawl

6    space.  He just couldn't get in there on his own.  Once I got

7    him in there, you know, kind of just help him lay down or

8    whatever.  It's cold down there.  I was trying to get him out

9    of sight, out of mind.

10   Q.  So, Mr. Whiteplume, let me interrupt you there.  How did

11   you get Chucky into the crawl space?  Was he able to move a

12   little bit on his own?  Was he able to help himself a little

13   bit?

14   A.  Yes.  Yes, sir.

15   Q.  So between -- was he fully able to just hop right up and

16   jump in or --

17   A.  No, he wasn't able to fully hop right up and jump in.

18   Q.  But he did help you a little?

19   A.  He helped himself.  I helped him a little.

20   Q.  Okay.  You helped him in there.  So once you help Chucky

21   in the crawl space, what do you do?

22   A.  Give him a blanket, tell him I'm going to get him to the

23   hospital in the morning.

24   Q.  Did you shut the crawl space door?

25   A.  I shut the crawl space door.

1    Q.   Where'd you go?

2    A.   I went and joined the party.  It was in a party.  I was

3    thinking, oh, shit.  I don't have my own cell phone then.  I

4    had to go up and take a couple more shots.  And I don't know

5    how many times -- I don't know how -- I don't know how much

6    time goes by that I was sitting back there in the living room

7    drinking.

8    Q.   And let me ask you, was -- who else was upstairs?  You

9    were doing this upstairs, so did you go upstairs?

10   A.   Yes.  It was me, Loren, and Arapaho at that time.

11   Q.   So Arapaho came upstairs with you once Chucky was in the

12   crawl space?

13   A.   Yes, sir.

14   Q.   And then you were drinking with Loren and Arapaho?

15   A.   Yes, sir.

16   Q.   Do you recall what you were drinking?

17   A.   We just poured it into a cup.  It was vodka.

18   Q.   So what happened when you guys were sitting there

19   drinking?

20   A.   I don't know.  It was -- I don't know how much time went

21   by.  We heard a commotion and, like, stuff move downstairs and

22   then go back downstairs and -- Arapaho goes back downstairs,

23   and I go in behind him.  And when we got down there and we

24   looked, Chucky was coming out of the -- coming out of the

25   crawl space.

1   Q.  And so what happened when -- what did you see next when

2   Chucky's out of the crawl space?  What happened?

3   A.  I'm thinking, oh, fuck.  I'm sorry.  It's -- it's -- I

4   don't know what to do for him then.  Arapaho already seen him.

5   Q.  So what did Arapaho do?  What did you see?

6   A.  When I seen he was getting out, Arapaho kind of pulled him

7   out of the crawl space too.

8   Q.  How'd he do that?

9   A.  Just pulled him, yanked him out.  He's already about

10  middle way through by his waist.  Did you guy see pictures of

11  the  crawl space?

12  Q.  Mr. Whiteplume, so Mr. Oldman pulls him the rest of the

13  way out?

14  A.  Yes, sir.

15  Q.  And then what did Mr. Oldman do?  What happened?

16  A.  I'm looking, like, damn.  It's going -- it's going to

17  happen.  And he grabs him by the hair, puts him back on his

18  knees.  And I know he's talking to me right there, but then he

19  hands me a knife, tries to hand me a knife, told me to handle

20  my business.  I couldn't do it.  I couldn't do it.

21  Q.  And so what happened next?  What did Mr. Oldman do?

22  A.  He told me to look away, go upstairs.  He put the knife

23  around his neck.  I go so far up the stairs.  I turned around

24  and looked back, and he had the knife by his throat.  I see

25  him make four or five tugging motions.

1  Q.  Did Chucky die there?

2  A.  He died right there.

3  Q.  And let me back you up a little bit.  So you said you --

4  you were drinking with Mr. Oldman and Loren, and then you

5  heard a commotion downstairs?

6  A.  No.  I'm drinking with Loren and Arapaho.

7  Q.  Gotcha.  Thank you.  And you hear a commotion downstairs?

8  A.  Yes.

9  Q.  And Mr. Oldman gets downstairs before you do?

10 A.  Yes.  I follow him down.

11 Q.  And so did you see Mr. Oldman with a knife?

12 A.  Yes.  He was trying to hand it to me.

13 Q.  And what did the knife look like?

14 A.  It was -- the base of it, I couldn't see the handle.  The

15 top part of it was wooden, like a regular steak knife.

16 Q.  Like from a house --

17 A.  Yeah.

18 Q.  -- like a regular steak knife?

19 A.  It was just a regular steak knife.  I don't know how to

20 explain it.

21 Q.  Do you recall what color the handle was?

22 A.  No.  It was too dark.  Like I said, I just seen the --

23 seen the wooden part.

24 Q.  Was the knife wrapped in anything?

25 A.  It was wrapped in a washcloth.

1    Q.  And what part of the knife was wrapped in a washcloth?

2    A.  The handle.

3    Q.  The handle was?

4    A.  Yes, sir.

5    Q.  Was Chucky saying anything when he was trying to get out

6    of the crawl space?

7    A.  No.  He was just trying to get out of the crawl space.

8    But while Arapaho was grabbing him, he kept saying, "Just let

9    me go.  Let me go, Arapaho, and I won't tell on you."

10   Q.  How many times did he say that?

11   A.  About three, four.

12   Q.  And when Arapaho -- when Mr. Oldman handed you the knife,

13   what did he say?

14   A.  He tried to hand me the knife and told me to handle my

15   business.

16   Q.  What does that mean, handle your business?  What did

17   you --

18   A.  He wanted me to -- wanted me to kill him.

19   Q.  Because you were the one mad at him?

20   A.  No.  He told me to handle my business, but I couldn't do

21   it.  I pushed his arm away.

22   Q.  Did you ever stab Chucky?

23   A.  No, I never stabbed Chucky.

24   Q.  Did you cut his throat?

25   A.  No, never cut his throat.

1    Q.   Did you hit him with a weapon?

2    A.   No, I didn't hit him with a weapon.

3    Q.   But you hit him?

4    A.   I punched him.  I kicked him.

5    Q.   And stomped him?

6    A.   Stomped him.

7    Q.   And we're going to back up a little bit.  You talked --

8    when you were kicking and stomping Chucky for the first time,

9    did you ever hear Mr. Oldman or anybody else in the basement

10   say anything, to get something?

11           MS. HUCKE:  Objection, Your Honor.  Leading.

12   A.   I heard somebody --

13           THE COURT:  Hold on, sir.

14           Restate the question.

15   Q.   (BY MR. CONDER)  Mr. Whiteplume, when you were kicking and

16   stomping Chucky for the first time, did Mr. Oldman say

17   anything to you or anyone else in the basement?

18   A.   He was talking to somebody.  I was too busy stomping.  He

19   said, "Go get --"

20       (Reporter interruption.)

21           THE COURT:  You said you were busy, and he said to go

22   get --

23           THE WITNESS:  The equalizer.

24   Q.   (BY MR. CONDER)  What's an equalizer?

25   A.   It's something my grandpa always told us.  You're walking

1    around and people are trying to beat you up or something, get

2    an equalizer.  Get a stick or a rock or whatever, equalize the

3    situation.

4    Q.  Who did Mr. Oldman say that to?

5    A.  I was stomping him.  The only person next to him could

6    have been Monty Tabaho.

7    Q.  Did Monty go get anything?

8    A.  I don't know if he went and got anything.  I was focusing

9    on stomping him.  I was focused on getting questions out of

10   him.  If he went up there and got something, he probably did.

11   Q.  And moving forward a little bit, you said you saw

12   Mr. Oldman at one point standing over Chucky, hitting him.

13   Did you see that?

14   A.  See what?

15   Q.  So when you went to get help from your Uncle Loren -- let

16   me ask it this way.  Did you see Mr. Oldman hit Chucky with a

17   weapon?

18   A.  Yes, sir.

19   Q.  How was he doing it?

20   A.  He was -- he was standing over him, hitting him.

21   Q.  And how many times?

22   A.  I don't know.  I only seen him twice.  When I seen him

23   using the weapon, I tried to go get Juju, like I said.

24   Q.  So, Mr. Whiteplume, Arapaho tries -- Mr. Oldman hands you

25   the knife, tries to hand you the knife to handle your

1  business.  He does what he does.  When Chucky's dead, what do

2  you guys do?

3  A.   Just cover him up.  Everybody's ready to go.  Everybody's

4  ready -- when I followed Mr. Arapaho -- when I followed

5  Mr. Oldman down there, the people I chased out of there was

6  Bernadette Brown, Lonestar Addison.  It was only me and

7  Arapaho down there -- me and Arapaho and Chucky.

8  Q.   Mr. Whiteplume, when Chucky's dead, what did you cover him

9  with?

10 A.   Covered him with whatever was there.  If you guys seen the

11 pictures, you guys know --

12 Q.   Mr. Whiteplume, was he on the floor?

13 A.   He was on the floor.

14 Q.   Okay.  And what did you do?  You covered him with

15 something, left him on the floor?  Where did you go?

16 A.   By then I was already blanking in and out, blanking in and

17 out then.  I was drinking throughout the night.  I was just --

18 everybody went upstairs.  Everybody left.  Everybody was

19 freaking out.  I don't -- it was crazy.

20 Q.   Did you go anywhere with Mr. Oldman that you remember?

21 A.   I don't -- I don't remember going over to Fatima's.  I

22 remember walking back from Fatima's.  I remember seeing the

23 sun.

24 Q.   So was Mr. Oldman with you?

25 A.   Yes, Mr. Oldman was with me.

1    Q.  So you don't remember walking over to Fatima's, but you

2    remember walking back?

3    A.  I wasn't at Fatima's.  I was over across the street at

4    Sitting Eagle's.

5    Q.  You remember walking back from Sitting Eagle's?

6    A.  Yes.

7    Q.  Where'd you walk to?

8    A.  Back to my grandma's.

9    Q.  Was Mr. Oldman with you?

10   A.  Yes, sir.

11   Q.  And what did you guys do once you got back?

12   A.  Drinking.

13   Q.  What were you drinking?

14   A.  Vodka.

15   Q.  Red cap?

16   A.  Yes, sir.

17   Q.  So what were you guys talking about?  Were you talking

18   about the dead body in the basement?

19   A.  He was talking about he was going to get rid of it.

20   Q.  Did you decide who was going to get rid of it?

21   A.  He was going to get rid of it.

22   Q.  Mr. Oldman was going to get rid of it?

23   A.  Yes, sir.

24   Q.  Is that what he told you?

25   A.  That's what he said.

1   Q.   Did he?

2   A.   No.

3   Q.   So you guys are sitting there drinking red cap vodka, and

4   Mr. Oldman said he'd take care of the body, get rid of it.

5   What -- what do you guys do next?

6   A.   Everybody was drinking.  Everybody was leaving.  I mean,

7   this -- this house is like a party house.  You seen it; right?

8   There's nothing around there.

9   Q.   Mr. Whiteplume, did Mr. Oldman leave when you were

10  drinking?  Did you go your separate ways that night?

11  A.   Yes, we went our separate ways.  He left before I even --

12  before I even woke up.  My Uncle Juju woke me up.

13  Q.   Where were you sleeping?

14  A.   I was sleeping downstairs.

15  Q.   On your mattress?

16  A.   Yes, sir.

17  Q.   And how did your Uncle Juju wake you up?

18  A.   He tapped me on my leg.

19  Q.   What did he tell you?

20  A.   "That guy's gone.  You got to go."  And then I asked him

21  where everybody went.  He said, "Everybody left."  He said,

22  "Arapaho left a couple hours ago."

23  Q.   So what'd you do?

24  A.   Get up and I leave.

25  Q.   And what did you do over the next few days?

1    A.   Drink.

2    Q.   Drank more than normal?

3    A.   Drank more than normal, whatever I could drink.

4    Q.   Were you still sleeping in the basement, spending the

5    nights there?

6    A.   Not from the time -- not every night.

7    Q.   But some nights?

8    A.   Some nights.

9    Q.   Was the body still there?

10   A.   Yes, the body was still there.

11   Q.   What'd you think about that?

12   A.   I'm thinking, "Oh, shit, he's not coming back for the

13   body."  I mean I -- I -- I was drinking to get drunk and

14   forget about the situation.  He said that he was going to burn

15   down my grandma's house, so the only reason I kept going over

16   there every single day was to make sure the house wasn't

17   burned down.

18   Q.   Mr. Whiteplume, did there come a time that you moved the

19   body?

20   A.   Yes, there was a time I moved the body.

21   Q.   And do you recall when that was?  And let me ask it this

22   way.  Was it before your grandma's memorial on the 26th?

23   A.   Yes, it was before the memorial on the 26th.

24   Q.   Was it around that same time, the same day before?

25   A.   Yes.

1  Q.  And how did you move the body into the crawl space?

2  A.  When I came back, it was -- I went down there.  My sister

3  and her boyfriend were there.

4  Q.  Is that Jori?

5  A.  That's Jori.

6  Q.  And Monty?

7  A.  And Monty.

8  Q.  And you went down to the basement.  What did you guys do?

9  A.  I showed Monty the body and stuff like this.  I mean, it

10 started stinking.  I'm thinking it -- you know, Arapaho said

11 he's going to come and go get it, but it started stinking too

12 much.  I decided to put -- let's put it in the crawl space

13 until Arapaho comes back, until he comes to get rid of it.

14 Q.  Did you tell Monty and Jori that you had killed Chucky?

15 A.  No.  I don't remember.  No.

16 Q.  Did you tell them that -- what did you tell Monty and Jori

17 about how the body got there?

18 A.  I told them about Arapaho, told them...

19 Q.  So when you told Monty and Jori to get the body in the

20 crawl space, how did you do that?  What did you do?

21 A.  Just -- just really wrap it around him, wrap him up, put

22 him in the crawl space.  That door -- my sister didn't know

23 about it by then.  She didn't know about it, just me and

24 Monty.  We tried getting it moved in there, but that door kept

25 coming down.  That flap to it kept coming down.  And that's

1   when I went up and got my sister and told her to come down and

2   told her to hold the door.  She held the door open.  Me and

3   Monty got it in and pushed it back there until he was out of

4   sight, out of mind.

5   Q.  Did you wear -- did you wear gloves or anything?

6   A.  I had them put socks over their hands.

7   Q.  Why'd you do that?

8   A.  So they wouldn't get no fingerprints.

9   Q.  What did you do once Chucky's body was in the crawl space?

10  What did you do?  Did you just leave?  What did you do?

11  A.  I just left.

12  Q.  Did you try and -- what did you do with the gloves that

13  were on your hands?

14  A.  I instructed -- I instructed my sister and them, my sister

15  and Monty, to put the gloves in trash bags.  We put -- I had

16  them put them in there, had them change their clothes.  I

17  grabbed a bag, I took it out, and I burned them.  And I had

18  that stuff, whatever blood was on, whatever had blood on it,

19  for them to put it in the trash bag.

20  Q.  So whatever had blood on it that you could see in the

21  basement, you put it in trash bags, you guys did?

22  A.  I put it in trash bags.  There was more than one thing

23  that had blood on it.

24  Q.  What did you do with that?

25  A.  I took them out back and I burned them.

1   Q.  Once Chucky's body was in the crawl space, did you ever

2   come back, come back down into the basement?

3   A.  That night?  After my -- after my grandma's memorial

4   dinner?  I went to jail.

5   Q.  So did you ever end up back in the basement after that

6   night, after the 26th?

7   A.  Yes, I did.

8   Q.  Did it seem the same?  Did it look like somebody had been

9   down?

10  A.  Yeah, it looked like somebody's been down there and

11  looking at it and -- if you had pictures, I could explain it

12  better.

13  Q.  And let me just ask you this, Mr. Whiteplume, and I'll

14  show you some pictures.  Why do you think somebody had been

15  down there?  Did it look cleaned up?

16  A.  When I came back, by the time I got out of jail and I came

17  back, it smelled clean.  I went down there and it smelled like

18  Clorox.  It smelled clean.

19  Q.  Did it smell like bleach?

20  A.  It smelled like bleach.

21  Q.  Did you ever go down into the crawl space again?

22  A.  Yes.

23  Q.  Tell us about that.

24  A.  I just went in there, was looking at it, figuring out how

25  I was going to get rid of it.

1    Q.  So walk me -- so do you recall when you went back into the

2    crawl space?

3    A.  No.  I'm still drinking whatever I can get my hands on.

4    To other people, explaining a week might seem like a long time

5    to you.  When you was drinking, I was drinking, whatever it

6    was, it was hard stuff.  I was drinking to forget.

7    Sometimes -- I don't know if -- you guys probably go on

8    vacations.  You guys drink.  Your week vacation seems like two

9    or three days.  That's what this whole week felt like to me.

10   Q.  Did you end up going back in that crawl space with

11   Chucky's body?

12   A.  From what time?

13   Q.  Anytime after you and Monty and Jori had put the body in

14   there, did you go back into the crawl space?

15   A.  Yes.

16   Q.  And who did you go with?

17   A.  I went with Isaac Sitting Eagle and Arapaho.

18   Q.  Why did you do that?

19   A.  I thought we were going to go move the body.

20   Q.  Did you?

21   A.  No.

22   Q.  Mr. Whiteplume, I'm going to show you or have you look at

23   the screen in front of you at what's marked as Government's

24   Exhibit 7-1.  Are you familiar with that?

25   A.  Yes, sir.

1  Q.  And is that a photograph of -- is that a photograph that

2  you're looking at?

3  A.  Yes.  It's an ID badge.

4  Q.  Is that true and accurate?  Is that what it looked like?

5  A.  Yes.

6          MR. CONDER:  Your Honor, at this time the United

7  States would move to admit 7-1 and publish it.

8          MS. HUCKE:  No objection.

9          THE COURT:  Exhibit 7-1 will be admitted and

10  published.

11      (Government's Exhibit 7-1 received.)

12  Q.  (BY MR. CONDER)  Mr. Whiteplume, where was that?  Do you

13  know where --

14  A.  That's on the wood table.  That's on the table.

15  Q.  That's on the table in the basement?

16  A.  Yes.

17  Q.  Next I would show you what's marked as Exhibit 7-2.  In

18  looking at that photograph, does it look familiar?

19  A.  Yes.

20  Q.  And what is that?

21  A.  It's a photograph you showed me before, but I don't -- it

22  looks like a sock and a sweater.  I can't say for sure if

23  that's -- if that's what he was wearing.  I can't say that for

24  sure.

25          MR. CONDER:  Okay.  Your Honor, the United States

1   would move to admit Government's Exhibit 7-2.

2            MS. HUCKE:  No objection, Your Honor.

3            THE COURT:  All right.  Exhibit 7-2 will be admitted

4   and may be published.

5        (Government's Exhibit 7-2 received.)

6   Q.  (BY MR. CONDER)  Mr. Whiteplume, is that a sock in the

7   photograph?  Is that what it looks like?

8   A.  It looks like it.

9   Q.  And does that look like it could have been one of the

10  socks that you or Monty or Jori wore on your hands?

11  A.  It could have been.

12  Q.  Next I would direct your attention and publish to the jury

13  Government's Exhibit 4-2.

14           THE COURT:  4-2 is being published to the ladies and

15  gentlemen of the jury.

16  Q.  (BY MR. CONDER)  Mr. Whiteplume, you said that during --

17  when all of this was going on in the basement, Mr. Oldman told

18  you to put up a blanket; is that true?

19  A.  That's true.

20  Q.  And where did you put up the blanket?  What did you put it

21  up over?

22  A.  The bottom left window.

23  Q.  So that window on the bottom left side, you put a blanket

24  over that window on the inside?

25  A.  Yes, sir.

1    Q.  And is that what Mr. Oldman told you to do?

2    A.  Yes, sir.

3    Q.  I would ask you to look at Government's Exhibit 4-3.  Now

4    I would go to 4-5.  Sorry.  What is that a picture of?

5    A.  It's the front door.

6    Q.  Of your house at 331?

7    A.  That's my grandma's house, 331 Great Plains.

8    Q.  Is that the door you checked twice?

9    A.  That's the door I checked twice.

10   Q.  And how does that door lock?  How does that door stay

11   shut?

12   A.  It don't.  It don't lock.

13   Q.  There's a rope or a string that looks like it's hanging on

14   that -- the railing.  What's that for?

15   A.  That's what you use to close the door.

16   Q.  So when you close the door, you tie it up with that

17   string?

18   A.  Yes.

19   Q.  Okay.  And when you said you turned out the light, is that

20   light above "331," those numbers there, is that the light you

21   turned out?

22   A.  Yes.

23   Q.  I would now direct your attention to Government's Exhibit

24   4-23.  What's this a picture of?

25   A.  That's a picture of the white couch.

1   Q.  And is that -- the nightstand over in the corner, your bed

2   used to be there?

3   A.  Yes, sir.

4   Q.  When did you take your bed out?

5   A.  A couple days after that.

6   Q.  Who helped you take your bed out?

7   A.  Monty and my sister.

8   Q.  And when you described coming down to the table and seeing

9   Mr. Oldman with the belt around Chucky's neck the first time,

10  is that the chair you were talking about?

11  A.  That's the chair I was talking about.

12  Q.  I would now show you what's marked as Government's Exhibit

13  4-20.  Do you recognize that photograph?

14  A.  Yes.

15  Q.  And what is that?

16  A.  That's by the dryer.  When I was telling you -- it's a

17  little bit more over, but that's -- that's where Chucky was at

18  the third time I came down.

19  Q.  I'll next show you what's marked as Government's Exhibit

20  4-30.  What's that a photograph of?

21  A.  That's where -- that's where he got killed.  That's where

22  he was getting beat up by the -- by the second time when I

23  came down, right there.  That -- that quilt wasn't there,

24  though.

25  Q.  So in that corner over there, is that where Mr. Oldman cut

1   Chucky's throat?

2   A.   Yes, sir.

3   Q.   And that blanket covering that window, did you put that

4   blanket over the window?

5   A.   Yes, sir.

6   Q.   I'll show you what's marked as Government's Exhibit 4-42.

7   Do you recognize that photo?

8   A.   Yes, sir.

9   Q.   And what is that?

10  A.   That red box, that's where -- that's where I got him in

11  the first time.  That's where he was -- I was trying to get

12  him earlier so he would stay out of sight, out of mind.

13  Q.   And let me show you what's marked as Government's Exhibit

14  4-45.  Is that that red box?

15  A.   That's that red box, yes, sir.

16  Q.   And what's the significance -- what's happened there?  Did

17  anything happen there?

18  A.   That's where I got him in.  And that's where I told him to

19  just lay there, be out of sight, out of mind.  That's when I

20  gave him that blanket and I told him I'd get him to the

21  hospital in the morning.

22  Q.   And I'll show you Government's Exhibit 4-47.  Do you

23  recognize that photograph?

24  A.   That's the blanket I gave him.

25  Q.   That's the blanket you gave Chucky when you helped him

1   into the crawl space?

2   A.  Yes, sir.

3   Q.  Mr. Whiteplume, do you remember -- do you remember when

4   you asked Monty to help you get Chucky's body in the crawl

5   space?

6   A.  When it started stinking.

7   Q.  Do you remember, did you tell Monty to cut off his head --

8   A.  No.

9   Q.  -- or do you remember?

10  A.  I never told him that.

11  Q.  Did you give Monty a knife and tell him to help dismember

12  the body so it could be moved?

13  A.  No.  I never told him that.

14  Q.  What did you tell Monty when you had him help you?

15  A.  I had him help me just move it.  A lot of -- a lot of the

16  stuff that Chucky sustained, I didn't -- I didn't know about

17  those wounds until I came to jail.  I didn't know that he had

18  broken arms and broken ligaments until I came to jail.

19  Q.  Let me -- do you recall what you told Monty?  Did you tell

20  Monty to do anything to the body except help you get it in the

21  crawl space?

22  A.  No.  Just help me get it in the crawl space.

23  Q.  Did you cut Chucky's body once he was dead?

24  A.  No, I never cut Chucky's body once he was dead.

25          MR. CONDER:  May I have a moment, Your Honor?

1           THE COURT:  You may.

2       (Discussion off the record.)

3  Q.  (BY MR. CONDER)  Mr. Whiteplume, you said when your Uncle

4  Edd or -- that your Uncle Edd came down and woke you up.  Do

5  you recall that?

6  A.  Yes.

7  Q.  And what was it that he said to you when he woke you up?

8  A.  "You got to go."

9  Q.  Did he say something before that?

10 A.  He said, "He's gone."

11          MS. HUCKE:  Objection, Your Honor.  Hearsay.

12          THE COURT:  Well, I'll sustain and strike the answer

13 as to what -- unless there's an exception as to what his uncle

14 said.

15 Q.  (BY MR. CONDER)  While you were down -- you talked about

16 Mr. Oldman pulling out a knife the first time.  What did

17 Chucky -- did Chucky say anything when that happened?

18 A.  The first time?  I don't recall.

19 Q.  At any time down in that basement, from the time this

20 started until the time Chucky was dead, what did Chucky ask of

21 you?  What did Chucky ask of Mr. Oldman?

22 A.  He wanted Mr. Oldman to stop beating him up.  He wanted me

23 to stop him.

24 Q.  Did he ask if he could leave?

25 A.  I don't remember him asking if he could leave.  He was

1  just asking for Mr. Oldman to stop punching him.  That's the

2  first time I seen the knife; right?  That's what you're

3  talking about?

4  Q.  Anytime in the basement.

5  A.  Anytime in the basement?  He's asking Arapaho, "Just let

6  me go," you know, "I promise I won't tell," you know, asking

7  him to stop beating him up.  He told me that it wasn't him

8  that jumped me, told me it was two youngsters.  The whole time

9  he was talking while I was trying to see who it was.

10 Q.  Now, Mr. Whiteplume, when your uncle woke you up that

11 morning, was Chucky's body still in the basement?

12 A.  Yes, sir.

13 Q.  Did your uncle see Chucky's body?

14 A.  Yes, sir.

15         MR. CONDER:  One moment, Your Honor.

16         THE COURT:  All right.

17     (Discussion off the record.)

18         MR. CONDER:  No further questions, Your Honor.

19         THE COURT:  All right.  Ladies and gentlemen, let's

20 go ahead and take a ten-minute recess, and I will try to be

21 good on my clock.  I'll remind you of the recess instruction.

22 We'll be back in ten minutes.

23         Please rise.

24     (The jury exited the courtroom at 3:27 p.m.)

25     (The following took place outside the presence of the

1      jury.)

2          THE COURT:  Anything we need to address before we

3  return for cross-exam?  Mr. Conder?

4          MR. CONDER:  Nothing for the United States, Your

5  Honor.

6          THE COURT:  Ms. Hucke?

7          MS. HUCKE:  No, Your Honor.

8          THE COURT:  We'll be back in ten.

9      (At 3:28 p.m., a recess was taken until 3:43 p.m.)

10     (The following took place outside the presence of the

11     jury.)

12         THE COURT:  Thank you.  I note the presence of

13  counsel, presence of the defendant, absence of the ladies and

14  gentlemen of the jury.

15         All right.  Any matters we need to address?

16  Mr. Conder?

17         MR. CONDER:  I apologize, Your Honor.

18         THE COURT:  Any matters?

19         MR. CONDER:  No, Your Honor.  Sorry.

20         THE COURT:  Ms. Hucke?

21         MS. HUCKE:  No, Your Honor.  Thank you.

22         THE COURT:  Let's go ahead then and bring in the

23  ladies and gentlemen of the jury.

24     (The jury entered the courtroom at 3:44 p.m.)

25         THE COURT:  Thank you.  Please be seated.

1        I'll remind the witness you're still under oath.

2        Ms. Hucke.

3                    CROSS-EXAMINATION

4    BY MS. HUCKE:

5    Q.  Mr. Whiteplume, you've met with the Government to talk to

6    them about what happened several times; correct?

7                    THE COURT:  Go ahead and answer.

8    A.  Yes, ma'am.

9    Q.  (BY MS. HUCKE)  So you talked to them on December 1, 2017;

10   correct?

11   A.  Yes, ma'am.

12   Q.  You talked to them again on December 7, 2017?

13   A.  I couldn't recall that one.

14   Q.  There was a time where the FBI was coming to the house to

15   look in the basement again and you and your sister were there?

16   A.  You're talking in 2017?

17   Q.  Correct.

18   A.  Oh, yes, ma'am.

19   Q.  And then you talked to them on December 12, 2018; is that

20   correct?

21   A.  Yes, ma'am.

22   Q.  And then a couple weeks ago, on December 27, 2018?

23   A.  I don't recall that one.

24   Q.  When you met at the U.S. Attorney's office.

25   A.  (No response.)

1    Q.  You don't recall meeting at the U.S. Attorney's office

2    with your attorney and the Government?

3    A.  Of this year?

4    Q.  2018.

5    A.  Okay.  I guess not.

6    Q.  And then again you came into this courtroom last Friday,

7    and you changed your plea to guilty; correct?

8    A.  Yes, ma'am.

9    Q.  And you told the judge your story again?

10             THE COURT:  Go ahead and answer.

11   A.  Yes, ma'am.

12   Q.  (BY MS. HUCKE)  So every time you tell this story, it's

13   different; correct?

14   A.  No, ma'am.  Not from the -- not from my point of view, but

15   from the way the questions are asked.

16   Q.  So let's talk about December 1, 2017, when you talked to

17   the FBI.  You were sitting in their car.  Do you recall that?

18   A.  December when?

19   Q.  December 1, 2017.

20   A.  Yes, ma'am.

21   Q.  And then you told them that the only thing you knew was

22   that Arapaho just told you he'd put in some work; is that

23   correct?

24   A.  Yes, ma'am.

25   Q.  And then you told them Arapaho was the one telling

1   everyone about the body and that you never saw a body?

2   A.  Yes, ma'am.

3   Q.  So again, next you said that you never saw a body down in

4   the basement and that you only knew about it because your Aunt

5   Angela told you?

6   A.  Yes, ma'am.

7   Q.  The FBI asked you if Arapaho had you help him clean up the

8   body, and you told them no?

9   A.  No.

10  Q.  So you did not tell them that you didn't help clean up the

11  body on December 1?

12  A.  Can you be more vague by what you mean by cleaned up?

13  Like wash him, move him, put clothes on him?

14  Q.  You told the FBI that you had never seen the body at that

15  time?

16  A.  But you still never asked me about the cleanup, the body.

17  What are you getting at about that?

18  Q.  You told the FBI on December 1 that you did not help clean

19  up the basement or the body; is that correct?

20  A.  That's correct.

21  Q.  And so that's different than what you said here today.

22          THE COURT:  Go ahead and answer.

23  A.  Yes.

24  Q.  (BY MS. HUCKE)  And so you lied on -- in December because

25  you had in fact saw the body?

1   A.   Yes.

2   Q.   Now let's talk about when you met -- talked to the FBI on

3   December 7, 2017.  This is when they came to your house to get

4   more things out of the basement.  Do you recall that time?

5   A.   Yes.

6   Q.   And on that day you told them you had no idea what

7   happened down there, and the only thing that you know is

8   Arapaho told you he did it; correct?

9   A.   Say that again.

10  Q.   You told the FBI that you had no idea what happened down

11  in the basement, and the only thing that you know is Arapaho

12  told you that he did it.

13  A.   No, I didn't tell them that.  I told them I heard Arapaho

14  did it.

15  Q.   Okay.  You didn't tell them you had no idea what happened?

16  A.   Yes, that part.

17  Q.   I'm sorry.  What was your answer?

18  A.   I said yes, that part.

19  Q.   You did tell them that?

20  A.   I did tell them that.

21  Q.   And you told the FBI on that day that you weren't going to

22  lie to them; is that correct?

23  A.   I don't remember that part.

24  Q.   You don't remember telling them that you weren't going to

25  lie to them?

1    A.   On what day is this?

2    Q.   On December 7.

3    A.   This is when they walked up through the front --

4    Q.   Uh-huh.

5    A.   -- walked in to get more things?  They didn't ask me those

6    questions like that.

7              MS. HUCKE:  Can you pull up Exhibit 476.

8              And, Your Honor, I guess before we do play it, this

9    is an audio clip from that interview, and I have the

10   transcript here I can show Mr. Conder.

11             THE COURT:  Any objections to the playing of that

12   audio?

13             MR. CONDER:  No, Your Honor.  If it -- if it is what

14   I think it is, I think it's fine.

15             THE COURT:  All right.  I'll allow it to be played.

16             MS. HUCKE:  It's 476.

17        (Playing recording.)

18   Q.   (BY MS. HUCKE)  Mr. Whiteplume, is that your voice in that

19   recording?

20   A.   That sounds highly intoxicated.

21   Q.   Is that your voice?

22   A.   They're not allowed to take a statement from --

23   Q.   Can you answer my question, sir?

24             THE COURT:  Listen to her question, sir.

25             Go ahead.

1  Q.  (BY MS. HUCKE)  Is that your voice in that recording?

2  A.  Yes.

3  Q.  And so now do you recall telling the FBI that you weren't

4  going to lie to them?

5  A.  No.  I was highly intoxicated in that situation.

6  Q.  Answer my question.  Did you tell the FBI you weren't

7  going to lie to them?

8  A.  Yes.  That's my voice.

9  Q.  And you told them that you didn't know anything about what

10  happened?

11  A.  You're talking to an intoxicated --

12  Q.  Mr. Whiteplume, answer my question.  You told them on that

13  day that you didn't know what happened; correct?

14  A.  I didn't even know I had that conversation that day.

15  Q.  Can you answer my question?

16  A.  If that's my voice, yes, that's my voice.  I don't even

17  recall that conversation.

18  Q.  Okay.  Do you recall talking to the FBI on December 12,

19  2017?

20  A.  Can you play that recording too?

21  Q.  I'm going to ask you questions about it.  Okay?

22  A.  I got -- I got to be able to remember these.

23  Q.  Okay.

24  A.  Because that one, that last one I obviously don't

25  remember.  I don't remember talking.  That's why when I get

1   certain dates, I don't remember.

2   Q.  But you said earlier you remember you've talked to the FBI

3   several times throughout the last year?

4   A.  Yeah, several times.

5   Q.  And on December 12 you finally then admitted that you were

6   there that night and you knew what happened; correct?

7          THE COURT:  Counsel, just so the reference is --

8   December 12th of 2018 or --

9          MS. HUCKE:  2017, Your Honor.

10          THE COURT:  Go ahead and answer the question.

11   A.  What's the question?

12   Q.  (BY MS. HUCKE)  The question was, you, on December 12,

13   2017, admitted to the FBI that you knew what happened that

14   night; correct?

15          THE COURT:  Did you say 2018 or '17?

16          MS. AMRAM:  I meant 2017.

17          THE COURT:  Now we're square.  Go ahead.

18   A.  We got a recording of this conversation too?

19   Q.  (BY MS. HUCKE)  Sir, can you just answer my question?

20   A.  I got to be able to know if I remember these

21   conversations.

22   Q.  I'm asking you, then, did you -- was there a point in time

23   where you told the FBI that you did know what happened that

24   night?

25   A.  Is this when I went and took the polygraph?

1  Q.  I'm just asking about a time that you talked to the FBI.

2  A.  I was highly intoxicated for the whole month.

3  Q.  Okay.  But you have changed your story.  Initially you

4  told them you had no idea what was going on, what happened.

5  A.  They're obviously talking to me when I'm drunk.

6  Q.  Okay.  And now we know that that's not true.

7  A.  I'm not drunk now.

8  Q.  You do know what happened that night; correct?

9  A.  Yes.  I do know what happened that night.

10 Q.  So there was a point in time where you then came and you

11 told the FBI that you did know what happened to Chucky that

12 night?

13 A.  Yes.

14 Q.  And when you first told them that, you told them that

15 Arapaho just flipped out and started beating Chucky, and you

16 had nothing to do with it; correct?

17 A.  Can you play the audio?

18 Q.  You need to answer my question.

19          THE COURT:  If you can't remember, you can't

20 remember.  But to the extent you can answer her question, you

21 need to answer her question.

22          THE WITNESS:  I -- I don't know the conversation that

23 she --

24          THE COURT:  All right.  Just a minute.

25          Ladies and gentlemen, I'm going to excuse you for a

1   minute.  We'll be right back.

2       (The jury exited the courtroom at 3:57 p.m.)

3       (The following took place outside the presence of the

4       jury.)

5           THE COURT:  Have a seat.

6           Mr. Whiteplume, to the extent they may have a

7   recording or may not, it doesn't matter.  You'll need to

8   answer the question.  If you don't recall, if you don't know,

9   you don't know.  But whether or not they have a recording, it

10  may eventually be played, but you have to answer, based upon

11  your recollection, the questions asked.

12          Here's the other thing.  I don't want you to make any

13  reference to any polygraph or any prior evaluation or

14  submission that you've made in terms of any polygraph.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  What's your question?  Go ahead and speak

17  into the microphone.

18          THE WITNESS:  Yes, sir.  If I don't know, I can't --

19  do I have to say no or yes, sir?  It's not -- it's not I'm

20  saying no; I'm not saying yes.  It's that I don't know.

21          THE COURT:  Well --

22          THE WITNESS:  I mean, that's not a yes or no

23  question.  That's not a yes or no response if I don't know.

24          Can I say something else?

25          THE COURT:  If you don't know, you don't know.  You

1   don't recall.  You don't know, you don't recall, whatever the

2   correct and honest answer is is the answer.  So that's all

3   that I want you to respond, is you know or don't know.  If you

4   don't recall, you don't recall.  Whatever it is, it is.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Anything further, Ms. Hucke?

7          MS. HUCKE:  Your Honor, I would say that since he had

8   mentioned the polygraph report, I think we should be able to

9   get in at this point --

10          THE COURT:  Hold on.

11          MS. HUCKE:  -- that he did take a polygraph and he

12   did fail the polygraph on that day.

13          THE COURT:  You can move tonight whatever you want to

14   do, but I'm not -- because there's all kinds of polygraphs

15   around here, and I'm not getting into any polygraphs and

16   opening that door.  I did not say anything.  I didn't strike

17   it.  I didn't put any alarm bells on it.  I'll give a limiting

18   instruction if you want, but we're not going down the

19   polygraph trail.  Unless there's some law you have to support

20   it, we're not going there.  We're going testimony and

21   evaluation by this jury as to who's credible and who's not.

22          Anything further?

23          MR. CONDER:  Your Honor, I would only note for the

24   record that Mr. Whiteplume's attorney, Mr. Craig Silva, is

25   present.  Not that anything needs to be done; I would just put

1    it on the record.

2              THE COURT:  All right.  Mr. Whiteplume, you

3    understand?  You need to answer the question.  Whatever the

4    answer is, it is.  If you know, you know.  If you don't, you

5    don't.  You just need to answer honestly and truthfully.  And

6    I don't want you to make any reference to any prior polygraph

7    that's been taken or any discussions regarding it.  All right?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Anything else we need to cover before we

10   bring in the ladies and gentlemen of the jury?

11             MR. CONDER:  Nothing for the Government, Your Honor.

12             MS. HUCKE:  I'm sorry, Your Honor.

13             THE COURT:  Anything else we need to address before

14   we bring in the jury?

15             MS. HUCKE:  No.

16             THE COURT:  All right.  Please rise.

17        (The jury entered the courtroom at 4:01 p.m.)

18             THE COURT:  Thank you.  Please be seated.  I'm sorry,

19   ladies and gentlemen.

20             Ms. Hucke.

21   Q.   (BY MS. HUCKE)  Mr. Whiteplume, when you met with the FBI

22   on December 12th of last year, 2017, do you recall telling

23   them at that point then you did see what happened to Chucky?

24   A.   I don't recall.

25   Q.   Do you recall telling them that you only hit him a couple

1   of times because you were afraid of Arapaho?

2   A.   I don't recall.

3   Q.   Okay.  Do you remember meeting with the FBI and the

4   Government in December of this year?

5   A.   Yes.

6   Q.   And at that time you told them that you decided this was

7   the time you were finally going to tell them the truth?

8   A.   I don't -- I don't remember that part.

9   Q.   Do you recall the story that you told them this year in

10  December was different than what you told them last year?  Is

11  that correct?

12  A.   That's correct.

13  Q.   Because now you've included more people that were at the

14  house; is that correct?

15  A.   That's correct.

16  Q.   You told them that your sister, Jori, was there?

17  A.   I didn't tell them that.

18  Q.   You don't recall telling the Government that your sister,

19  Jori, was there this year, that she was there that night?

20  A.   I don't recall that conversation, that part of the

21  conversation.

22             MS. HUCKE:  Can you play Exhibit 489.

23             THE COURT:  And, Counsel, before we play this, just

24  so that it's clear, can you go ahead and put on the record

25  what it is.

1           MS. HUCKE:  Yes, Your Honor.  This is a recording

2   from an interview at the U.S. Attorney's office on December

3   27th of this year.

4           THE COURT:  All right.  Go ahead.

5       (Counsel confer.)

6           THE COURT:  Any objections, Counsel?

7           MR. CONDER:  No, Your Honor.

8           THE COURT:  Go ahead.

9       (Playing recording.)

10          THE COURT:  Let's pause for one moment and we'll

11   replay it.  Can you turn up the volume on your computer.

12          MS. DOMINGUEZ:  That's as high as it goes.

13          MS. HUCKE:  Your Honor, I will let the Court know

14   this is a really muffled recording.  We've had hard times with

15   that as well, and I think that's as high as it goes.

16          THE COURTROOM DEPUTY:  I've got it maxed too.

17          THE COURT:  Let's be very quiet, then, and we'll

18   listen to it.

19      (Playing recording.)

20   Q.  (BY MS. HUCKE)  Mr. Whiteplume, is that your voice?

21   A.  Yes.

22   Q.  And could you hear you saying that your sister was at the

23   house?

24   A.  Yes.

25   Q.  And you also stated that Monty was there?

1    A.   Yes.

2    Q.   And you stated that Bernadette Brown was there but that

3    you previously knew her by a different name?

4    A.   Yes.

5    Q.   So you stated on December 27 and today in court that

6    Mr. Oldman had a belt around Chucky's neck; is that correct?

7    A.   That's correct.

8    Q.   But you had never mentioned a belt to the Government

9    before those dates?

10   A.   I told them about the belt.

11   Q.   So you told them about the belt just in the last couple

12   weeks?

13   A.   (No audible answer.)

14        THE COURT:  You need to audibly answer.  I'm sorry.

15   Was that a yes or a no?

16        THE WITNESS:  It's one of those tricky questions.

17        THE COURT:  Go ahead and restate it, Counsel.

18   Q.   (BY MS. HUCKE)  So you told the Government about the belt

19   within the last couple weeks; is that correct?

20   A.   I told them about the belt before too.

21   Q.   Okay.  So you're saying that you told them about the belt

22   before December 27, 2018?

23   A.   I keep telling them about the belt.

24   Q.   So let's talk about the belt.  Was this a leather belt?

25   A.   I just told them all I seen was a brown belt.

1   Q.   I'm sorry.  A round belt?

2   A.   A brown belt.

3   Q.   A brown belt.  And you're saying that you didn't see the

4   belt be placed on Chucky's neck?  You just came down and the

5   belt was already on his neck?

6   A.   That's correct.

7   Q.   And other people were in the basement when the belt was

8   around his neck?

9   A.   Are you asking me to speak from other people's point of

10  view?

11  Q.   No.  I'm asking you if other people were also in the

12  basement when the belt was around Chucky's neck.

13  A.   When I came down and seen them, yeah, he had a belt around

14  his neck.

15  Q.   And my question was, were other people also in the

16  basement?

17  A.   Yes.

18  Q.   Specifically, was Bernadette in the basement at that time?

19  A.   Yes.

20  Q.   And so she would have been able to clearly see the belt

21  around Chucky's neck?

22  A.   I can't speak from her point of view.  You're asking me to

23  speak from other people's point of view.

24  Q.   But it was pretty obvious that there was a belt around his

25  neck; correct?

1   A.   I noticed it.

2   Q.   And so you previously testified that you became angry when

3   you thought Chucky was one of the people that had jumped you

4   prior; is that correct?

5   A.   That's correct.

6   Q.   So let's talk about when you were jumped.  So this was

7   just a couple weeks prior to Thanksgiving of last year;

8   correct?

9   A.   When I got jumped?

10  Q.   Uh-huh.

11  A.   That was, I think -- I got jumped twice that year.

12  Q.   Okay.  So you got jumped twice that year.  But you --

13            THE COURT:  Twice that year or day?

14            THE WITNESS:  That year.

15            THE COURT:  Go ahead.

16  Q.   (BY MS. HUCKE)  But you were placed in the hospital the

17  time that you were jumped that was closer to Thanksgiving of

18  last year; correct?

19  A.   I was in the hospital twice.

20  Q.   Okay.  So you were in the hospital when you were jumped

21  the time that was close to Thanksgiving?

22  A.   I was -- I was jumped twice.

23  Q.   Okay.  And so then you were in the hospital twice?

24  A.   More than twice that year.

25  Q.   And do you recall speaking to the police about that

1    incident?

2    A.  Which one?

3    Q.  So you spoke to the police -- I'm talking about the time

4    that was closest to Thanksgiving.  Okay?  I know there was one

5    time maybe in the summer that you were jumped.

6    A.  You got the hospital records or --

7    Q.  There was a -- you just need to answer my question.  There

8    was a time -- I know you're saying you got jumped twice last

9    year; correct?

10   A.  That's correct.

11   Q.  And you were mad at Chucky because you thought he was one

12   of the people who jumped you?

13   A.  Yes, I was mad.

14   Q.  Okay.  And so the time that you thought Chucky was

15   involved was just a couple weeks before Thanksgiving last

16   year; correct?

17   A.  I was asking about both times.  All I heard was, "This is

18   one of the people that jumped you."  I wasn't clear on what

19   time or any time.  He didn't make that specific.  I was mad.

20   Q.  Okay.  So you were mad because you thought he had

21   previously jumped you; correct?

22   A.  Yes.

23   Q.  And you had been jumped just a couple weeks before this

24   all happened; correct?

25   A.  Like I said, I'd been jumped twice that year.

1   Q.  Okay.  And the time before -- the couple weeks before

2   Thanksgiving, you spoke to the police about what happened?

3   A.  Do you know which police station?

4   Q.  I'm sorry.  What?

5   A.  Do you know which police it was?

6   Q.  I'm talking about the time that was a couple weeks before

7   Thanksgiving.

8   A.  A couple weeks before Thanksgiving I was also hospitalized

9   for spider bites.

10          MS. HUCKE:  Okay.  So give me a moment, Your Honor.

11          THE COURT:  All right.

12  Q.  (BY MS. HUCKE)  Mr. Whiteplume, I'm going to show you

13  something, and I'd like for you to look at it on the screen

14  and read it to yourself.

15          MS. HUCKE:  Can you bring up Exhibit 462.

16          THE COURT:  The witness is being shown Exhibit 462

17  only and counsel.  Go ahead.

18  Q.  (BY MS. HUCKE)  And let us know when you're ready for us

19  to show you the next page.

20  A.  Yes, I'm ready.

21  Q.  Okay.  So does that help clarify the time we're talking

22  about when you were jumped?

23  A.  That's --

24      (Reporter interruption.)

25          MS. HUCKE:  Can you show him the next page.

1   Q.  (BY MS. HUCKE)  So does that help clarify the time that

2   I'm asking you about?

3   A.  Yes.  That clarifies it a little bit more.

4   Q.  And on the second page -- if you want to go back to the

5   second page -- there is actually a typo in the last page.  It

6   says October 2, but that was actually on November 2.

7           MR. CONDER:  Your Honor, I guess I would object.  I

8   don't know how we know that.

9           THE COURT:  Well, I'll sustain the objection.  But

10  you can point him to other places.  Maybe the page that's up

11  on the screen now.

12  Q.  (BY MS. HUCKE)  I'm just trying to clarify I know you've

13  been jumped a few times.  I'm just trying to clarify that I'm

14  talking about this specific time.  Does that help refresh your

15  memory?

16  A.  It was really dark when I got jumped that time.  It says

17  4:22.

18  Q.  Okay.  So you got -- this is the time that we're talking

19  about that you got jumped.  It was just a couple weeks before

20  Thanksgiving last year.

21  A.  So we're talking about the incident now; right?

22  Q.  Correct.  And do you recall -- you talked to the police

23  about that?

24  A.  Can I read that second page again?

25  Q.  Sure.

1    A.   This is from the Riverton Police Department?

2    Q.   That's correct.

3    A.   Did they get my BAC?

4         THE COURT:  Mr. Whiteplume, you'll need to answer her

5    question based upon the information contained in here.

6         THE WITNESS:  I'm sorry, sir.

7         THE COURT:  Go ahead.

8    Q.   (BY MS. HUCKE)  So my question was, you spoke to the

9    police about this incident; correct?

10   A.   Yes.

11   Q.   And at that time you told them that you wanted to handle

12   the situation yourself; correct?

13   A.   Yes.

14        MS. HUCKE:  Okay.  Thank you.  We can take it down,

15   Your Honor.

16        THE COURT:  All right.

17   Q.   (BY MS. HUCKE)  And so you were upset about what happened

18   to you that day?

19   A.   Yes, I was upset.

20   Q.   And you thought Chucky was one of the people who were

21   involved in that?

22   A.   Yes, I thought he was one of the people.

23   Q.   And so you were angry when you thought that?

24   A.   When I thought that, I was angry.

25   Q.   And so not only when you found out, but you were

1  punching -- you were punching Chucky in the face; correct?

2  A.  Correct.

3  Q.  And you said you were kicking him?

4  A.  More of a stomp.

5  Q.  So you were stomping on him?

6  A.  Correct.

7  Q.  And when you were stomping on him, you were using all of

8  your body weight because you were mad?

9  A.  I was stomping him.

10  Q.  Okay.  You were stomping him hard because you were mad?

11  A.  I was stomping him.  I was stomping him, like I said.

12  Q.  So now I want to talk a little bit about your sister,

13  Jori.  Her name's Jori Lamebull; is that correct?

14  A.  That's correct.

15  Q.  And you stated that she was there that night?

16  A.  During the interview?

17  Q.  Was your sister, Jori, there the night before Thanksgiving

18  2017?

19  A.  That night?  That same night?  She could have been there

20  that night.  She could have left too.  I mean, it does get

21  dark around 5:30, 6:00.  And you're talking about the whole

22  night, until the sun comes up; right?

23  Q.  Do you recall that you got in a fight with your sister,

24  Jori, a couple days before Chucky was murdered?

25  A.  No.  I didn't recall that until people showed me.

1   Q.  And during that fight you actually pulled a knife on her;

2   correct?

3   A.  No.  We were eating.

4   Q.  And after the murder happened, you actually talked to her

5   about it; correct?

6   A.  I remember -- I remember talking about bits and pieces.

7   Q.  Okay.  And so the day before, I believe it was your

8   grandma's memorial.  That was on the 26th of November 2017?

9   A.  I don't know.  We are drinking quite a bit.

10  Q.  So you previously testified that you remember that there

11  was a memorial dinner for your grandmother that year; correct?

12  A.  Correct.

13  Q.  And that that was on November 26, 2017?

14  A.  Correct.

15  Q.  And the day before that, on December -- excuse me,

16  November 26, the day before that.  On November 25, 2017, you,

17  Jori, and Monty were all at 331 Great Plains; correct?

18  A.  What time was this?

19  Q.  I just asked that on that day, the 25th, the day before

20  your grandma's memorial, the three of you were at 331 Great

21  Plains; correct?

22  A.  Yes.  We were all three there.

23  Q.  And Chucky's body was also in the basement on that day?

24  A.  Yes.

25  Q.  And you wanted to get rid of that body out of the

1    basement; correct?

2    A.  Every time I came after, whenever came after, when I came

3    after him.

4    Q.  So you wanted the body out of the basement?

5    A.  On the day before?

6    Q.  Correct.

7    A.  On the day before, Arapaho still never came after the

8    body.  It was starting to stink.

9    Q.  Mr. Whiteplume --

10   A.  It was starting to stink.

11           THE COURT:  Go ahead and ask the question.

12           Answer the question, sir.

13   Q.  (BY MS. HUCKE)  On that day you wanted the body out of the

14   basement; correct?

15   A.  Correct.

16   Q.  And so you brought Monty downstairs to help you move the

17   body?

18   A.  That's correct.

19   Q.  And you actually handed him a box cutter, and you told him

20   that "We need to cut his head off to start dismembering his

21   body"; is that correct?

22   A.  That's not correct.

23   Q.  And that you actually ordered Monty to use the box cutter

24   to cut off Chucky's neck; correct?

25   A.  I never did that.

1   Q.  And you actually told him that you would give him $200 to

2   cut off Chucky's head; correct?

3   A.  I never did that.

4   Q.  You told him that the Irish mob was coming from Colorado

5   to collect Chucky and that that's why you needed to cut him

6   up; is that correct?

7   A.  Never did that.

8   Q.  And during this time you got pretty angry; correct?

9   A.  Why would I be angry?

10  Q.  And you were actually hitting and punching and kicking

11  Chucky's dead body?

12  A.  Nope.

13  Q.  And you actually said to Monty, "I want to cut off his

14  penis and put it in his mouth, like the movie *Platoon*";

15  correct?

16  A.  Never did that.

17  Q.  And then you ordered Monty to check his pockets for money?

18  A.  Never did that.

19  Q.  So there was a point that you and Monty were downstairs in

20  the basement with Chucky's body, just the two of you with

21  Chucky's body; correct?

22  A.  Correct.

23  Q.  And you tried to both lift him up and get him in the crawl

24  space, but you weren't able to do it with just the two of you;

25  correct?

1    A.   Correct.

2    Q.   And so then you called your sister, Jori, down to help

3    you?

4    A.   Yes.

5    Q.   And when your sister saw the body, she actually got pretty

6    upset, didn't she?

7    A.   Yeah.  She didn't know about it until then.

8    Q.   So she started yelling and screaming a little bit because

9    she got upset?

10   A.   She got a little bit mad.

11   Q.   I'm sorry.  What was that?

12   A.   Seemed like she got a little bit mad.  I don't know if it

13   was actually screaming upset.

14   Q.   So when she got loud, you actually went up to her and you

15   put your hand over her mouth and told her to be quiet?

16   A.   No.

17   Q.   And you told her, "Be quiet.  Everything's going to be

18   okay"?

19   A.   No.

20   Q.   Then you ordered the two of them to help you put Chucky's

21   body into the crawl space?

22   A.   I talked to them about helping me put it in the crawl

23   space.

24   Q.   So and you Monty lifted up Chucky's body, and Jori held

25   open the door?

Whiteplume - Cross by Ms. Hucke                    457

1   A.   That's correct.

2   Q.   And you ordered them to go around and collect anything

3   that that they could see that had blood on it down in the

4   basement?

5   A.   That's correct.

6   Q.   And you had them put it in trash bags so you could burn it

7   in the burn barrel?

8   A.   That's correct.

9   Q.   So you cleaned up the scene down there as best you could

10  with their help?

11  A.   I just picked it up and burned stuff.

12  Q.   So you cleaned up everything you saw down there that had

13  blood on it?

14  A.   Whatever they picked up that fit into a trash bag.

15  Q.   So on the night that this happened, you testified that

16  Mr. Oldman ordered you to put a blanket up over the window; is

17  that correct?

18  A.   That's correct.

19  Q.   I'm going to show you Government's Exhibit 4-32.

20          THE COURT:   Could I have the Government's counsel put

21  up 4-32, please.

22          All right.   This has been admitted, so I'll publish

23  it to the ladies and gentlemen of the jury.   Go ahead.

24  Q.   (BY MS. HUCKE)   So you can see is this a clear picture of

25  the basement?

1    A.   Yes, that's the basement.

2    Q.   And the blanket that is hanging over the window, that's

3    the blanket that you were ordered to put up that night?

4    A.   That's correct.

5    Q.   And there's -- clearly, there's no curtain rod to hang a

6    blanket over; is that correct?

7    A.   That's correct.

8    Q.   And so this blanket was held up by nails; correct?

9    A.   That's correct.

10   Q.   So you're testifying that while Mr. Oldman was beating

11   Chucky, he ordered you to put up this blanket, and you nailed

12   it into the frame of the window; is that correct?

13   A.   He didn't order me to nail it.  Those nails were already

14   in there.

15   Q.   So you had to put nails in to hang up the blanket?

16   A.   I didn't have to put nails in.  The nails were already

17   there.

18   Q.   So, Mr. Whiteplume, let's talk about your plea agreement a

19   little bit.  Okay?

20        MS. HUCKE:  And I'd like that taken down.  Thank you.

21   Q.   (BY MS. HUCKE)  So you came into this courtroom last

22   Friday and you pled guilty to aiding and abetting second

23   degree murder; correct?

24   A.   That's correct.

25   Q.   When you were initially charged -- you were charged here

Whiteplume - Cross by Ms. Hucke                    459

1    in federal court?

2    A.   I was initially charged with --

3    Q.   You were charged in federal court?

4    A.   When I was initially charged, I was charged in Lander,

5    Wyoming.  I was charged with accessory after the fact.

6    Q.   But then you were indicted on an aiding and abetting first

7    degree murder charge; correct?

8    A.   In July.

9    Q.   Okay.  So you were indicted for aiding and abetting first

10   degree murder in July; correct?

11   A.   That's correct.

12   Q.   And you were aware that the sentence you were facing on

13   that charge was a mandatory life sentence; correct?

14   A.   That's correct.

15   Q.   And by changing your plea, the Government has agreed to

16   have -- agreed to have you plead to a lesser charge of second

17   degree murder; correct?

18   A.   State that again.

19   Q.   So as part of your plea agreement, the Government has

20   allowed you to plead guilty to aiding and abetting second

21   degree murder; correct?

22   A.   That's correct.

23   Q.   As opposed to first degree murder?

24           THE COURT:  If you have an answer, answer.  Go ahead

25   and answer the question.

1          THE WITNESS:  That's like a --

2          THE COURT:  Go ahead and restate the question.

3          MS. HUCKE:  Okay.  I can just strike the end part of

4    that question.

5    Q.  (BY MS. HUCKE)  And so now you're no longer facing a

6    mandatory life sentence, are you?

7    A.  I'm still facing life.

8    Q.  But you're not facing a mandatory life sentence?

9    A.  I'm still facing life.

10   Q.  When you were charged with aiding and abetting first

11   degree murder, you were facing mandatory life; correct?

12   A.  I was charged with first degree and aiding and abetting

13   and accessory after the fact.

14   Q.  But when you were charged with aiding and abetting first

15   degree murder, you were facing a mandatory life sentence,

16   which means that the judge wouldn't even be allowed to go any

17   less than that.

18   A.  The mandatory -- that mandatory was because I was charged

19   with first degree murder and aiding and abetting and accessory

20   after the fact.  So that -- that mandatory popped up when the

21   first -- when the first degree popped up.

22   Q.  So your understanding is the mandatory part means that the

23   judge couldn't even give you less than a life sentence?

24   A.  I was charged with all three.  Accessory after the fact is

25   zero to 15.  The first degree is a mandatory life.

1   Q.   Right.  And with mandatory life, your understanding is the

2   judge couldn't sentence you to anything less than life if you

3   were convicted of that charge?

4   A.   If I was convicted of first degree murder.

5   Q.   Correct.

6   A.   If I was convicted of first degree murder, that means it's

7   mandatory.  The accessory after the fact is still zero to 15.

8   Q.   So you're getting a big benefit from your plea agreement,

9   because you're no longer facing mandatory -- a mandatory life

10  sentence; correct?

11  A.   I'm still facing life.

12  Q.   So life is the maximum that you could get under aiding and

13  abetting second degree murder?

14  A.   That's correct.

15  Q.   But the judge can sentence you to less than that?

16  A.   It's up to life, yes.

17  Q.   You can get less than that?

18  A.   Yes.

19  Q.   And you're aware that you have a guideline sentence that

20  could be somewhere between 22 years to 27 years potentially?

21  A.   I've been seeing guidelines, but the way it's been

22  explained to me is this pops up, that pops up, this is here,

23  that's there.  It's -- it's -- I still don't even understand

24  where it's going to pop up, where it's going to end at even

25  after the trial.  I could still get life.

1   Q.   Okay.  But you also understand that as part of your plea

2   agreement and coming here and agreeing to testify today, that

3   the Government could recommend even less for your cooperation?

4   A.   That's -- that's all legal stuff.

5   Q.   But you understand that you could get a lesser sentence

6   from coming here today to testify?

7                THE WITNESS:  Does that make --

8                THE COURT:  Go ahead and -- do you understand her

9   question?

10               THE WITNESS:  No.  She's --

11               THE COURT:  Go ahead and restate the question,

12  Ms. Hucke.

13  Q.   (BY MS. HUCKE)  So you understand that because you came in

14  here and testified and you're cooperating with the Government,

15  that the Government could ask for even less time when you get

16  sentenced?

17  A.   There's no promises made.

18  Q.   But that could happen?

19  A.   My lawyer has to talk that up.

20  Q.   So, Mr. Whiteplume, you stated earlier that you have

21  talked to people about this murder after it happened; correct?

22               THE COURT:  Can you be specific, Counsel?

23  Q.   (BY MS. HUCKE)  Specifically, you've talked to Bernadette

24  Brown about what happened to Chucky that night; correct?

25               THE COURT:  You need to answer as best you can.

1   A.   I don't remember.

2   Q.   (BY MS. HUCKE)  And there was a time that you were at the

3   Center of Hope with Bernadette Brown where you both talked

4   about Chucky's murder?

5   A.   Center of Hope, is that the VOA?

6   Q.   It's through the VOA.

7   A.   I don't remember.

8        MS. HUCKE:  Can I just have a moment, Your Honor?

9        THE COURT:  You may.

10   (Counsel confer.)

11   Q.   (BY MS. HUCKE)  Mr. Whiteplume, while you've been in the

12   jail, you've actually told people to pin it on Arapaho; is

13   that correct?

14   A.   That's not correct.

15   Q.   And going back to your change of plea hearing that you had

16   in here on Friday, you remember as part of that hearing you

17   have to tell the judge what happened; correct?

18   A.   Say that again.

19   Q.   When you came in here to plead guilty to the charge of

20   aiding and abetting second degree murder, you had to tell the

21   judge what happened; right?

22   A.   That's correct.

23   Q.   And at that hearing you told the judge that Jori and Monty

24   had nothing to do with anything that night; is that correct?

25   A.   Are you talking about -- talking about physically?

1   Q.  You said --

2   A.  I kicked him and I punched him.

3   Q.  I'm talking about Monty and Jori.  When you came in here

4   and changed your plea --

5   A.  I did not see them kick or punch him.

6   Q.  You said they had nothing to do with anything that night?

7   A.  Are -- you're talking about the beating; right?

8   Q.  I'm talking --

9   A.  That was --

10          THE COURT:  Hold on.  Let her finish and clarify.

11  Q.  (BY MS. HUCKE)  You said in your change of plea that Monty

12  and Jori had nothing to do with anything that night, the night

13  that Chucky was murdered.

14  A.  So this is about the beating; right?

15  Q.  Correct.

16  A.  Me and Arapaho.

17  Q.  Okay.  But my question was, you told the Court Monty and

18  Jori had nothing to do --

19  A.  That's what I stated --

20  Q.  -- with the beating that night?

21  A.  -- me and Arapaho.  I punched him and kicked him.  Arapaho

22  did what he did.

23  Q.  And you testified earlier that Monty actually handed

24  Arapaho something that night; is that correct?

25  A.  I just seen hands being switched, hands being made.  Is

1   that while I was kicking him?  Because that was my main focus.

2   Is that while I was punching?  Because that's my main focus.

3   Like I said, I can't talk for other people through their eyes.

4   I can't -- I can talk through my eyes.

5   Q.  Mr. Whiteplume, you said earlier that Monty -- you saw

6   Monty hand something to Arapaho that night?

7   A.  I saw that out of the corner of my eyes.  I seen hands

8   made.

9   Q.  And you know that when you come into Court, that you say

10  things and that you're under oath to tell the truth; correct?

11  A.  That's correct.

12       MS. HUCKE:  Can I have a moment, Your Honor?

13       THE COURT:  You may.

14  (Counsel confer.)

15       MS. HUCKE:  We have no further questions, Your Honor.

16       THE COURT:  All right.  Redirect.

17                      REDIRECT EXAMINATION

18  BY MR. CONDER:

19  Q.  Mr. Whiteplume, when you spoke with the FBI on December 1,

20  2017, was that just you and the FBI agents?

21  A.  There was three FBI agents.

22  Q.  Why didn't you tell them that you were involved?

23  A.  I didn't want to get in trouble.

24  Q.  You didn't want to get in trouble.  Were you trying to

25  protect yourself?

1   A.   Yes.

2   Q.   Is that a yes?

3   A.   Yes.

4   Q.   And on December 7th of 2017, when the FBI came to your

5   house and spoke to you and we heard that recording, again, was

6   that just you and the FBI?

7   A.   That -- that recording when I was drunk?

8   Q.   Okay and so were you drunk on that time you heard

9   yourself?  Were you drunk when you were talking to them?

10  A.   I was drunk, yeah.  That don't sound like me right now.

11  Q.   So the other times when you spoke to the FBI, in December

12  and January of 2018, why didn't you tell them the story you

13  told today?

14  A.   Scared.

15  Q.   What were you scared of?

16  A.   (No response.)

17  Q.   Were you scared of -- go ahead.

18  A.   I was scared of getting in trouble, scared of him.

19  Q.   You were scared of getting in trouble and scared of what

20  else?

21  A.   Scared of him.

22  Q.   And who's "him"?

23  A.   Arapaho.

24  Q.   Why were you scared of him?

25  A.   Because I knew by then he -- there's a body in the ground.

1    He's not playing games.

2    Q.  So backing up, why did you think Chucky was involved in

3    assaulting you earlier?  Why did you think Chucky jumped you?

4    A.  Because Arapaho told me.

5    Q.  So until Mr. Oldman told you that, you never thought that,

6    did you?

7    A.  No.

8    Q.  We talked about that blanket on the window.  Where'd you

9    get that blanket?  Where'd it come from?

10   A.  Just laying around in the basement.

11   Q.  Just picked it up off the ground?

12   A.  Yes, right there.  It just -- there's a lot of stuff in

13   the basement.  You seen pictures.

14   Q.  You said you hung that blanket up before?

15   A.  Yes, I did.

16   Q.  So were those nails already in there?

17   A.  Those nails were already in there.

18   Q.  Did you ever hit Chucky with a weapon?

19   A.  No.

20   Q.  Did you cut his throat?

21   A.  No.

22   Q.  Did Jori Lamebull ever hit Chucky Dodge with a weapon?

23   A.  No.

24   Q.  Did Jori Lamebull cut Chucky Dodge's throat?

25   A.  No.

1    Q.   Monty Tabaho, did he hit Chucky Dodge with a weapon?

2    A.   No.

3    Q.   Did Monty Tabaho cut Chucky Dodge's throat?

4    A.   No.

5    Q.   At 331 Great Plains around Thanksgiving 2017, who did you

6    see hit Chucky Dodge with a weapon?

7    A.   Arapaho.

8    Q.   And who did you see cut Chucky Dodge's throat?

9    A.   Arapaho.

10          MR. CONDER:  May I have a moment, Your Honor?

11          THE COURT:  You may.

12       (Discussion off the record.)

13          MR. CONDER:  No further questions, Your Honor.

14          THE COURT:  All right.  May this witness be released

15   from any subpoenas?  Ms. Hucke?

16          MS. HUCKE:  Yes, Your Honor.

17          MR. CONDER:  Yes, Your Honor.

18          THE COURT:  You may step down.

19          The United States may call its next witness.

20          MR. CONDER:  Your Honor, the United States would call

21   Bridget Oldman.

22          THE COURT:  Bridget Oldman will come forward and be

23   sworn.

24          MR. CONDER:  Your Honor, may we have a sidebar?

25          THE COURT:  You may.

1        (At sidebar.)

2            MR. CONDER:  Your Honor, the next witness is Bridget

3    Oldman.  The next two witnesses after that are WinterHawk

4    Felter and Little Sun Felter.  Those are her high school

5    student sons.  Ms. Oldman has to be back in Fremont County

6    tomorrow for a medical procedure.  Her sons are with her.

7    They're a package deal.  I'd like to go tonight.  I don't want

8    to, but I would ask the Court to do that.  And I apologize.

9            THE COURT:  We'll go.  If it gets too late or

10   something comes up, then we'll change it.  But I don't have

11   anything else scheduled.

12           MS. AMRAM:  I don't expect it'll be a long

13   cross-examination.

14           MR. CONDER:  And I don't think so either.

15           THE COURT:  All right.  Well, hopefully it won't be

16   as painful as the last one.

17       (End of sidebar.)

18       (The witness was sworn.)

19           THE COURT:  All right.  Somebody's got a cell phone

20   that has a ringer on.  Turn it off or I'm going to put it in a

21   bucket of water.  I don't care if it's an Apple 8 or not.

22           Oh, it's mine.  It's my phone ringing in my chambers.

23   All right.  I'll go put it in the water along with the budget

24   bill.  All right.  I apologize.

25           THE COURTROOM DEPUTY:  Please state and spell your

1    name for the record.

2            THE WITNESS:  Bridget Oldman.  B-R-I-D-G-E-T, Oldman

3    O-L-D-M-A-N.

4            THE COURTROOM DEPUTY:  Please state your occupation

5    and your city of residence.

6            THE WITNESS:  I'm unemployed right now, so I just

7    take care of my grandbaby.  I live in Arapahoe, Wyoming.

8            THE COURT:  Counsel, before you begin, ladies and

9    gentlemen, we're going to go a little later with this witness

10   to get some witnesses off.  Does anyone have any concerns with

11   doing that?  Indicate otherwise.  Do you have any other plans

12   or anything?

13           JUROR NUMBER 14:  How much later?

14           THE COURT:  Probably around 6:00.

15           JUROR NUMBER 14:  (Nodding head.)

16           THE COURT:  Okay.  Go ahead.

17           MR. CONDER:  Thank you, Your Honor.

18               BRIDGET OLDMAN, GOVERNMENT'S WITNESS

19                       DIRECT EXAMINATION

20   BY MR. CONDER:

21   Q.  Ms. Oldman, could you tell us a little bit about yourself?

22   Where do you live?

23   A.  I live at -- in Arapahoe, Wyoming, at Ben Gay Heights

24   project.

25   Q.  All right.  And did you grow up on the Wind River Indian

1    Reservation?

2    A.  Yes, on the --

3    Q.  And are you a tribal member?

4    A.  Yeah.

5    Q.  What tribe?

6    A.  Northern Arapaho.

7    Q.  And do you have any children?

8    A.  Yeah.

9    Q.  How many kids do you have?

10   A.  I have four boys.

11   Q.  And how old are your boys?

12   A.  19, 18, 17, and 14.

13   Q.  Do you know an individual by the name of Arapaho Oldman?

14   A.  Yeah.

15   Q.  And how do you know Mr. Oldman?

16   A.  Through one of my adopted sisters.  I knew of him growing

17   up, but we never really hung out until this last year or 2017.

18   Q.  And your last name is Oldman.  Are you guys related?

19   A.  Yeah, like five -- fifth cousins.  But I didn't really

20   know him.

21   Q.  So you kind of met him in 2017?

22   A.  Yeah, in July.

23   Q.  And what's your relationship like with him?  Are you guys

24   close?

25   A.  I helped him get through Sundance as much as I could and

1    just started to get better relations, a better relationship

2    built with him, you know, help him out.

3    Q.  And do you recognize Arapaho Oldman here in the courtroom

4    today?

5    A.  Yeah.

6    Q.  And could you tell us what he's wearing?

7    A.  A turtleneck.

8    Q.  Thank you.

9          MR. CONDER:  I'm going to put up a calendar which is

10   marked as Government's Exhibit 1-2 on the screen, and I would

11   move to publish that.  And it's already been admitted.

12         THE COURT:  All right.  I'm muting it because that

13   doesn't look right.

14         MS. DAWSON:  That's not my computer.

15         THE COURT:  And that's why.  All right.  Go ahead.

16   Q.  (BY MR. CONDER)  Ms. Oldman, that's just a calendar of

17   November 2017; is that correct?

18   A.  Yeah.

19   Q.  In looking at that calendar, I'm only giving that if you

20   need a hand.  Do you recall what you did the day before

21   Thanksgiving 2017?  That would be the 22nd of November.

22   A.  Yeah.  That evening, I do.

23   Q.  And did you see Mr. Oldman that day?

24   A.  Yeah.

25   Q.  And what happened?  What were you guys doing?

1    A.   We were -- that day or that evening?

2    Q.   Start out in the day and take us to the evening.

3    A.   We were out looking -- supposed to be looking for jobs.

4    We were both unemployed.  And my son was driving us.

5    Q.   And which son would that be?

6    A.   WinterHawk Felter.

7    Q.   And so it was you and -- what kind of vehicle were you in?

8    A.   We were in my brother's white double-cab truck.

9    Q.   So a white truck?

10   A.   Uh-huh.

11   Q.   And that's what you were doing during the daytime?  The

12   three of you driving around looking for jobs?

13   A.   Yeah.

14   Q.   What -- what happened?  Did you guys all stay together?

15   A.   Until that afternoon, evening, because I had to go home

16   and cook supper for the rest of my -- rest of my three boys.

17   Q.   So what did you do with Mr. Oldman?  Where'd you put him?

18   A.   We took him to where he was staying at Charlotte's.

19   Q.   And where's Charlotte's?

20   A.   Down Eastman Road, past the dog pound.

21   Q.   Is that in Riverton?

22   A.   Yeah.

23   Q.   So you dropped him off there?

24   A.   Yeah.

25   Q.   And then you and WinterHawk went home?

1   A.   Yeah.

2   Q.   And what did you do when you got home?

3   A.   Cooked supper, ate supper, then decided to go to the

4   casino.

5   Q.   So who did you go to the casino with?

6   A.   At first, me and WinterHawk.

7   Q.   And which casino did you go to?  The big casino?

8   A.   Yeah.  We went to the big casino.

9   Q.   And what were you and WinterHawk doing at the big casino?

10  A.   We were playing, and my son was going to get something to

11  eat at the deli.

12  Q.   Were you guys winning?

13  A.   No.

14  Q.   Who -- who drove you guys from the house to the big

15  casino?

16  A.   WinterHawk.

17  Q.   Still driving the white truck?

18  A.   Yeah.

19  Q.   Okay.  So how was it that you came into contact with

20  Mr. Oldman again that night?

21  A.   He -- he texted me.

22  Q.   What did he text you?

23  A.   That he didn't want to stay home and that he didn't want

24  to be home alone and that he had been sober.  And I was trying

25  to keep him sober, and he didn't want to drink.  So I went

1  ahead and went and got him.

2  Q.  And did you go alone, or did WinterHawk --

3  A.  No.  WinterHawk had to drive me.  I couldn't drive.  I was

4  on crutches.

5  Q.  You had crutches?

6  A.  Uh-huh.

7  Q.  So do you recall, was it dark time when you went to get

8  him?

9  A.  Yeah.

10  Q.  And where did you pick up Mr. Oldman?

11  A.  At Charlotte's.

12  Q.  Same place you dropped him off?

13  A.  Yeah.

14  Q.  Do you recall when you got there, was he waiting outside,

15  or did you have to tell him you were there?  How'd he come

16  out?

17  A.  I think he was already coming out, because I texted him

18  that I was almost there.  And he came out.

19  Q.  So did you -- what happened then?  So you picked him up.

20  Where did you and Mr. Oldman and WinterHawk go?

21  A.  We went straight back up to the big casino.

22  Q.  What'd you guys do?

23  A.  I went back in to go gamble.

24  Q.  Did you talk to anybody?  Did Mr. Oldman go with you?

25  A.  Yeah.  We all went in, but not too long after we arrived,

1  the security came and told him he couldn't be there.

2  Q.  And told who he couldn't be there?

3  A.  Told Arapaho that he couldn't be -- couldn't come in for a

4  few more days, because he was kicked out of the casino.

5  Q.  So do you know where he went?

6  A.  At first he was supposed to have gone to the deli with

7  WinterHawk, because they were going to let him wait until

8  WinterHawk got done eating, so he could leave, take him home.

9  But he wandered off and tried to gamble, and they took him --

10  escorted him out from there.

11  Q.  So Mr. Oldman left the casino?

12  A.  Yeah.

13  Q.  Was there a time -- when did you next talk to him?

14  A.  That morning, on the 23rd, Thanksgiving morning.

15  Q.  And how was it that you talked to him?

16  A.  By text.

17  Q.  And let me back up.  So once Mr. Oldman had left the

18  casino, did you and WinterHawk stay and gamble?

19  A.  Yes.

20  Q.  Did you and WinterHawk eventually go home?

21  A.  Yeah.  We left late.

22  Q.  So you said Mr. Oldman contacted you early on the 23rd.

23  Do you recall how he -- how he contacted you?

24  A.  He texted me.

25  Q.  Do you recall what he said in the text?

1   A.   That he forgot his bottle on my -- on my truck and that he

2   was starting to hang over.  He wanted to come up and get it,

3   but it was like really, really cold that night, because I was

4   out looking for my nephew before that.  But I remember it was

5   really freezing.

6   Q.   So when he texted you and said he left the bottle on your

7   truck, does that mean he left the bottle inside your truck?

8   A.   Yeah.

9   Q.   And so once he texted you and told you that, what did you

10  do?

11  A.   Kind of got after him first because he wasn't -- he knows

12  I don't like alcohol around my kids.  And I didn't want him

13  walking all the way up from where -- from Great Plains to my

14  house.  So I told him I'd bring it down to him.

15  Q.   And how -- how did you take it down to him?

16  A.   On my brother's white truck.  I woke my son up.  And he

17  had just laid down, but I got him up out of bed to take it

18  down to him.

19  Q.   And which son of yours was that?

20  A.   That was my second oldest, Little Sun.

21  Q.   So you and Little Sun got in the white truck, and --

22  A.   Yeah.

23  Q.   -- where did you guys go?

24  A.   We went to the Shakespeare residence.

25  Q.   Is that in Great Plains housing?

1   A.   Yeah.

2   Q.   And is that 331 Great Plains?

3   A.   I'm not sure.

4   Q.   So when you got to this house in Great Plains, what

5   happened?

6   A.   Arapaho came outside.

7   Q.   And what did you notice?

8   A.   That he wasn't wearing the same clothes and that the coat

9   he had on was a little bit small for him.

10  Q.   And did he walk up to the truck and talk to you?

11  A.   Yeah.  He came to the passenger side.  And I had opened

12  the door because I didn't know where his bottle was, and we

13  started -- I reached back, and it was just right there on that

14  seat.  I didn't even notice.  But I gave to him.

15  Q.   And what kind of bottle was it?

16  A.   Like a vodka bottle.  A red cap, I guess.

17  Q.   That's all you remember?

18  A.   Uh-huh.

19  Q.   When Mr. Oldman came up to the door and was talking to you

20  and got his bottle of red cap, did he say anything to you?

21  A.   At first I kind of got after him because it was cold and

22  for drinking and this -- that he did get into a fight with

23  somebody or he did kick somebody's ass.

24  Q.   What did he tell you?

25  A.   That he kicked somebody's ass.  And I wasn't really paying

1   attention, and when I asked who, he turned and looked away.

2   And I still can't remember the name he said.

3   Q.  So you said he was wearing different clothes.  So

4   different clothes from when you were with him at the casino?

5   A.  Yeah.

6   Q.  Do you recall what he was wearing when he came out and

7   talked to you in the truck?

8   A.  Just trunks and a coat, a regular coat he put on, not a

9   hoodie.

10  Q.  And by trunks, do you mean like shorts?

11  A.  Yeah.

12  Q.  And the coat, did the coat fit him?

13  A.  No.

14  Q.  Did you talk to him about that?

15  A.  Yeah, because I told him to zip up.  It wouldn't even --

16  it was too small.

17  Q.  Did you notice anything about his body?  Did he have

18  anything on him?

19  A.  No.  After he told me he had got into a fight, he was

20  trying to show me his hands, but I just barely looked at him

21  and pushed him away and told him, "Gross.  I don't want to see

22  that."  And I was telling my boy to go ahead and go back home.

23  Q.  And why was it gross when you saw his hands?

24  A.  I don't know.  It's just something that I always say.

25  Just --

1    Q.  Was there something on his hands?

2    A.  There was -- you could tell he got into a scuffle, a

3    fight, a little bit of blood.  But it was -- I just really

4    didn't look.  I just pushed his hands away, his arms away.

5    Q.  Did he ask you anything?  Did Mr. Oldman ask you for

6    anything besides a bottle?

7    A.  Yeah.  If we could take him up to Jessica's.

8    Q.  So he wanted a ride?

9    A.  Yeah.

10   Q.  And who's Jessica?  Do you know?

11   A.  That's his girlfriend.

12   Q.  What'd you tell him?

13   A.  That I didn't want Little Sun driving that late at night

14   on the road.

15   Q.  So where did Mr. Oldman go?

16   A.  He went back in.

17   Q.  Back into the house?

18   A.  Yeah.

19   Q.  Do you know who lives at that house?

20   A.  The Shakespeares, Loren and Juju.

21   Q.  Juju lives there?

22   A.  Yeah.

23   Q.  Does he have -- does he go by another name?

24   A.  I don't even -- I've never known his real name ever,

25   really.

1    Q.   You just know him as Juju?

2    A.   Yeah.

3    Q.   Ms. Oldman, first I guess I would ask you, during November

4    of 2017, what was your cell phone number?

5    A.   (307) 314-5375.

6    Q.   Thank you.

7         MR. CONDER:  Your Honor, the United States would --

8    well, let me do it this way.

9    Q.   (BY MR. CONDER)  Ms. Oldman, would you look at what's

10   marked as Government's Exhibit 8-1 on the overhead in front of

11   you?

12        THE COURT:  It's being shown to the witness and

13   counsel only.

14   Q.   (BY MR. CONDER)  And so is that your cell phone number at

15   the top, (307) 314-5375?

16   A.   Yeah.

17   Q.   And I would zoom in down to the date of November 22 and go

18   to the evening time on, I guess, the next page.  Looking at

19   that, can you tell what that is?  Does that look familiar?  It

20   probably doesn't look familiar, but can you figure out what

21   that is?

22   A.   No.

23        MR. CONDER:  Okay.  Your Honor, at this time the

24   United States would move to admit Government's Exhibit 8-1.

25        THE COURT:  Objections?

1         MS. AMRAM:  No, Your Honor.

2         THE COURT:  All right.  Exhibit 8-1 will be admitted.

3     (Government's Exhibit 8-1 received.)

4         THE COURT:  And, Counsel, as I understand,

5     Exhibit 8-1 is her cell phone log of calls or --

6         MR. CONDER:  It's a cell phone log that's a summary,

7     a summary of her cell phone logs to a number.

8         THE COURT:  All right.  Thank you.

9     Q.  (BY MR. CONDER)  Let me actually -- it might be easier to

10    do this, Ms. Oldman.

11        MR. CONDER:  The United States, Your Honor, would

12    move to admit and publish Government's Exhibit 8-2.

13        THE COURT:  Any objections?

14    (Counsel confer.)

15        MS. AMRAM:  No objections, Your Honor.

16        THE COURT:  All right.  Exhibit 8-2 will be admitted

17    and is being displayed to the ladies and gentlemen of the

18    jury.

19    (Government's Exhibit 8-2 received.)

20    (Playing video.)

21    Q.  (BY MR. CONDER)  Ms. Oldman, do you know what that is?

22    A.  Yeah.

23    Q.  Is that your cell phone?

24    A.  Uh-huh.

25    Q.  And what's on your cell phone there?  What are we looking

1   at?

2   A.  My texts to Arapaho.

3   Q.  And are those your texts to Arapaho on November 22nd and

4   23rd that we've been talking about?

5   A.  Uh-huh.

6   Q.  So I'll pause it there and go back to the beginning.

7       (Playing video.)

8   Q.  (BY MR. CONDER)  Can you see that okay?

9   A.  Yeah.

10  Q.  So the first, it reads at the top Wednesday, November 22,

11  7:41 p.m.  And did he text you?

12  A.  Yeah.

13  Q.  And what did he text you?

14  A.  Asked if I could give him a ride.

15  Q.  And what's your response?

16  A.  I was already at the casino and asked him where he needed

17  to go.

18  Q.  And what was his response?

19  A.  "Gamble."

20  Q.  And your response?

21  A.  "I thought you was kicked out."

22  Q.  And how did he respond?

23  A.  "Clean shaved.  Didn't mean to bother."  So I told him I

24  was coming.

25  Q.  Okay.  And we'll go forward just a little bit.

1      (Playing video.)

2    Q.  (BY MR. CONDER)  And then we'll stop right there.  And so

3    you respond again.  You said you're coming?

4    A.  Yeah.  And I'm with my son, and he has the truck.

5    Q.  Okay.  And then what did you say next?

6    A.  "Are you still gonna come?"

7    Q.  Okay.  And what was his response?

8    A.  "Yeah."

9    Q.  And then you responded back?

10   A.  Yeah.  But my son asked if he had a couple bucks for gas.

11        MR. CONDER:  We'll go forward a little bit.  We'll

12   stop right there.

13   Q.  (BY MR. CONDER)  And then he responded to that when you

14   said your son asked if he had a couple bucks for gas, LOL?

15   And he responded?

16   A.  "Two."

17   Q.  And then what did you say?

18   A.  "Okay.  We'll be there in a few.  I gotta crutch out of

19   here."

20   Q.  Is that because you were on crutches?

21   A.  Uh-huh.

22   Q.  And what did he say?

23   A.  He said he was outside waiting.

24   Q.  Do you know what time that was?

25        MR. CONDER:  If we can scroll forward a little bit.

1    We'll pause right there.

2    A.  9:04.

3    Q.  (BY MR. CONDER)  So at 9:04 on November 22, he told you he

4    was outside waiting?

5    A.  Yeah.

6    Q.  Is that about accurate with what you remember?

7    A.  Yeah.

8    Q.  Okay.  Thanks.

9          MR. CONDER:  We'll go forward a little bit further

10   and stop it right there.

11   Q.  (BY MR. CONDER)  And it says Thursday, November 23 at

12   12:40 a.m.  And what did you -- it looks like you sent him a

13   text.  What did you say?

14   A.  I was checking on him.  It says, "Hey, bro, you all right?

15   Sent Winter out to take you wherever you wanted to go, and he

16   said you was gone.  But I went --" do I have to read the whole

17   thing?

18   Q.  And then does it say, "I went fricking broke because

19   you --"

20   A.  Yeah.

21   Q.  Yeah.

22   A.  And I asked him about the DVD thing.

23          MR. CONDER:  Okay.  And we'll scroll down a little

24   further.

25   Q.  (BY MR. CONDER)  So that was at 12:40 a.m. on the 23rd?

1   A.  Yeah.

2        MR. CONDER:  Okay.  Scroll forward.  Back it up just

3   a little.

4   Q.  (BY MR. CONDER)  All right.  So on Thursday, November 23

5   at 4:02, you received a text from him.  And what does that

6   say?

7   A.  "Got my trav and, sis, need help."

8   Q.  What's your response?

9   A.  "What's up?"

10       MR. CONDER:  All right.  Go forward.  Stop right

11  there.

12  Q.  (BY MR. CONDER)  What did he say to you:

13  A.  "Left my travel on your ride, sis.  Can I come get it?

14  Sick bad.  At GP."

15  Q.  What does that mean, "Left my travel on your ride?"  Is

16  that the bottle?

17  A.  Probably, yeah.

18  Q.  And you knew that was a traveler?  Is that what he meant,

19  you think?

20  A.  Yeah.

21  Q.  And what's GP?

22  A.  Great Plains.

23  Q.  So you knew where to go?

24  A.  Yeah.

25  Q.  And then your response?

Bridget Oldman - Direct by Mr. Conder                    487

1    A.   Supposed to been "Really?"  But it didn't go through.

2    Q.   And then the next one?

3    A.   It says "I'm outside --" or "Outside."

4    Q.   And we'll -- it will tell us what time right there.

5    A.   4:39.

6    Q.   So at 4:39 a.m. you went outside and talked to Mr. Oldman

7    and gave him his bottle and talked to him?

8    A.   Yeah.

9    Q.   Okay.  Thank you.  Do you recall after that early morning

10   hour of November 23 the next time you saw Mr. Oldman?

11   A.   That Saturday morning.

12   Q.   And what was -- where did you see him?  What happened that

13   day?

14   A.   We went and picked up one of his friends up in Fort

15   Washakie.

16   Q.   And where did you take them?

17   A.   To Riverton.

18   Q.   And did they -- did they pay you for taking them over

19   there?

20   A.   Yeah.

21   Q.   So when was the next time you saw him?  Let me back up.  I

22   apologize.

23        So when you -- when you picked up Arapaho on the 25th

24   and took him to Fort Washakie, where did you pick him up at?

25   A.   Charlotte's.

1   Q.  Same place in Riverton?

2   A.  Yeah.

3   Q.  And then it was just you and he rode to Fort Washakie

4   together?

5   A.  Yeah.

6   Q.  What'd you guys talk about?

7   A.  That he -- he had talked with WinterHawk when we were

8   together that Wednesday about our Native American church and

9   how he wanted to go back to it and wanted WinterHawk to help

10  him and how he kind of wanted to change.

11  Q.  Did you talk to him about the night -- the Thanksgiving

12  morning, stopping by the house, dropping off a bottle, and him

13  saying he beat somebody up?

14  A.  No.  It never came up.

15  Q.  You didn't talk about any of that?

16  A.  No.

17  Q.  At any time that day, on the 25th, did you guys talk about

18  that at all?

19  A.  No.

20  Q.  When was the next time you saw Mr. Oldman?  Do you recall?

21  A.  I can't --

22  Q.  Early December?

23  A.  Yeah.

24  Q.  And where did you see him?

25  A.  He showed up at my house.

1   Q.  Did he come inside your house?

2   A.  No.

3   Q.  Why not?

4   A.  Because we said he couldn't come in.

5   Q.  Why wasn't he allowed in your house?

6   A.  Because we already heard what was being said and what

7   happened.

8   Q.  Did you talk to Mr. Oldman about what was being said and

9   what happened?

10  A.  When we left my house, because I gave him a ride.

11  Q.  Where'd you give him a ride to?

12  A.  To Big Wind.  I don't know whose house it is, but it's a

13  blue house at Big Wind.

14  Q.  Did he tell you -- what did he tell you?

15  A.  That the feds are after him and they almost got him and

16  that he barely got away and that he spent the night in the big

17  ditch.

18  Q.  Did he tell you anything about what happened that night

19  when you picked him up at Great Plains?

20  A.  I -- I asked him, because I had told him that was going to

21  be the last time I helped him.  And I told him not to lie to

22  me, and I asked him if he did it.

23  Q.  What'd he tell you?

24  A.  He said, "No, but I helped."

25  Q.  What did he tell you after that?

1   A.   After I got him to the house at that gate, he stopped.  He

2   was getting out.  He just said that -- to "tell my nephews I'm

3   sorry" and turned around and gave me a hug and said, "I love

4   you, sis," and he got out.

5   Q.   When you guys were driving and talking that day, did he

6   talk to you about going anywhere or doing anything?

7   A.   Yeah.

8   Q.   What did he talk to you about?

9   A.   Just that my cousin Dionne was going to be coming to get

10  him.

11  Q.   Who's Dionne?

12  A.   His wife.

13  Q.   And where does she live?

14  A.   I think Sheridan.

15  Q.   And so what did he say?  She was going to come get him and

16  do what?  What was going on?

17  A.   I don't know.  He just said in a couple days Dionne was

18  going to be there to get him.

19  Q.   Why did you tell him you couldn't help him again?

20  A.   Because I didn't want to get in trouble.

21        MR. CONDER:  May I have one moment, Your Honor?

22        THE COURT:  You may.

23      (Discussion off the record.)

24  Q.   (BY MR. CONDER)  Ms. Oldman, we saw that Government's

25  Exhibit 8-2 was a video of your phone and some text messages.

1   When you were speaking with the FBI, did you show them other

2   text messages?

3   A.   I shared everything I saved, I believe.

4   Q.   What's that?

5   A.   I think I shared the same thing with everybody, showed you

6   guys everything I had.

7   Q.   Okay.  No, and I understand that.  I was just -- but did

8   you show -- when the authorities came to talk to you, did you

9   show them your cell phone?

10  A.   Yeah.

11          MR. CONDER:  Okay.  At this time, Your Honor, the

12  United States would move to admit Government's Exhibits 8-3

13  and 8-4.

14          THE COURT:  Any objections?

15          MS. AMRAM:  No, Your Honor.

16          THE COURT:  All right.  Exhibits 8-3 and 8-4 will be

17  admitted.

18      (Government's Exhibits 8-3 and 8-4 received.)

19          MR. CONDER:  Your Honor, just a housekeeping measure.

20  Was 8-1 admitted?  8-1?

21          THE COURTROOM DEPUTY:  Yes.

22          THE COURT:  Yes.  And so that the record's clear, 8-3

23  and 8-4 are?

24          MR. CONDER:  8-3 and 8-4, Your Honor, are videos of

25  text messages in the ensuing days, from the 24th, 25th, and

1    ensuing days of November.

2              THE COURT:  From Ms. Oldman's phone?

3              MR. CONDER:  Ms. Oldman's phone to Mr. Oldman, to and

4    from the defendant, Your Honor.

5              THE COURT:  All right.  Very well.  Thank you.

6              Cross-exam.

7              MS. AMRAM:  Just one second, Your Honor.

8         (Counsel confer.)

9              MS. AMRAM:  No questions, Your Honor.

10             THE COURT:  All right.  May this witness be released

11   from any subpoena?

12             MR. CONDER:  Yes, Your Honor.

13             MS. AMRAM:  Yes, Your Honor.

14             THE COURT:  Ma'am, you may step down.  You're free to

15   go.

16             The United States may call its next witness.

17             MR. CONDER:  Your Honor, the United States would call

18   WinterHawk Felter.

19             THE COURT:  Mr. WinterHawk Felter will come forward

20   and be sworn.

21        (The witness was sworn.)

22             THE COURTROOM DEPUTY:  Please state and spell your

23   name for the record.

24             THE WITNESS:  My name's WinterHawk Felter,

25   W-I-N-T-E-R-H-A-W-K  F-E-L-T-E-R.

1          THE COURTROOM DEPUTY:  Please state your occupation

2    and your city of residence.

3          THE WITNESS:  My occupation?

4          THE COURTROOM DEPUTY:  Do you work?

5          THE WITNESS:  No.  I'm in school.

6          THE COURTROOM DEPUTY:  Thank you.  And where do you

7    live?  What town?

8          THE WITNESS:  Arapahoe, Wyoming.

9              WINTERHAWK FELTER, GOVERNMENT'S WITNESS

10                    DIRECT EXAMINATION

11   BY MR. CONDER:

12   Q.  Good afternoon, Mr. Felter.  So if you could tell us a

13   little bit about yourself.  How old are you?

14   A.  I am 19 years old.

15   Q.  And where do you go to school?

16   A.  Saint Stephens Indian High School.

17   Q.  Where is that?  Is that on the Wind River Indian

18   Reservation?

19   A.  Yes.

20   Q.  What do you do at Saint Stephens?

21   A.  Right now I'll be -- well, since it's the second semester,

22   I'll be working for college classes.

23   Q.  All right.  What grade are you in?

24   A.  12th, senior.

25   Q.  Senior.  Are you on track to graduate?

1   A.   Yes.

2   Q.   Do you play any sports or activities?

3   A.   Football.

4   Q.   And how'd your team do this year?

5   A.   We didn't go too far.

6   Q.   What are your plans for the future with regard to

7   football?

8   A.   Hopefully to be playing at a junior college league

9   somewhere.

10  Q.   And so where do you live?

11  A.   Left Hand Circle.

12  Q.   Okay.  And is that in Arapahoe?

13  A.   Yes.

14  Q.   And who's your mom?

15  A.   Bridget Oldman.

16  Q.   And who do you live with?

17  A.   My mother, Bridget Oldman.

18  Q.   And do you have any siblings?

19  A.   I have three little siblings.

20  Q.   And how old are they?

21  A.   We go from 18, 17, to 15.

22  Q.   And you're the oldest at 19?

23  A.   Yeah.

24  Q.   Are they all as big as you?

25  A.   Almost.

1    Q.   Do you know Mr. Arapaho Oldman?

2    A.   Yes, a little bit.

3    Q.   How do you know him?

4    A.   Met him through my mom.

5    Q.   And so how long do you think you've known him?

6    A.   A couple months, a little -- a couple months.

7    Q.   Do you remember the day before Thanksgiving of 2017?

8    A.   A little bit.

9    Q.   Did you see Arapaho Oldman that day?

10   A.   No.  That evening?

11   Q.   Okay.  That evening did you see him?

12   A.   (Nodding head.)

13   Q.   And where did you see him that evening?

14   A.   When we went and picked him up at the trailer park.

15   Q.   Okay.  In Riverton?

16   A.   Yes.

17   Q.   And what were you driving?

18   A.   My uncle's truck, Ford.

19   Q.   A Ford truck.  What color is that truck?

20   A.   White.

21   Q.   White.  Okay.  And who was with you when you picked up

22   Mr. Oldman?

23   A.   My mother, Bridget.

24   Q.   Okay.  And you picked him up in Riverton?

25   A.   Yes.

1   Q.   And do you remember what he was wearing?

2   A.   No.  It was just jeans, shoes, and I think a white shirt.

3   Q.   Jeans and shoes and a white shirt?

4   A.   Yeah.

5   Q.   So where did you and your mom come from?

6   A.   The Wind River Casino.

7   Q.   And when you picked Mr. Oldman up, where did you guys go?

8   A.   Back to the casino.

9   Q.   And what did you guys do at the casino?

10  A.   Gambled.

11  Q.   Did you win?

12  A.   No, sadly.

13  Q.   And so did you do anything with Mr. Oldman when you were

14  at the casino?

15  A.   I ordered some food.  He sat with me.  He got up and

16  wanted to play, but he got chased back to me.  It scared him.

17  Q.   So the security sent him back over to you while you were

18  eating?

19  A.   Yeah.  And then we both got up, went next to the

20  nonsmoking area, to the very end, to the hotel.  That's where

21  we were -- that's where we were sitting gambling and -- yeah.

22  Q.   And where did he go?  Did he stay with you, or did he

23  leave?

24  A.   No, he didn't stay with me.  He got chased out.

25  Q.   So he left?

1    A.   Yes.

2    Q.   Do you know where he went?

3    A.   No.

4    Q.   Are you familiar with the Great Plains area --

5    A.   Yes.

6    Q.   -- of the Wind River Indian Reservation?

7              Do you recall being there in that area on November

8    30th of 2017?

9    A.   Yes.

10   Q.   Why were you there?

11   A.   I was with my cousin Jeremiah.

12   Q.   What were you guys doing?

13   A.   Just hanging out at his house, playing games.

14   Q.   What did you notice?

15   A.   There was, like, cops, lights, and, like, a big old

16   commotion at that house.  I can't remember which house.

17   Q.   What's that house?  Do you know that house?

18   A.   No.  I know it's next to my Grandpa Suttle's [phonetic]

19   house.

20              MS. AMRAM:  Your Honor, can we have a sidebar,

21   please?

22              THE COURT:  You may.

23        (At sidebar.)

24              MS. AMRAM:  Your Honor, my concern is I think -- you

25   tell me if I'm wrong -- that Mr. Conder is going to have him

1    say that his mom told him that Arapaho had done something at

2    the house, and I would object to that under hearsay rules and

3    the confrontation clause.  And so I just -- if that's what's

4    happening, I wanted to note that objection before it was said.

5              MR. CONDER:  No, Your Honor.  I honestly recognize

6    that, and I am going to ask him, though, if when Mr. Oldman

7    came to the house, if he would let him in.  And he wouldn't

8    let him in the house.

9              THE COURT:  All right.

10             MS. AMRAM:  I just don't want his mom -- having his

11   mom say what she said to him [sic].

12             THE COURT:  All right.  I'll ask you to lead him in

13   terms of it so we avoid any potential of that.

14             MR. CONDER:  Okay.

15        (End of sidebar.)

16             THE COURT:  Go ahead, Mr. Conder.

17             MR. CONDER:  Thank you.

18   Q.  (BY MR. CONDER)  Mr. Felter, do you remember, after being

19   with Mr. Oldman on the night of November 22, when did you next

20   see him?

21   A.  The next month.

22   Q.  In December?

23   A.  In December.

24   Q.  And where did you see him?

25   A.  At my house, in front of my door.

1   Q.  And did he come inside?

2   A.  No.

3   Q.  Did he stay outside on the porch and talk to your mom?

4   A.  Yeah.

5   Q.  And did he leave with your mom?

6   A.  No.

7   Q.  Did your mom give him a ride, or do you remember?

8   A.  I don't.  I just remember chasing him off, though.

9           MR. CONDER:  May I have one moment, Your Honor?

10          THE COURT:  You may.

11      (Discussion off the record.)

12          MR. CONDER:  No further questions, Your Honor.

13          THE COURT:  Cross-exam.

14          MS. AMRAM:  No questions, Your Honor.

15          THE COURT:  May this witness be released from

16  subpoena?

17          MR. CONDER:  Yes, Your Honor.

18          MS. AMRAM:  Yes, Your Honor.

19          THE COURT:  You may step down.  You're free to go.

20          The United States may call its next witness.

21          MR. CONDER:  Your Honor, the United States would call

22  Little Sun Felter.

23          THE COURT:  Mr. Little Sun Felter will come forward

24  and be sworn.

25      (The witness was sworn.)

1          THE COURTROOM DEPUTY:  Please state and spell your

2     name for the record.

3          THE WITNESS:  Little Sun Felter.  Spell it too?

4          THE COURTROOM DEPUTY:  Yes, please.

5          THE WITNESS:  L-I-T-T-L-E  S-U-N  F-E-L-T-E-R.

6          THE COURTROOM DEPUTY:  Please state your occupation

7     or your grade in school and your city of residence.

8          THE WITNESS:  Junior.  Arapahoe.

9          THE COURTROOM DEPUTY:  Thank you.

10              LITTLE SUN FELTER, GOVERNMENT'S WITNESS

11                       DIRECT EXAMINATION

12    BY MR. CONDER:

13    Q.  Mr. Felter, you're a high school junior?

14    A.  Uh-huh.

15    Q.  Where do you go to school?

16    A.  Saint Stephens Indian School.

17    Q.  Good deal.  Are you involved in any sports or activities?

18    A.  Just football.

19    Q.  Did you play basketball too?

20    A.  No.

21    Q.  No basketball?

22    A.  No.

23    Q.  And so where do you live?  Not the exact address, but

24    what's the street name?

25    A.  Left Hand Circle.

1   Q.   And that's in Arapahoe?

2   A.   Yeah.

3   Q.   On the Wind River Reservation?

4   A.   Yeah.

5   Q.   All right.  And who's your mom?

6   A.   Bridget Oldman.

7   Q.   And who do you live there with at Left Hand Ditch Circle?

8   A.   I live with my mom and my three other brothers.

9   Q.   And what number brother are you?

10  A.   I'm the second.

11  Q.   You're the second oldest.  All right.  And do you know

12  Arapaho Oldman?

13  A.   No, not really.

14  Q.   Have you heard of him before?

15  A.   Yes.

16  Q.   Do you remember going with your mom on the early morning

17  of Thanksgiving 2017?

18  A.   Yes.

19  Q.   And where did you go?

20  A.   Just down the road, where, like, a housing -- a little bit

21  down where the road there's other housings.  Just that far.

22  Q.   Into Great Plains?

23  A.   Yeah.

24  Q.   And why did you go there?

25  A.   Because my mom couldn't drive the steering wheel of the

1   truck.  It was very difficult to drive with.

2   Q.  Was your mom on crutches, or do you remember?

3   A.  I can't remember.  I think she was.

4   Q.  And why did you go over to the Great Plains housing?

5   A.  Because she wanted me to drive her.  She couldn't drive.

6   Q.  And when you got there, did you go to a house?

7   A.  Yes.

8   Q.  And what happened when you got to that house?

9   A.  Just pulled up to -- it's not a driveway but the little

10  parts of it in front of the house, you could say, just pulled

11  up.  And he just walked out, came up and went up to my mom and

12  said -- she was on the passenger; I was on the driver.

13  Q.  And who's "him"?  Is that Mr. Oldman?

14  A.  Yeah.

15  Q.  Okay.  And what did he do when he got up to the car and

16  spoke to your mom?

17  A.  He just asked for his drink.  I don't know what kind of

18  drink it was but...

19  Q.  Could you hear him and your mom talk?

20  A.  They were talking about him blanking out, blacked out,

21  like, if I remember.  He just said he had -- that he fought

22  someone, I guess.  That's all I heard, remembered.

23  Q.  You heard Mr. Oldman say that he fought somebody?

24  A.  Yeah.

25  Q.  And that he blanked out?

1    A.  Yeah, that he didn't remember.  That's what I heard from

2    him.

3    Q.  And just to be clear, did he say he didn't remember who he

4    beat up?  Is that what he was getting at?

5    A.  Yes.

6    Q.  Or at least you understood it that way?

7    A.  Yeah.

8    Q.  Did you notice anything about him, how he was dressed or

9    anything on him?

10   A.  No.  I just remembered he weared a gray tank top and blue

11   trunks.

12   Q.  And shorts maybe?

13   A.  Yeah.

14   Q.  Did you notice anything about his body or his face or

15   arms, legs?

16   A.  No.

17   Q.  But he was over on the other side, talking to your mom?

18   A.  Yes.

19          MR. CONDER:  May I have a moment, Your Honor?

20          THE COURT:  You may.

21       (Discussion off the record.)

22   Q.  (BY MR. CONDER)  Mr. Felter, did you notice anything on

23   Mr. Oldman's hands?

24   A.  Huh-uh.  He just showed my mom.  I didn't bother to pay

25   any attention.

504

1          MR. CONDER:  Thank you.

2          No further questions, Your Honor.

3          THE COURT:  All right.  Cross-exam.

4          MS. AMRAM:  No questions, Your Honor.

5          THE COURT:  May this witness be released from any

6   subpoena?

7          MS. AMRAM:  Yes, Your Honor.

8          MR. CONDER:  Yes, Your Honor.

9          THE COURT:  You may step down.  You're free to go.

10  Thank you.

11         All right.  Quickly, sidebar, Counsel.

12     (At sidebar.)

13         THE COURT:  Do we have any five-minute witnesses?

14         MR. CONDER:  I'd have to look.  I don't think so,

15  though.

16         THE COURT:  All right.  We'll go ahead and take our

17  evening recess, and then I'm going to talk with you about a

18  couple things.

19     (End of sidebar.)

20         THE COURT:  Ladies and gentlemen of the jury, we'll

21  take our evening recess.  I'll remind you of the recess

22  instruction.  Don't talk about this case with anyone.  Don't

23  allow anyone to talk to you about it.  If anyone attempts to

24  do so, immediately report it to the Court.

25         Remember, you may only consider that evidence

1    introduced here in court through the witnesses and exhibits

2    introduced during this case.  Don't conduct any independent

3    research or any other matters outside of this court to render

4    a decision.

5            Remember, don't begin deliberations until all the

6    evidence, instructions of law, arguments of counsel, and

7    hearing the views of your fellow jurors.

8            We'll stand in recess until 8:30 a.m.

9            Please rise.

10    (The jury exited the courtroom at 5:36 p.m.)

11    (The following took place outside the presence of the

12    jury.)

13            THE COURT:  Go ahead and have a seat.  I note the

14    absence of the ladies and gentlemen of the jury.

15            A couple of things that I wanted to address.  First,

16    with regards to some objections, Ms. Hucke, you made during

17    examination of Mr. Whiteplume regarding leading, there were

18    two problems that I had and the reason why I overruled your

19    objection.  One was it was a restatement.  In some cases it

20    was a restatement of what had been said, so it wasn't

21    necessarily leading but rather a restatement.  I probably

22    would have sustained an objection as to cumulative or asked

23    and answered.

24            But in any event, the other one with regards to

25    objection, hearsay, at least with regards to the uncle

506

1  downstairs, there had previously been testimony as to what the

2  uncle had said.  But in any event I sustained the second

3  question regarding that when there was an objection raised.

4       With regards to some leading, I'll tell you, Counsel,

5  what I get nervous about and where I'll enforce leading

6  questions is when we're dealing with critical facts and

7  details that go to the memory and the recollection of the

8  witness.  If we're doing foundational, if we're doing some

9  matters that aren't nitty-gritty detail, I'm not going to be

10  as tight on leading.  But when we get into specific details,

11  that's where I become more strict on that.

12       Polygraph, there are a couple of cases.  The Tenth

13  Circuit has generally recognized that polygraph results are

14  not admissible to show one is truthful.  That's *United States*

15  *v. Hall,* 805 F.2d 1410 at 1416, Tenth Circuit 1986.

16       The question that led to the reference to polygraph,

17  can we --

18       (Discussion off the record.)

19       (The reporter read the questions and answer at

20       page 438, line 22 through page 439, line 1.)

21       THE COURT:  So his response was an attempt to insert

22  the polygraph.  It was a response -- there was another

23  response where he became nervous, and I asked you to be

24  specific as to who he talked to because I didn't want him to

25  make reference to it regarding the polygraph.  So I don't see

507

1    that that was inserted gratuitously or inappropriately.  It

2    was in response to the question.

3         There are -- well, what I would do -- and I didn't

4    make any reference to it.  There was no request at that time

5    for any limiting instruction.  But certainly in the case

6    law -- in particular *U.S. v. Tenorio*, and that's found at 809

7    F.3d 1126, footnote 3, where an issue regarding the polygraph

8    came up in trial, and the trial court instructed -- and

9    actually it was coming out of *Hall*.  The Court instructed,

10   "I'm going to instruct you that you are not to speculate --

11   you're not to take into consideration and you are not to

12   speculate as to what those polygraph examinations or the

13   results of those were in reference to the guilt or innocence

14   of the defendant, in reference to whether or not he did or did

15   not commit the acts that are charged in the indictment."

16        That comes out of *Hall* at 1415 through -16.  It is

17   referenced in *Tenorio*, which I noted that not only do the jury

18   instructions mirror those that were approved in *Hall* but --

19   and that was what was approved in *Hall*.  They footnoted that

20   statement.

21        So if defendant wishes to have this Court give a

22   limiting instruction, I will certainly do that, but I did not

23   want to ring the bell unless you wanted me to ring it.  And

24   I'm certainly willing to give that limiting instruction given

25   that I don't want the jury to speculate about any polygraph

508

1    results.

2         All right.  Anything regarding those matters,

3    Ms. Amram?

4         MS. AMRAM:  Your Honor, we -- I understand the

5    Court's ruling.  If I could just make a brief record about the

6    polygraph issue.

7         As the Court mentioned when we discussed it at

8    sidebar -- I think it was in a break -- there have been a

9    number of polygraphs in this case.  The -- for the most part,

10   the Government's witnesses failed them, except for Bernadette

11   Brown, which was inconclusive.  Arapaho Oldman passed one.  I

12   did not ask -- move in limine for any polygraph results to be

13   admitted because I -- well, obviously I would have wanted them

14   to be for many reasons, because I looked at the Tenth Circuit

15   case law.  And while the Tenth Circuit said it should be on a

16   case-by-case basis, I think it's fair to say the Tenth Circuit

17   was less than enthusiastic about polygraphs.  And so I did not

18   ask.

19        But I am concerned that because a Government witness

20   mentioned that he took a polygraph, that the jury -- whatever

21   the Court does with an instruction, and we'll consider whether

22   or not to ask for one -- will, you know, wonder if he passed

23   it.  And I think that the jury should be told that he failed.

24   I understand that it was not something Mr. Conder elicited,

25   and it's not his fault personally.  And I understand the

1   witness was struggling, but it was still a Government witness

2   who said that he'd taken a polygraph.

3           So because of that, we would ask that it just be

4   admitted that he failed, not -- but I understand the Court's

5   ruling.  I just wanted to put that on the record.

6           THE COURT:  All right.  Mr. Conder, anything you want

7   to put on the record regarding the matter?

8           MR. CONDER:  Your Honor, I would just briefly say in

9   regard to Mr. Whiteplume, he was asked a vague question, and

10  he gave an answer trying to figure out what time was being

11  talked about.  I think that was clear.  He was asked over and

12  over multiple times, "Last month?  Last year?"  The year was

13  being confused between '19, '18, '17.  And so I don't think he

14  was trying to do anything nefarious.  He just answered that

15  trying to answer the question he thought he was asked.  We had

16  obviously talked to his attorney and told him not to say

17  anything like that.

18          Additionally, Your Honor, I would just note for the

19  record that not all polygraphs are the same.  And so before

20  any polygraph results are admitted, we'd want a hearing.  But

21  the Court doesn't seem like that's an option.

22          THE COURT:  Well, there's been multiple references in

23  various motions, DNA evidence motion, all those and whatnot as

24  to the polygraph tests and who failed, who passed.  It's not

25  coming in.  The jury's going to determine who fails and passes

1    in terms of what the issues and charges in this case are.

2            If you had wanted those results, the details of those

3    results in, I would anticipate you would have sought that and

4    we would have gone around that.  I can understand why you

5    wouldn't give the Tenth Circuit case law.  But they did

6    recognize in subsequent cases that there's not a per se

7    inadmissibility, but it's on a case-by-case basis.  And

8    there's not been one case that I've found, frankly, where the

9    Tenth Circuit or any District Court, for that matter, has

10   admitted in a criminal matter polygraph results in the Tenth

11   Circuit.

12           That being said, the issue that's created by the --

13   and certainly counsel asked a question, and the witness is

14   challenging, and he responds to the question trying to get

15   clarification.  And the question was asked by defense counsel.

16   You weren't seeking to elicit it, but it came out.  Now,

17   having come out, I'm not going to allow you to use a shield

18   and a sword.  I mean, you asked the question.  He gave the

19   response.  It wasn't a completely gratuitous response.

20           That being said, the sole remedy and the appropriate

21   remedy this Court would find, if the defendant wishes to have

22   it done, is for this Court to simply advise the ladies and

23   gentlemen of the jury that they are not to take into

24   consideration or speculate as to any polygraph examinations or

25   the results of those examinations with regards to any

1   witnesses.  They and they alone will determine the truth and

2   credibility of the witnesses.  If you want that, it's yours.

3   If you don't, then I'm not going to give it, because it's your

4   right to protect.  All right.  You can tell me in the morning.

5   You can contemplate it.

6              Anything else we need to address at this time,

7   Mr. Conder?

8              MR. CONDER:  Nothing from the United States, Your

9   Honor.

10             MS. AMRAM:  Your Honor, I just wanted to get -- if we

11  could have an update as to scheduling.  And I know the

12  Government has, I believe, ten more witnesses to go.  I am

13  trying to figure out if we need to have defense witnesses

14  lined up for tomorrow.  My guess is it would take us tomorrow

15  to do ten witnesses, but if we should have defense witnesses

16  here, we will.  So I wanted to check.

17             THE COURT:  We'll go ahead and go off the record.

18        (Proceedings concluded at 5:46 p.m., January 8, 2019.)

19

20

21

22

23

24

25

512

1                           C E R T I F I C A T E

2

3          I, ANNE BOWLINE, Court Reporter in the state of

4   Wyoming, a Registered Merit Reporter and Certified Realtime

5   Reporter, do hereby certify that I reported by machine

6   shorthand the proceedings contained herein on the

7   aforementioned subject on the date herein set forth, and that

8   the foregoing 295 pages constitute a full, true and correct

9   transcript.

10         Dated this 1st day of May, 2019.

11

12

13

14                    ___/s/ Anne Bowline___

15                         ANNE BOWLINE
                      Registered Merit Reporter
16                    Certified Realtime Reporter

17

18

19

20

21

22

23

24

25